**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

**IN RE:**

**APPLICATION OF PALLADIAN**
**PARTNERS, L.P., HBK MASTER FUND**
**L.P., HIRSH GROUP LLC, AND**
**VIRTUAL EMERALD**
**INTERNATIONAL LIMITED FOR AN**
**ORDER TO TAKE DISCOVERY FOR**
**USE IN FOREIGN PROCEEDINGS**
**PURSUANT TO 28 U.S.C. § 1782**

Misc. Action No. _____

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS'**
**APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY**
**FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................... 1

I.     THE PARTIES ................................................................................................................... 4

II.    FACTUAL BACKGROUND .............................................................................................. 7

      A.    Petitioners' Obtain a €1.5 Billion Judgment Following Argentina's Default on the Warrants ........................................................................................ 7

      B.    The Contemplated Foreign Proceedings ................................................................ 8

      C.    *Viva La Libertad* & the $LIBRA Token Catastrophe ......................................... 9

            1.    The Development of $LIBRA and the *Viva La Libertad* Initiative ............ 9

            2.    $LIBRA's Architecture and Rapid Collapse ............................................... 11

III.   THE REQUESTED DISCOVERY ................................................................................... 13

      A.    The Davis Respondents ........................................................................................ 13

IV.   ARGUMENT ................................................................................................................... 14

      A.    Petitioners Satisfy The Statutory Requirements Of 28 U.S.C. § 1782 .................. 16

            1.    Respondents Are "Found" In The Northern District of Texas ................. 16

            2.    The Discovery Sought Is "For Use" In Foreign Proceedings .................... 18

            3.    Petitioners Are Interested Persons ............................................................. 21

      B.    All Discretionary *Intel* Factors Favor Permitting The Discovery Petitioners Seek ...................................................................................................... 22

            1.    The First *Intel* Factor Favors Granting Discovery .................................... 22

            2.    The Second *Intel* Factor Favors Granting Discovery ................................. 22

            3.    The Third *Intel* Factor Favors Granting Discovery .................................... 23

            4.    The Fourth *Intel* Factor Favors Granting Discovery .................................. 24

V.    CONCLUSION ................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*In re Application of Eurasian Bank Joint Stock Co.*,
  2015 WL 6438256 (N.D. Tex. Oct. 21, 2015) ..................................................................21

*In re Application of financialright claims GmbH*, 2024 WL 4818177 (D. Del.
  Nov. 18, 2024) .................................................................................................................21

*In re Ex Parte Application of Glob. Energy Horizons Corp.*,
  2015 WL 1325758 (N.D. Cal. Mar. 24, 2015) ...............................................................19

*In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*,
  121 F.3d 77, 79 (2d Cir. 1997) ......................................................................................24

*In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*,
  195 F. Supp. 3d 899 (S.D. Tex. 2016) ...........................................................................15

*In re the Application of Sauren Fonds-Select SICAV v. For Discovery Pursuant to
  28 U.S.C. § 1782*, 2016 WL 6304438 (D.N.J. Oct. 26, 2016) ......................................20

*In re Application of Shervin Pishevar*,
  439 F. Supp. 3d 290 (S.D.N.Y. 2020) ............................................................................23

*In re Application of Temp. Servs. Ins. Ltd.*,
  2009 WL 2843258 (W.D.N.Y. Aug. 28, 2009) ...............................................................19

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998), *as amended* (July 23, 1998) ......................................16, 24

*In re Biomet Orthopaedics Switzerland GmBh*,
  742 F. App'x 690 (3d Cir. 2018) ....................................................................................15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) .............................................................................................20

*Bravo Express Corp. v. Total Petrochemicals & Refin. USA, Inc.*,
  613 F. App'x 319 (5th Cir. 2015) ...................................................................................15

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113, 120 (2d Cir. 2015) ...................................................................................21

*Chevron Corp. v. 3TM Consulting, LLC*,
  2010 WL 8814519 (S.D. Tex. Apr. 5, 2010) ..................................................................21

*In re Clerici*,
   481 F.3d 1324 (11th Cir. 2007) ......................................................................... 19

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
   779 F.3d 258 (5th Cir. 2015) ............................................................................ 17

*In re del Valle Ruiz,*
   939 F.3d 520 (2d Cir. 2019) ............................................................................. 17

*Ecuadorian Plaintiffs v. Chevron Corp.*,
   619 F.3d 373 (5th Cir. 2010) ........................................................................... 23

*In re Godfrey*,
   2009 WL 10670524 (N.D. Tex. Mar. 24, 2009) .............................................. 17

*Grupo Mexico SAB de CV,*

   2014 WL 12691097 (N.D. Tex. Oct. 17, 2014) ............................................... 19

*In re Hornbeam Corp.*,
   722 F. App'x 7 (2d Cir. 2018) ......................................................................... 19

*Hurlock v. Kelsier Ventures et al*,
   No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025) ..................................... 4, 9, 14

*In re IKB Deutsche Industriebank AG*,
   2010 WL 1526070 (N.D. Ill. Apr. 8, 2010) ..................................................... 25

*Intel Corp. v Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ................................................................................. *passim*

*John Deere Ltd. v. Sperry Corp.*,
   754 F.2d 132 (3d Cir. 1985) ............................................................................ 16

*In re Kim*,
   2024 WL 3430583 (N.D. Tex. June 26, 2024*)* ................................................ 17

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
   62 F.Supp.3d 358 (S.D.N.Y. 2014) .............................................................. 20, 23

*LEG Q LLC v. RSR Corp.*,
   2017 WL 3780213 (N.D. Tex. Aug. 31, 2017) ................................................ 24

*In re Letter of Request from Crown Prosecution Serv. of U.K.*,
   870 F.2d 686 (D.C. Cir. 1989) ......................................................................... 19

*Linsen Int'l Ltd. v. Humpuss Sea Transp. PTE LTD*,
   2011 WL 1795813 (S.D.N.Y. Apr. 29, 2011) ............................................... 20, 23

iv

*Palladian Partners, L.P. et al v. The Republic of Argentina*,
  No. 25-cv-01954-CKK (June 23, 2025)..................................................................7

*Pinchuk v. Chemstar Prod. LLC*,
  2014 WL 2990416 (D. Del. June 26, 2014)........................................................25

*In re Request for Subpoena by Ryanair Ltd.*,
  2014 WL 5583852 (N.D. Cal. Oct. 31, 2014) ...................................................19

*Matter of Rosa Carolina Germano Dos Santos*,
  2023 WL 4993673 (D.N.J. Aug. 4, 2023) .........................................................19

*Snyder v. Pitts*,
  150 Tex. 407 (1951) ...........................................................................................18

*Tex. Keystone, Inc. v. Prime Nat. Res., Inc.*,
  694 F.3d 548 (5th Cir. 2012) ............................................................................15

*In re Veiga*,
  746 F. Supp. 2d 8 (D.D.C. 2010).......................................................................24

*In re Xiaomi Tech. Germany GmbH*,
  2022 WL 4009046 (W.D. Tex. Sept. 2, 2022) ..................................................16

*In re Yasuda*,
  2019 WL 4933581 (N.D. Cal. Oct. 7, 2019) .....................................................18

*In re Yilport Holding A.S.*,
  2023 WL 2140111 (D.N.J. Feb. 21, 2023) ...................................................18, 19

## Statutes

28 U.S.C. § 1782.................................................................................... *passim*

Texas Tax Code Section 171.309 ...............................................................6

