# EXHIBIT 1

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | | |
|---|---|---|
| Palladian Partners, L.P. et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| KELSIER LABS LLC, HAYDEN M. DAVIS, GIDEON B. DAVIS, CHARLES THOMAS DAVIS | ) ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        KELSIER VENTURES LLC, C/O GIDEON B. DAVIS (REGISTERED AGENT),
627 Brookstone Dr., Irving, TX 75039-3649

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:    SEE ATTACHMENT A

| Place:  Quinn Emanuel Urquhart & Sullivan, LLP 3100 McKinnon St, Suite 1125 Dallas, TX 75201 | Date and Time: |
|---|---|

The deposition will be recorded by this method:    Stenographic and video recording

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  SEE ATTACHMENT A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    07/25/2025

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Palladian Partners, L.P. _____, who issues or requests this subpoena, are:

Elinor C. Sutton, Quinn Emanuel Urquhart & Sullivan, LLP, elinorsutton@quinnemanuel.com, (469) 902-3600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

A-00006

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

A-00007

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

### Instructions

1.    In responding to this Subpoena, You are required to produce all responsive documents that are in Your possession, custody, or control or in the possession, custody, or control of Your agents, employees, or other representatives.  A document shall be deemed to be within Your control if You have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.    A reference to an organization or other legal entity (whether formed as a corporation, trust, partnership, or otherwise) means that entity and each and all of its: predecessors, successors, subsidiaries, divisions, partnerships, limited partners, related parties, joint ventures, or affiliates; present and former Officers, employees, agents, representatives, trustees, directors, or its board of directors (either generally or committees thereof); its attorneys, accountants, agents, representatives, and advisors (including investment bankers and public relations or other media consultants); any professional employed or retained by that entity; and all other Persons acting or purporting to act on its behalf.

3.    A reference to a natural person includes that person and each and all of his or her: employees, agents, or representatives; attorneys, accountants, agents, representatives, and advisors (including investment bankers and public relations or other media consultants); any professional employed or retained by him or her; and all other Persons acting or purporting to act on his or her behalf.

4.    Whenever used herein: the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular; the term "including" shall be deemed to mean "including, but not limited to," and shall not be construed to limit the scope of any definition or Interrogatory herein; the masculine shall be deemed to include the feminine,

1

and the feminine shall be deemed to include the masculine; the disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); and each of the functional words "any," "each," "every," and "all" shall be deemed to include each of the others.

5.    The requests shall be deemed to be continuing so as to require supplemental productions as You obtain additional documents between the time of the initial production hereunder and the time of trial in these actions.

6.    Each requested document shall be produced in its entirety, without abbreviation or redaction, and shall include all attachments, appendices, exhibits, lists, schedules or other documents at any time affixed thereto.  If a document responsive to any request cannot be produced in full, it shall be produced to the extent possible with an explanation stating why production of the remainder is not possible.

7.    You must produce responsive documents as they have been kept in the usual course of business or shall organize or label them to correspond to the enumerated requests of this Subpoena.  If, after exercising due diligence to secure them, You cannot provide some or any of the requested documents, so state and provide all documents to the extent possible, specifying the reason for Your inability to produce the remainder of the documents, and stating whatever information or knowledge You have concerning each document not produced.

8.    If any document is withheld under any claim of privilege, including without limitation, attorney-client privilege and attorney work product, You should provide the following information with respect to such document: the date of the document; the name of its author or preparer(s); the name of each person who was sent or furnished with the

2

document or a copy thereof; the title or description of the document sufficient to identify it without revealing the information for which privilege is claimed; the claim of privilege under which it is withheld; and a description of the subject matter of the document in sufficient detail to support Your contention that the document is privileged.

9.    If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this action or unless otherwise permitted by the Court.

10.    If an objection is made to any request, state Your objection and the ground or grounds with particularity in Your written response.  If an objection is made only to part of the request, identify that part in Your written response and state Your objection and the ground therefore.

11.    Terms not specifically defined shall be given their ordinary meanings as You understand them to be used in the trade or pursuant to ordinary usage.

12.    When producing documents and records in response to these requests, You should produce data as it exists and is correlated within Your systems. If Your systems do not maintain linkages between certain data points (e.g., between specific wallet addresses and user accounts, or between API calls and individual transactions), You are not required to create such linkages for purposes of this production, but should clearly indicate the limitations of available correlations in Your response.

13.    If a Wallet Address or Wallet Identifier listed in Appendix A or otherwise referenced in this Subpoena appears only in partial form (e.g., truncated, redacted, or with missing characters), You are instructed to perform a reasonable search using available tools, logs,

3

or internal identifiers to identify any complete Wallet Addresses or Wallet Identifiers in Your possession, custody, or control that match or correspond to the partial identifier. This includes, without limitation:

- Searching logs, databases, authentication records, or metadata fields for Wallet Addresses that begin with, end with, or otherwise match the partial identifier;

- Using any tagging, mapping, or indexing systems maintained by You to identify full Wallet Addresses linked to the partial value;

- Reviewing any historical records or internal references that may preserve the full Wallet Address or a record of its truncation, redaction, or abbreviation.

Upon identification of any such matching Wallet Address or Wallet Identifier, You shall treat it as fully within the scope of the Requests and produce responsive Records accordingly.

14. For all digital assets and wallets, document all transfers of control, identify all persons with access, record any changes to access permissions, and preserve security logs and authentication records.

15. Your response should, where applicable, distinguish between data available for custodial wallet services (where You maintain access to private keys or seed phrases) versus non-custodial wallet services (where You provide interface or authentication services only). The scope and granularity of available data may differ significantly between these service types.

16. When producing blockchain-related data, You shall provide complete transaction hashes (not truncated, and inclusive of the associated attribution data associated with each address), block numbers or slot numbers, timestamp in UTC, From and To addresses, token amounts with proper decimal notation, gas fees or transaction costs, and any internal transaction or program instruction data.

4

17.     For any encrypted messaging platforms (WhatsApp, Signal, Telegram, etc.), You must preserve and produce message content including text, images, and attachments, sender and recipient information, timestamps, group/channel membership lists, deleted messages if recoverable, and metadata including read receipts and online status.

18.     You must make reasonable efforts to correlate partial wallet addresses to complete addresses using internal databases or lookup tables, transaction patterns or common counterparties, temporal proximity to known events, any labeling or tagging systems, and cross-reference with exchange deposit addresses.

19.     All timestamps in produced documents must specify the time zone. If converting to UTC, preserve the original time zone information.

20.     When producing smart contract or software code, include all versions and commits, preserve comments and documentation, include compilation/deployment scripts, provide any audit reports or security reviews, and include test files and development notes.

21.     For any financial data or calculations, show all underlying formulas or methodologies, preserve original source data, include exchange rates used for conversions, document any assumptions or estimates, and provide both cost basis and fair market value where applicable.

22.     For social media posts or web content, capture full page/post including comments, preserve all multimedia content, include engagement metrics (likes, shares, views), document deletion or modification timestamps, and capture cached or archived versions.

A-00013

### Definitions

1.  **"Airdrop"** means any distribution of cryptocurrency tokens to multiple wallet addresses without requiring payment from recipients, including but not limited to promotional distributions, community rewards, marketing campaigns, bounty programs, or any other method of freely distributing tokens to increase adoption or create market activity.

2.  **"Argentine Persons"** means any current or former officials, employees, contractors, or agents of the Republic of Argentina, including, but not limited to President Javier Milei, Karina Milei, Santiago Caputo, Mauricio Novelli, and any member of the Executive, Legislative, or Judicial branches; any military, intelligence, or law enforcement personnel; and any individual acting on their behalf, including family members, advisors, political consultants, beneficial owners, nominees, or intermediaries. This term also includes any non-governmental person or entity that received payments or communications referencing an intent to benefit the Argentine government or economy through LIBRA-related transactions and is not limited to individuals holding Argentine citizenship.

