# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| In re Application of: | § | |
| | § | |
| | § | |
| PALLADIAN PARTNERS, L.P., HBK | § | |
| MASTER FUND L.P., HIRSH GROUP LLC, | § | No. 3:25-mc-00058-S-BT |
| and VIRTUAL EMERALD | § | |
| INTERNATIONAL LIMITED, | § | |
| | § | |
| Petitioners, | § | |
| | § | |
| FOR AN ORDER TO TAKE DISCOVERY | § | |
| FOR USE IN FOREIGN PROCEEDINGS | § | |
| PURSUANT TO 28 U.S.C. § 1782 | § | |

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' AMENDED APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................1

I.     THE PARTIES..........................................................................................................3

II.    FACTUAL BACKGROUND .....................................................................................5

     A.    Petitioners' Obtain a €1.5 Billion Judgment Following Argentina's
           Default on the Warrants ...................................................................................5

     B.    The Foreign Proceedings .................................................................................7

     C.    The Davis Respondents Control the $LIBRA Proceeds Reasonably
           Believed to Belong to Argentina......................................................................7

           1.    Hayden Davis Describes Himself as Argentina's "Facilitator" and
                  Custodies $LIBRA Funds ........................................................................8

           2.    Formal Government Agreements Established Exclusive
                  Partnerships...........................................................................................10

           3.    Secretary General Karina Milei Controlled All Government
                  Negotiations and Access ........................................................................12

           4.    Argentine Authorities Pursue Criminal Investigations Treating
                  Proceeds as State Assets .......................................................................13

III.   THE REQUESTED DISCOVERY............................................................................14

IV.   ARGUMENT ...........................................................................................................15

     A.    Petitioners Satisfy The Statutory Requirements Of 28 U.S.C. § 1782 .................16

           1.    Respondents Are "Found" In The Northern District of Texas .................17

           2.    The Discovery Sought Is "For Use" In Foreign Proceedings...................18

           3.    Petitioners Are Interested Persons ..........................................................21

     B.    All Discretionary *Intel* Factors Favor Permitting The Discovery Petitioners
           Seek................................................................................................................22

            1.    The First *Intel* Factor Favors Granting Discovery ...................................22

           2.    The Second *Intel* Factor Favors Granting Discovery ..............................22

           3.    The Third *Intel* Factor Favors Granting Discovery ..................................23

           4.    The Fourth *Intel* Factor Favors Granting Discovery................................24

V.    CONCLUSION........................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Application of Eurasian Bank Joint Stock Co.*,
2015 WL 6438256 (N.D. Tex. Oct. 21, 2015) ........................................................................21

*In re Ex Parte Application of Glob. Energy Horizons Corp.*,
2015 WL 1325758 (N.D. Cal. Mar. 24, 2015) ........................................................................19

*In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*,
195 F. Supp. 3d 899 (S.D. Tex. 2016) ....................................................................................16

*In re Application of Shervin Pishevar*,
439 F. Supp. 3d 290 (S.D.N.Y. 2020)......................................................................................23

*In re the Application of Sauren Fonds-Select SICAV v. For Discovery Pursuant to
28 U.S.C. § 1782*,
2016 WL 6304438 (D.N.J. Oct. 26, 2016)...............................................................................20

*In re Application of Temp. Servs. Ins. Ltd.*,
2009 WL 2843258 (W.D.N.Y. Aug. 28, 2009) ......................................................................19

*In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*,
121 F.3d 77 (2d Cir. 1997).......................................................................................................24

*Banco Mercantil de Norte, S.A. v. Paramo*,
2024 WL 4905981 (S.D. Tex. Nov. 27, 2024) .......................................................................16

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012).......................................................................................................20

*Bravo Express Corp. v. Total Petrochemicals & Refin. USA, Inc.*,
613 F. App'x 319 (5th Cir. 2015) ............................................................................................15

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015).....................................................................................................21

*Chevron Corp. v. 3TM Consulting, LLC*,
No. 4:10-MC-134, 2010 WL 8814519 (S.D. Tex. Apr. 5, 2010) ...........................................21

*In re Clerici*,
481 F.3d 1324 (11th Cir. 2007) ...............................................................................................19

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
779 F.3d 258 (5th Cir. 2015) ...................................................................................................17

*In re del Valle Ruiz,*
    939 F.3d 520 (2d Cir. 2019)...............................................................17

*Ecuadorian Plaintiffs v. Chevron Corp.,*
    619 F.3d 373 (5th Cir. 2010) ...........................................................23

*In re Godfrey,*
    2009 WL 10670524 (N.D. Tex. Mar. 24, 2009) ...........................16, 18

*Grupo Mexico SAB de CV,*
    2014 WL 12691097 (N.D. Tex. Oct. 17, 2014)...............................23

*In re IKB Deutsche Industriebank AG,*
    2010 WL 1526070 (N.D. Ill. Apr. 8, 2010) ....................................25

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004).................................................................. passim

*John Deere Ltd. v. Sperry Corp.,*
    754 F.2d 132 (3d Cir. 1985)..............................................................17

*In re Kim,*
    2024 WL 3430583 (N.D. Tex. June 26, 2024) ...............................18

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus,*
    62 F.Supp.3d 358 (S.D.N.Y. 2014) .............................................19, 23

*LEG Q LLC v. RSR Corp.,*
    2017 WL 3780213 (N.D. Tex. Aug. 31, 2017)..................................24

*In re Letter of Request from Crown Prosecution Serv. of U.K.,*
    870 F.2d 686 (D.C. Cir. 1989) ..........................................................19

*Linsen Int'l Ltd. v. Humpuss Sea Transp. PTE LTD,*
    2011 WL 1795813 (S.D.N.Y. Apr. 29, 2011)...............................19, 23

*Palladian Partners, L.P. et al v. The Republic of Argentina,*
    No. 25-cv-01954-CKK (June 23, 2025) .............................................5

*Pinchuk v. Chemstar Prod. LLC,*
    2014 WL 2990416 (D. Del. June 26, 2014).....................................25

*In re Request for Subpoena by Ryanair Ltd.,*
    2014 WL 5583852 (N.D. Cal. Oct. 31, 2014)..................................19

*Snyder v. Pitts,*
    150 Tex. 407 (1951)...........................................................................18

*Tex. Keystone, Inc. v. Prime Nat. Res., Inc.*,
   694 F.3d 548 (5th Cir. 2012) ........................................................................15, 16

*In re Veiga*,
   746 F. Supp. 2d 8 (D.D.C. 2010) ..............................................................................24

