**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re Application of:<br><br>PALLADIAN PARTNERS, L.P., HBK MASTER FUND L.P., HIRSH GROUP LLC, and VIRTUAL EMERALD INTERNATIONAL LIMITED,<br><br>Petitioners,<br><br>FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | § <br>§ <br>§ <br>§ <br>§  No. 3:25-mc-00058-S-BT<br>§ <br>§ <br>§ <br>§ <br>§ <br>§ <br>§ <br>§ |

**DECLARATION OF AIDAN ALEXANDER O'ROURKE**
**IN SUPPORT OF PETITIONERS' AMENDED APPLICATION**
**FOR AN ORDER TO TAKE DISCOVERY**
**FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

I, Aidan Alexander O'Rourke, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.      I submit this declaration in support of the application by Palladian Partners, L.P., HBK Master Fund L.P., Hirsh Group LLC, and Virtual Emerald International Limited ("Petitioners" or the "Claimants") for an order from this court pursuant to 28 U.S.C. § 1782 authorizing them to obtain discovery from Hayden Davis, Gideon Davis, Charles Thomas ("Tom") Davis, and their company, Kelsier Labs LLC (a/k/a and hereafter, "Kelsier Labs") (and with Hayden, Gideon, and Tom, the "Davis Respondents") for use by Petitioners in foreign proceedings, namely the English Proceedings (being the English Proceedings described at Section III below) (the "Application").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application and accompanying Memorandum of Law.

1

2.     Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; and (c) information supplied to me by Petitioners, by their officers, directors and employees, or professionals retained by them.

3.     All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies.

## I.     BACKGROUND AND QUALIFICATIONS

4.     I am a Solicitor of the Senior Courts of England and Wales. I obtained that qualification in 2016, having first qualified as a Barrister and Solicitor of the High Court of New Zealand in 2008.  I obtained a Bachelor of Laws from Victoria University Wellington, New Zealand, in 2007 and from 2008 to 2011 worked as a solicitor in the commercial litigation team in the Wellington office of the New Zealand law firm Russell McVeagh.  I joined the London Office of Quinn Emanuel Urquhart & Sullivan UK LLP in February 2012, and have been a Partner of the firm since January 2019.  I am an experienced commercial litigator and have conducted litigation in all of the senior courts of England and Wales.

5.     I have conducted the English Proceedings on behalf of Petitioners.

## II.     FACTUAL BACKGROUND

### *The Relevant Parties*

6.     Petitioners are the beneficial owners of Euro-denominated securities (trading under ISIN XS0209139244) issued by the Republic of Argentina (the "Republic") in 2005 and 2010 and linked to Argentina's gross domestic product ("GDP") (collectively, the "Securities").  Palladian Partners, L.P. ("Palladian") is a limited partnership organized under the laws of the Cayman Islands, located at One Nexus Way, Camana Bay, Grand Cayman, KY1-9005, Cayman Islands.  HBK Master Fund L.P. ("HBK") is a limited partnership organized under the laws of the Cayman Islands, located at PO Box 10008, Willow House,

2

Cricket Square, George Town, KY1-1001, Cayman Islands.  Hirsh Group LLC ("Hirsh") is a limited liability company organized under the laws of Delaware, with its principal place of business in New York.  Virtual Emerald International Limited ("Emerald") is a company organized under the laws of the British Virgin Islands, located at Craigmuir Chambers, Road Town, Tortola, VG 110, British Virgin Islands.  Petitioners together hold approximately 46% of the total outstanding notional amounts of the Securities.

7.    Petitioners understand that Hayden Mark Davis is a 29-year-old cryptocurrency promoter who serves as CEO of Kelsier Labs LLC.  Hayden operates Kelsier Labs with his brother Gideon Davis—who serves as the Chief Operating Officer—and their father, Tom Davis—who serves as its Chairman.  Hayden Davis, in collaboration with Gideon and Tom, led the launch of the $LIBRA token by and through his collaboration with Argentine President Javier Milei, who was the lead sponsor of $LIBRA.

8.    Petitioners understand that Kelsier Labs LLC (d/b/a Kelsier Ventures) is a venture capital, marketing, and consulting solutions firm that specializes in digital assets and web3 technology.  Kelsier Labs was the institutional launch strategist for the $LIBRA token, and "deployed" the $LIBRA token on the Solana blockchain via the Meteora platform.  Kelsier Labs is incorporated in Texas, and maintains its principal place of business in Irving, Texas, at the assumed residence of the Davis family.

***The Securities***

9.    The Securities were issued as part of the major debt restructuring following the Republic's 2001 sovereign debt crisis.  The Securities were issued in two tranches, one in 2005 and the other in 2010.  The terms of the 2005 and 2010 exchanges were identical, with approximately 75% of creditors participating in the 2005 exchange and approximately a further 15% in the 2010 exchange.

10.     As part of the exchange, creditors received a combination of the Securities and certain conventional bonds.  Participating creditors took a steep "haircut" from the face value of the defaulting bonds, receiving approximately 25% to 30% of the value of their claims.  However, the Securities provided for additional contingent payments based on the performance of the Argentine economy through the year 2034, provided that the country's real GDP met certain contractually specified benchmarks.