## Other Authorities

Agustino Fontevecchia y Giselle Leclerq, "*Eliminé la entrevista por pedido de
  Gideon Davis*": la trastienda del podcast que reveló el acuerdo entre Milei y
  los creadores de $Libra*, Perfil (Mar. 3, 2025),
  tinyto.me/piir_ov ..............................................................................10

Alfredo Izaguirre, *A month on from '$LIBRA,' Milei siblings at centre of judicial
  tug-of-war*, Buenos Aires Times (Mar. 18, 2025),
  tinyto.me/xpee_Nb ............................................................................10

Amy Booth, *Milei is Already Facing Impeachment Requests and Lawsuits in $LIBRA Crypto Scandal*, Buenos Aires Herald (Feb. 17, 2025), tinyto.me/LjfW_ZW ............................................................................................... 12

Ben Weiss, *Argentina Seeks Arrest of U.S. Crypto Figure Tied to Melania and Milei cryptocurrencies*, Fortune (Mar. 13, 2025), tinyto.me/mnew_PK ............................................................................................... 12

*Milei shutters office investigating 'cryptogate' $LIBRA scandal,* Buenos Aires Times (May 20, 2025), tinyto.me/BKjG_qi ................................................................................................ 13

Camila Dolabjian*, El creador de $LIBRA alardeaba "controlar" a Javier Milei y de haber pagado sobornos en la Argentina*, La Nación (Feb. 18, 2025), tinyto.me/VD3-_o9 ................................................................................... 3, 11, 13

Carol Goforth, *The Lawyer's Cryptionary: A Resource for Talking to Clients About Crypto-Transactions*, 41 Campbell L. Rev. 47 (2019) ................................... 11

Emily Nicolle, *Counterfeiting and cult murder: Family behind Milei memecoin has chequered past,* Buenos Aires Times (Feb. 26, 2025), tinyto.me/HkwI_mo .................................................................................................5

*How Hayden Davis Rugged $LIBRA for $100M With President Milei*, Bubblemaps (Mar. 25, 2025), tinyto.me/USaY_tm ................................................................................................3

Hugo Alconada Mon, *Milei aparece ligado a otro negocio cripto con personajes en común al caso $LIBRA,* LA NACION (Feb. 25, 2025), tinyto.me/lGQD_GH ..............................................................................................6

Jai Hamid, *Hayden Davis exposes Trump and Melania for crypto insider trading alongside other crimes,* Cryptopolitan (Feb. 17, 2025), tinyto.me/AOHB_CK ..............................................................................................3

Javier Milei, X (Jan 30, 2025), tinyto.me/PtN1_gw ............................................................................................... 10

Judicial Assistance to Foreign Tribunals, 14B Fed. Prac. & Proc. Juris. § 3692 (5th ed.) ......................................................... 17

Katherine Long, *Hayden Davis: The 'Hustling Expert' Behind Argentina's $250 Million Crypto Scandal*, The Wall Street Journal (last updated Mar. 3, 2025), tinyto.me/Ycfi_3i ................................................................................................5

*LIBRA Token Launch: Addressing Recent Developments* (Feb. 15, 2025), tinyto.me/63cy_sO ................................................................................................2

Matthew Gault, *Argentina Wants the Crypto Entrepreneur Behind Melania and Milei Coins Arrested*, GIZMODO (Mar. 14, 2025),
tinyto.me/PNBt_jq ................................................................................................3

Omkar Godbole, *LIBRA Memecoin Fiasco Destroyed $251M in Investor Wealth*, Research Shows, COINDESK (Feb. 20, 2025),
tinyto.me/44-2_nk ..........................................................................................2, 11

Oficina del Presidente (@OPRArgentina), X (Feb. 15, 2025),
tinyto.me/tAnj_tj ................................................................................................10

*STATEMENT FROM KIP ON $LIBRA LAUNCH*, Kip Protocol (Feb. 24, 2025),
tinyto.me/WYdo_0a ............................................................................................12

*The $LIBRA Affair: Tracking the Memecoin That Launched a Scandal in Argentina, TRM LABS* (Feb. 16, 2025),
tinyurl.com/2r3n7tac ......................................................................................2, 11

TodoNoticias, *JAVIER MILEI EN ¿LA VES? - ENTREVISTA COMPLETA DEL 17/02/2025*, YouTube (Feb. 17, 2025),
tinyto.me/G6iT_1- ..............................................................................................12

*Vismaya V, Co-Founder of Crypto Firm Behind Trump, Melania Tokens Resigns Amid Insider Trading Allegations*, Decrypt (Feb. 18, 2025),
tinyto.me/BE5l_RY ..............................................................................................12

voidzilla, *the LIBRA interview*, YouTube (Feb. 16, 2025),
tinyto.me/uVli_Ku ....................................................................... 2, 3, 9, 11, 13

Zameer Attar, *Interpol-Wanted Scammer Hayden Davis Exposed in $40M WOLF Crypto Rug Pull*, Coinpedia (Mar. 17, 2025),
tinyto.me/hSAI_zU..............................................................................................12

## DISCLOSURE OF USE OF ARTIFICAL INTELLIGENCE

Pursuant to LR 7.2(f), counsel discloses that generative artificial intelligence tools were used in preparing this brief for the following limited purposes: (1) factual investigation and research; and (2) refinement of draft language, although every word of the final version of this document was reviewed, edited and approved by counsel.  Counsel also availed itself of the artificial intelligence tools embedded within the standard commercial legal research databses, including Westlaw and Lexis.  All citations and legal authorities have been independently verified by counsel.

Petitioners Palladian Partners, L.P., HBK Master Fund L.P., Hirsh Group LLC, and Virtual Emerald International Limited (collectively, "Petitioners") respectfully submit this Memorandum of Law in support of their Application and Petition pursuant to 28 U.S.C. § 1782 (the "Application"), for an order authorizing them to obtain discovery from Hayden Davis, Gideon Davis, Charles ("Tom") Davis, and their company, Kelsier Labs LLC (d/b/a Kelsier Ventures and hereafter, "Kelsier Labs") (collectively, the "Davis Respondents") in the form of the attached subpoenas for documents and testimony (the "Subpoenas").[1]

## PRELIMINARY STATEMENT

Petitioners bring this Application for the purpose of obtaining targeted and necessary discovery to aid in contemplated proceedings in London, England, and possibly elsewhere, to enforce and collect on the €1,543,508,749.15 awarded against the Republic of Argentina ("Argentina" or the "Republic") on June 9, 2023 (the "Judgment") by the High Court of Justice, King's Bench Division, Commercial Court, in London, England (the "High Court"). Petitioners commenced an action in the High Court seeking to recover unpaid amounts due to all warrant holders of the Euro-denominated securities (trading under ISIN XS0209139244) issued by Argentina in 2005 and 2010 and linked to Argentina's gross domestic product ("GDP") (collectively, the "GDP Warrants"). Petitioners' Judgment became final on October 14, 2024, when the Supreme Court of the United Kingdom refused Argentina's application to file a further appeal in that court. Petitioners now expect to pursue enforcement against Argentina in the High Court, and possibly elsewhere, to recover the still outstanding and unpaid balance of the Judgment,

---

[1] The Subpoenas seek documents and associated testimony from each of the Respondents. *See* Declaration of Elinor C. Sutton, dated July 25, 2025 ("Sutton Decl."), Exs. 1–4 (A–00005–00193).

amounting to €1,543,508,749.15 (the "Foreign Proceedings").[2] Consequently, Petitioners seek proportional discovery from Respondents to aid in the development and execution of their enforcement strategy against the Republic in the contemplated Foreign Proceedings.