3.  **"Associates"** means any person or entity who acted in concert with, provided substantial assistance to, or shared a financial interest with Kelsier, its Officers, or any Related Entity in connection with the $LIBRA scheme, including but not limited to: family members of Officers (by blood, marriage, or adoption); romantic partners or cohabitants; business partners, joint venturers, or co-investors; persons sharing cryptocurrency wallets, bank accounts, or beneficial ownership of assets; intermediaries, nominees, or straw purchasers used to conceal ownership or control; professionals providing non-privileged services (including cryptocurrency traders, market makers, or financial advisors); persons who received $LIBRA tokens or proceeds with knowledge of their

6

source; co-conspirators in related token schemes (MELANIA, TRUST, KACY, VIBES, HOOD, WOLF); and any person who facilitated the concealment, transfer, or laundering of $LIBRA proceeds. This definition includes both formal and informal relationships where assets, information, or benefits were exchanged in furtherance of the scheme.

4.    **"Banking Records"** means all records, data, documents, or communications reflecting or relating to any financial transactions involving fiat currency or traditional currency transacted in financial institutions conducted by, on behalf of, or in connection with any user, User Account, or Wallet Address using or accessing Your services. This includes, without limitation:

(a)    Records of deposits, withdrawals, transfers, or settlements between cryptocurrency wallets and bank accounts (e.g., ACH, SWIFT, SEPA, wire transfers, credit/debit card transactions);

(b)    Transaction receipts, invoices, confirmations, or account statements reflecting fiat onramps (e.g., purchases of cryptocurrency using a credit card, debit card, or bank transfer) or offramps (e.g., conversions of cryptocurrency to fiat currency and withdrawal to a bank account), including through centralized exchanges;

(c)    Records of interactions with centralized exchanges (CEXs) or fiat/crypto conversion services used to facilitate asset purchases, liquidations, settlements, custody, or identity verification (e.g., Coinbase, Binance, Kraken, Moonpay, Sardine, Transak, Stripe, Wyre, or Plaid);

(d)    User-submitted or system-collected banking information, including account holder name, bank name, routing number, account number, credit card details, and any associated verification documentation;

(e)    Internal records tracking or auditing fiat-related activity connected to User Accounts, Wallet Addresses, or fiat-to-crypto conversion events;

(f)    Compliance, due diligence, or internal review records relating to fiat transactions, including anti-money laundering (AML), Know Your Customer (KYC), sanctions screening, fraud detection, or risk scoring; and

(g)    Correspondence, logs, or communications relating to the creation, verification, approval, or use of any fiat payment method, withdrawal channel, or third-party exchange account.

7

5.  **"Blockchain"** means any decentralized, cryptographically secured digital ledger or distributed database used to record, verify, and publicly or privately memorialize the transfer, storage, or ownership of digital assets, tokens, or smart contract interactions. For purposes of this request, "Blockchain" specifically includes:

(a)  the Solana blockchain, including all its environments—mainnet-beta, testnet, and devnet—with particular reference to slot numbers, block heights, transaction signatures, inner instructions, log messages, program account changes, and validator confirmations;

(b)  any layer-1 or layer-2 blockchain networks on which Kelsier or its Officers, Intermediaries and/or Associates deployed, promoted, or interacted with smart contracts or token ecosystems, including but not limited to Ethereum, Arbitrum, Polygon, and Base;

(c)  any cross-chain bridges or interoperability protocols used to transfer, wrap, or re-deploy assets associated with LIBRA or other tokens, including Solana Wormhole, Circle's CCTP, or any bridge facilitated by or integrated with infrastructure operated by Kelsier or its Officers, Intermediaries and/or Associates;

(d)  any ledger entries, transaction receipts, validator logs, smart contract event logs, or account state changes viewable or recorded through block explorers, APIs, or analytics platforms used or accessed by Kelsier or its Officers, Intermediaries and/or Associates, including any such data internally retained or generated through proprietary dashboards or infrastructure;

(e)  all on-chain and off-chain metadata, access logs, or cryptographic event records authenticated, facilitated, logged, routed, or retained by Kelsier or its Officers, Intermediaries and/or Associates in connection with user or administrator interactions through any smart contract, wallet, or application interface under its control.

6.  **"Bot" or "Trading Bot"** means any automated software, script, algorithm, or program designed to execute cryptocurrency transactions, including but not limited to:

(a)  Market making bots;

(b)  Arbitrage bots;

(c)  MEV (Maximum Extractable Value) extraction bots;

(d)  Sniping bots for early token access;

8

(e)    Price manipulation algorithms; and

(f)    Wash trading programs.

7.    **"Bridge" or "Cross-Chain Bridge"** means any protocol, smart contract, or service that facilitates the transfer of digital assets between different blockchain networks, including but not limited to Wormhole, Circle's Cross-Chain Transfer Protocol (CCTP), or any other interoperability solution.

8.    **"Centralized Exchange" or "CEX"** means any cryptocurrency trading platform that maintains custody of user assets, controls the matching engine for trades, and requires users to deposit funds into exchange-controlled wallets before trading, including but not limited to: Coinbase, Binance, Kraken, Bitget, KuCoin, Bybit, OKX, Crypto.com, Gemini, FTX (pre-bankruptcy), and any other platform that maintains order books, executes trades on behalf of users, provides custodial wallet services, controls private keys for user deposits, implements KYC/AML procedures, or offers fiat-to-cryptocurrency conversion services. This definition includes both the primary exchange entities and any affiliated services such as Coinbase Prime, Binance.US, or institutional trading desks.

9.    **"Communications"** means any transmittal and/or receipt of information, whether such was oral or written, and whether such was by chance, prearranged, formal or informal, and specifically includes, but is not limited to, conversations in person, telephone conversations, electronic mail (including instant messages and text messages), transmittals of information on social media platforms or applications, voicemail, letters, memoranda, statements, media releases, magazine and newspaper articles, and video and audio transmissions.

A-00017

10. **"Cryptocurrency"** means any form of digital or virtual asset that uses cryptographic protocols or blockchain-based technologies to record, secure, verify, or facilitate transactions, whether or not such currency is legal or has legal tender status in any jurisdiction. The term "Cryptocurrency" also includes any associated metadata, ledger entries, wallet balances, or transaction records, whether stored on-chain or off-chain. This includes, but is not limited to:

(a) coins and tokens (including fungible and non-fungible tokens (NFTs)) that operate on decentralized or distributed ledger technologies (including but not limited to Bitcoin, Ethereum, Solana, and similar networks);

(b) digital assets issued, traded or utilized to engage on decentralized platforms such as Decentralized Exchanges (DEXs);

(c) stablecoins or algorithmic tokens that purport to maintain value parity with fiat currency or other assets; and

(d) any derivative instruments, wrapped tokens, staking derivatives, or synthetic representations of digital or fiat assets transacted using blockchain infrastructure.

11. **"Custom Metadata or Labels"** means any internal tags, classifications, annotations, or identifiers applied by Your Systems to a user's Wallet Address, User Account, or associated data. This includes, but is not limited to:

(a) Labels or categories assigned to transactions, Wallet Addresses, or User Accounts for purposes of risk management, fraud prevention, or behavioral analysis;

(b) Any notes or internal identifiers created by Your team for organizing or tracking user activity, wallets, or transactions;

(c) Behavioral scoring or risk scoring associated with a Wallet Address or User Account;

(d) Labels or identifiers used for categorizing users (e.g., verified, flagged, suspicious, etc.); and

(e) Any custom metadata attached to Wallet Addresses that was manually or automatically applied by Your platform or services.