*In re Xiaomi Tech. Germany GmbH*,
   2022 WL 4009046 (W.D. Tex. Sept. 2, 2022).........................................................17

## Statutes

28 U.S.C. § 1782............................................................................................... *passim*

28 U.S.C. § 1782(a) ...........................................................................18, 19, 20, 23

Texas Tax Code Section 171.309 ...............................................................................4

## Other Authorities

Judicial Assistance to Foreign Tribunals, 14B Fed. Prac. & Proc. Juris. § 3692
   § 3692 (5th ed.)........................................................................................................17

## <u>DISCLOSURE OF USE OF ARTIFICAL INTELLIGENCE</u>

Pursuant to LR 7.2(f), counsel discloses that generative artificial intelligence tools were used in preparing this brief for the following limited purposes: (1) factual investigation and research; and (2) refinement of draft language, although every word of the final version of this document was reviewed, edited and approved by counsel. Counsel also availed itself of the artificial intelligence tools embedded within the standard commercial legal research databses, including Westlaw and Lexis. All citations and legal authorities have been independently verified by counsel.

Petitioners Palladian Partners, L.P., HBK Master Fund L.P., Hirsh Group LLC, and Virtual Emerald International Limited (collectively, "Petitioners") respectfully submit this Memorandum of Law in support of their Amended Application and Petition pursuant to 28 U.S.C. § 1782 (the "Amended Application"), for an order authorizing them to obtain discovery from Hayden Davis, Gideon Davis, Charles ("Tom") Davis, and their company, Kelsier Labs LLC (d/b/a Kelsier Ventures and hereafter, "Kelsier" or "Kelsier Labs") (collectively, the "Davis Respondents") in the form of the attached subpoenas for documents and testimony (the "Subpoenas").[1]

## PRELIMINARY STATEMENT

Petitioners bring this Application for the purpose of obtaining targeted and necessary discovery to aid in proceedings in High Court of Justice, King's Bench Division, Commercial Court, in London, England (the "High Court") to enforce and collect on the €1,543,508,749.15 judgment awarded against the Republic of Argentina ("Argentina" or the "Republic") on June 9, 2023 (the "Judgment"). As set forth in the November 3, 2025 Declaration of Petitioners' English Counsel Aidan Alexander O'Rourke, on July 29, 2025, Petitioners filed the first of several third-party debt orders against the Republic (the "Foreign Proceedings")[2] seeking information regarding Argentine assets held by a swath of financial institutions within the High Court's jurisdiction. To aid in further anticipated actions within the same adjudicative proceeding, Petitioners have refined

---

[1]  The Subpoenas seek documents and associated testimony from each of the Respondents.  *See* Declaration of David M. Orta, dated November 3, 2025 ("Orta Decl."), Exs. 1–4.

[2]  The Declaration of Aidan O'Rourke, dated November 3, 2025 ("O'Rourke Decl.")  sets forth the procedural history and current status of Petitioners' €1.5 billion judgment against Argentina, identifies the critical enforcement-related information in Respondents' possession, and confirms the admissibility of Section 1782 discovery in English proceedings.

the First Application to a targeted inquiry into the custodial relationship between assets within the Respondents' control and the Argentine Republic.

Petitioners seek discovery concerning the creation, promotion, and financial disposition of the $LIBRA token ("$LIBRA")—the digital asset developed by the Davis family through Respondent Kelsier Labs LLC with assistance from Argentine President Javier Milei, who promoted the memecoin as a transformative initiative for Argentina's economy dubbed the *Viva La Libertad! Project* ("*Viva La Libertad!*" or "VLL"). President Milei advertised $LIBRA as part of a plan to revolutionize underbanked sectors of the Argentinian economy by providing them access to the global financial network via the blockchain. However, his dream quickly curdled into a nightmare: $LIBRA collapsed within hours of launch, resulting in approximately $250 million in investor losses while the Davis Respondents extracted over $100 million in proceeds which they claim to "custody" for the "government, or at least the country of Argentina." Petitioners seek discovery to determine whether the $LIBRA proceeds may partially satisfy the Judgment and, if so, to guide asset recovery efforts in the Foreign Proceedings.

This Amended Application satisfies all requirements of Section 1782. The Davis Respondents are found in the Northern District of Texas as individuals domiciled and/or conducting significant activity therein, including through Kelsier, a Texas LLC. The discovery sought—production of $LIBRA-related documents and communications, and related depositions—is critical to the Foreign Proceedings. Moreover, each discretionary factor set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), favors granting the requested discovery. Petitioners respectfully request that the Court grant their Application.

## I.    THE PARTIES

*Petitioners*.  Petitioners are beneficial owners of the GDP Warrants seeking to enforce the Judgment against Argentina in the High Court and beyond.  **Palladian Partners, L.P.** is a limited partnership organized under the laws of the Cayman Islands, located at c/o One Nexus Way, Camana Bay, Grand Cayman, Cayman Islands KY1-9005, Cayman Islands.  **HBK Master Fund L.P.** is a limited partnership organized under the laws of the Cayman Islands, located at P.O. Box 10008, Willow House, Cricket Square, George Town, KY1-1001, Cayman Islands.  **Hirsh Group LLC** is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York.  Hirsh's sole member is Kenneth Hirsh, an individual residing in New York.  **Virtual Emerald International Limited** is a company organized under the laws of the British Virgin Islands, located at Craigmuir Chambers, Road Town, Tortola, VG 110, British Virgin Islands.

*The Davis Family.*  **Hayden Davis** is a 29-year-old cryptocurrency promoter who serves as CEO of Kelsier Labs LLC.[3]  Hayden operates Kelsier Labs with his brother **Gideon Davis**— who serves as the Chief Operating Officer—and their father, **Tom Davis**—who serves as its Chairman.[4]  In Gideon's words, Hayden Davis is "the big visionary and he you know has big dreams and things he thinks can make happen and you know often makes them happen."  Tom, meanwhile, is "more on the investment side of what… we do."[5]  Tom Davis has a criminal history, having served time in prison for counterfeiting checks and identity fraud before becoming a

---

[3]  Katherine Long, *Hayden Davis: The 'Hustling Expert' Behind Argentina's $250 Million Crypto Scandal*, The Wall Street Journal (last updated Mar. 3, 2025), tinyto.me/Ycfi_3i.
[4]  *Id.*; *see also* ECF No. 6-5 (Gideon Davis Unscripted Arena Podcast Interview (Nov. 8, 2024)) at 29:51–30:29; 52:05–22.
[5]  ECF No. 5 at 29:51–30:29; 52:05–22.