11.     On December 15, 2014, the Republic failed to make payment under the Securities for the year 2013, contending that one of the contractual payment conditions, which required the Argentine economy to grow at a particular rate, was not satisfied as a result of the country's change in methodology for calculating its GDP.  A dispute then arose between Petitioners and the Republic concerning, amongst other things, the proper construction of the governing documents of the Securities, including the Trust Indenture dated June 2, 2005, between the Republic as "Issuer" and the Bank of New York Mellon as "Trustee" (the "Trustee"), and the Terms and Conditions set out on the reverse side of the Global Security representing the Securities.

## III.    THE ENGLISH PROCEEDINGS

### *English Trial Court Proceedings*

12.     The Securities are governed by English law with an English jurisdiction clause.

13.     As required under English civil procedure, Petitioners Palladian, HBK, and Hirsh originally raised their claims against the Republic in a letter before action served on the Republic on May 10, 2019.  The parties were unable to resolve the dispute by correspondence. On August 9, 2019, Petitioners Palladian, HBK, and Hirsh commenced proceedings in the High Court of Justice, King's Bench Division, Commercial Court in London, England (the "English Trial Court") (Claim No: FL-2019-000010) by filing a Claim Form against both the Republic and the Trustee, seeking to recover unpaid amounts due to all holders of the Securities (the

"Claim"). The Claim alleged that on their proper construction, a payment should have been made under the Securities for the year 2013, and in either case, the change in methodology of the Republic's GDP calculations was irrational, arbitrary and capricious. Petitioners' Claim sought declaratory relief, payment of the amounts due under the Securities, damages, interest, specific performance, injunctive relief and costs. A copy of the Claim Form and Particulars of Claim filed by Petitioners are at **Exhibit 1** and **Exhibit 2**.

14.    On August 12, 2019, Petitioners Palladian, HBK, and Hirsh served the Republic with notice of the proceedings. On August 23, 2019, the Republic filed an Acknowledgement of Service with the English Trial Court, confirming that service was proper and that it had notice of the proceedings. A copy of the Acknowledgment of Service filed by the Republic is at **Exhibit 3**.

15.    On December 11, 2019, the Petitioners filed an Amended Claim Form in the English Trial Court, adding Petitioner Emerald as an additional claimant in the proceedings. A copy of the Amended Claim Form is at **Exhibit 4**.

16.    A trial was conducted by the English Trial Court between October 24 and November 18, 2022. On April 5, 2023, following the trial, the English Trial Court issued judgment in favour of the Petitioners, and on June 9, 2023, following post-trial hearings, the English Trial Court issued an order giving effect to its judgment (the "English Trial Court Order"). Copies of the judgment and the English Trial Court Order are at **Exhibit 5** and **Exhibit 6**.

17.    The English Trial Court Order required, amongst other things, the Republic to pay to the Trustee:

A.    EUR 1,329,760,063.39, being the Republic's payment obligations under the Securities for the year 2013 (the "2013 Payment Amount");

5

B. EUR 233,220,560.34 as pre-judgment interest on the 2013 Payment Amount;

C. EUR 64,311,645.07 in respect of Part 36 Entitlements (the "Petitioners' Part 36 Entitlements");

D. Post-judgment interest on each of the above amounts, at a rate of 2% per annum above Euribor with a six-month tenor calculated based on the average rate over each six-month period from the date of the order—June 9, 2023; and

E. The Petitioner's costs of the proceedings.

(together, the "Judgment Sums").

18. Petitioners' Part 36 Entitlements are Judgment Sums to which the Petitioners are entitled because they made a formal monetary offer to the Republic under Part 36 of the Civil Procedure Rules (being the civil procedure rules that apply in the English Trial Court) to settle the proceedings, which was not accepted by the Republic, and which Petitioners beat at trial. The Petitioners' Part 36 Entitlements (and related post-judgment interest) and costs of the proceedings are therefore entitlements for the benefit of the Petitioners only, while the remaining components of the Judgment Sums are entitlements for the benefit of all holders of the Securities.

19. The English Trial Court Order § 15 provides that for so long as each Petitioner retains holdings of the Securities, each Petitioner shall have an individual right to enforce the Judgment Sums, subject to Schedule A to the English Trial Court Order, which details the enforcement relationship between the Petitioners and the Trustee. Relevantly, Schedule A provides:

A. In enforcement proceedings, Petitioners shall act in and use only their own names and shall not and shall have no right to act in the Trustee's name. Sch. A § 3.d;

6

   B. The Republic shall not make payments in respect of the Judgment Sums or any part of them other than direct to the Trustee.  Sch. A § 3.a;

   C. Petitioners shall use their best endeavours to procure that all payments in respect of the Judgment Sums are paid direct to the Trustee, and that if Petitioners receive any such payment, they shall transfer those payments within seven (7) days to the Trustee.  Sch. A. § 3.b;

   D. Notwithstanding the above, Petitioners retain the right to enforce payments of their Petitioners' Part 36 Entitlements "directly against the Republic, without any need to account for and pay such amount to the Trustee."  Sch. A. § 4.

20. As per Section 21 of the English Trial Court Order, the execution of certain provisions (including those requiring payment of the amounts listed above) was stayed until the Republic exhausted its avenues of appeal.  Section 14.a of the English Trial Court Order further provides that the Judgment Sums would become due forty-five (45) days following the expiration of the stay.