Petitioners seek discovery from the Davis Respondents to obtain information within their possession, custody, or control concerning the creation, promotion, and financial disposition of the $LIBRA token ("$LIBRA")—a digital asset that was developed by the Davis family through Kelsier Labs, and assisted by Argentina's President Javier Milei, who also promoted the memecoin as a transformative initiative for Argentina's economy.[3] President Milei's stated plans to deploy funds raised by $LIBRA sales towards the digitization of the Argentine economy was far from the reality: $LIBRA collapsed within hours of launch, resulting in approximately $250 million in investor losses while the Davis Respondents "sniped" over $100 million in proceeds from the launch.[4, 5] Far from an isolated event, $LIBRA was only the latest in a long series of stunning

---

[2]  The Declaration of Aidan O'Rourke, dated July 25, 2025 ("O'Rourke Decl.") (A–00242–00259), sets forth the procedural history and current status of Petitioners' €1.5 billion judgment against Argentina, identifies the critical enforcement-related information in Respondents' possession, and confirms the admissibility of Section 1782 discovery in English proceedings.

[3]  *See The $LIBRA Affair: Tracking the Memecoin That Launched a Scandal in Argentina, TRM LABS* (Feb. 16, 2025), tinyurl.com/2r3n7tac (describing the rapid rise and fall of $LIBRA's market capitalization).

[4]  Omkar Godbole, *LIBRA Memecoin Fiasco Destroyed $251M in Investor Wealth*, Research Shows, COINDESK (Feb. 20, 2025), tinyto.me/44-2_nk (detailing investors $250+ million in losses).

[5]  voidzilla*, the LIBRA interview*, YouTube (Feb. 16, 2025), tinyto.me/uVli_Ku at 5:58–6:09; 39:45–40:25; 44:15–20; 44:28–36 ("Q:  How much money do you all have sitting on the sidelines? A: No, no, no, it's, it's it's like more or less one hundred mill … probably like eleven million or so in tokens, and like 13 in fees. … so let's say like 110ish million, right, of cash … [I]t's a plan gone miserably wrong, with $100 million sitting in an account that I'm the custodian of."); Kelsier Ventures (@KelsierVentures), *LIBRA Token Launch: Addressing Recent Developments*, X (Feb. 15, 2025, 10:02 AM), tinyto.me/63cy_sO ("I was responsible for ensuring liquidity for the project and still maintain control over all associated fees and treasury fund." "[This amounts to] as much as $100 million.").

pump-and-dump schemes perpetrated by the Davis family, whose multi-generational pedigree in fraud has led to painful investor losses across several high profile memecoin launches.[6] Petitioners seek discovery from the Davis Respondents to determine whether the $LIBRA proceeds may partially satisfy the High Court's Judgment and, if so, to guide Petitioners' asset recovery efforts within the contemplated Foreign Proceedings.

The Davis Respondents—Hayden (Chief Executive Officer), Gideon (Chief Operating Officer), Tom (Chairman), and Kelsier Labs (the family's firm)—orchestrated ***every aspect*** of the token's creation and launch, from securing President Milei's assistance and endorsement through multiple meetings at Argentina's Casa Rosada (the official workplace of the President, including some members of the President's administration), to engineering the liquidity pools that enabled the extraction of funds.[7] Hayden Davis boasted about paying bribes to President Milei's inner circle to gain access to and influence over the President, including Milei's sister Karina Milei— General Secretary of the Presidency of Argentina. Hayden wrote that he "send[s] $$ to his sister and … [Milei] does what I want."[8] Following the controversial launch of $LIBRA, the Davis family vanished from public view, scrubbing their online presence and refusing to respond to legal

---

[6] *How Hayden Davis Rugged $LIBRA for $100M With President Milei*, Bubblemaps (Mar. 25, 2025), tinyto.me/USaY_tm (examining how wallets associated with Hayden Davis "sniped", crypto parlance for insider trading, the launches of the $TRUMP and $MELANIA memecoins, among others); *see also* Jai Hamid, *Hayden Davis exposes Trump and Melania for crypto insider trading alongside other crimes*, Cryptopolitan (Feb. 17, 2025), tinyto.me/AOHB_CK (detailing Hayden Davis's own admissions that the Davis Respondents had sniped the $MELANIA and $TRUMP launches) ("This is an insiders' game. It's an unregulated casino … The people with the most money, the most access, and the most control always win … [T]he reality is, it's just a game. The people who know how to play win. The rest lose.") (quoting voidzilla, supra note 4)).

[7] Matthew Gault, *Argentina Wants the Crypto Entrepreneur Behind Melania and Milei Coins Arrested*, GIZMODO (Mar. 14, 2025), tinyto.me/PNBt_jq.

[8] Camila Dolabjian*, El creador de $LIBRA alardeaba "controlar" a Javier Milei y de haber pagado sobornos en la Argentina*, LA NACIÓN (Feb. 18, 2025), tinyto.me/VD3-_o9.

processes while retaining control of the misappropriated Argentine assets.[9]  As recently as July 1, 2025, Davis's counsel confirmed before Judge Jennifer L. Rochon that Davis remains in custody of the $LIBRA proceeds and seeks to use them for "grants" to Argentine businesses.[10]

This Application meets all of the requirements of Section 1782.  The Davis Respondents are found in the Northern District of Texas as individuals domiciled and/or conducting significant activity therein, including via Respondent Kelsier Labs, a Texas LLC.  The discovery sought by Petitioners—the production of $LIBRA-related documents and communications, and related depositions—is critical to the issues that will be at stake in the Foreign Proceedings.  Moreover, each of the discretionary factors set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), favors granting the requested discovery.  Petitioners respectfully request that the Court grant their Application.

## I.    THE PARTIES

*Petitioners*.  Petitioners are beneficial owners of the GDP Warrants seeking to enforce the Judgment against Argentina in the High Court and beyond.  **Palladian Partners, L.P.** is a limited partnership organized under the laws of the Cayman Islands, located at c/o One Nexus Way, Camana Bay, Grand Cayman, Cayman Islands KY1-9005, Cayman Islands.  **HBK Master Fund L.P.** is a limited partnership organized under the laws of the Cayman Islands, located at P.O. Box

---

[9]  *See* Gault, *supra* note 7.

[10]  Sutton Decl., Ex. 13 at A-00224 (July 1, 2025 Hr'g Tr. in *Hurlock v. Kelsier Ventures*) ("[o]ne of the permissible uses that we'd like to have—that would be him using these coins—would be for him to utilize them for their intended purpose, which is to benefit Argentinian businesses."); *see also Hurlock v. Kelsier Ventures et al*, No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 93 (counsel for securities class action plaintiff detailing the Argentinian $LIBRA wallets in Hayden Davis's possession following his counsel's request to modify the TRO to allow use of the Argentinian custodial wallets).

10008, Willow House, Cricket Square, George Town, KY1-1001, Cayman Islands. **Hirsh Group LLC** is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York. Hirsh's sole member is Kenneth Hirsh, an individual residing in New York. **Virtual Emerald International Limited** is a company organized under the laws of the British Virgin Islands, located at Craigmuir Chambers, Road Town, Tortola, VG 110, British Virgin Islands.

  *The Davis Family.* Hayden Mark Davis is a 28-year-old cryptocurrency promoter who serves as CEO of Kelsier Labs LLC.[11] Hayden operates Kelsier Labs with his brother Gideon Davis—who serves as the Chief Operating Officer—and their father, Tom Davis—who serves as its Chairman.[12] Tom Davis has a notable criminal history, having served time in prison for counterfeiting checks and identity fraud before becoming a Christian minister.[13] Hayden's mother Emily Chynoweth Davis, also an officer of Respondent Kelsier, is the granddaughter of polygamist cult leader Ervil LeBaron.[14] Despite—or perhaps because of—this unconventional history, the Davis family portrayed themselves as crypto-missionaries capable of revolutionizing Argentina's

---

[11]  Katherine Long, *Hayden Davis: The 'Hustling Expert' Behind Argentina's $250 Million Crypto Scandal*, The Wall Street Journal (last updated Mar. 3, 2025), tinyto.me/Ycfi_3i.