12.    **"Data Retention"** and/or **"Deletion Activity"** means any actions or records reflecting the retention, archiving, deletion, or anonymization of any data associated with a user, User Account, or Wallet Address.  This includes, but is not limited to:

(a)    Logs or records indicating when and how data was retained, archived, or deleted;

(b)    Policies or procedures governing data retention and deletion practices, including retention periods;

(c)    Records of any automated or manual processes involved in data deletion;

(d)    Any communication or documentation related to user requests for deletion of personal data, account data, or transaction history; and

(e)    Records of data anonymization or data purging, including the removal of user identifiers, transaction data, or wallet metadata.

13.    **"DeFi"** or **"Decentralized Finance"** means protocols, applications, or smart contracts that provide financial services without traditional intermediaries, including but not limited to:

(a)    Decentralized exchanges (DEXs);

(b)    Liquidity pools and automated market makers;

(c)    Yield farming and staking protocols;

(d)    Lending and borrowing platforms; and

(e)    Derivative instruments.

14.    **"Device Identifier"** means any data, string, code, or unique attribute used to distinguish, tag, recognize, or associate a specific physical or virtual device with a user or account. "Device Identifier" includes both persistent and ephemeral identifiers, whether user-visible or system-generated, and whether collected explicitly or through passive telemetry.  This includes, without limitation:

(a)    hardware identifiers (e.g., IMEI, MAC address, serial number);

(b)    software identifiers (e.g., advertising ID, IDFA, Android ID);

11

A-00019

(c)      browser or device fingerprinting data (e.g., screen resolution, operating system, font libraries, plugins, timezone);

(d)      any unique identifier generated or assigned by Your systems to a device; and

(e)      third-party SDK or analytics tool identifiers (e.g., from Firebase, Segment, Mixpanel, or similar services).

15.     **"Documents"** is meant in the broadest possible sense and includes, but is not limited to, any writings and includes the following items, whether printed or recorded or reproduced by any other mechanical process or written or produced by hand, including drafts: agreements; communications; correspondence; electronic mail; text messages; telegrams; memoranda; summaries, records or reports of telephone conversations, personal conversations, interviews, meetings, conferences, investigations or negotiations; opinions or reports of consultants; diaries; graphs; reports; notebooks; charts; plans; drawings; sketches; maps; photographs; film; brochures; pamphlets; advertisements; circulars; press releases; letters; faxes; any marginal comments appearing in any documents; tape recordings; electronic transmissions; computer printouts and all other writings. Documents shall not be limited in any way as to the form of storage (such as paper, microfiche, magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, or other electronic-storage device). A draft or non-identical copy of a document is a separate document within the meaning of this term.

16.     **"Fiat/Crypto Conversion Services"** means any service, platform, protocol, or intermediary that facilitates the exchange between traditional fiat currency (USD, EUR, ARS, etc.) and cryptocurrency assets, including but not limited to: fiat on-ramp providers (Moonpay, Sardine, Transak, Wyre, Ramp, Banxa); fiat off-ramp services enabling cryptocurrency-to-bank transfers; payment processors supporting cryptocurrency transactions (Stripe, PayPal, Square); peer-to-peer exchange platforms (LocalBitcoins,

12

Paxful); OTC (over-the-counter) trading desks and brokers; cryptocurrency ATM operators; prepaid card services funded by cryptocurrency (Crypto.com Card, Coinbase Card); stablecoin issuers and redeemers (Circle for USDC, Tether for USDT); banking-as-a-service providers connecting crypto platforms to traditional banking; and any service that bridges traditional financial systems with blockchain-based assets. This includes both direct service providers and any APIs, widgets, or embedded solutions integrated into websites or applications.

17.    **"Geolocation"** means any data or metadata that identifies, approximates, or is capable of being used to determine the physical location of a device, user, session, or network access point. This includes, without limitation:

(a)    GPS coordinates;

(b)    IP address-based location data;

(c)    Wi-Fi access point data;

(d)    cell tower triangulation;

(e)    browser or device location services;

(f)    location information inferred from user behavior or activity patterns; and

(g)    any third-party geolocation service data integrated into or accessed by Your systems.

"Geolocation" shall include both real-time and historical location data, whether precise or approximate, and regardless of whether such data was actively collected with user consent or passively logged by systems, applications, or network infrastructure.

18.    **"Government"** refers to any governing body, including the United States of America, the Republic of Argentina, INTERPOL, or any other federal government, state governments, and local governments, and their related agencies, entities, and agents.

13

19.    **"Identify"** means

    (a)    with respect to a Person, providing

        (i)    their name,

        (ii)    their job title (if a natural Person),

        (iii)    their address and telephone number, and

        (iv)    a general description of the information about which the Person has knowledge, as sought below; and

    (b)    with respect to a Document, providing

        (i)    its Bates number,

        (ii)    its custodian,

        (iii)    its date,

        (iv)    its author(s), and

        (v)    a general description.

20.    **"Influencer"** means any person or entity purporting to have the ability to affect the purchasing decisions or investment behavior of others through social media presence, including but not limited to content creators on Twitter/X, YouTube, TikTok, Discord, Telegram, or other platforms, regardless of follower count or verification status.

21.    **"Insider"** means any person or entity who had knowledge of, access to, or involvement in the LIBRA token project before its public announcement or launch, including but not limited to:

    (a)    Kelsier personnel and affiliates;

    (b)    Technical developers and advisors;

    (c)    Early investors or token recipients;

    (d)    Marketing partners; and

    (e)    Anyone with pre-launch token access.

22. **"Investors"** means any person or entity who purchased, acquired, or attempted to purchase $LIBRA tokens or any other tokens issued by Kelsier or its Officers, Intermediaries and/or Associates, including but not limited to: retail purchasers who acquired tokens through decentralized exchanges, liquidity pools, or direct transfers; institutional or accredited investors; early access participants who received preferential pricing or timing; persons who transferred cryptocurrency, fiat currency, or other consideration in exchange for tokens or the promise of tokens; participants in presales, private sales, or initial offerings; persons who were solicited to purchase tokens through social media, direct communication, or marketing campaigns; persons who suffered financial losses from token purchases; and any person who held tokens with the expectation of profit based on the efforts of Kelsier or its Officers, Intermediaries and/or Associates or its promoters. This definition includes both successful purchasers and those who attempted but failed to purchase tokens due to technical issues, sold-out conditions, or other barriers.

23. **"Intermediaries"** means any person or entity who facilitated, arranged, or participated in connections, communications, transactions, or relationships between Kelsier (or its Officers and Associates) and third parties in connection with the $LIBRA scheme, including but not limited to: brokers or agents who arranged meetings with government officials; persons who provided introductions to Argentine Persons or other potential partners; cryptocurrency traders or market makers who facilitated token transactions; persons who served as nominees, proxies, or straw purchasers; translators or interpreters present during meetings or communications; consultants or advisors who arranged financing or investor connections; persons who facilitated banking relationships or fiat

conversions; technical service providers who enabled token deployment or trading; persons who arranged media appearances or influencer partnerships; lawyers, accountants, or other professionals providing non-privileged services; and any person who received compensation, tokens, or other benefits for facilitating aspects of the scheme. This definition encompasses both formal business intermediaries and informal connections who advanced the interests of the $LIBRA project.

24.  **"IP Records"** means any logs, data, metadata, or other records reflecting or relating to an Internet Protocol (IP) address associated with any interaction by a user with Your systems, platforms, applications, APIs, or infrastructure. This includes, without limitation, records of IP addresses collected during:

(a)  account registration or login;

(b)  wallet access or usage events;

(c)  transaction initiation or approval;

(d)  communication with customer support or API endpoints; and

(e)  any device or session data reflecting geolocation, device fingerprinting, browser type, or timestamped access.

"IP Records" shall include, where available, any associated headers, cookies, session tokens, device IDs, or other data points that accompany or are linked to such IP address logs.