Christian minister.[6]  Despite—or perhaps because of—this unconventional history, the Davis family styled themselves as crypto-evangelists capable of revolutionizing Argentina's economy through the *Viva La Libertad!* project and funded by $LIBRA trading. Hayden, Gideon, and Tom each reside within or are otherwise "found" in the Northern District of Texas.[7]

**Kelsier Labs.**  Kelsier Labs LLC is a Texas limited liability company[8] that was formally incorporated to execute cryptocurrency projects.[9]  In COO Gideon Davis's words, "… from my brother's skill set, my dad's skill set, and my skill set … [we] creat[ed] a marketing and consulting company which is Kelsier[,]" whose early successes—for the Davises, at least—included an "NFT project that did very[] well probably shockingly well.  It was the highest pre-sold NFT of any blockchain I think still in history."[10]  The company served as developers and lead promoters of the $LIBRA token scheme,[11] which was only the latest in a long line of pump-and-dump memecoin

---

[6]  Emily Nicolle, *Counterfeiting and cult murder: Family behind Milei memecoin has chequered past*, Buenos Aires Times (Feb. 26, 2025), tinyto.me/HkwI_mo.

[7]  *See* ECF No. 6-8 (Hayden M. Davis Driver's License – LexisNexis Public Records Reports); ECF No. 6-7 (Gideon B. Davis Driver's License – LexisNexis Public Records Reports); ECF No. 6-9 (Charles Thomas Davis Driver's License - LexisNexis Public Records Reports); ECF No. 6-10 (PageVault Capture of Kelsier.io "About Us" Page) (detailing the Davises role within the Kelsier Labs organization).

[8]  *See* ECF No. 11 (Texas Secretary of State Business Organizations Inquiry Report) (listing Gideon Davis as registered agent); ECF No. 12 (Texas Secretary of State Forfeiture Notice dated Feb. 21, 2025) (rescinding Kelsier's license to do business in Texas pursuant to Section 171.309 of the Texas Tax Code).

[9]  Orta Decl., Ex. 5 (certified translation of Hugo Alconada Mon, *Milei aparece ligado a otro negocio cripto con personajes en común al caso $LIBRA*, LA NACION (Feb. 25, 2025), tinyto.me/lGQD_GH,

[10]  ECF No. 6-5 (Gideon Davis Unscripted Arena Podcast Interview (Nov. 8, 2024) at 29:51–30:29; 30:33–45.

[11]  *The $LIBRA Affair: Tracking the Memecoin That Launched a Scandal in Argentina*, TRM LABS (Feb. 16, 2025), tinyurl.com/2r3n7tac (describing the rapid rise and fall of $LIBRA's market capitalization).

launches orchestrated by Kelsier, including the $TRUMP, $MELANIA, $WOLF (a collaboration with and homage to the "Wolf of Wall Street"), and *several* other memecoins.[12]

## II.    FACTUAL BACKGROUND

Petitioners hold an approximately €1.5 billion judgment against the Republic of Argentina arising from the Republic's sale and subsequent default on GDP-linked Warrants issued under a 2005 Indenture Agreement (as amended in 2010). The Judgment is final and enforceable in the United Kingdom, and Petitioners have commenced recognition proceedings in the United States.[13] As set forth in the O' Rourke Declaration, Petitioners require the requested discovery to aid in the development and execution of their asset recovery within the United Kingdom.

### A.    Petitioners' Obtain a €1.5 Billion Judgment Following Argentina's Default on the Warrants

The Petitioners' claims arise from Argentina's historic sovereign debt default and subsequent restructuring.  In December 2001, Argentina defaulted on its external debt, leading to a comprehensive restructuring of those obligations.  In 2005 and 2010, Argentina made exchange offers to its creditors, offering GDP-linked securities as consideration for participating in the restructuring.[14]  These securities represented a significant reduction from the face amount of the defaulted bonds—participating creditors received approximately 25% to 30% of the value of their original claims.[15]  However, the securities provided for additional contingent payments based on

---

[12]  *How Hayden Davis Rugged $LIBRA for $100M With President Milei*, Bubblemaps (Mar. 25, 2025), tinyto.me/USaY_tm (examining how wallets associated with Hayden Davis "sniped", crypto parlance for insider trading, the launches of the $TRUMP and $MELANIA memecoins, among others) .

[13]  *See Palladian Partners, L.P. et al v. The Republic of Argentina*, No. 25-cv-01954-CKK (June 23, 2025).

[14]  *See* ECF No. 7 ¶¶ 9-11 (describing the terms of sale of the Warrants).

[15]  *Id.*

the performance of the Argentine economy through 2034, effectively giving creditors a stake in Argentina's future economic growth.[16]

On December 15, 2014, Argentina failed to make payment under the Securities for the year 2013, contending that one of the contractual conditions for payment was not met as a result of the country's change in methodology for calculating its GDP.[17]  On August 9, 2019, Petitioners Palladian, HBK, and Hirsh commenced proceedings in the High Court of England and Wales by filing a Claim Form against Argentina and the Bank of New York Mellon as Trustee.[18]

The High Court awarded Petitioners a complete victory on their claims, and on June 9, 2023, entered judgment requiring Argentina to pay €1,329,760,063.39 (the 2013 Payment Amount) plus €233,220,560.34 in pre-judgment interest, as well as €64,311,645.07 to the Petitioners for costs consequences under England's Part 36 settlement rules, for a total judgment of €1,627,292,268.80 plus post-judgment interest at 2% above EURIBOR.[19]  The Judgment became final on October 14, 2024, when the UK Supreme Court refused Argentina's application for permission to appeal.[20]  As of September 30, 2025, the Judgment sums due and outstanding have accrued to €1,559,318,610.91 (approximately $1,794,307,925.57).

---

[16]  *Id.* ¶10.
[17]  *Id.* ¶11.
[18]  *Id.* ¶¶13-14. On December 11, 2019, the Petitioners filed an Amended Claim Form adding Virtual Emerald International Limited to the proceedings. *See id.* ¶15.
[19]  *Id.* ¶16.
[20]  O'Rourke Decl. ¶ 26.

**B.    The Foreign Proceedings**

Petitioners are pursuing enforcement of the Judgment against Argentina in the United Kingdom to recover the outstanding debt from the GDP Warrants.[21]  To that end, Petitioners seek this Court's assistance in identifying the provenance, custody, and location of assets that stem from the $LIBRA catastrophe, as these may be available for satisfaction of the Judgment via Petitioners' Foreign Proceedings.