***English Appellate Court Proceedings***

21. On June 30, 2023, the Republic applied to the Court of Appeal of England & Wales (the "<u>English Appellate Court</u>") for permission to appeal the English Trial Court's ruling.  Permission was granted by the English Appellate Court on January 18, 2024 and on February 22, 2024, the English Appellate Court ordered that such permission be subject to the condition that the Republic, by April 5, 2024, either (i) pay the Trustee EUR 309,876,449.80, or (ii) provide security for the same amount in a form acceptable to the Petitioners and Trustee. A copy of the English Appellate Court's February 22, 2024 order is at **Exhibit 7**.

22. On March 22, 2024, the English Appellate Court ordered that the Republic could satisfy the condition of bringing its appeal by providing a letter of credit in the sum of EUR 313,876,449.80 in favour of the Trustee from Banco Santander, S.A.  A copy of the

March 22, 2024 Order of the English Appellate Court is at **Exhibit 8**. That letter of credit was issued by Banco Santander, S.A. on April 3, 2024 (the "Letter of Credit"), a copy of which is at **Exhibit 9**.

23.     The appeal was heard by the English Appellate Court from May 21 to May 23, 2024.

24.     On June 12, 2024, the English Appellate Court issued a judgment dismissing the Republic's appeal, a copy of which is at **Exhibit 10**.

25.     On June 21, 2024, the English Appellate Court issued an order (the "English Appellate Court Order") affirming the Republic's obligations to make monetary payments as under the English Trial Court Order, but partly modifying them to (i) increase the post - judgment interest all holders of the Securities are entitled to on the 2013 Payment Amount by an additional 3% for the period October 25, 2023 to June 21, 2024 (the "Appeal Part 36 Entitlements"), and (ii) require the Republic to pay the Petitioner's costs of the appeal. The Appeal Part 36 Entitlements were awarded because Petitioners, on October 3, 2023, made a further offer under Part 36 of the Civil Procedure Rules to settle the Proceedings which was again rejected by the Republic. This further offer was made on behalf of the entire class of holders of the Securities, not just on behalf of Petitioners, and are therefore entitlements of all holders of the Securities. A copy of the English Appellate Court's June 21, 2024 order is at **Exhibit 11**.

26.     The Republic applied for further permission to appeal to the Supreme Court of the United Kingdom on July 10, 2024. That application was refused by the Supreme Court on October 14, 2024. A copy of the Supreme Court's order refusing the Republic's application for further permission to appeal is at **Exhibit 12**.

*Enforcement*

8

27.    The Supreme Court's refusal to grant permission to appeal exhausted the Republic's final avenue of appeal, thereby lifting the stay of execution on the Republic's obligation to pay the Judgment Sums under the English Trial Court Order.  The Judgment Sums therefore became due and payable on November 28, 2024, and the Petitioners have taken active steps in the proceedings to enforce the Republic's obligation to pay the Judgment Sums.

28.    On December 16, 2024, Petitioners applied to the English Appellate Court for an order authorising the Trustee to drawdown on and distribute the EUR 313,876,449.80 provided under the Letter of Credit.

29.    On December 20, 2024, Petitioners and the Republic agreed that the Republic would pay USD 4.238 million in respect of the remaining, outstanding balance of the Petitioners' costs of the proceedings which had not already been satisfied by interim payments by the Republic during the course of the proceedings.  That USD 4.238 million balance was paid on February 17, 2025, with the result that all costs sums due by the Republic to Petitioners have been satisfied.

30.    The English Appellate Court granted the Petitioners' December 16, 2024 application on January 14, 2025.  A copy of the English Appellate Court's January 14, 2025 order is at **Exhibit 13**.  On February 27, 2025, the Trustee publicly announced that (i) Banco Santander S.A has accepted the Trustee's demand under the Letter of Credit and transferred the Trustee the sum of EUR 313,876,449.80, (ii) EUR 23,500,000 would be retained by the Trustee to pay the Trustee's and Petitioner's anticipated costs of enforcement, (iii) EUR 11,310,558.24 would be paid by the Trustee directly to the Petitioners in respect of the Part 36 Entitlements, and (iv) the EUR 279,065,891.56 balance would be distributed to holders of the Securities.  A copy of the Trustee's public announcement is at **Exhibit 14**.

31.    On June 23, 2025, Petitioners filed a petition in the United States District Court for the District of Columbia seeking recognition and enforcement of the outstanding Judgment

9

Sums. *See Palladian Partners, L.P. et al v. The Republic of Argentina*, No. 1:25-cv-01954-CKK (June 23, 2025), ECF No. 1.

32.     Following (i) the agreement and payment of the balance of Petitioners' costs of the proceedings, and (ii) the drawdown and distribution of the EUR 313,876,449.80 Letter of Credit Funds, the Judgment Sums that remain outstanding as at September 30, 2025 comprise:

A.     EUR 1,219,141,083.91 in respect of the 2013 Payment Amount;

B.     EUR 213,819,601.41 in respect of the pre-judgment interest on the 2013 Payment Amount;

C.     EUR 59,009,884.90 in respect of the Petitioners' Part 36 Entitlements;

D.     EUR 24,149,013.80 in respect of the Appeal Part 36 Entitlements;

E.     EUR 34,737,173.12 in post-judgment interest on the EUR 1,219,141,083.91 balance of the 2013 Payment Amount, calculated at the rate of 2% above EURIBOR for the period from January 29, 2025 (the date the Trustee received the amounts drawn down under the Letter of Credit) to September 30, 2025.