[12]  *Id.*; *see also* Sutton Decl., Ex. 5 (Gideon Davis Unscripted Arena Podcast Interview (Nov. 8, 2024)) at 29:51–30:29; 52:05–22 (In Gideon's words, Hayden Davis is "the big visionary and he you know has big dreams and things he thinks can make happen and you know often makes them happen." Tom, meanwhile, is "more on the investment side of what… we do.").

[13]  Emily Nicolle, *Counterfeiting and cult murder: Family behind Milei memecoin has chequered past*, Buenos Aires Times (Feb. 26, 2025), tinyto.me/HkwI_mo.

[14]  *See id.*.

economy through blockchain technology.  Hayden, Gideon, Emily, and Tom each reside within or are otherwise "found" in the Northern District of Texas.[15]

*Kelsier Labs.*  Kelsier Labs LLC is a Texas limited liability company[16] that was formally incorporated to execute cryptocurrency projects.[17]  In COO Gideon Davis's words, "… from my brother's skill set, my dad's skill set, and my skill set … [we] creat[ed] a marketing and consulting company which is Kelsier[,]" whose early successes—for the Davises, at least—included an "NFT project that did very[] well probably shockingly well.  It was the highest pre-sold NFT of any blockchain I think still in history."[18]  The company served as developers and lead promoters of the $LIBRA token scheme,[19] which was only the latest in a long line of pump-and-dump memecoin launches orchestrated by Kelsier, including the $TRUMP, $MELANIA, $WOLF (a collaboration with and homage to the "Wolf of Wall Street"), and *several* other memecoins.[20]

---

[15]    *See* Sutton Decl., Ex. 8 (Hayden M. Davis Driver's License – LexisNexis Public Records Reports); Ex. 7 (Gideon B. Davis Driver's License – LexisNexis Public Records Reports); Ex. 9 (Charles Thomas Davis Driver's License - LexisNexis Public Records Reports); Ex. 10 (PageVault Capture of Kelsier.io "About Us" Page) (detailing the Davises role within the Kelsier Labs organization).

[16]    *See* Sutton Decl., Ex. 11 (Texas Secretary of State Business Organizations Inquiry Report) (listing Gideon Davis as registered agent); Ex. 12 (Texas Secretary of State Forfeiture Notice dated Feb. 21, 2025) (rescinding Kelsier's license to do business in Texas pursuant to Section 171.309 of the Texas Tax Code).

[17]    Hugo Alconada Mon, *Milei aparece ligado a otro negocio cripto con personajes en común al caso $LIBRA*, LA NACION (Feb. 25, 2025), tinyto.me/lGQD_GH.

[18]    Sutton Decl., Ex. 5 (Gideon Davis Unscripted Arena Podcast Interview (Nov. 8, 2024)) at 29:51–30:29; 30:33–45.

[19]    TRM Labs *supra* note 3.

[20]    Bubblemaps supra note 6 (documenting the fund flows between several wallets known to be associated with Davis and Kelsier, and demonstrating their pattern of "sniping", a crypto-trading tactic that emulates insider trading in both method and consequence).

## II.    FACTUAL BACKGROUND

Petitioners hold an approximate €1.5 billion judgment against the Republic of Argentina arising from the Republic's sale, and subsequent default, on GDP-linked Warrants sold under the terms of a 2005 Indenture Agreement (as amended in 2010). Petitioners' Judgment is final and enforceable in the United Kingdom, and Petitioners have commenced recognition proceedings in the United States.[21] As set forth in the Declaration of Petitioners' Foreign Counsel, Aidan O' Rourke, Petitioners require the requested discovery to aid in the development and execution of their asset recovery within the United Kingdom and/or other appropriate jurisdictions.

### A.    Petitioners' Obtain a €1.5 Billion Judgment Following Argentina's Default on the Warrants

The Petitioners' claims arise from Argentina's historic sovereign debt default and subsequent restructuring. In December 2001, Argentina defaulted on its external debt, leading to a comprehensive restructuring of those obligations. In 2005 and 2010, Argentina made exchange offers to its creditors, offering GDP-linked securities as consideration for participating in the restructuring.[22] These securities represented a significant reduction from the face amount of the defaulted bonds—participating creditors received approximately 25% to 30% of the value of their original claims.[23] However, the securities provided for additional contingent payments based on the performance of the Argentine economy through 2034, effectively giving creditors a stake in Argentina's future economic growth.[24]

---

[21]  *See Palladian Partners, L.P. et al v. The Republic of Argentina*, No. 25-cv-01954-CKK (June 23, 2025).
[22]  *See* O'Rourke Decl., A–00244–00245 (describing the terms of sale of the Warrants).
[23]  *Id.*
[24]  *Id.* .

On December 15, 2014, Argentina failed to make payment under the Securities for the year 2013, contending that one of the contractual conditions for payment was not met as a result of the country's change in methodology for calculating its GDP.[25]  On August 9, 2019, Petitioners Palladian, HBK, and Hirsh commenced proceedings in the High Court of England and Wales by filing a Claim Form against Argentina and the Bank of New York Mellon as Trustee.[26]  The High Court awarded Petitioners a complete victory on their claims, and on June 9, 2023, entered judgment requiring Argentina to pay €1,329,760,063.39 (the 2013 Payment Amount) plus €233,220,560.34 in pre-judgment interest, as well as €64,311,645.07 to the Petitioners for costs consequences under England's Part 36 settlement rules, for a total judgment of €1,627,292,268.80 plus post-judgment interest at 2% above EURIBOR.[27]  The judgment became final on October 14, 2024, when the UK Supreme Court refused Argentina's application for permission to appeal.[28]

### B.    The Contemplated Foreign Proceedings

Petitioners intend to pursue enforcement of the Judgment against Argentina in the United Kingdom and elsewhere to recover the outstanding debt from the GDP Warrants.[29]  To that end, Petitioners seek this Court's assistance in identifying the provenance, custody, and location of Argentine assets that stem from the $LIBRA catastrophe, as these may be available for satisfaction of the Judgment via Petitioners Foreign Proceedings.

---

[25]  *Id.* at A–00246.

[26]  *Id.* On December 11, 2019, the Petitioners filed an Amended Claim Form adding Virtual Emerald International Limited to the proceedings. *See id.*

[27]  *Id.* at A–00246–00247.

[28]  *Id.,* at A–00249–00250.

[29]  *See* O'Rourke Decl., at A–00252–00256 (describing Petitioners' enforcement objectives and affirming the admissibility of the section 1782 discovery).

### C.    *Viva La Libertad* & the $LIBRA Token Catastrophe

Petitioners have identified the $LIBRA proceeds as possible Argentine assets that may be seized to satisfy the approximately $2 billion Judgment.  The Davis Respondents have confirmed that they are "sitting on" $100 to $110 million of $LIBRA proceeds on Argentina's behalf, and are awaiting a "game plan" before they return the money to Argentina or reinvest it in $LIBRA.[30] Hayden Davis has recently requested that Judge Rochon modify the temporary restraining order in the *Hurlock* matter to permit Davis to release "500,000,000 $LIBRA tokens [dubbed the "Argentine Growth Wallet"] … to the custodial wallet designated for the *Viva La Libertad* [] initiative in the Argentine Republic, subject to safeguards and reporting obligations."[31]  Petitioners seek targeted discovery from the Davis Respondents to test and confirm the foregoing, and further determine what, if any, Argentine assets are known to the Davis family and available for satisfaction of the Judgment within the reach of the Foreign Proceedings or beyond.