25.  **"Kelsier"** means Kelsier Labs LLC, Kelsier Ventures LLC, and all of their past or present subsidiaries, affiliated entities, parent companies, successors, predecessors, joint ventures, fictitious business names (DBAs), and investment vehicles, whether formally registered or informally operated. This includes any entity controlled by, managed by, or under common control with Hayden Davis, Gideon Davis, or Charles Thomas Davis,

16

including any shell companies, trusts, special purpose vehicles (SPVs), or crypto wallets or protocols operated in the name of a Kelsier-affiliated entity or nominee. This term also encompasses all current and former Officers, directors, managers, employees, contractors, consultants, agents, representatives, and any other personnel acting on behalf of or under the direction of any Kelsier entity, regardless of whether such persons were formally employed, independently contracted, or informally engaged to perform services related to the development, promotion, or management of the $LIBRA token or any associated activities.

26.    **"Know-Your-Customer Records"** or **"KYC Records"** means any and all documentation, data, or information collected or maintained by You or on Your behalf to identify or verify the identity of users, whether collected voluntarily, for compliance purposes, or pursuant to legal, regulatory, or internal policy obligations.

This includes, without limitation:

(a)    full name, date of birth, physical address, email address, and phone number;

(b)    government-issued identification documents (e.g., driver's licenses, passports), and scans or images thereof;

(c)    biometric data (e.g., facial recognition data, fingerprint scans);

(d)    identity verification responses and authentication methods;

(e)    documents used for proof of address (e.g., utility bills, bank statements);

(f)    results of identity checks, sanctions screening, or adverse media screening;

(g)    IP address, device data, and location data used in connection with identity verification; and

(h)    all communications, records, notes, or files maintained in connection with the identity verification process.

"KYC Records" includes both data provided directly by users and any data obtained through third-party KYC or identity verification service providers.

17

27.    **"$LIBRA" or "LIBRA"** means the cryptocurrency token launched in early 2025 on the

Solana blockchain by or in connection with Kelsier, also known as "Viva La Libertad,"

and associated with the token contract address

Bo9jh3wsmcC2AjakLWzNmKJ3SgtZmXEcSaW7L2FAvUsU and/or

Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT, including but not

limited to all associated smart contracts, liquidity pools, promotional campaigns, token

distributions, staking arrangements, derivative instruments, and cross-chain bridges. This

definition includes any representations made in connection with LIBRA's issuance,

including references to "freedom tokens," "Argentina Growth Wallet," or tokens

promised to benefit the Argentine economy.

28.    **"Liquidity Pool"** means any smart contract-based mechanism that holds reserves of

multiple tokens to facilitate automated trading, including single-sided and double-sided

pools, concentrated liquidity positions, and any associated LP (liquidity provider) tokens

or rewards.

29.    **"Media"** refers to all means of mass communication and information dissemination,

including but not limited to: traditional print media (newspapers, magazines, journals,

newsletters); broadcast media (television, radio, podcasts); digital and online media

(websites, blogs, online publications, streaming platforms); social media platforms and

channels (Twitter/X, Facebook, Instagram, TikTok, YouTube, LinkedIn, Reddit, Discord,

Telegram, WhatsApp groups or channels, and any other social networking services);

mobile applications and push notifications; messaging platforms and chat applications;

forums and online communities; email newsletters and distribution lists; press releases

and wire services; and any other current or future technology used to communicate

A-00026

information to multiple recipients or the public at large. This definition encompasses both platforms where content is created and channels through which content is distributed, regardless of whether such communication is one-to-many, many-to-many, or occurs in public or private groups.

30.    **"Memecoin"** means any cryptocurrency token created, marketed, or traded primarily for speculative purposes based on internet culture, social media trends, viral content, or popular figures, rather than underlying utility or technological innovation, including but not limited to: tokens named after or inspired by internet memes, celebrities, political figures, or cultural phenomena; tokens marketed through social media influencers or viral campaigns; tokens with no functional use case beyond trading and speculation; tokens designed to capitalize on current events or trending topics; pump-and-dump schemes disguised as community-driven projects; tokens that derive value primarily from community hype, celebrity endorsements, or social media momentum rather than fundamental utility; and any token that prioritizes marketing narratives over technical development or real-world application. This definition specifically includes tokens such as $LIBRA, $POPE, $MELANIA, $TRUST, $KACY, $VIBES, $HOOD, $WOLF, and similar speculative instruments launched, developed, promoted, exchanged, or otherwise associated with Kelsier and/or its Officers.

31.    **"Metadata"** means any data that provides information about other data, and includes, but is not limited to:

(a)    System Metadata: Information automatically recorded by a computer system or software when data is created, modified, accessed, transmitted, or deleted. Examples include:

(i)    File creation and modification dates.

(ii)    File size.

19

      (iii)     File format or extension.

      (iv)     User or device ID responsible for the action.

      (v)     Network path or storage location.

(b)     Application Metadata: Data embedded within or associated with files or records that describe how, when, and by whom a piece of data was created or modified. This may include:

      (i)     Author name.

      (ii)     Version history.

      (iii)     Document properties (e.g., title, subject, tags).

      (iv)     Edit or access timestamps.

(c)     Web and Session Metadata: Information automatically collected during user interactions with digital platforms or applications, including:

      (i)     IP addresses.

      (ii)     Browser type and version.

      (iii)     Device identifiers.

      (iv)     Session duration and timestamps.

      (v)     Geolocation data.

      (vi)     Referring URLs or dApps.

(d)     Blockchain Metadata: Information surrounding cryptocurrency transactions or smart contract interactions that is not necessarily on-chain but is logged or recorded by intermediary platforms, such as:

      (i)     Transaction tags or internal notes.

      (ii)     Off-chain identifiers associated with a wallet or transaction.

      (iii)     User behavior data or risk scores.

      (iv)     Tags or labels applied to wallet addresses or assets.

Metadata shall include both visible and hidden data, and may be stored separately from or embedded within the underlying file or database record.

A-00028

32. **"Meteora"** means Meteora.ag, Meteora, Meteora DAO, any employees associated with Meteora and any other person/entity associated with the creation, maintenance, operation, governance or in any way involved with Meteora.ag, a decentralized platform offering dynamic liquidity pools, amongst other services.

33. **"MEV" or "Maximum Extractable Value"** means the maximum value that can be extracted from block production in excess of standard block rewards and gas fees through transaction ordering, insertion, or censorship, including sandwich attacks, arbitrage, and liquidations.

34. **"Mixer" or "Tumbler"** means any service, protocol, or technique designed to obfuscate the source, destination, or ownership of cryptocurrency transactions, including but not limited to Tornado Cash, CoinJoin implementations, or privacy-focused protocols.

35. **"Multisig" or "Multi-signature Wallet"** means any cryptocurrency wallet or smart contract requiring multiple cryptographic signatures to authorize transactions, including the identity of all signatories, threshold requirements, and governance structures.

36. **"Officers"** means any person holding an executive, managerial, or decision-making position within Kelsier or its Officers, Intermediaries and/or Associates, whether formally appointed or acting in such capacity, including but not limited to: chief executive Officers, chief financial Officers, chief technology Officers, presidents, vice presidents, managing members, general partners, directors, or any person exercising comparable authority or control over operations, finances, or strategic decisions. For purposes of this Subpoena, "Officers" specifically includes Hayden Davis, Gideon Davis, Emily Chynoweth Davis, and Charles Thomas ("Tom") Davis, regardless of their formal titles, as well as any person who had signatory authority over bank accounts, cryptocurrency

21

wallets, or smart contracts; participated in investment decisions regarding $LIBRA proceeds; or directed the activities of employees, contractors, or agents in connection with the $LIBRA token project.

37.   **"OTC" or "Over-the-Counter"** means any cryptocurrency transaction conducted directly between parties outside of public exchanges, including peer-to-peer trades, broker-facilitated deals, or private sales.

38.   **"Person"** or **"Persons"** mean natural persons, proprietorships, corporations, companies, partnerships, trusts, joint ventures, groups, associations, organizations, and all other forms of organization or entity, including governmental bodies and agencies and all of its directors, Officers, employees, representatives, or agents.