**C.    The Davis Respondents Control the $LIBRA Proceeds Reasonably Believed to Belong to Argentina**

The Davis Respondents have confirmed they retain custody of $100 to $110 million in $LIBRA proceeds on Argentina's behalf, awaiting "answers from Javier Milei, until I have answers from his group" before sending the money to Argentina.[22]  The details of $LIBRA's development that have seeped into the public domain are *strongly* suggestive that these proceeds are collectable assets that belong to the Republic.

*First*, Davis has repeatedly and publicly acknowledged that he holds the funds in custody for the Argentine government, characterizing himself as a mere intermediary with no ownership claim.  *Second*, the Davis Respondents developed and launched $LIBRA through extensive collaboration with President Milei and senior Argentine officials pursuant to formal government agreements, with the express purpose of funding Argentina's economic initiatives.  *Finally*,

---

[21]    *See* O'Rourke Decl. at ¶¶ 35-56 (describing Petitioners' enforcement objectives and affirming the admissibility of the section 1782 discovery).

[22]  voidzilla, *the LIBRA interview*, YouTube (Feb. 16, 2025), tinyto.me/uVli_Ku at 5:58–6:09; 44:15–20; 44:28–36 ("[I]t's a plan gone miserably wrong with a hundred million dollars sitting in account that I'm the custodian of but I'm not I I I don't I'm I would love instruction on what to do with it. … So if I custody it with somebody else, even if it's a trusted third party, I lose my leverage. … [U]ntil I have answers from Javier Milei, until I have answers from his group, until I get an actual real game plan.").

Argentine authorities are now pursuing civil and criminal investigations that treat the $LIBRA proceeds as state assets, seeking to freeze Davis's cryptocurrency wallets and recover funds belong[ing] to the President of the Nation."

1.     **Hayden Davis Describes Himself as Argentina's "Facilitator" and Custodies $LIBRA Funds**

Davis made numerous public statements acknowledging that he holds the $LIBRA proceeds in custody for the Argentine government and characterizing himself as acting under direct instructions from President Milei and other Argentine officials rather than as an independent actor. In his February 17, 2025 interview with Dave Portnoy, Davis stated: "it's definitely not my [money], it's Argentina's."[23] He elaborated: "I'm just custody[ing] the money that should be for the government or at least the country of Argentina ... I was a facilitator ... I'm intermediary between parties. I'm not trying to claim that I have this money."[24] He told Portnoy the funds were "the country's money that was supposed to be you know this big amazing long-term project,"[25] and explained to Voidzilla: "There's ... a hundred million dollars sitting in account that I'm the custodian of but I'm not I I I don't ... I would love instruction on what to do with it."[26]

Davis consistently disclaimed personal ownership while emphasizing the governmental nature of the project: "this is the government of Argentina, Milei ... I am not the team,"[27] and "I'm making decisions on behalf of the government of Argentina who's distanced themselves from

---

[23]    Dave Portnoy, *Hayden Davis Tells All on the $LIBRA Launch*, YouTube (Feb. 17, 2025), https://tinyurl.com/bvvpas9e at 4:19 – 4:32.
[24]    Portnoy, *supra* note 23 at 7:59 – 8:33.
[25]    *Id.* at 23:04 – 23:18.
[26]    voidzilla, *supra* note 22 at 5:48 – 6:20.
[27]    *Id.* at 38:01 – 38:20.

this."[28] He told Voidzilla he undertook the project "on behalf of Milei" as his "advisor": "I wasn't taking any money on this deal. I was doing this on behalf of Milei. .. I wanted to do this to further other conversations, further other blockchain technology."[29] He explained he was following government direction and awaiting instructions from the president: "I was instructed, hey, don't inject any back in until Milei's second video. So Milei's second video never comes. Uh then he deletes the tweet, then he says he doesn't support the project."[30] When asked if officials had provided guidance on handling the proceeds, Davis told Voidzilla: "Zero. Zero. Nobody said shit to me. Zero."[31]

Davis presented $LIBRA as an official Argentine government blockchain experiment rather than a private venture. He explained to Voidzilla: "Milei has a deep desire to put everything on chain... to tokenize... all the financial transactions of the country... the idea was like okay well let's experiment with this [meaning the $LIBRA project] and see how it goes."[32] He told Portnoy the goal was to "tokeniz[e] a country,"[33] describing it as "a plan gone very wrong at a presidential level," not "some random fucking scam."[34] President Milei's February 14, 2025 post confirmed this governmental framing, stating the purpose was "encourag[e] the growth of Argentina's economy by funding small Argentine businesses and startups," and linking to VivalaLibertadProject.com with $LIBRA's contract ID.[35]

---

[28]  *Id.*; *see also* Alfredo Izaguirre, *A month on from '$LIBRA,' Milei siblings at centre of judicial tug-of-war*, Buenos Aires Times (Mar. 18, 2025), tinyto.me/xpee_Nb.
[29]  voidzilla, *supra* note 22 at 1:04:52 – 1:05:08.
[30]  Portnoy*, supra* note 23 at 5:47 – 6:03.
[31]  voidzilla*, supra* note 22 at 48:44 – 48:48.
[32]  *Id.* at 9:08 – 9:38.
[33]  Portnoy, note 23 at 10:10 – 10:23.
[34]  voidzilla*, supra* note 22 at 44:01 – 44:09.
[35]  Javier Milei, X (Feb. 14, 2025), tinyto.me/PtN1_gw.

The collaboration between Davis and the Argentine government developed through multiple high-level meetings. The project originated in July 2024 when President Milei invited Davis to Casa Rosada to present "a proposal for a technology partnership linked to blockchain."[36] Entry logs confirm Davis made multiple visits: on July 16, 2024, with Bartosz Lipinski (Cube CEO), Mauricio Novelli, and Manuel Terrones to present the blockchain partnership proposal;[37] and on November 21, 2024, with Novelli and Glenn Brooks Heard, celebrating that evening at the Four Seasons Hotel.[38] All visits were authorized by Karina Milei.[39] Between June 2024 and early 2025, Davis and the Milei held multiple development meetings, with Hayden attending the October 2024 Tech Forum Argentina and reportedly sitting front-row during President Milei's speech.