F.     EUR 6,092,394.56 in post-judgment interest on the EUR 213,819,601.41 balance of the pre-judgment interest on the 2013 Payment Amount, calculated at the rate of 2% above EURIBOR for the period from January 29, 2025 to September 30, 2025;

G.     EUR 1,681,377.66 in post-judgment interest on the EUR 59,009,884.90 balance of the Petitioner's Part 36 Entitlements, calculated at the rate of 2% above EURIBOR for the period from January 29, 2025 to September 30, 2025; and

H.     EUR 688,081.54 in post-judgment interest on the EUR 24,149,013.80 balance of the Appeal Part 36 Entitlements, calculated at the rate of 2% above EURIBOR for the period from January 29, 2025 to September 30, 2025.

33.     As at September 30, 2025, Petitioners calculate the total Judgment Sums that remain outstanding to be EUR 1,559,318,610.91.

34.     Petitioners are now in the process of identifying available assets held by the Republic in contemplation of enforcement motions in the English Proceedings or elsewhere to satisfy the outstanding Judgment Sums. Petitioners are also in the process of responding to certain objections and actions of the Republic and third parties in response to applications that have been made by Petitioners in England and Wales to enforce against the Republic's assets.

## IV.     THE NATURE OF THE ENGLISH ENFORCEMENT PROCEEDINGS

35.     To assist the U.S. Court, I set out below a description of: (a) enforcement steps available to judgment creditors in England and Wales, including with respect to assets identified outside the jurisdiction; and (b) enforcements steps already taken by Petitioners in the English Proceedings.

36.     As an initial point, judgments delivered by the English Courts are enforceable as of right in England and Wales. There is no need to commence separate enforcement proceedings. Additionally:

A.     The courts of certain other jurisdictions recognise judgments of the English Courts without judgment creditors needing to initiate formal recognition proceedings, and  recognition in those jurisdictions is largely an administrative process following which enforcement steps can take place. These jurisdictions are mainly Commonwealth jurisdictions (namely, certain countries that were formerly part of the British Empire).

B.     Judgment creditors may also use enforcement processes in certain jurisdictions directly. The jurisdictions in which enforcement processes are directly available include, most relevantly in the context of the English Proceedings, member states of the European Union (subject to certain criteria being met).

11

*Enforcement motions available in England and Wales*

37.    Petitioners are not in a position to confirm what specific future enforcement steps are contemplated in light of the need to maintain confidentiality and privilege. However, I describe below the enforcement steps generally available to judgment creditors in England and Wales with respect to assets located both within and outside the jurisdiction.

38.    **Third party debt orders**: Where debts are identified as owing to the judgment debtor, the judgment creditor may obtain a third party debt order under Pt 72 of the English Civil Procedure Rules ("CPR"). This is a form of attachment order whereby a debt owed to the judgment debtor becomes payable to the judgment creditor. As I explain below, Petitioners have already filed third party debt order applications in the English Proceedings with respect to bank accounts maintained by the Republic at eight banks with a presence in England and Wales.

39.    **Charging orders**: Where other assets of the judgment debtor are identified (including land, trust interests, shares and other securities), the judgment creditor may obtain a charging order under CPR 73. This is another form of attachment order, whereby the judgment creditor receives a charge over the asset in question and may apply to the English Court for an order to sell the assets and apply the sale proceeds to satisfaction of the judgment debt.

40.    **Writs and warrants of control**: The judgment creditor may obtain a writ or warrant of control under CPR 83 and 84. A writ or warrant of control authorises a High Court Enforcement Officer, being a type of bailiff, to seize and sell the judgment debtor's property to satisfy a money judgment. High Court Enforcement Officers can also be granted warrants to forcibly enter third-party premises.

41.    **Freezing orders**: The judgment creditor may apply for a freezing order (with either domestic or worldwide application) under CPR 25.1(1). This is an order that prevents the judgment debtor from disposing of assets (including, in the case of a worldwide freezing

order, anywhere in the world) until such time as the judgment debt is satisfied. The freezing order is, in this way, a protective measure that supports subsequent enforcement motions both within England and Wales and elsewhere.

42.     **<u>Receivership and insolvency (bankruptcy) applications</u>**: Where assets of the judgment debtor are difficult to enforce against, the judgment creditor may apply to the Court under CPR 69 to appoint a receiver for the purposes of realising the value of those assets. By way of example, a receiver might be appointed: (a) to enforce a beneficial interest in an asset held in trust; (b) to assist in unwinding complex asset structures, particularly where there has been extensive asset transfers or dissipation requiring tracing; or (c) to collect income streams from a judgment debtor's business or property. Judgment creditors may also seek to rely on the English insolvency regime to place the judgment debtor (or a company associated with the judgment debtor) into an applicable restructuring or insolvency procedure. However, I note that the English Courts recognise that English insolvency procedures are not generally available in the context of a sovereign judgment debtor.