### 1.    The Development of $LIBRA and the *Viva La Libertad* Initiative

The seeds of the $LIBRA launch were first planted in July 2024, when President Milei invited Hayden Davis and other $LIBRA associates to meet with him at the Casa Rosada.[32]  Over the next several months, President Milei and Hayden would develop and finalize the details of $LIBRA and the *Viva La Libertad* economic digitization initiative.  The Davis family attended the

---

[30] voidzilla, supra note 5, tinyto.me/nhL2_Fqat 5:58–6:09; 44:15–20; 44:28–36.. ("[I]t's a plan gone miserably wrong with a hundred million dollars sitting in account that I'm the custodian of but I'm not I I I don't I'm I would love instruction on what to do with it. … So if I custody it with somebody else, even if it's a trusted third party, I lose my leverage. … [U]ntil I have answers from Javier Milei, until I have answers from his group, until I get an actual real game plan.").

[31] *See Hurlock v. Kelsier Ventures et al*, No. 25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 93 (Counsel for Plaintiff affirming consent to Hayden Davis's request to modify the TRO and laying out the terms of the modification).

[32]  Alconada Mon, *supra* note 17.

October 2024 Tech Forum Argentina—sitting front-row during President Milei's speech—where key introductions were facilitated by Argentine cryptocurrency entrepreneurs and alleged Milei associates, Mauricio Novelli and Manuel Terrones Godoy.[33]  Gideon Davis confirmed in a November 2024 podcast interview that his brother Hayden had traveled to Argentina at least twice and that Argentina and the Davis Respondents had signed a Letter of Intent relating to cryptocurrency initiatives.[34]  Following a pivotal meeting on January 30, 2025, Hayden Davis and Milei inaugurated their friendship and work on the *Viva La Libertad* project with a selfie on X (formerly Twitter).[35]

According to multiple sources and Hayden Davis's own statements, Hayden's extraordinary close access to the Argentine President' was obtained through payments to Milei's sister—Karina Milei—who also serves as the General Secretary of the Argentine Presidency.[36]  As is his custom, Hayden Davis later bragged about this arrangement, claiming he could "control" President Milei through these payments.[37]

---

[33]  Long, *supra* note 11.

[34]  Agustino Fontevecchia y Giselle Leclerq, "*Eliminé la entrevista por pedido de Gideon Davis*": *la trastienda del podcast que reveló el acuerdo entre Milei y los creadores de \$Libra*, Perfil (Mar. 3, 2025), tinyto.me/piir_ov; *see also* Sutton Decl., Ex. 5 (Gideon Davis Interview on Unscripted Arena Podcast (Nov. 8, 2024)).

[35]  Javier Milei, X (Jan 30, 2025), tinyto.me/PtN1_gw ("LA TECNOLOGÍA ES ALIADA DE LA LIBERTAD Hoy mantuvimos una muy interesante charla con el empresario Hayden Mark Davis, quien me estuvo asesorando sobre el impacto y las aplicaciones de la tecnología blockchain e inteligencia artificial en el país. Seguimos trabajando para acelerar el desarrollo tecnológico argentino y hacer de Argentina una potencia tecnológica mundial. VIVA LA LIBERTAD CARAJO...!!!") (detailing their "very interesting" conversation" and emphasizing their continued work together for Argentina).

[36]  Oficina del Presidente (@OPRArgentina), X (Feb. 15, 2025, 8:34 PM), tinyto.me/tAnj_tj; Alfredo Izaguirre, *A month on from '\$LIBRA,' Milei siblings at centre of judicial tug-of-war*, Buenos Aires Times (Mar. 18, 2025), tinyto.me/xpee_Nb.

[37]  Dolabjian, *supra* note 8.

### 2.    $LIBRA's Architecture and Rapid Collapse

Hayden Davis identified the key parties involved in the $LIBRA token launch as follows: he confirmed that the Davis Respondents acted as the "Launch Strategist[s],"; Meteora acted as the digital marketplace for $LIBRA trading, and Julian Peh, through his firm KIP Protocol, Inc., was to manage the reinvestment of $LIBRA proceeds in Argentina.[38]  $LIBRA's intended purpose, as President Milei explained in his February 14, 2025 launch post on X (formerly Twitter), was to "encourag[e] the growth of Argentina's economy by funding small Argentine businesses and startups[.]"  President Milei's X post included a link to *VivalaLibertadProject.com*, the launch and promotional page for the $LIBRA project, and the unique contract ID for the $LIBRA token.[39]  He concluded: "The world wants to invest in Argentina.  VIVA LA LIBERTAD CARAJO…!!!!"[40]

Shortly after Milei's announcement, $LIBRA received significant inflows, raising its market capitalization to roughly $4.5 billion.  However, "within hours, $LIBRA imploded," losing 89% of its value, and causing investors approximately $251 million in losses.[41]  The fallout from the $LIBRA token was swift, immediately leading to calls for President Milei's impeachment, and accusations that he and Davis had operated a rug pull or pump-and-dump fraud scheme.[42]  In the aftermath of $LIBRA's dramatic collapse, President Milei has repeatedly rejected his intimate

---

[38]  voidzilla, supra note 5 at 2:32–36, 49:50–56, 50:06–48.

[39]  *See generally* Carol Goforth, *The Lawyer's Cryptionary: A Resource for Talking to Clients About Crypto-Transactions*, 41 Campbell L. Rev. 47 (2019) (cataloguing the various forms of digital assets and their infrastructure in a "cryptionary").

[40]  *See The $LIBRA Affair: Tracking the Memecoin That Launched a Scandal in Argentina*, TRM Blog (Feb. 16, 2025), tinyto.me/MfPg_ey.

[41]  *See id.*; Omkar Godbole, *LIBRA Memecoin Fiasco Destroyed $251M in Investor Wealth, Research Shows*, CoinDesk (Feb. 20, 2025), tinyto.me/44-2_nk.

[42]  Amy Booth, *Milei is Already Facing Impeachment Requests and Lawsuits in $LIBRA Crypto Scandal*, Buenos Aires Herald (Feb. 17, 2025), tinyto.me/LjfW_ZW.

association with the project,[43] as has KIP Protocol.[44]  Furthermore, Meteora's CEO, Benjamin

Chow, resigned from that position.[45]  And Hayden Davis, seemingly undeterred by an Argentine

prosecutor's request of an Interpol Red Notice seeking his arrest,[46] facilitated the launch of the

$WOLF meme coin, another alleged rug pull launched with the "Wolf of Wall Street" Jordan

Belfort that precipitated an additional $40 million in investor losses.[47]  Davis's nonchalance to

investor losses of over $250 *million* is par for the course—the Davis Respondents have fleeced

investors out of hundreds of millions of dollars, and Davis blames *them* for any losses they suffer

in his "unregulated casino".[48]  Meanwhile, President Milei currently faces a criminal proceeding

relating to his $LIBRA dealings before Judge María Romilda Servini de Cubría in Argentina.[49]

---

[43]  TodoNoticias, *JAVIER MILEI EN ¿LA VES? - ENTREVISTA COMPLETA DEL 17/02/2025*, YouTube (Feb. 17, 2025), www.youtube.com/watch?v=xAaawoteoME (pinning the blame on Davis and the other investor developers of LIBRA).