39.   **"Records"** means any and all written, typed, printed, recorded, graphic, photographic, digital, electronic, or machine-readable materials of any kind, whether stored on paper, film, tape, disk, server, cloud-based platform, database, or any other medium. For purposes of this request, "Records" includes, but is not limited to:

(a)     Emails, messages, chat logs, notifications, or other communications;

(b)     Files, documents, spreadsheets, presentations, notes, or memoranda;

(c)     Data logs, audit trails, metadata, or transaction histories;

(d)     User-generated content, system-generated data, or structured database entries;

(e)     Internal reports, analyses, charts, graphs, or dashboards;

(f)     Photographs, screenshots, recordings, or visual media; and

(g)     Any drafts, backups, archives, or deleted versions of the foregoing.

"Records" includes all versions, whether original, duplicate, altered, or redacted, and regardless of whether the information is held actively, archived, temporarily stored, or deleted but recoverable.

A-00030

40.    **"Relating"** or **"Related"** when used with respect to any subject, means and includes: analyzing, consisting, constituting, containing, compromising, commenting upon, connected with, concerning, contradicting, dealing with, describing, embodying, establishing, evidencing, identifying, listing, memorializing, pertaining to, purporting, referring to, relating to, regarding, recording, responding to, reflecting, representing, stating, substantiating, showing, supporting, or with respect to, whether in whole or in part of having any logical or factual connection whatsoever with that subject, regardless of whether the factual connection is favorable or adverse to You.

41.    **"Rug Pull"** means any exit scam or scheme where cryptocurrency developers or insiders abandon a project and abscond with investor funds, typically by draining liquidity pools, selling large token holdings, or exploiting smart contract backdoors.

42.    **"Smart Contract"** means any self-executing program deployed on a blockchain that automatically enforces agreement terms through code, including but not limited to token contracts, liquidity pools, governance contracts, or any other on-chain logic.

43.    **"Stablecoin"** means any cryptocurrency designed to maintain price stability relative to a reference asset (typically USD), whether through collateralization, algorithmic mechanisms, or other methods, including but not limited to USDC, USDT, DAI, or similar tokens.

44.    **"Token Launch"** means the initial deployment and public availability of a cryptocurrency token, including but not limited to:

(a)    Smart contract deployment;

(b)    Liquidity provision;

(c)    Public announcement;

(d)    First trading activity; and

23

(e)    Any pre-launch distributions.

45.    **"Viva La Libertad Initiative"** means the purported economic development project associated with the $LIBRA token that claimed to support Argentine economic growth and libertarian principles, including but not limited to: all representations that token proceeds would benefit the Argentine economy or its citizens; the allocation of 500 million $LIBRA tokens to the "Argentina Growth Wallet" (42rex5yRsP1mdAKHzB5avDzagT6mqB5uYPergUFZ2Tgn); any actual or proposed reinvestment schemes for Argentine businesses or entrepreneurs; marketing materials, whitepapers, or project documentation describing economic benefits to Argentina; the website VivalaLibertadProject.com or VivalaLibertadProject.vip and any associated domains or social media accounts; communications linking the project to President Javier Milei's political philosophy or "La Libertad Avanza" movement; any governance structures, advisory boards, or oversight mechanisms claimed to ensure funds would benefit Argentina; representations made to investors about the project's legitimacy, government endorsement, or charitable purposes; and all technical infrastructure, smart contracts, or financial arrangements created to effectuate the purported initiative. This definition includes both the public-facing narrative of Argentine economic development and any internal discussions or documents revealing the actual intended use of funds.

46.    **"Wash Trading"** means the practice of simultaneously buying and selling the same financial instruments to create misleading market activity, including circular trades between controlled wallets or coordinated trading to inflate volume.

47.    **"You"** or **"Your"** means Kelsier Labs LLC, Kelsier Ventures LLC, and all of their past or present subsidiaries, affiliated entities, parent companies, successors, predecessors, joint ventures, fictitious business names (DBAs), and investment vehicles, whether

24

formally registered or informally operated. This includes any entity controlled by, managed by, or under common control with Hayden Davis, Gideon Davis, or Charles Thomas Davis, including any shell companies, trusts, special purpose vehicles (SPVs), or crypto wallets or protocols operated in the name of a Kelsier-affiliated entity or nominee. This term also encompasses all current and former officers, directors, managers, employees, contractors, consultants, agents, representatives, and any other personnel acting on behalf of or under the direction of any Kelsier entity, regardless of whether such persons were formally employed, independently contracted, or informally engaged to perform services related to the development, promotion, or management of the $LIBRA token or any associated activities.

A-00033

### Document Requests

**REQUEST NO. 1:**

All Documents and Communications concerning the creation, naming, development,

marketing, deployment, administration, or technical infrastructure of the $LIBRA token,

including but not limited to:

(a)  Smart contract source code, deployment records, and configuration parameters for token address Bo9jh3wsmcC2AjakLWzNmKJ3SgtZmXEcSaW7L2FAvUsU;

(b)  Whitepapers, litepapers, presentations, pitch decks, tokenomics models, and the "Viva La Libertad" project documentation, including all versions and drafts;

(c)  Business plans, financial projections, and internal strategy documents;

(d)  Materials, PR campaigns, and social media content strategies;

(e)  Communications with Meteora, Dynamic Labs, Solana developers, or Circle Internet Financial regarding token architecture, liquidity pools, or USDC transactions;

(f)  Documents reflecting the single-sided liquidity pool structure and its intended operation; and

(g)  Pre-launch token transfers to insider wallets occurring before President Milei's tweet.

**REQUEST NO. 2:**

All Documents sufficient to show the distribution, allocation, and wallet-level

deployment of $LIBRA tokens at launch, including but not limited to:

(a)  Token distribution schedules and allocation spreadsheets;

(b)  Smart contract deployment records and initialization parameters;

(c)  Wallet creation records for all addresses receiving initial token allocations;

(d)  Documentation of the approximated 500,000,000 $LIBRA tokens allocated to the "Argentina Growth Wallet" (42rex5yRsP1mdAKHzB5avDzagT6mqB5uYPergUFZ2Tgn);

A-00034

(e)      Documentation of the approximated 200,000 $LIBRA tokens allocated to the "Treasury Wallet" (Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT);

(f)      Private key custody arrangements and multisig configurations;

(g)      Internal tracking databases or spreadsheets mapping wallet ownership and control; and

(h)      All such Documents maintained by or accessible to Kelsier and/or its Officers, Intermediaries, and/or Associates;

## REQUEST NO. 3:

All Documents sufficient to identify every cryptocurrency Wallet Address that Kelsier, its Officers, or its Associates have owned, controlled, accessed, beneficially held, or used during the Relevant Period, AND all Documents reflecting the flow, conversion, custody, current location, and status of assets through such wallets, including but not limited to:

(a)      Wallet creation records, private keys, seed phrases, recovery phrases, and hardware wallet identifiers;

(b)      Complete transaction histories with transaction hashes (not truncated, and inclusive of the associated attribution data associated with each address), timestamps, and block confirmations for all $LIBRA-related transfers;

(c)      Liquidity pool entry and exit records from Meteora pool BzzMNvfm7T6zSGFeLXzERmRxfKaNLdo4fSzvsisxcSzz;

(d)      Cross-chain bridge transactions and fiat conversion records;

(e)      The Wallets in Your Possession, Custody, and Control held at Circle Internet Group;

(f)      Current holdings and balances across all wallets, exchanges, and platforms;

(g)      Multi-signature configurations and signing authorities;

(h)      Blockchain transaction logs showing incoming investments with investor wallet addresses and amounts;

(i)      MEV extraction strategies and bot configurations;

(j)      Any transfers to the United Arab Emirates, the United Kingdom, and/or other offshore jurisdictions;

A-00035

(k)     Communications regarding the provenance, status, and intended disposition of all proceeds;

(l)     Communications regarding any attempts to move, conceal, or restructure these assets after notice of legal proceedings; and

(m)     All banking and financial records showing the flow of $LIBRA proceeds into traditional financial systems, including:

     (i)     Bank accounts receiving fiat conversions with all account statements;

     (ii)     Wire transfer records, SWIFT confirmations, and transaction details;

     (iii)     Use of fiat on/off ramp services (Moonpay, Sardine, Transak, Stripe, Wyre, Plaid);

     (iv)     Cryptocurrency exchange account statements and trading histories;

     (v)     Records of large cash transactions or structured deposits;

     (vi)     Safe deposit box rental agreements and access logs;

     (vii)     Any comingling of $LIBRA proceeds with other funds;

     (viii)     Compliance records including AML, KYC, sanctions screening, and risk scoring.