Even after the collapse, Davis continued characterizing the situation as Argentina's responsibility rather than his own: "they've said they're [Argentine officials] not supporting [it]... so now... I guess it's become my problem but it's their problem still."[40] He emphasized President Milei's full awareness and involvement: "there's evidence of me being with him multiple times."[41]

### 2.    Formal Government Agreements Established Exclusive Partnerships

The Davis entities formalized their relationship with Argentina through exclusive agreements demonstrating Argentina's ownership interest. Argentina had no rational basis to

---

[36]  Izaguirre, *supra* note 28.

[37]  Orta Decl., Ex. 7 (certified translation of Ignacio Grimaldi, *Karina Milei, la puerta de entrada a la Casa Rosada para los personajes detrás de la criptomoneda del escándalo,* LA NACION (Feb. 16, 2025), https://tinyurl.com/4fnt7avk/).

[38]  Ex. 5 (certified translation of Hugo Alconada Mon, *Un festejo con champagne y el supuesto "acuerdo millonario" del que alardeaban los creadores de $LIBRA,* LA NACION (Feb. 22, 2025), https://tinyurl.com/59ex4am3).

[39]  *Id.*

[40]  voidzilla, *supra* note 22 at 24:40 – 25:02.

[41]  voidzilla, *supra* note 22 at 46:35 – 46:40.

execute exclusive blockchain partnerships with companies developing $LIBRA unless it expected ownership of resulting proceeds.

Cube Exchange announced on October 14, 2024: "Cube x Argentina w/ Javier Milei ᴀʀ... We're joining forces with the Argentina government, bringing blockchain innovation to the public sector for the benefit of its citizens."[42] Gideon Davis explained in November 2024 that Argentina and Cube signed a Letter of Intent to "use [Cube's] underlying technology to help with crypto stuff ... I think it's the first foreign entity LOI signed and stamped by Javier Milei."[43] He later asked the podcast host to delete the interview.[44]

At Tech Forum Argentina, President Milei reportedly announced making the Republic a deregulated "refuge" for technological and crypto innovation. Cube CEO Lipinski promoted his plan to "integrat[e] blockchain technology into the fabric of Argentina['s] financial system."[45] Official records confirm Milei met with Lipinski, Manuel Adorni (then Undersecretary of Communications), and Novelli to discuss "[b]ringing blockchain innovation to the public sector."[46]

Kelsier Labs secured a separate exclusive partnership. Sergio Morales was named "the official Web3/Blockchain advisor to Javier Milei" in a draft contract including Hayden Davis.[47] La Nacion obtained a November 20, 2024 draft showing "Kelsier Ventures would form an indirect

---

[42]  cubexch (@cubexch), Instagram (Oct. 14, 2024), https://tinyurl.com/5xaa9pz7.

[43]  Agustino Fontevecchia y Giselle Leclerq, *"Eliminé la entrevista por pedido de Gideon Davis": la trastienda del podcast que reveló el acuerdo entre Milei y los creadores de $Libra*, Perfil (Mar. 3, 2025), tinyto.me/piir_ov.

[44]  *Id.*

[45]  Cube Group CEO at Tech Forum Argentina 2024 - Bartosz Lipinski, YOUTUBE (Oct. 19, 2024), https://tinyurl.com/33rpr6zd at 6:30–7:45.

[46]  Grimaldi, *supra* note 37.

[47]  *Alconada Mon*, *supra* note 38.

partnership with the Government of Argentina to exclusively support blockchain/Web3."[48] That evening, Davis's team reportedly celebrated at the Four Seasons that Milei had signed "everything."[49] When Cube could not serve as marketplace, Davis replaced it with Meteora Exchange for $LIBRA trading.

### 3. Secretary General Karina Milei Controlled All Government Negotiations and Access

Secretary General Karina Milei controlled all negotiations and access to President Milei. She reviewed both the Cube Letter of Intent and Kelsier partnership agreement before they reached President Milei.[50] Entry logs confirm Novelli visited the president's workplace ten times in 2024 and residence twice, with Davis accompanying him at least three times. Karina Milei authorized all visits.[51] Leaked text messages revealed Davis secured access through payments to Karina Milei.[52] In December 2024, Davis wrote to investors: "We can make Milei tweet, hold meetings in person and do promotion... I control that n***a... I send $$ to his sister and he signs whatever I say and does what I want."[53] While denying payments, Davis noted the Mileis's "only concern was ensuring proceeds from Libra would benefit Argentina's people and economy."[54] $LIBRA is reportedly one of several pay-to-play schemes orchestrated by Karina Milei.[55]

---

[48] *Id.*

[49] *Id.*

[50] Grimaldi, *supra* note 37; *see also* Exs. 6 and 7 (Argentine Press articles detailing Karina Milei's critical role in negotiations).

[51] *Id.* at Exs. 6 & 7.

[52] Danny Nelson, *Libra Token's Co-Creator Claimed He Paid Argentinian President Milei's Sister*, CoinDesk (Feb. 18, 2025), https://tinyurl.com/bdeu4tcm.

[53] *Id.*

[54] *Id.*

[55] Débora Rey, *Argentina investigates alleged fraud entangling Milei's inner circle, including sister Karina*, AP News (Aug. 22, 2025), https://tinyurl.com/w8yvu9e7; Hugo Alconada Mon,

### 4. Argentine Authorities Pursue Criminal Investigations Treating Proceeds as State Assets

Following the collapse of $LIBRA, calls for President Milei's impeachment arose immediately along with pump-and-dump fraud accusations.[56] In March 2025, authorities raided residences and offices of Sergio Morales, Mauricio Novelli, and Tech Forum, seizing devices for forensic analysis.[57] Prosecutor Taiano sought to reconstruct financial profiles of Javier and Karina Milei, Novelli, Terrones, and Morales from 2023 to present to determine whether illegal enrichment occurred.[58]

On March 26, 2025, Prosecutor Taiano requested freezing approximately $45 million USDC in Davis-tied wallets.[59] In May 2025, Judge Servini ordered asset seizures of Novelli, Terrones, and Morales, and froze over $50 million in Davis-linked cryptocurrency wallets.[60] On August 8, 2025, the Attorney General issued a memo identifying cryptocurrency payments to officials "ten days before LIBRA launch" as "instruments of the criminal scheme."[61] Prior reporting had identified two approximately $500,000 transfers from Davis-linked wallets—one immediately following Davis's January 30, 2025 meeting with Milei at Casa Rosada, another

---

*Milei aparece ligado a otro negocio cripto con personajes en común al caso $LIBRA*, LA NACION (Feb. 25, 2025), tinyto.me/lGQD_GH.