43.     I wish to draw the U.S. Court's attention to several matters bearing on the nature of the above enforcement motions available under English law:

A.      *First*, each of the enforcement motions I outline above is a substantive procedure requiring the English Courts to consider issues of fact and law and make judicial determinations. They are not available automatically or by way of a "rubber stamping" exercise. By way of example, charging orders and third party debt orders generally require the Court to determine issues regarding: (a) the ownership of relevant property, which can be legal or beneficial in nature; (b) whether the property in question is capable of being subject to the type of order requested; and (c) relevantly for the purposes of the English Proceedings, any immunity from suit claimed with respect to the property. Worldwide freezing orders, in turn,

13

require the Court to determine (amongst other issues) whether there is a real risk of the judgment debtor dissipating assets so as to justify the Court freezing those assets.[1]

       B.     *Secondly*, the English Courts usually require judgment creditors seeking enforcement orders to provide: (a) evidence to assist in determining the factual issues;[2] and (b) written and oral legal submissions to assist in resolving the legal issues.[3] Parties may also seek permission from the Court to file expert evidence where relevant to the substantive issues at play, which might include for example when the assets in question are novel in nature.

       C.     *Thirdly*, as I explain below, many of the enforcement motions available under English law can be made against third parties, including creditors of the judgment debtor, such as banks and business partners, or co-owners of property. These third parties may themselves hold or have rights in respect of the targeted assets of the judgment debtor. As a result, enforcement applications are frequently contested hearings requiring the determination of multiple parties' rights in respect of the judgment debtor's assets.

44.     In addition to the above enforcement motions, judgment creditors may apply to the English Courts for information and other disclosure from the judgment debtor and third parties. I describe these information and disclosure applications below.

45.     **<u>Examination and disclosure from the judgment debtor</u>**: CPR 71 permits judgment creditors to compel a judgment debtor (or an officer of a judgment debtor) to attend the High Court of England and Wales to give information and documents for the purposes of facilitating enforcement of a judgment or other order of the English Courts. This can include information and documents regarding the judgment debtor's foreign and domestic asset

---

[1]  *Derby & Co Ltd v Weldon* [1990] Ch 48, 55–62 (a true and correct copy of which is at **<u>Exhibit 15</u>**).

[2]  E.g. CPR 25.13 requires applicants for a freezing order to file affidavit evidence substantiating the real risk of dissipation, amongst other issues.

[3]  E.g. Applications for freezing orders are considered at a hearing, requiring written and oral submissions.

position. The English Courts are also able to order disclosure pursuant to their inherent jurisdiction.[4]

46.     **<u>Non-party disclosure</u>**: Judgment creditors may also be able to seek discovery from non-parties under CPR 31.17 relevant to enforcement matters where those non-parties are subject to the jurisdiction of the English Courts (which, importantly in this case, the Davis Respondents are not).

47.     **<u>Disclosure to support freezing injunction</u>**: The judgment creditors can also apply to the Court under CPR 25.1(1)(g) for an order compelling the judgment debtor to provide a list of their assets worldwide to assist with obtaining, implementing and monitoring compliance with a freezing order.

48.     Similarly to the position for enforcement motions, each of these information and disclosure applications is a substantive procedure requiring the English Courts to consider issues of fact and law before proceeding to make rulings and issue an order. The Courts again generally require parties applying under these procedures to support their applications with evidence, and the applications frequently proceed to a contested hearing involving legal and factual argument. For example, applications for disclosure to support the obtaining of a freezing injunction require the Court to consider various issues, which include a risk of the judgment debtor dissipating or hidings its assets, or otherwise putting its assets beyond the reach of the judgment creditor.[5] Applications to examine officers of the judgment debtor require the English Courts to determine whether those officers are amenable to the jurisdiction of the English Courts, such that they can be compelled to give evidence. The English Courts will consider

---

[4]   *Maclaine Watson & Co Ltd v International Tin Council (No 2)* [1987] 1 WLR 1711, 1714-1717 (a true and correct copy of which is at **Exhibit 16**).

[5]   *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2016] 1 WLR 160, [49] (a true and correct copy of which is at **Exhibit 17**).

whether the officer factually resides within the jurisdiction of England and Wales, and (if not) whether the officer has otherwise submitted to the personal jurisdiction of the English Courts. [6]

***Enforcement steps already taken in the English Proceedings***

49.    The Judgment Sums became due and payable on 28 November 2024. As at 30 September 2025, the total Judgment Sums that remain outstanding are EUR 1,559,318,610.91.

50.    On 29 July 2025, Petitioners filed motions in the courts of England and Wales to seek third party debt orders under CPR 72 in respect of accounts held by the Republic with eight banks, namely: (a) Standard Chartered Plc; (b) ICBC Standard Bank Plc; (c) Banco Santander S.A.; (d) Santander UK Plc; (e) Bank of China Ltd; (f) Bank of China (UK) Limited; (g) Banco Bilbao Vizcaya Argentaria S.A.; and (h) JPMorgan Chase Bank, National Association.

51.    Master Eastman of the King's Bench Division of the High Court of England and Wales made interim orders in respect of those CPR 72 applications on 4 August 2025, and the interim orders were sealed by the Court on 6 August 2025. Copies of the interim orders are at **Exhibits 19** to **26**.

52.    The interim orders compel the eight banks to search for accounts the Republic holds with these institutions and freeze those accounts pending a final hearing. At the final hearing, the Court will consider whether to make a final third party debt order compelling the banks to transfer amounts held in credit in those accounts to Petitioners in satisfaction of the Judgment Sums.