[44]     *STATEMENT FROM KIP ON $LIBRA LAUNCH*, Kip Protocol (Feb. 24, 2025), tinyto.me/WYdo_0a.

[45]  *Vismaya V, Co-Founder of Crypto Firm Behind Trump, Melania Tokens Resigns Amid Insider Trading Allegations*, Decrypt (Feb. 18, 2025), tinyto.me/BE5l_RY.

[46]     Ben Weiss, *Argentina Seeks Arrest of U.S. Crypto Figure Tied to Melania and Milei cryptocurrencies*, Fortune (Mar. 13, 2025), tinyto.me/mnew_PK.

[47]  Zameer Attar, *Interpol-Wanted Scammer Hayden Davis Exposed in $40M WOLF Crypto Rug Pull*, Coinpedia (Mar. 17, 2025), tinyto.me/hSAI_zU.

[48]  voidzilla, supra note 5 at 55:04–12 ("So so my point is with that and with Trump or any of these big ones like this is it's it's it is an insider's game. This is an unregulated casino.") *Id.* at 14:22–45 ("And people that get mad are the people that aren't insiders. That is what happens. That's the all the bitching on socials is all the people that don't get into the deals. You'll never hear them bitch if they're in the deal."); *Id.* at 39:12–22 ("it's … horseshit that people would throw all their life savings into these").

[49]  *See* Buenos Aires Times, *Milei shutters office investigating 'cryptogate' $LIBRA scandal*, (May 20, 2025), tinyto.me/BKjG_qi; *see also* Camila Dolabjian, *El creador de $LIBRA alardeaba "controlar" a Javier Milei y de haber pagado sobornos en la Argentina*, La Nación (Feb. 18, 2025), tinyto.me/VD3-_o9.

## III.    THE REQUESTED DISCOVERY

To help conclusively determine the full extent of assets extracted from the $LIBRA scheme, trace their current locations, and identify all parties who profited from this fraud, Petitioners seek discovery from the Davis Respondents, each of whom possesses critical information that will aid Petitioners in discovering Argentine assets for judgment enforcement.

### A.    The Davis Respondents

The Davis family, through Kelsier Labs, designed and executed every aspect of the $LIBRA token scheme with President Milei's assistance.  As the self-identified "Launch Strategist" who claims custody of $100+ million in proceeds, Hayden Davis possesses unique knowledge of asset locations, wallet addresses, and the ultimate disposition of funds.[50]  His brother Gideon (COO) and father Tom (Chairman) were integral to Kelsier's operations, with Gideon openly discussing the venture in public interviews.[51]  As recently confirmed by Hayden Davis's counsel in federal court proceedings, Davis continues to maintain custody and control of these funds, seeking court permission to distribute them as "grants" to Argentine businesses—further confirming both his ongoing possession of the assets and their Argentine character.[52]

---

[50]  Gault *supra* note 7.

[51]  Sutton Decl., Ex. 5 (Gideon Davis Unscripted Arena Interview) at 29:51–30:29 ("So yeah my dad my dad and my brother were going around the world like I said investing and then I I really jumped in and dove deep with NFTs. All the NFT stuff it it got like it got really crazy in 2020, 2021. We ended up from that from my brother's skill set my dad's skill set and my skill set uh creating a marketing and consulting company which is Kelsier. … [T]he first thing … we did was market an NFT project[,] at least for me and my brother. My dad is really like he helps us with the marketing but he's more on the investment side of what of what we do … But yeah the investment, or sorry, … we marketed an NFT project that did very, very well, probably shockingly well.").

[52]  *See Hurlock v. Kelsier Ventures et al*, No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 93 (Counsel for Plaintiff affirming consent to Hayden Davis's request to modify the TRO and laying out the terms of the modification).

The Subpoenas seek comprehensive discovery from the Davis Respondents regarding the $LIBRA cryptocurrency scheme that defrauded investors of over $280 million, as summarized below:

| No. | Discovery Request |
|---|---|
| 1 | The creation, deployment, and marketing of the $LIBRA token, including smart contracts, whitepapers, and internal communications |
| 2 | Complete identification and transaction histories for all cryptocurrency wallets owned or controlled by the Davis family, with particular focus on the current location of approximately $110 million in $LIBRA proceeds |
| 3 | Communications and financial arrangements with Argentine government officials, including President Milei and his sister Karina, with specific attention to the January 30, 2025 meeting and February 14, 2025 promotional tweet |
| 4 | The "Argentina Growth Wallet" containing 500 million LIBRA tokens and its purported purpose |
| 5 | Investor funds received and any refund efforts |
| 6 | Relationships with technology partners including Benajmin Chow, Meteora, Dynamic Labs, Julian Peh, and/or Meteora |
| 7 | Attempts to conceal, secret, or launder proceeds through various means including offshore transfers to Dubai and/or other jurisdictions whether at the direction, or for the benefit of, Argentina |
| 8 | $LIBRA proceeds frozen by Judge Rochon in the *Hurlock v. Kelsier Ventures et al*, No. 25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 19 |
| 9 | Banking and digital asset holding records sufficient to trace the total balance of the $LIBRA proceeds in which Argentina has an interest |
| 10 | Depositions on topics including wallet ownership, Argentine government communications, money laundering efforts, and the current disposition of $LIBRA proceeds |

These records are fundamental to Petitioners' ability to trace and recover Argentina's assets for satisfaction of the Judgment.

## IV.    ARGUMENT

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought must reside or be found in the district in which the application is filed; (2) the discovery must be for use in a proceeding before a foreign tribunal; and

(3) the application must be made by a foreign or international tribunal or 'any interested person.'" *Bravo Express Corp. v. Total Petrochemicals & Refin. USA, Inc.*, 613 F. App'x 319, 322 (5th Cir. 2015) (citing *Tex. Keystone, Inc. v. Prime Nat. Res., Inc.*, 694 F.3d 548, 553 (5th Cir. 2012)).

After determining that the three statutory requirements are satisfied, courts may then consider four discretionary factors in deciding whether to grant a Section 1782 application, namely: (i) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (ii) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (iii) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country or the United States; and (iv) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264–65 (2004); *see also Tex. Keystone*, 694 F.3d at 553-54, 553 n.2; *In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*, 195 F. Supp. 3d 899, 902 (S.D. Tex. 2016).

Moreover, courts in this Circuit and beyond evaluate discovery requests under Section 1782 in light of the "twin aims" of the statute: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *In re Biomet Orthopaedics Switzerland GmBh*, 742 F. App'x 690, 696 (3d Cir. 2018) (quoting *Intel*, 542 U.S. at 252); *see also Tex. Keystone*, 694 F.3d at 553–54 (same). Courts have routinely emphasized Congress's intent to provide a *liberal* avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247–48; *In re Bayer AG*, 146 F.3d 188, 191, 195 (3d Cir. 1998), *as amended* (July 23, 1998) ("Congress liberalized many of the procedures for obtaining discovery for use in foreign litigation … Consistent with the statute's

15

modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application.").  "As long as the discovered information is intended for use in a foreign proceeding which comports with notions of due process, the requirements of 28 U.S.C. § 1782 have been met and an appropriate order should issue." *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 138 (3d Cir. 1985)

### A.    Petitioners Satisfy The Statutory Requirements Of 28 U.S.C. § 1782

Petitioners plainly satisfy the three statutory requirements of Section 1782: (1) The Davis Respondents are "found" in the Northern District of Texas; (2) the requested discovery is for use in the contemplated Foreign Proceedings; and (3) Petitioners are "interested persons" as the lead Claimants in those Foreign Proceedings.