## REQUEST NO. 4:

All Documents and Communications with or concerning the following persons (legal or natural) and their representatives:

(a)     Meteora and Benjamin Chow, including liquidity pool configurations and privileged access;

(b)     KIP Protocol and Julian Peh, including all agreements and correspondence;

(c)     Dave Portnoy and/or his company, Barstool Sports;

(d)     Circle Internet Financial, including account records and USDC transactions;

(e)     Cube Exchange, Binance, Bitget, FixedFloat, and any other exchanges that processed or facilitated the exchange and/or transfer of $LIBRA and/or its proceeds, whether at Your direction or not;

(f)     Moonpay, Sardine, Transak, or other fiat on/off ramp providers and any other providers that processed or facilitated the exchange and/or transfer of $LIBRA and/or its proceeds, whether at Your direction or not; and

(g)    Any other person (legal or natural) involved in $LIBRA token deployment or trading.

**REQUEST NO. 5:**

All Documents and Communications with or concerning Argentine Persons, Government

Officials, or any person acting on their behalf, including but not limited to:

(a)    President Javier Milei, Karina Milei, Santiago Caputo, Mauricio Novelli, Manuel Terrones Godoy, and their staff or representatives;

(b)    All meetings, including the January 30, 2025 meeting at Casa Rosada and Tech Forum events;

(c)    Any payments, gifts, tips, gratuities, bribes, wire transfers, cryptocurrency transactions, or transfers of value provided;

(d)    All communications preceding, succeeding, or otherwise associated with December 11, 2024 WhatsApp message referencing payments to General Secretary Karina Milei;

(e)    Travel expenses, hospitality, entertainment, or consulting agreements;

(f)    Communications regarding the Viva La Libertad Project or political messaging;

(g)    Safe deposit box arrangements at Banco Galicia;

(h)    The alleged $4.5 million transfer for POPE memecoin purchases;

(i)    Records of Wire transfers, cryptocurrency transactions, or cash payments;

(j)    Consulting agreements or service contracts;

(k)    Gifts, donations, or charitable contributions; and

(l)    Due diligence on recipients or beneficial owners;

(m)    Any quid pro quo arrangements or understandings; and

(n)    A complete list of all Argentine persons with whom Kelsier or its Officers, Intermediaries and/or Associates communicated regarding $LIBRA.

**REQUEST NO. 6:**

All Documents concerning President Milei's February 14, 2025 tweet promoting

$LIBRA, including but not limited to:

A-00037

(a)     Planning communications and coordination with Milei's team;

(b)     Draft versions of the tweet and suggested language;

(c)     Timing discussions to maximize market impact;

(d)     Blockchain evidence of insider token distributions before the tweet;

(e)     Market manipulation strategies leveraging the endorsement;

(f)     Communications regarding the tweet's deletion;

(g)     Damage control strategies and public relations responses;

(h)     Any compensation, benefits, or agreements provided in connection with the tweet; and

(i)     Analysis of the tweet's impact on token price and investor behavior.

**REQUEST NO. 7:**

All Documents concerning any meeting between Hayden Davis and President Milei,

including but not limited to:

(a)     Travel itineraries and expense records;

(b)     Meeting agendas, notes, and summaries;

(c)     Pre-meeting briefing materials and strategy documents;

(d)     Cash movements or asset transfers surrounding the meeting date;

(e)     Communications with Intermediaries or Associates and/or any Argentine Persons who arranged the meeting;

(f)     Post-meeting notes, minutes, follow-up and action items;

(g)     Any agreements or understandings reached during or after the meeting; and

(h)     Allocation proposals for remaining assets.

**REQUEST NO. 8:**

All Documents concerning Julian Peh and KIP Protocol, including but not limited to:

(a)     All Communications between Kelsier, the Officers, and Peh;

(b)     KIP Protocol's involvement in the $LIBRA project and all agreements;

(c)     Peh's proposed role in overseeing Argentine fund distributions;

(d)     Representations made to third parties about Peh's authority;

(e)     Any agreements regarding custody or management of funds;

(f)     Post-launch communications about the project, including about the project's failure; and

(g)     Legal strategies and any indemnification or cooperation agreements.

**REQUEST NO. 9:**

All Communications with Investors, Influencers, and media figures, including but not limited to:

(a)     Dave Portnoy, including refund arrangements and selection criteria;

(b)     Coffeezilla (Stephen Findeisen) and interview preparations;

(c)     Tech Forum participants and/or other crypto influencers;

(d)     Major token purchasers and their investment amounts;

(e)     Representations about government backing or support;

(f)     Promises regarding token value or investment returns; and

(g)     A complete list of all persons You or the Officers encouraged or solicited to purchase $LIBRA tokens.

**REQUEST NO. 10:**

All Documents reflecting investor funds received in connection with $LIBRA and compliance obligations associated with the $LIBRA, including but not limited to:

(a)     Blockchain transaction logs showing incoming investments with investor wallet addresses and amounts;

(b)     Records of USDC, USDT, SOL, or other digital asset transfers received;

(c)     KYC/AML documentation collected or deliberately avoided;

(d)     Anti-Money Laundering procedures and Suspicious Activity Reports;

(e)     IP logs, device fingerprints, and geolocation data for investors;

(f)     Internal tracking, categorization, or risk scoring of investor funds and sources;

(g)     Total amounts raised from each investor and aggregate totals;

(h)     Cross-chain transfers using bridging protocols to obscure origins;

(i)     Communications regarding compliance obligations and regulatory matters; and

(j)     Any communication regarding efforts to circumvent, minimize compliance with, or avoid regulatory requirements.

**REQUEST NO. 11:**

All Documents concerning refund or restitution efforts, including but not limited to:

(a)     Criteria for determining refund eligibility;

(b)     List of investors who received refunds and amounts;

(c)     Segregated wallet addresses for restitution funds;

(d)     Communications with investors about refund processes;

(e)     Any statements about assets reserved or otherwise set aside for refunds; and

(f)     Any escrow or trust arrangements for investor funds.

**REQUEST NO. 12:**

All Documents and Communications concerning frozen or restricted assets, including but

not limited to:

(a)     Wallet Addresses frozen and/or potentially affected by the Circle Freeze or Judge Rochon's Freeze Order dated May 28, 2025;

(b)     Communications with Circle regarding the freeze;

(c)     Proposals to substitute collateral or restructure custody;

(d)     Any attempts to move assets as a result of pending, anticipated, or potential legal proceedings;

(e)     Calculations of total investor losses and estimates of criminal fines and civil damages in any and all applicable jurisdictions;

(f)     Fund recovery plans and feasibility assessments;

(g)     Allocation proposals for remaining assets;

A-00040

(h)     Insurance policies or indemnification agreements; and

(i)     Asset protection strategies and offshore structures.

## REQUEST NO. 13:

All analyses and communications regarding liability and investor losses, including but

not limited to:

(a)     Calculations of total investor losses ($251 million);

(b)     Estimates of criminal fines and civil damages in any and all applicable jurisdictions;

(c)     Fund recovery plans and feasibility assessments;

(d)     Allocation proposals for remaining assets;

(e)     Insurance policies or indemnification agreements; and

(f)     Asset protection strategies and offshore structures.