[56]  Amy Booth, *Milei is Already Facing Impeachment Requests and Lawsuits in $LIBRA Crypto Scandal*, Buenos Aires Herald (Feb. 17, 2025), tinyto.me/LjfW_ZW.

[57]  Leo Nieva, *Criptogate: el avance de la investigación judicial*, Revista Quórum (Apr. 3, 2025), https://tinyurl.com/4thubja2

[58]  *Id.*

[59]  *Id.*

[60]  *Id.*

[61]  *See* Ex. 8 (Argentine Attorney General Taiano's Aug. 8, 2025 Memorandum); Ben Weiss, *Argentina Seeks Arrest of U.S. Crypto Figure Tied to Melania and Milei cryptocurrencies*, Fortune (Mar. 13, 2025), tinyto.me/mnew_PK.

shortly after Milei posted a photo with Davis.[62] Davis also reportedly transferred $1.2 million in crypto assets on February 13, 2025, the day before launch.[63]

Meanwhile, legislative investigations have waxed and waned in vigor, but they continue. In August, the Argentine legislative $LIBRA Investigative Commission, empowered by a strengthened electoral mandate, renewed their investigation into $LIBRA, which they claim belong to the President of the Nation. The Commission sent several subpoenas for documents and testimony to President Milei, Karina Milei, and other government officials reportedly associated with $LIBRA.[64]

## III.    THE REQUESTED DISCOVERY

To help conclusively determine the full extent of assets extracted from the $LIBRA scheme, trace their current locations, and identify their relationship to the Argentine government and its public officials, Petitioners seek discovery from the Davis Respondents, each of whom possesses critical information that will aid Petitioners in discovering Argentine assets for judgment enforcement.

The Davis family, through Kelsier Labs, designed and executed every aspect of the $LIBRA token scheme with President Milei's assistance. As the self-identified "Launch Strategist" who claims custody of $100+ million in proceeds, Hayden Davis possesses unique knowledge of asset locations, wallet addresses, discussions had with President Milei and other Argentine officials about $LIBRA, and the ultimate disposition of $LIBRA funds. His brother Gideon (COO)

---

[62]   Danny Nelson, *Libra Token's Co-Creator Claimed He Paid Argentinian President Milei's Sister*, CoinDesk (Feb. 18, 2025), https://tinyurl.com/bdeu4tcm.
[63]   *Id.*
[64]   Camila Grigera Naón, *Argentine Court Asked To Arrest The President's Allies In the LIBRA Scandal* (Oct. 22, 2025), https://tinyurl.com/2xteym66.

and father, Tom (Chairman) were integral to Kelsier's operations, with Gideon describing the company's formation as combining the family's collective skill sets into "a marketing and consulting company." (ECF No. 6-5 at 29:51–30:29). In recent court filings before Judge Jennifer L. Rochon, Davis's counsel explained the structure of the custodial wallet and requested permission to deploy the funds as "grants" to Argentine businesses, confirming both Davis's ongoing possession and the assets' Argentine character. (*See* Case No. 1:25-cv-03891 (JLR), ECF No. 93 at 1-3). The documents and information in their possession are fundamental to Petitioners' ability to trace and recover Argentina's assets for satisfaction of the Judgment.

## IV.    ARGUMENT

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought must reside or be found in the district in which the application is filed; (2) the discovery must be for use in a proceeding before a foreign tribunal; and (3) the application must be made by a foreign or international tribunal or 'any interested person.'" *Bravo Express Corp. v. Total Petrochemicals & Refin. USA, Inc.*, 613 F. App'x 319, 322 (5th Cir. 2015) (citing *Tex. Keystone, Inc. v. Prime Nat. Res., Inc.*, 694 F.3d 548, 553 (5th Cir. 2012)).

After determining that the three statutory requirements are satisfied, courts may then consider four discretionary factors in deciding whether to grant a Section 1782 application, namely: (i) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (ii) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (iii) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country or the

United States; and (iv) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264–65 (2004); *see also Tex. Keystone*, 694 F.3d at 553-54, 553 n.2; *In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*, 195 F. Supp. 3d 899, 902 (S.D. Tex. 2016).

Moreover, courts in this Circuit and beyond evaluate discovery requests under Section 1782 with attention to the purpose of the statute, which "aims to provide efficient assistance to parties litigating in foreign tribunals and, by example, to encourage foreign assistance in U.S. Courts." *Banco Mercantil de Norte, S.A. v. Paramo*, 2024 WL 4905981, at *3 (S.D. Tex. Nov. 27, 2024), *aff'd sub nom.* 2025 WL 2305399 (5th Cir. Aug. 11, 2025) (quoting *Banca Pueyo SA v. Lone Star Fund IX (US), L.P.,* 55 4th 469, 473 (5th Cir. 2022). Courts have routinely emphasized Congress's intent to provide a *liberal* avenue to discovery in aid of foreign and international proceedings. *See*, e.g., *In re Godfrey*, 2009 WL 10670524, at *7 (N.D. Tex. Mar. 24, 2009) (quoting *In re Bayer AG*, 146 F.3d 188, 195 (3rd Cir. 1998) ("Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application.")."As long as the discovered information is intended for use in a foreign proceeding which comports with notions of due process, the requirements of 28 U.S.C. § 1782 have been met and an appropriate order should issue." *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 138 (3d Cir. 1985)

A.    **Petitioners Satisfy The Statutory Requirements Of 28 U.S.C. § 1782**

Petitioners plainly satisfy the three statutory requirements of Section 1782: (1) The Davis Respondents are "found" in the Northern District of Texas; (2) the requested discovery is for use

in the contemplated Foreign Proceedings; and (3) Petitioners are "interested persons" as the lead

Claimants in those Foreign Proceedings.

### 1.    Respondents Are "Found" In The Northern District of Texas

The threshold question of any Section 1782 application is whether the respondent "resides

or is found" within the jurisdictional boundaries of the reviewing court.  Because the statute "does

not define" these terms, this court "interpret them according "their ordinary, contemporary,

common meaning."  *In re Xiaomi Tech. Germany GmbH*, 2022 WL 4009046, at *2 (W.D. Tex.

Sept. 2, 2022), *report and recommendation adopted*, 2022 WL 17815724 (W.D. Tex. Sept. 19,

2022) (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015)).