53.    At the date of this declaration, correspondence with the eight banks is ongoing as to the scope of searches to be conducted pursuant to the interim orders in order to identify bank accounts belonging to the Republic. A key issue in that correspondence is who holds

---

[6]   *Masri v Consolidated Contractors International (UK) Ltd and others (No 4)* [2009] 3 WLR 385, [26] (a true and correct copy of which is at **Exhibit 18**).

accounts of the Republic, in terms of: (a) which entities, organs and officeholders might hold the Republic's accounts; and (b) whether the Republic may have control over (or beneficial ownership of) accounts not held in its name. A final hearing is not yet listed in respect of the applications.

54.     By letter dated 15 September 2025, the Republic has indicated that it will seek to oppose the granting of any final third party debt orders against the eight banks at a final hearing. The Republic's grounds of opposition relevantly include that: (a) as a factual matter, relevant accounts may not be subject to the jurisdiction of the English Courts; (b) relevant accounts may be subject to sovereign immunity; and (c) relevant accounts may not properly belong to the Republic, in that they may be owned by organs or entities alleged to be separate from the Republic. A copy of the Republic's letter (sent by their solicitors), and Petitioners' response (sent by my firm), are at **Exhibits 27** and **Exhibit 28**.

55.     Without waiver of privilege, Petitioners' efforts to identify further assets of the Republic available for execution both within England and Wales and elsewhere otherwise remain ongoing.

56.     On October 13, 2025, Petitioners wrote to the Republic requesting details of its worldwide foreign assets. The Republic has not responded to that request. A copy of Petitioners' letter (sent by my firm) is at **Exhibit 29**.

## V.     JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

57.     Petitioners understand that the Republic may own assets generated by the launch of the $LIBRA token, a digital asset whose proceeds were intended to directly fund small business development initiatives and the digitization of the Argentine economy.  Further details about the $LIBRA token and the reasons why the Republic may own assets generated by the launch of the token are at Section I & II of the Memorandum of Law accompanying the 1782 Application.

58. As explained at paragraphs 7 and 8 above, Petitioners also understand that the Davis Respondents are Texas residents and/or a Texas company who led the launch of the $LIBRA token by and through collaboration with Argentine President Javier Milei and "deployed" the $LIBRA token on the Solana blockchain via the Meteora platform. The Davis Respondents have furthermore confirmed their custody of assets belonging to the Republic associated with the $LIBRA token in ongoing proceedings before the Southern District of New York, *see Hurlock v. Kelsier Ventures et al*, No. 1:25-cv-03891-JLR (S.D.N.Y. May 9, 2025), ECF No. 93 (Counsel for Plaintiff affirming consent to Hayden Davis's request to modify the TRO freezing $LIBRA assets and laying out the terms of the modification).

59. None of the Respondents are parties to the English Proceedings.

60. Petitioners are unable to obtain documents and information held by the Davis Respondents within the framework of the English Proceedings. The Davis Respondents, upon information and belief, are not present in England and Wales, and there does not appear to be any proper basis on which the English court could exercise *in personam* jurisdiction over them. It follows that the English court will not be in a position to make an order compelling documentary disclosure and provision of testimonial evidence from the Davis Respondents in the course of the English Proceedings, and Petitioners to-date have not identified another method to obtain information held by the Davis Respondents other than through the 1782 assistance of the U.S. court. It is for this reason the 1782 Application is made.

61. By their Application, Petitioners are seeking documents and witness evidence from Respondents (as further set out in the Application and accompanying Memorandum of Law) that may be used to identify assets generated by the launch of the $LIBRA token in which the Republic has a beneficial or other legal interest and which may Petitioners may therefore enforce against to satisfy the Judgment Sums outstanding in the English Proceedings.

62.    It is my expectation that each potential enforcement proceeding in contemplation would require the English Courts to make substantive legal determinations beyond merely locating assets. As I explained above, enforcement motions in England and Wales are substantive procedures requiring the Courts to determine legal and factual issues. In the context of this case, enforcement applications may for instance raise questions as to: (a) sovereign immunity, (b) the ownership of assets (both legally and as a matter of fact); and (c) whether the specific legal and factual criteria relevant to each enforcement motion have been satisfied. I expand on these points below.

### Substantive issues of sovereign immunity

63.    Any enforcement application would likely require the High Court to make substantive legal determinations as to whether the assets in question are ones on which Petitioners have the legal right to execute and whether the Republic may claim sovereign immunity with respect to those assets.

64.    I note that, while the Republic has issued a waiver of sovereign immunity in relation to the Securities on the terms set out in the Trust Indenture, I would still expect sovereign immunity issues to arise including for the reasons below.

65.    *First*, the Republic's waiver of sovereign immunity is subject to and limited by the terms of the Trust Indenture. It is not absolute. There is, therefore, a real likelihood that the Republic will assert sovereign immunity against Petitioners in respect of certain of its assets. Any such assertion of sovereign immunity may raise issues regarding the true nature and use of assets requiring judicial determination, including for the purposes of the commercial use exception to sovereign immunity.

66.    *Second*, consistent with the waiver not being absolute, the Republic has in the English Proceedings (and, indeed, in other proceedings) already asserted sovereign immunity in respect of its assets within England and Wales and abroad:

A.      By its letter sent on 15 September 2025 in the context of the third party debt order applications filed in the English Proceedings, the Republic raises issues of sovereign immunity in respect of any accounts that may be held in the name of the Central Bank of Argentina. The letter (page 5) relies on section 14(4) of the State Immunity Act 1978 to say that "the central bank's assets are separately immune from execution".