### 1.    Respondents Are "Found" In The Northern District of Texas

The threshold question of any Section 1782 application is whether the respondent "resides or is found" within the jurisdictional boundaries of the reviewing court.  Because the statute "does not define" these terms, this court "interpret them according "their ordinary, contemporary, common meaning."  *In re Xiaomi Tech. Germany GmbH*, 2022 WL 4009046, at *2 (W.D. Tex. Sept. 2, 2022), *report and recommendation adopted*, 2022 WL 17815724 (W.D. Tex. Sept. 19, 2022) (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015)).  Although courts are "divided over the correct statutory interpretation of the requirement that a person or corporation against whom the discovery order is sought 'resides' or is 'found' within the

district[,]"[53] courts within this district have looked favorably at the pronouncement of *In re del Valle Ruiz* that "the phrase 'resides or is found' … extends to the limits of personal jurisdiction consistent with due process."  939 F.3d 520, 527 (2d Cir. 2019) (holding that the "statutory scope of 'found'" is not limited to mere physical presence but "extends to the limits of personal jurisdiction").  Both the Northern District of Texas and its sister courts in this circuit have been "persuaded that this is the appropriate reading of 'is found'" in Section 1782(a).  *In re Kim*, 2024 WL 3430583, at *4 (N.D. Tex. June 26, 2024*), report and recommendation adopted*, 2024 WL 3841546 (N.D. Tex. Aug. 15, 2024).

Upon information and belief, Hayden, Gideon, and Tom Davis share a residence  in Irving, Texas at 627 Brookstone Dr., Irving, TX 75039-3649.[54]  Respondent Kelsier Labs maintains its principal place of business at the same address.[55]  Moreover, both personally, and via Respondent Kelsier, the Davis Respondents have individually and/or collectively engaged in significant business activities within the district.  Accordingly, the Davis Respondents are "found" in the Northern District of Texas.  *See, e.g.*, *In re Godfrey*, 2009 WL 10670524, at *6 (N.D. Tex. Mar. 24, 2009) (finding individual and corporate respondents who "regularly conduct[ed] business in the State of Texas" "reside[d]" or could "be found" in the district); *Snyder v. Pitts*, 150 Tex. 407, 415–17 (1951) (finding the fact that the defendant "spent about five days a week in [Texas] for two years" to be sufficient to establish "residence").

---

[53]  § 3692 Judicial Assistance to Foreign Tribunals, 14B Fed. Prac. & Proc. Juris. § 3692 (5th ed.).
[54]   *See* Sutton Decl., Ex. 8 (Hayden M. Davis Driver's License – LexisNexis Public Records Reports); Ex. 7 (Gideon B. Davis Driver's License – LexisNexis Public Records Reports); Ex. 9 (Charles Thomas Davis Driver's License - LexisNexis Public Records Reports); Ex. 10 (PageVault Capture of Kelsier.io "About Us" Page) (detailing the Davises role within the Kelsier Labs organization).
[55]   Sutton Decl., Ex. 11.

## 2.    The Discovery Sought Is "For Use" In Foreign Proceedings

Petitioners' English Counsel has set forth the key timing considerations and potential remedies available in the United Kingdom, and their associated relevance to Petitioners' request.[56] The $LIBRA records sought in the Subpoenas are "for use" in "foreign proceedings."  28 U.S.C. § 1782(a).  *First*, Section 1782 does ***not*** require the Foreign Proceedings be "currently pending, or even imminent."  *In re Yasuda*, 2019 WL 4933581, at *3 (N.D. Cal. Oct. 7, 2019).  Instead, a petitioner must only demonstrate that the proceedings are "within reasonable contemplation," or provide "some showing of 'objective indicium' and a 'concrete basis' that a contemplated action will proceed."  *In re Yilport Holding A.S.*, 2023 WL 2140111, at *4 (D.N.J. Feb. 21, 2023) (citation omitted); *see also Intel*, 542 U.S. at 258–59 (noting that "[i]t is not necessary . . . for the [adjudicative] proceeding to be pending at the time the evidence is sought," and that the statute requires only that the "evidence is eventually to be used in such a proceeding") (citation omitted).

Petitioners' English Counsel avers that he has been retained to pursue the Judgment enforcement against Argentina and that he is weighing available enforcement strategies, including initiating enforcement proceedings within the United Kingdom and that the requested discovery likely will be of use in the enforcement of the Judgment.[57]  Courts have recognized such counsel's declaration as objective evidence that a petitioner's "foreign proceeding" is "within reasonable contemplation."  *See In re Hornbeam Corp.*, 722 F. App'x 7, 9–10 (2d Cir. 2018) (holding that a foreign proceeding was reasonably contemplated where the applicant "represented that it intended to initiate further litigation," and "articulated a theory on which it intended to litigate") (citation

---

[56] *See* O'Rourke Decl., at A–00252–00256.
[57] *See id.*

omitted); *Matter of Rosa Carolina Germano Dos Santos*, 2023 WL 4993673, at *5 (D.N.J. Aug. 4, 2023) ("[A] sworn statement evincing the intent to litigate … is generally sufficient to demonstrate reasonable contemplation."); *Yilport Holding*, 2023 WL 2140111 at *4 ("A foreign proceeding need not be pending at the time a Section 1782 application is filed, provided it is 'within reasonable contemplation.'") (quoting *Intel*, 542 U.S. at 259).

Numerous courts have also affirmed that civil proceedings before English courts satisfy Section 1782's requirement that the proceedings be in a "foreign or international tribunal." *See, e.g.*, *In re Letter of Request from Crown Prosecution Serv. of U.K.*, 870 F.2d 686, 691 (D.C. Cir. 1989) ("[T]here is no question that British courts qualify as 'tribunals' [for Section 1782 purposes]."); *In re Ex Parte Application of Glob. Energy Horizons Corp.*, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015) (holding that "proceeding before the High Court of Justice in England, United Kingdom . . . is undisputedly a 'proceeding before a foreign or international tribunal' under Section 1782(a)") (citations omitted).

Moreover, courts have approved the use of Section 1782 discovery in judgment-enforcement proceedings. *See In re Request for Subpoena by Ryanair Ltd.*, 2014 WL 5583852, at *1–2 (N.D. Cal. Oct. 31, 2014) (granting application for use in Dublin judgment-enforcement proceeding); *In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007) (permitting discovery for use in a Panamanian post-judgment proceeding); *In re Application of Temp. Servs. Ins. Ltd.*, 2009 WL 2843258, at *1–2 (W.D.N.Y. Aug. 28, 2009) (granting application where the applicant sought discovery to locate assets of foreign judgment debtor for purposes of enforcing that judgment); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F.Supp.3d 358, 360–61 (S.D.N.Y. 2014) (granting application to obtain communications for use in a proceeding brought in the United

19

Kingdom to enforce the applicant's default judgment); *Linsen Int'l Ltd. v. Humpuss Sea Transp. PTE LTD*, 2011 WL 1795813, at *1 (S.D.N.Y. Apr. 29, 2011) (granting an application to locate assets to enforce an English Worldwide Freezing Order or *Mareva* injunction).  Thus, the Foreign Proceedings qualify as foreign proceedings under Section 1782.[58]

Further, Petitioners are not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings.  *Intel*, 542 U.S. at 260 ("[N]othing in the text of [Section] 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.").  Rather, the burden on a Section 1782 petitioner is *de minimis*; petitioners need only show that the evidence is potentially relevant to the Foreign Proceedings.  *See In re the Application of Sauren Fonds-Select SICAV v. For Discovery Pursuant to 28 U.S.C. § 1782*, 2016 WL 6304438, at *4 (D.N.J. Oct. 26, 2016) (explaining that the petitioner's "sworn statement that the discovery sought by the subpoenas is to aid it in prosecuting its claims [in the foreign action] . . . is sufficient, given that there is no contrary information on which the Court could conclude otherwise"); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 77 (2d Cir. 2012) ("Section 1782(a) contains no requirement that particular evidence be admissible in a foreign proceeding to be considered 'for use in a proceeding in a foreign or international tribunal.'").