## REQUEST NO. 14:

All Documents concerning the technical infrastructure, creation, deployment, and

administration of the $LIBRA token, including but not limited to:

(a)     Smart contract source code, deployment records, and configuration parameters for token addresses Bo9jh3wsmcC2AjakLWzNmKJ3SgtZmXEcSaW7L2FAvUsU and Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT and/or the Wallets of Interest listed in Appendix A;

(b)     VivalaLibertadProject.com and .vip domain registration, hosting, and website analytics;

(c)     Solana RPC node access, validator relationships, and blockchain technical records;

(d)     API integrations with exchanges or liquidity platforms;

(e)     Bot configurations for market making or price manipulation;

(f)     Backend code repositories, development logs, and content management systems;

(g)     Communications with Meteora, Dynamic Labs, Solana developers, or Circle regarding infrastructure; and

(h)      Pre-launch token transfers to insider wallets.

## REQUEST NO. 15:

All Documents concerning other tokens launched by Kelsier or its Officers and/or

Associates and/or Intermediaries, including but not limited to:

(a)      token and connections to $LIBRA infrastructure;

(b)      $MELANIA, $TRUST, $KACY, $VIBES, $HOOD, $BRYAN and $WOLF
tokens or any other token controlled by Kelsier or its Officers, Intermediaries
and/or Associates that transferred assets to or from $LIBRA Wallets under
Kelsier's or its Officers', Intermediaries', and/or Associates' control;

(c)      Shared wallet addresses across multiple tokens;

(d)      Cross-promotion strategies and investor lists;

(e)      Profit distributions from other token launches;

(f)      Technical similarities in smart contract design; and

(g)      Communications acknowledging pattern of fraudulent launches.

## REQUEST NO. 16:

All banking and financial records showing the flow of $LIBRA proceeds into traditional

financial systems, including but not limited to:

(a)      Bank accounts receiving fiat conversions from cryptocurrency with all account
statements;

(b)      Wire transfer records, SWIFT confirmations, and transaction details;

(c)      Credit card, debit card, or payment processor transactions;

(d)      Use of fiat on/off ramp services (Moonpay, Sardine, Transak, Stripe, Wyre, Plaid,
etc.);

(e)      Cryptocurrency exchange account statements and trading histories;

(f)      Records of large cash transactions or structured deposits;

(g)      Safe deposit box rental agreements and access logs;

(h)      Documentation of funds held in Dubai, UAE, or other jurisdictions;

34

(i)        Any comingling of $LIBRA proceeds with other funds; and

(j)        Compliance records including AML, KYC, sanctions screening, and risk scoring.

## REQUEST NO. 17:

All blockchain technical records and logs, including but not limited to:

(a)        Solana RPC node access and validator relationships;

(b)        Smart contract deployment transactions and gas fees;

(c)        MEV extraction strategies and bot configurations;

(d)        Cross-chain bridge usage (Wormhole, CCTP, etc.);

(e)        Failed transactions or reverted operations;

(f)        Program instruction records and slot numbers; and

(g)        Any blockchain forensics or analytics performed internally.

## REQUEST NO. 18:

All internal categorization and tracking systems, including but not limited to:

(a)        Wallet labeling and ownership mapping;

(b)        Risk classifications for transactions or counterparties;

(c)        Behavioral scoring of wallet addresses;

(d)        Sanctions screening results and alerts;

(e)        Custom metadata applied to blockchain data;

(f)        Internal databases tracking fund flows; and

(g)        Fraud detection flags or suspicious activity markers.

## REQUEST NO. 19:

All data retention and deletion activities, including but not limited to:

(a)        Document retention policies and procedures;

(b)        Deletion of emails, messages, or files;

(c)        Wallet purging or private key destruction;

A-00043

(d)    Social media post deletions (Twitter, Telegram, etc.);

(e)    Website content removal or modifications;

(f)    Device wiping or factory resets; and

(g)    Any spoliation of evidence after notice of legal proceedings.

## REQUEST NO. 20:

All access logs and authentication records, including but not limited to:

(a)    IP addresses used to access wallets or platforms;

(b)    VPN usage and anonymization attempts;

(c)    Session tokens and API keys;

(d)    Two-factor authentication records;

(e)    Login timestamps and geolocation data;

(f)    Failed authentication attempts; and

(g)    Device identifiers for each access event.

## REQUEST NO. 21:

All device identification records, including but not limited to:

(a)    Mobile devices used for wallet access (IMEI, phone numbers);

(b)    Computer hardware identifiers (MAC addresses);

(c)    Browser fingerprints and user agents;

(d)    Mobile app installations and SDK data;

(e)    Hardware wallet device serial numbers;

(f)    Any devices used to access $LIBRA-related accounts; and

(g)    Device synchronization and backup records.

## REQUEST NO. 22:

Records of all travel related to the development or promotion of $LIBRA, including:

36

(a)     A complete list of persons solicited, consulted with, and/or otherwise at all affiliated with the sale and promotion of $LIBRA;

(b)     Relevant dates, locations, and meetings, and attendees for each meeting;

(c)     Evidence of all travel; and

(d)     Associated documents and communications.

## REQUEST NO. 23:

All Documents relating to the "Argentina Growth Wallet"

(42rex5yRsP1mdAKHzB5avDzag16mqB5uYPergUFZ2Tgn), including but not limited to:

(a)     Documents explaining the allocation of 500 million LIBRA tokens to this wallet;

(b)     Agreements, understandings, or internal analysis regarding the use, control, and beneficiaries of these tokens;

(c)     Communications about "strengthening the Argentine economy from the ground up";

(d)     Actual or proposed reinvestment plans for Argentine businesses;

(e)     Internal discussions comparing stated versus actual intended uses;

(f)     Control mechanisms, signing authorities, and governance structure;

(g)     Communications with Julian Peh regarding oversight or management;

(h)     Current balance, transaction history, and any disbursements made;

(i)     Any plans to redirect funds to Milei, any persons designated by Milei or persons acting on his behalf, Argentine Persons', Kelsier's or the Officers' interests; and

(j)     Communications or analysis regarding carve-outs from asset freeze orders.

## REQUEST NO. 24:

All Documents relating to the "Treasury Wallet"

(Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT), including but not limited to:

(a)     Documents explaining the allocation of 200,000 $LIBRA tokens to this wallet;

(b)     Agreements, understandings, or internal analysis regarding the use, control, and beneficiaries of these tokens;

A-00045

(c)     Communications about the *Viva La Libertad* initiative;

(d)     Actual or proposed reinvestment plans for Argentine businesses;

(e)     Internal discussions comparing stated versus actual intended uses;

(f)     Control mechanisms, signing authorities, and governance structure;

(g)     Communications with Julian Peh regarding oversight or management;

(h)     Current balance, transaction history, and any disbursements made;

(i)     Any plans to redirect funds to Milei, any persons designated by Milei or persons acting on his behalf, Argentine Persons', Kelsier's or the Officers' interests; and

(j)     Communications or analysis regarding carve-outs from asset freeze orders.

**REQUEST NO. 25:**

All Documents and Communications relating to the Wallets of Interest listed in Appendix

A including but not limited to:

(a)     Communications, Agreements, understandings, or internal analysis regarding the use, control, and beneficiaries of these tokens;

(b)     Actual or proposed reinvestment plans for Argentine businesses;

(c)     Control mechanisms, signing authorities, and governance structure;

(d)     Current balance, transaction history, and any disbursements made;

(e)     Any plans to redirect funds to Milei, any persons designated by Milei or persons acting on his behalf, Argentine Persons', Kelsier's or the Officers' interests; and

(f)     Communications or analysis regarding carve-outs from asset freeze orders.