Although courts are "divided over the correct statutory interpretation of the requirement that a

person or corporation against whom the discovery order is sought 'resides' or is 'found' within the

district[,]"[65] courts within this district have looked favorably at the pronouncement of *In re del

Valle Ruiz* that "the phrase 'resides or is found' … extends to the limits of personal jurisdiction

consistent with due process."  939 F.3d 520, 527 (2d Cir. 2019) (holding that the "statutory scope

of 'found'" is not limited to mere physical presence but "extends to the limits of personal

jurisdiction").  Both the Northern District of Texas and its sister courts in this circuit have been

"persuaded that this is the appropriate reading of 'is found'" in Section 1782(a).  *In re Kim*, 2024

WL 3430583, at *4 (N.D. Tex. June 26, 2024*), report and recommendation adopted*, 2024 WL

3841546 (N.D. Tex. Aug. 15, 2024).

---

[65]  § 3692 Judicial Assistance to Foreign Tribunals, 14B Fed. Prac. & Proc. Juris. § 3692 (5th ed.).

Upon information and belief, Hayden, Gideon, and Tom Davis share a residence in Irving, Texas at 627 Brookstone Dr., Irving, TX 75039-3649.[66]  Respondent Kelsier Labs maintains its principal place of business at the same address.[67]  Moreover, both personally, and via Respondent Kelsier, the Davis Respondents have individually and/or collectively engaged in significant business activities within the district.  Accordingly, the Davis Respondents are "found" in the Northern District of Texas.  *See, e.g.*, *In re Godfrey*, 2009 WL 10670524, at *6 (N.D. Tex. Mar. 24, 2009) (finding individual and corporate respondents who "regularly conduct[ed] business in the State of Texas" "reside[d]" or could "be found" in the district); *Snyder v. Pitts*, 150 Tex. 407, 415–17 (1951) (finding the fact that the defendant "spent about five days a week in [Texas] for two years" to be sufficient to establish "residence").

### 2.    The Discovery Sought Is "For Use" In Foreign Proceedings

Petitioners' English Counsel has set forth the key timing considerations and potential remedies available in the United Kingdom, and their associated relevance to Petitioners' request.[68] The $LIBRA records sought in the Subpoenas are "for use" in "foreign proceedings."  28 U.S.C. § 1782(a).

---

[66]    *See* ECF No. 6-8 (Hayden M. Davis Driver's License – LexisNexis Public Records Reports); ECF No. 6-7 (Gideon B. Davis Driver's License – LexisNexis Public Records Reports); ECF No. 6-9 (Charles Thomas Davis Driver's License - LexisNexis Public Records Reports); ECF No. 6-10 (PageVault Capture of Kelsier.io "About Us" Page) (detailing the Davises role within the Kelsier Labs organization).

[67]    *See* ECF No. 6-11.

[68]    *See* O'Rourke Decl. at ¶¶ 35-56.

Specifically, Petitioners' English Counsel avers that he has been retained to pursue the Judgment enforcement against Argentina and has initiated enforcement proceedings within the United Kingdom. The requested discovery will be of use in the enforcement of the Judgment.[69]

Numerous courts have affirmed that civil proceedings before English courts satisfy Section 1782's requirement that the proceedings be in a "foreign or international tribunal." *See, e.g.*, *In re Letter of Request from Crown Prosecution Serv. of U.K.*, 870 F.2d 686, 691 (D.C. Cir. 1989) ("[T]here is no question that British courts qualify as 'tribunals' [for Section 1782 purposes]."); *In re Ex Parte Application of Glob. Energy Horizons Corp.*, 2015 WL 1325758, at *2 (N.D. Cal. Mar. 24, 2015) (holding that "proceeding before the High Court of Justice in England, United Kingdom . . . is undisputedly a 'proceeding before a foreign or international tribunal' under Section 1782(a)") (citations omitted).

Moreover, courts have approved the use of Section 1782 discovery in judgment-enforcement proceedings. *See In re Request for Subpoena by Ryanair Ltd.*, 2014 WL 5583852, at *1–2 (N.D. Cal. Oct. 31, 2014) (granting application for use in Dublin judgment-enforcement proceeding); *In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007) (permitting discovery for use in a Panamanian post-judgment proceeding); *In re Application of Temp. Servs. Ins. Ltd.*, 2009 WL 2843258, at *1–2 (W.D.N.Y. Aug. 28, 2009) (granting application where the applicant sought discovery to locate assets of foreign judgment debtor for purposes of enforcing that judgment); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F.Supp.3d 358, 360–61 (S.D.N.Y. 2014) (granting application to obtain communications for use in a proceeding brought in the United Kingdom to enforce the applicant's default judgment); *Linsen Int'l Ltd. v. Humpuss Sea Transp.*

---

[69]   *See id.*

*PTE LTD*, 2011 WL 1795813, at *1 (S.D.N.Y. Apr. 29, 2011) (granting an application to locate assets to enforce an English Worldwide Freezing Order or *Mareva* injunction). Thus, the Foreign Proceedings qualify as foreign proceedings under Section 1782.[70]

Further, Petitioners are not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings. *Intel*, 542 U.S. at 260 ("[N]othing in the text of [Section] 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there."). Rather, the burden on a Section 1782 petitioner is *de minimis*; petitioners need only show that the evidence is potentially relevant to the Foreign Proceedings. *See In re the Application of Sauren Fonds-Select SICAV v. For Discovery Pursuant to 28 U.S.C. § 1782*, 2016 WL 6304438, at *4 (D.N.J. Oct. 26, 2016) (explaining that the petitioner's "sworn statement that the discovery sought by the subpoenas is to aid it in prosecuting its claims [in the foreign action] . . . is sufficient, given that there is no contrary information on which the Court could conclude otherwise"); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 77 (2d Cir. 2012) ("Section 1782(a) contains no requirement that particular evidence be admissible in a foreign proceeding to be considered 'for use in a proceeding in a foreign or international tribunal.'").

Petitioners also satisfy the "for use" requirement. The $LIBRA records sought in the Subpoenas are highly relevant to the Foreign Proceedings because they relate to the provenance, custody, and geographic location of the Republic's assets and/or assets as to which the Republic

---

[70] *See also* O'Rourke Decl. ¶¶ 35-56.

may have a claim.  As discussed, Petitioners will use the requested discovery to develop, refine, and/or execute their judgment enforcement action in the High Court.[71]

### 3.       Petitioners Are Interested Persons

Finally, Section 1782 requires persons seeking discovery to show they possess a reasonable interest in the foreign proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782[,]" *Intel*, 542 U.S. at 256; *In re Application of financialright claims GmbH*, 2024 WL 4818177, at *7 (D. Del. Nov. 18, 2024).  Petitioners are beneficial owners of the GDP Warrants, and accordingly are the prototypical "interested person[s]" under *Intel*.  *See In re Application of Eurasia Bank Joint Stock Co.*, 2015 WL 6438256, at *2 (N.D. Tex. Oct. 21, 2015) (finding that, "as a prospective litigant in the Republic of Kazakhstan, Eurasia is an 'interested person' within the meaning of Section 1782") (citation omitted); *see also Chevron Corp. v. 3TM Consulting, LLC*, No. 4:10-MC-134, 2010 WL 8814519, at *1 (S.D. Tex. Apr. 5, 2010) (finding that, "as a litigant in that proceeding, Chevron is an 'interested person' within the meaning of Section 1782").