B.      In separate third-party proceedings in England and Wales, the Republic argued at a hearing on 30 June 2025 that all of its assets held in the jurisdiction are diplomatic or consular assets subject to sovereign immunity: *Petersen Energia Inversora, S.A.U. and ors v The Argentine Republic* CL-2024-000129. A copy of the Republic's written submissions for that hearing is at **Exhibit 30**.

C.      In U.S. proceedings, the Republic has similarly asserted that: (a) its assets (other than bank accounts) held outside of Argentina "consist of … consular and military real property"; and (b) its foreign bank accounts "consist solely of … military, diplomatic, and consular accounts": *Petersen Energia Inversora, S.A.U. and Petersen Energia S.A.U. v. Argentine Republic*, 15 Civ. 2739 (LAP), Dist. Ct. SDNY.[7]

***Substantive issues of asset ownership***

67.    The contemplated enforcement proceedings may additionally require the English Court to make substantive legal determinations regarding issues of asset ownership, including by reference to evidence obtainable through the Davis Respondents' testimony and documents.

68.    Relevantly, the Republic has already raised issues about the ownership of bank accounts in the context of the third party debt order applications filed in the English Proceedings. By its letter of 15 September 2025, the Republic takes the position that assets

---

[7]   See the Argentine Republic's Responses and Objections to Plaintiffs' Information Subpoena (Document 737-1), *Petersen Energia Inversora, S.A.U. and Petersen Energia S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP), Dist. Ct. SDNY, a copy of which is at **Exhibit 31**.

held by certain decentralised agencies of the Republic are not assets of the Republic. The Republic may seek to take similar positions in respect of relevant cryptocurrency wallets identified with the assistance of the Davis Respondents' evidence.

***Substantive issues relevant to the availability of particular enforcement orders***

69.     The contemplated enforcement proceedings will also require the parties and the Court to engage with issues regarding the availability of particular enforcement orders. As I explained above, enforcement applications in England and Wales are substantive procedures requiring the English Courts to consider issues of fact and law. Each enforcement order has its own criteria that fall to be determined, and so there is likely to be argument regarding whether the Court is empowered to and should make a particular order in the factual and legal circumstances and in light of the available evidence.

## VI.     ENGLISH COURT'S RECEPTIVENESS TO SECTION 1782 APPLICATION AND NON-CIRCUMVENTION OF ENGLISH PROOF-GATHERING POLICIES

70.     I have no reason to believe that the English courts would not be receptive to the judicial assistance requested in the Application, and the request does not seek to circumvent foreign proof-gathering restrictions or other policies of England & Wales.  For the avoidance of doubt, there is no restriction or prohibition under English law for collecting and using the type of discovery that is sought in the 1782 Application. I provide further detail on the English Courts' approach to 1782 evidence below.

***The general approach of English Courts to 1782 applications***

71.     In general: (a) English courts will, and as a general matter do, give effect to a request for assistance pursuant to 1782 applications; and (b) factual evidence gathered by use of section 1782 is admissible under English law where relevant to the issues in dispute and without regard to how the adducing party obtained it (provided no illegality is involved).

72.     There is nothing unacceptable about the use of a section 1782 application to obtain evidence in the U.S. for use in English proceedings, and that is so even though the means by which such evidence is gathered is not available under English law (such as the taking of depositions). This is consistent with the general approach of English Courts, which is that litigants are left to gather factual evidence by any means available, provided that the means used are lawful in the relevant jurisdiction in which the evidence is gathered. English Courts will decline to interfere in the use of foreign evidence gathering procedures unless the person seeking to restrain use of the procedure can show that use of the procedure would constitute unconscionable conduct interfering with the fair disposal of English proceedings: *South Carolina co v Assurantie Maatschappij 'De Zeven Provincien' NV* (a true and correct copy of which is attached as **Exhibit 32**).  Consequently, the only basis for objection to use of a section 1782 application is that it would be abusive or oppressive, neither of which appears to be the case here.

73.     The above position is borne out by the decision in *South Carolina co v Assurantie N.V.*, in which the House of Lords rejected a finding by the Court of Appeal that use of information obtained from a 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure.  The House of Lords held that it did not consider that a party to English proceedings, "by seeking to exercise a right potentially available to them under the federal law of the United States [i.e., seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court."[8]  "All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in

---

[8]     *South Carolina Co v Assurantie N V.* [1987] 1 A.C. 24 (HL) at 42.

that country, documentary evidence which they believe they need in order to prepared and present their case."[9]

74. A similar decision was reached in *Nokia Corporation v Interdigital Technology Corp* (a true and correct copy of which is attached as **Exhibit 33**). There the English court denied a request to restrain a party from making a 1782 application in the United States and stated that "it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings."[10] The court further stated that "the English court should not seek to circumscribe the discretion possessed by the [U.S. District Court] by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the [Section 1782] request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment."[11]

75. The English Courts are cognisant that § 1782 differs from the procedures available under English law. This is not a bar to use of the procedure.[12] In *Omega Group Holdings Ltd v Kozeny*, Mr Peter Gross QC (sitting as a deputy judge of the High Court of England and Wales) explained that: "The fact that a party to English litigation is able to obtain evidence by means of a right available in a foreign country significantly different from that available in the English system does not, by itself, constitute unconscionable conduct."[13]

---

[9] *Id.*

[10] *Nokia Corporation v. Interdigital Technology Corp.* [2004] 12 WLUK 191; [2004] EWHC 2920 at [32].