Petitioners also satisfy the "for use" requirement.  The $LIBRA records sought in the Subpoenas are highly relevant to the Foreign Proceedings because they relate to the provenance, custody, and geographic location of the Republic's assets.[59]  As discussed, Petitioners will use the

---

[58]  *See also* O'Rourke Decl., at A–00252–00253 (setting forth the menu of options available to Petioners' English counsel).
[59]  *See* O'Rourke Decl., at A–00252–00253

requested discovery to develop, refine, and/or execute their judgment enforcement action in the High Court.[60]

### 3.    Petitioners Are Interested Persons

Finally, Section 1782 requires persons seeking discovery to show they possess a reasonable interest in the foreign proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782[,]" *Intel*, 542 U.S. at 256; *In re Application of financialright claims GmbH*, 2024 WL 4818177, at *7 (D. Del. Nov. 18, 2024).  Petitioners are beneficial owners of the GDP Warrants, and accordingly are the prototypical "interested person[s]" under *Intel*.  *See In re Application of Eurasian Bank Joint Stock Co.*, 2015 WL 6438256, at *2 (N.D. Tex. Oct. 21, 2015) (finding that, "as a prospective litigant in the Republic of Kazakhstan, Eurasian is an 'interested person' within the meaning of Section 1782") (citation omitted); *see also Chevron Corp. v. 3TM Consulting, LLC*, No. 4:10-MC-134, 2010 WL 8814519, at *1 (S.D. Tex. Apr. 5, 2010) (finding that, "as a litigant in that proceeding, Chevron is an 'interested person' within the meaning of Section 1782").

---

[60]  *See id.*.

**B.** **All Discretionary *Intel* Factors Favor Permitting The Discovery Petitioners Seek**

Once the threshold requirements under Section 1782 are met, the Court shall consider the four discretionary "*Intel* factors." Each of these factors weighs in favor of granting the requested discovery. *First*, Respondents will not be a party to the English Proceedings. *Second*, there is no reason to believe that English courts would be unreceptive to evidence obtained through Section 1782 discovery. *Third*, Petitioners are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence. *Fourth*, Petitioners' requests are proportional to the complexity of the fraud and have a clear nexus to Petitioners' asset recovery efforts.

### 1. The First *Intel* Factor Favors Granting Discovery

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. *See Intel*, 542 U.S. at 244, 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for [Section] 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."). Here, Respondents will not be parties to the Foreign Proceedings.[61]

### 2. The Second *Intel* Factor Favors Granting Discovery

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to the evidence obtained through a Section 1782 application. *See id.* The Fifth Circuit has emphasized that, "to avoid speculative foray[s] into legal territories unfamiliar to federal judges, parties must provide authoritative proof that a foreign tribunal would reject evidence

---

[61] *See* O'Rourke Decl., at A–00253.

because of a violation of [an] alleged [foreign] privilege." *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) (internal quotation marks and citations omitted).

For the reasons set forth in U.K. counsel's declaration, the English courts likely will be receptive to evidence obtained through this Application.[62]  *See also In re Application of Shervin Pishevar*, 439 F. Supp. 3d 290, 303–04 (S.D.N.Y. 2020) (holding that the petitioner "has made a showing that the English courts would be receptive to evidence obtained" through the Section 1782 application).  Evidence of asset transfers associated with or originating from a judgment debtor are highly relevant in judgment enforcement proceedings.  *See, e.g.*, *Linsen Int'l Ltd.*, 2011 WL 1795813, at *1 (granting an application to locate assets for use in English proceedings); *La Suisse*, 62 F. Supp. 3d at 360–61 (granting application to obtain communications for use English proceedings); *see also Grupo Mexico SAB de CV*, 2014 WL 12691097, at *3 (N.D. Tex. Oct. 17, 2014) (granting discovery where "there [was] no evidence to suggest that the Mexican court is hostile to [Section 1782 discovery]").

### 3.     The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782 requires the evidence sought to be discoverable in the foreign proceeding itself, and there is similarly no requirement that a petitioner must exhaust his remedies in the foreign court first.  *See id.* at 244 ("Section 1782 is a provision for assistance to tribunals abroad.  It does not direct [U.S.] courts to engage in comparative analysis to determine whether analogous proceedings exist

---

[62] *See* O'Rourke Decl., at A–00254–00255.

here.").[63] Here, there is no reason to believe that any of the discovery sought violates any foreign laws and/or public policy. Rather, the discovery Petitioners seek is highly limited and focused specifically on the information needed to identify the insiders that profited alongside Hayden Davis's $LIBRA token launch, as well as other records needed to determine the current location of Argentina's assets. Moreover, these requests do not offend UK law.[64]

### 4.    The Fourth *Intel* Factor Favors Granting Discovery

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 245, 265. The standard is substantively the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure. "The reference in [Section] 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute." *Bayer AG*, 146 F.3d at 195. Relevancy in this context is "broadly construed" and "[w]hen relevance is in doubt, the district court should be permissive." *In re Veiga*, 746 F. Supp. 2d 8, 19 (D.D.C. 2010) (citing *Bayer AG*, 146 F.3d at 195).

Here, the discovery requests are proportional to the scale and sophistication of this fraud, and necessary for Petitioners' enforcement objectives. Whatever burden Respondents may incur is both reasonable and proportionate given the critical nature of the discovery sought. Indeed, courts have held that "[j]ust because a discovery request is broad does not mean that it is unduly

---

[63] *See also In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement' finds no support in the plain language of the statute and runs counter to its express purposes[.]") (citation omitted); *LEG Q LLC v. RSR Corp.*, 2017 WL 3780213, at *8 (N.D. Tex. Aug. 31, 2017) (holding that applicants are "not require[d]" "to seek discovery in the foreign jurisdiction before seeking the assistance of a district court").
[64] *See* O'Rourke Decl., at A–00254–00255.

burdensome." *See Pinchuk v. Chemstar Prod. LLC*, 2014 WL 2990416, at *3 (D. Del. June 26, 2014) (subpoena quashed on other grounds). If the requests' subject matter appear to be "reasonably tailored" to the scope of the claims in the foreign proceedings, the applicant has a colorable argument that the requests are proportional and relevant to the foreign proceeding. *See id.* "If there is a possibility that the discovery sought may lead to information relevant to the subject matter of the action, then the discovery should generally be allowed." *In re IKB Deutsche Industriebank AG*, 2010 WL 1526070, at *5 (N.D. Ill. Apr. 8, 2010).

## V.    CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order associated with Petitioners' application; (c) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas for information and for the requested depositions; and (d) grant any and all other relief to Petitioners as deemed just and proper.

DATED:   July 25, 2025          Respectfully submitted,

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

By:  */s/ Elinor C. Sutton*

Elinor C. Sutton (No. 24129804)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
3100 McKinnon St., Suite 1125
Dallas, TX 75201
Tel.: (469) 902-3600
Fax: (469) 902-3610
elinorsutton@quinnemanuel.com

*Counsel for Plaintiffs Palladian Partners, L.P.,
HBK Master Fund L.P., Hirsh Group LLC, and
Virtual Emerald International Limited*

26