**REQUEST NO. 26:**

All Documents and Communications concerning coordination with technology partners

and service providers, including but not limited to:

(a)     Meteora and Benjamin Chow regarding liquidity pool configurations;

(b)     Dynamic Labs regarding wallet infrastructure and authentication;

(c)     Cube Exchange and Bartosz Lipinski;

(d)    KIP Protocol and Julian Peh regarding project oversight;

(e)    Circle Internet Group regarding USDC transactions and account freezes;

(f)    Cloudflare, GoDaddy, and Namecheap regarding website hosting and domain services for VivalaLibertad.com, VivalaLibertad.vip, and/or Kelsier.io;

(g)    Blockchain validators, RPC providers, or node operators;

(h)    Smart contract auditors or security consultants; and

(i)    Any agreements for preferential treatment or non-standard configurations.

## REQUEST NO. 27:

All Documents and Communications relating to assets purchased or investments made with $LIBRA proceeds, including but not limited to:

(a)    Real estate transactions or property purchases;

(b)    Vehicle purchases or luxury goods acquisitions;

(c)    Investment accounts or business ventures funded with proceeds;

(d)    Cryptocurrency investments or DeFi positions;

(e)    Transfers to family trusts or asset protection structures;

(f)    Precious metals, art, or collectibles purchases;

(g)    Prepaid cards, gift cards, or stored value instruments; and

(h)    Any attempts to convert proceeds into non-traceable assets.

## REQUEST NO. 28:

All Documents relating to the technical infrastructure used for the $LIBRA launch, including but not limited to:

(a)    Smart contract deployment transactions and configuration parameters;

(b)    VivalaLibertadProject.com or .vip domain registration and hosting arrangements;

(c)    Server logs, access records, and visitor analytics;

(d)    API integrations with exchanges or liquidity platforms;

A-00047

(e)    Bot configurations for market making or price manipulation;

(f)    Security measures to prevent unauthorized access or trading;

(g)    Backend code repositories and development environments; and

(h)    Any technical advantages provided to insiders or preferred traders.

**REQUEST NO. 29:**

All Documents sufficient to identify the financial impact of the $LIBRA scheme,

including but not limited to:

(a)    Total amount raised from all investors;

(b)    Investor losses calculated at various price points;

(c)    Amounts retained by You or Your Associates and/or Intermediaries;

(d)    Profits extracted through early trading or insider advantages;

(e)    Fees, commissions, or revenue sharing arrangements;

(f)    Cost basis and profit calculations for tax purposes;

(g)    Distribution of proceeds among Kelsier principals; and

(h)    Any economic analysis of the scheme's impact.

**REQUEST NO. 30:**

All Documents concerning any planned or actual donation, reinvestment, or transfer of

$LIBRA proceeds to Argentine entities, including but not limited to:

(a)    Use of privacy coins, mixing services, or tornado protocols;

(b)    Creation of shell companies, nominee accounts, or layered structures;

(c)    Cross-chain transfers to obscure origins;

(d)    OTC desk transactions or peer-to-peer trades avoiding KYC;

(e)    Proposed uses of proceeds raised by the Viva La Libertad Initiative;

(f)    Actual or planned transfers to Argentine businesses or entities;

(g)    Charitable contributions or economic development programs;

40

    (h)      Government-endorsed investment schemes;

    (i)       Communications with Argentine officials about fund deployment;

    (j)       Analysis of whether transfers would satisfy legal obligations; and

    (k)      Any sophisticated money laundering techniques identified by blockchain forensics.

## REQUEST NO. 31:

All records of transactions or interactions with Meteora or similar platforms, including but not limited to:

    (a)      Liquidity pool creation and configuration settings;

    (b)      Trading bot deployments and algorithmic strategies;

    (c)      Smart contract interaction logs and approvals;

    (d)      Privileged access or non-standard arrangements;

    (e)      Fee structures and revenue sharing agreements;

    (f)       Communications with platform operators or developers;

    (g)      Any exploits, manipulations, or unfair advantages utilized; and

    (h)      Post-collapse attempts to recover or redirect funds.

A-00049

## DEPOSITION TOPICS

Pursuant to Fed. R. Civ. P. 30(b)(6), Kelsier Labs LLC must designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, to testify about the matters described below. The persons so designated must testify about information known or reasonably available to the organization." You shall designate one or more persons to testify on Your behalf regarding:

**TOPIC NO. 1:**

The ownership, control, and current location of all cryptocurrency wallets containing $LIBRA proceeds.

**TOPIC NO. 2:**

The creation and deployment of the $LIBRA token smart contract.

**TOPIC NO. 3:**

All communications and meetings with Argentine government officials or persons designated by such officials.

**TOPIC NO. 4:**

The purpose and control of the "Argentina Growth Wallet."

**TOPIC NO. 5:**

Financial arrangements or payments to Argentine Persons.

**TOPIC NO. 6:**

The relationship between $LIBRA and other token schemes.

**TOPIC NO. 7:**

Efforts to conceal or transfer $LIBRA proceeds.

**TOPIC NO. 8:**

Current location and form of the $LIBRA proceeds.

42

A-00050

**TOPIC NO. 9:**

Technical infrastructure used for the token launch.

**TOPIC NO. 10:**

Investor representations and token marketing.

**TOPIC NO. 11:**

Compliance with AML/KYC regulations.

**TOPIC NO. 12:**

The December 11, 2024 WhatsApp message regarding payments to General Secretary of

the Argentine Presidency Karina Milei.

**TOPIC NO. 13:**

Plans for the disposition of frozen and unfrozen proceeds.

**TOPIC NO. 14:**

Corporate structure and beneficial ownership of Kelsier entities.

**TOPIC NO. 15:**

Coordination with other parties involved in the scheme.

A-00051

# APPENDIX A

## WALLETS OF INTEREST

| Addresses |
|---|
| jwudCiJ5QUUmfxPXN41jaqYKnSc3UmKo5RoRGkZzomN |
| BXoCWWijZiVQFXNRqcZAiHQroYkaUnjkRznnZrt9gj42 |
| 8NScYncjpY1 mKrbxV JFFdVqNPEocyXTnQqy9GW1 hg4j3 |
| 5fnahDWBtUB8QBTXWH m2QzfAoAVHToxvMf38i3a 7 okGe |
| P5tb4T6SBVQaM3BAoGfpVudLtTdecqjsh4KV9ESAhKg |
| DefcyKc4yAjRsCLZjdxWuSUzVohXtLna9g22y3pBCm2z |
| 0xcEAeFb5BEC983Fd10e324d7e6F5457507BA006e2 |
| EFrg9SXbnCfuVqJPJf2hKKY3CITPLHvipEpgrHjBkb4L |
| 5Wsjee6FgZQtxjUBedfNq9ZbV6RN7wgb4N422LyV3ZEr |
| FdWhTThthSN7mbcmBgh 18dzogi1 dXqQqBb6BnnzZEJJn |
| Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT |
| 3apupKwTisjy4Wx1zVndXVegmxtR9majPEgHatBRZ1 LF |
| 61yKS9bjxWdqNgAHt439DfoNfwK3uKPAJGWAsFkC5M4C |
| B9KTwxhc9e6qrjw5nfmhgcN38oKFTBtnef8AwaTPVQ6q |
| FTjLYkNARZHnqekpKj5mHzbJx7EqW1fSr15Ec4oijBUQ |
| CpxV2iKkA8DT8d2dWMLanF6PAJVvTp1qJXEN5QmqsRPS |
| 42rex5yRsP1mdAKHzB5avDzagT6mqB5uYPergUFZ2Tgn |
| 4za6Cf |
| 0y9tS9 |
| 41sz23 |
| 662aG3 |
| F6GpYe |
| 9wk1Vr |
| 0x3516 (Arbitrum) |
| qW6gMV |
| 61aUyPe |
| 6MsuHd |

A-00052