---

[71]  *See* O'Rourke Decl. ¶¶ 57-69

**B.**    **All Discretionary *Intel* Factors Favor Permitting The Discovery Petitioners Seek**

Once the threshold requirements under Section 1782 are met, the Court shall consider the four discretionary "*Intel* factors."  Each of these factors weighs in favor of granting the requested discovery.  *First*, Respondents will not be a party to the English Proceedings.  *Second*, there is no reason to believe that English courts would be unreceptive to evidence obtained through Section 1782 discovery.  *Third*, Petitioners are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence.  *Fourth*, Petitioners' requests are proportional to the complexity of the fraud and have a clear nexus to Petitioners' asset recovery efforts.

**1.**    **The First *Intel* Factor Favors Granting Discovery**

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding.  *See Intel*, 542 U.S. at 244, 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for [Section] 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").  Here, Respondents will not be parties to the Foreign Proceedings.

**2.**    **The Second *Intel* Factor Favors Granting Discovery**

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to the evidence obtained through a Section 1782 application.  *See id.*  The Fifth Circuit has emphasized that, "to avoid speculative foray[s] into legal territories unfamiliar to federal judges, parties must provide authoritative proof that a foreign tribunal would reject evidence because of a violation of [an] alleged [foreign] privilege." *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) (internal quotation marks and citations omitted).

For the reasons set forth in U.K. counsel's declaration, the English courts likely **will be receptive** to evidence obtained through this Amended Application.[72] *See also In re Application of Shervin Pishevar*, 439 F. Supp. 3d 290, 303–04 (S.D.N.Y. 2020) (holding that the petitioner "has made a showing that the English courts would be receptive to evidence obtained" through the Section 1782 application).  Evidence of asset transfers associated with or originating from a judgment debtor are highly relevant in judgment enforcement proceedings.  *See, e.g.*, *Linsen Int'l Ltd.*, 2011 WL 1795813, at *1 (granting an application to locate assets for use in English proceedings); *La Suisse*, 62 F. Supp. 3d at 360–61 (granting application to obtain communications for use English proceedings); *see also Grupo Mexico SAB de CV*, 2014 WL 12691097, at *3 (N.D. Tex. Oct. 17, 2014) (granting discovery where "there [was] no evidence to suggest that the Mexican court is hostile to [Section 1782 discovery]").

### 3.    The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  The *Intel* Court expressly rejected the notion that Section 1782 requires the evidence sought to be discoverable in the foreign proceeding itself, and there is similarly no requirement that a petitioner must exhaust his remedies in the foreign court first.  *See id.* at 244 ("Section 1782 is a provision for assistance to tribunals abroad.  It does not direct [U.S.] courts to engage in comparative analysis to determine whether analogous proceedings exist

---

[72] *See* O'Rourke Decl. ¶¶ 70-84.

here.").[73] Here, there is no reason to believe that any of the discovery sought violates any foreign laws and/or public policy.  Rather, the discovery Petitioners seek is highly limited and focused specifically on the information needed to identify the insiders that profited alongside Hayden Davis's $LIBRA token launch, as well as other records needed to determine the current location of Argentina's assets.  Moreover, these requests do not offend UK law.[74]

### 4.    The Fourth *Intel* Factor Favors Granting Discovery

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 245, 265.  The standard is substantively the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  "The reference in [Section] 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."  *Bayer AG*, 146 F.3d at 195. Relevancy in this context is "broadly construed" and "[w]hen relevance is in doubt, the district court should be permissive."  *In re Veiga*, 746 F. Supp. 2d 8, 19 (D.D.C. 2010) (citing *Bayer AG*, 146 F.3d at 195.

Here, the discovery requests are proportional to the scale and sophistication of this fraud, and necessary for Petitioners' enforcement objectives. Whatever burden Respondents may incur is both reasonable and proportionate given the critical nature of the discovery sought and the direct participation of the Davis family and their company in the $LIBRA project.  Indeed, courts have

---

[73] *See also In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement' finds no support in the plain language of the statute and runs counter to its express purposes[.]") (citation omitted); *LEG Q LLC v. RSR Corp.*, 2017 WL 3780213, at *8 (N.D. Tex. Aug. 31, 2017) (holding that applicants are "not require[d]" "to seek discovery in the foreign jurisdiction before seeking the assistance of a district court").

[74] *See* O'Rourke Decl. ¶¶ 70-84.

held that "[j]ust because a discovery request is broad does not mean that it is unduly burdensome." *See Pinchuk v. Chemstar Prod. LLC*, 2014 WL 2990416, at *3 (D. Del. June 26, 2014) (subpoena quashed on other grounds). If the requests' subject matter appear to be "reasonably tailored" to the scope of the claims in the foreign proceedings, the applicant has a colorable argument that the requests are proportional and relevant to the foreign proceeding. *See id.* "If there is a possibility that the discovery sought may lead to information relevant to the subject matter of the action, then the discovery should generally be allowed." *In re IKB Deutsche Industriebank AG*, 2010 WL 1526070, at *5 (N.D. Ill. Apr. 8, 2010).

## V.    CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the Amended Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order associated with Petitioners' application; (c) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas for information and for the requested depositions; and (d) grant any and all other relief to Petitioners as deemed just and proper.

DATED:   November 3, 2025

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

 /s/  David M. Orta

David M. Orta (*pro hac vice*)
Julianne F. Jaquith (*pro hac vice*)
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW
Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
Fax:  (202) 538-8100
davidorta@quinnemanuel.com
juliannejaquith@quinnemanuel.com

Elinor C. Sutton
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
3100 McKinnon St., Suite 1125
Dallas, TX 75201
Tel.: (469) 902-3600
Fax: (469) 902-3610
elinorsutton@quinnemanuel.com

*Counsel for Petitioners Palladian Partners,*
*L.P., HBK Master Fund L.P., Hirsh Group*
*LLC, and Virtual Emerald International*
*Limited*