[11] *Id.*

[12] *South Carolina Insurance Co v* Assurantie *Maatschappij 'De Zeven Provincien' NV* [1987] A.C. 24, 36 and 41-42; *Omega Group Holdings Ltd v Kozeny* [2002] C.L.C. 132, [21] (a true and correct copy of which is attached as **Exhibit 34**).

[13] *Omega Group Holdings Ltd v Kozeny* [2002] C.L.C. 132, [21].

76.      Indeed, English law actively supports and implements the principle of mutual cooperation between states on gathering evidence abroad. U.S. litigants can, for instance, seek the assistance of the English Courts for the purposes of U.S. litigation in turn. The *Evidence (Proceedings in Other Jurisdictions) Act 1975* empowers English Courts to order the examination of witnesses and the production of documents in England and Wales for use in civil foreign proceedings. Section 25 of the *Civil Jurisdiction and Judgments Act 1982* additionally empowers English Courts to grant interim remedies available in domestic proceedings (including freezing orders) in support of civil foreign proceedings. There is consistent judicial commentary to the effect that: "it is the duty and pleasure of the [English Court] to give all such assistance as it can to the requesting court within the limits imposed by the [empowering legislation]".[14]

### Position as regards depositions conducted under § 1782

77.      While depositions are not part of standard English civil procedure, English Courts nevertheless permit litigants to conduct depositions under § 1782 for the purposes of gathering evidence for use in English proceedings: *Dreymoor Fertilisers Overseas PTE Ltd v ECTG and EuroChem* [2018] EWHC 2267 (Comm), [83] (a true and correct copy of which is attached as **Exhibit 36**).

78.      Depositions were in fact introduced into evidence in the trial of the English Proceedings. Those depositions had been conducted in the U.S. as part of parallel proceedings commenced by holders of the U.S. dollar-denominated Securities issued by the Republic, and were admitted into evidence on the basis that the evidence given in those depositions was relevant to the issues in dispute at trial.

---

[14]   *USA v Philip Morris Inc* [2004] EWCA Civ 330 at [16] (a true and correct copy of which is attached as **Exhibit 35**).

79.     For the purposes of Petitioners' contemplated enforcement action in England and Wales, and in circumstances where I understand that the Davies Respondents have a close understanding of and access to information regarding the launch of the $LIBRA token, the evidence sought from the Davies Respondents by way of deposition seems likely to be similarly of assistance to (and welcomed by) the English Courts.

***Position as regards non-party discovery obtained under § 1782***

80.     English Courts permit litigants to obtain non-party discovery under § 1782 for the purposes of gathering evidence for use in English proceedings: *South Carolina co v Assurantie Maatschappij 'De Zeven Provincien' NV*; *Soriano v Forensic News LLC and ors* [2023] EWCA Civ 223 (a true and correct copy of which is attached as **Exhibit 37**). It is not relevant that the procedural thresholds to non-party discovery under English law (such as under CPR 31.17) differ from those applicable under § 1782.

***Position as regards non-party costs of complying with § 1782***

81.     English Courts do not expect or require U.S. Courts to be constrained by English procedural rules as they apply to evidence gathering procedures, including any rules as to costs. § 1782 is a U.S. law procedure supervised by the U.S. Courts. § 1782 orders are routinely obtained by parties in the context of English litigation in which my firm is acting for one of the parties, and I am not aware of any instances where the English costs rules have been applied by the U.S. Courts in place of the U.S. Courts' own procedures.

82.     Relevantly, English Courts have held that the imposing of a costs burden on persons ordered to make discovery under § 1782 does not render the procedure unconscionable so as to require intervention by the English Courts.[15] Indeed, Lord Brandon of Oakbrook, who

---

[15]     *South Carolina co v Assurantie Maatschappij 'De Zeven Provincien' NV* [1987] A.C. 24, 43-44; *Soriano v Forensic News LLC and ors* [2023] EWCA Civ 223, [18] and [34].

gave the lead judgment of the House of Lords in the *South Carolina* case, referred (at page 44) to costs incurred in opposing any § 1782 discovery as being "self-imposed".[16]

## VII.    ACCESS TO COURT RECORDS

83.    Under English law, there is a principle of open justice and hearings in English will generally be open to the public.

84.    It may be important to note, however, that documents obtained from other parties by way of disclosure are protected from collateral use both as a matter of common law and pursuant to the CPR.  Specifically, CPR 31.22(1) provides that a party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed, except where: (a) the document has been read to or by the court or referred to at a hearing which has been held in public; (b) the court gives permission; or (c) the party who disclosed the document and the person to whom the document belongs agree. The English court may also make an order restricting or prohibiting the use of a document which has been disclosed, even where the document has been read to or by the court or referred to at a hearing which has been held in public.

---

[16]    *South Carolina co v Assurantie Maatschappij 'De Zeven Provincien' NV* [1987] A.C. 24, 44.

26

I declare under penalty of perjury pursuant to 28 U.S.C § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on November 3, 2025.

London, England

/s/ Aidan Alexander O'Rourke
Aidan Alexander O'Rourke