# EXHIBIT 2

<u>**IN THE HIGH COURT OF JUSTICE**</u>          <u>**Claim No.**</u> **FL-2019-000010**

<u>**BUSINESS & PROPERTY COURTS**</u>

**COMMERCIAL COURT (QBD)**

**FINANCIAL LIST**


**BETWEEN**

**(1) PALLADIAN PARTNERS, L.P.**
**(2) HBK MASTER FUND L.P.**
**(3) HIRSH GROUP LLC**
**(4) <span style="color:red"><u>VIRTUAL EMERALD INTERNATIONAL LIMITED</u></span>**

<u>**Claimants**</u>

**-v-**


**(1) THE REPUBLIC OF ARGENTINA**
**(2) THE BANK OF NEW YORK MELLON (as Trustee)**

<u>**Defendants**</u>

---

<u>**RE-**<span style="color:green">**AMENDED**</span> **PARTICULARS OF CLAIM**</u>

---

**A: INTRODUCTION**

1. This claim relates to certain securities ("**the Securities**") issued by the First Defendant ("**the Republic**") in 2005 and 2010 and linked to its Gross Domestic Product ("**GDP**"). The Securities are Euro-denominated and trade under ISIN XS0209139244.

2. The First and Second Claimants are limited partnerships registered in the Cayman Islands, and are beneficial holders of the Securities. The Third Claimant is an limited liability company incorporated under the laws of Delaware and is a beneficial holder of the Securities. <span style="color:red"><u>The Fourth Claimant is a company incorporated under the laws of the British Virgin Islands and is a beneficial holder of the Securities.</u></span> At the <span style="color:red"><u>date of the Particulars of Claim</u></span><s>present date</s> the <span style="color:red"><u>First to Third</u></span> Claimants together <s>hold</s> <span style="color:red"><u>held</u></span> approximately 29% of such Securities in issue<span style="color:red">. <u>At the date of the Re-</u></span><span style="color:green"><u>Re-</u></span><span style="color:red"><u>Amended Particulars of Claim the Fourth Claimant holds approximately 16% of such Securities in issue, and the Second Claimant</u></span>

has increased its holding from approximately 13.1% to approximately 16.3%. The holdings of each Claimant ~~as at today's date~~ are set out in Appendix A to these Particulars.

3. The Second Defendant ("**the Trustee**") is the Trustee under a Trust Indenture ("**the Indenture**") dated 2 June 2005 between the Republic as Issuer and the Trustee as Trustee and a First Supplemental Indenture dated 30 April 2010. The Trustee is joined for the purposes of ensuring that, insofar as necessary, it is bound by and/or has the benefit of the relief sought. No wrongdoing is alleged against the Trustee.

4. The claim arises principally from the failure of the Republic to make any payment under the Securities in respect of Reference Year 2013, on the basis of its contention that one of the conditions for payment, the Performance Condition (as defined below), was not met by reason of the switch by the Republic from 1993 prices to 2004 prices in the applicable Year of Base Prices for the measurement of GDP under the Securities.

5. In summary, the Claimants' case is that:

   a) On the basis that (as the Republic contends) the use of GDP figures purportedly based on 2004 prices in respect of Reference Year 2013 is effective for relevant purposes, the Performance Condition is nevertheless met. The Republic's contention that the Performance Condition is not met is incorrect because it ignores the Adjustment Provision (as defined below) in the Securities which applies where a Year of Base Prices other than 1993 is used;

   b) The Republic's contention that the Claimants must show manifest error, wilful misconduct or bad faith in order to succeed in its claim is incorrect, but in any event, the Republic's conduct amounts to a manifest error and/or wilful misconduct and/or bad faith on its part;

   c) In the alternative, the purported retrospective switch by the Republic in March 2014 to 2004 prices in respect of the Reference Year 2013 and its decision not to publish the GDP data in 1993 prices, was carried out by the Republic for an improper purpose and/or was irrational, arbitrary and capricious.

6. The Claimants' solicitors set out a summary of the claims advanced in these Particulars in a Letter of Claim dated 10 May 2019 and sent on behalf of the First and Second Claimants.

The Republic's solicitors responded by a letter of 11 July 2019 ("**the Response Letter**"), indicating that the Republic did not accept the claims. As set out in their solicitors' letter of 26 July 2019, the First and Second Claimants do not consider that the Republic's solicitors' letter complied with the requirements of the Practice Direction on Pre-Action Conduct and Protocols, and that their rights (including as to costs) are reserved accordingly.

## B: THE SECURITIES

7.  In 2001, the Republic defaulted on its liabilities, leading to a restructuring of its debts. As part of this, it made exchange offers to its creditors in which the Securities comprised a portion of the consideration offered. Approximately 75% of creditors participated in 2005, and approximately 90% by 2010. Creditors received approximately 25% to 30% of the value of their claims.

8.  The Securities are governed by the Indenture, and by the Terms and Conditions set out on the reverse side of the Global Security representing the Securities ("**the Terms and Conditions**").  The Securities are governed by English law, and pursuant to Section 12.8 of the Indenture, in respect of the Securities the Republic submits to the jurisdiction of the English Court.

9.  Whether a payment is required to be made by the Republic for each Reference Year under the Securities depends on whether each of the three conditions to payment set out therein is satisfied. The amount of any such payment depends on the calculation of the Payment Amount (as defined). As to this:

    a)  The three conditions are set out in Section 2(b) of the Terms and Conditions[1], being:

        i)   that Actual Real GDP for the Reference Year is greater than Base Case GDP for the Reference Year ("**the GDP Level Condition**");

        ii)  that Actual Real GDP Growth for such Reference Year is greater than Base Case GDP Growth for such Reference Year ("**the Performance Condition***"); and

        iii) that the aggregate amount of all payments made under the Securities does not exceed the Payment Cap (so defined).

---

[1] Form of Global Security G-10.

b) In respect of any given Reference Year, the Calculation Date[2], which is the date when the payment amount due from the Republic is determined, is 1 November of the following year, and the Payment Date[3] is 15 December of that following year.

10. Under the Terms and Conditions, certain calculations are based on statistics published by 'Argentinian Instituto Nacional de Estadistica y Censos (National Institute of Statistics and Census)' ("**INDEC**"). INDEC is a government agency established by statute, responsible for the collection and processing of statistical data. INDEC is supervised by the Ministry of Treasury of Argentina and is a part of the Republic; it is further, or alternatively, subject to the control of the Republic.

<u>Calculation of Payment Amount</u>

11. The Payment Amount[4] for the relevant Reference Year is calculated by reference to "Excess GDP"[5] as defined in the Terms and Conditions. This is, for any given Reference Year, the amount by which Actual Nominal GDP exceeds the Nominal Base Case GDP:

a) Actual Nominal GDP[6] for such Reference Year is determined by multiplying Actual Real GDP by the GDP Deflator for the relevant Reference Year. Actual Real GDP[7] is the GDP of Argentina for that Reference Year, measured in constant prices of the Year of Base Prices, as published by INDEC. The original Year of Base Prices is specified to be 1993.[8]

b) Nominal Base Case GDP[9] is determined by multiplying the specified Base Case GDP for the relevant Reference Year (as set out in the table in the Terms and Conditions[10]) by the GDP Deflator.

---

[2] Form of Global Security G-7.
[3] Form of Global Security G-8.
[4] Form of Global Security G-8.
[5] Form of Global Security G-7.
[6] Form of Global Security G-6.
[7] Form of Global Security G-6.
[8] Form of Global Security G-9.
[9] Form of Global Security G-8.
[10] Form of Global Security G-7.

c) The GDP Deflator[11] reflects the change in price levels since 1993. It is produced by dividing the gross domestic product for that Reference Year in current prices, as published by INDEC, by the Actual Real GDP for that Reference Year.

d) Thus, in summary, Excess GDP is determined as Actual Nominal GDP for the Reference Year minus Nominal Base Case GDP for the Reference Year.

12. A calculation is then performed to calculate Available Excess GDP.[12] This is (as defined in the Terms and Conditions) an amount equal to 5% of Excess GDP for the relevant Reference Year, multiplied by the Unit of Currency Coefficient for the Euro Securities, which is 0.015387 as defined in the Terms and Conditions.[13]

13. The Payment Amount[14] itself is then calculated by converting the Available Excess GDP into Euros at the average free market exchange rate of Argentine pesos to Euros during the 15 days preceding 31 December of the relevant Reference Year, multiplied by the notional amount of the outstanding Securities (subject to a Payment Cap in any given Reference Year).

14. The formula by which the Payment Amount is calculated is set out in Appendix B.

<u>The Performance Condition under the Securities</u>

15. The Performance Condition under the Securities is the second condition set out in Section 2(b) of the Terms and Conditions.[15] This provides that no payment shall be made unless Actual Real GDP Growth is greater than Base Case GDP Growth for the Reference Year. For these purposes:

a) Actual Real GDP Growth[16] is the percentage change in Actual Real GDP for the relevant Reference Year, compared to the previous Reference Year.

---

[11] Form of Global Security G-8.
[12] Form of Global Security G-6.
[13] Form of Global Security R-5.
[14] Form of Global Security G-8.
[15] Form of Global Security G-10.
[16] Form of Global Security G-6.

b) Base Case GDP Growth[17] is defined, for any given Reference Year, as the percentage change in Base Case GDP for that Reference Year, as compared to Base Case GDP defined in the Indenture for the immediately preceding Reference Year.

16. The proper construction of the Performance Condition is in issue in these proceedings, and the Claimants plead in respect of that construction below.

General Provisions Relating to Relevant Figures and Calculations

17. Under the terms of the Terms and Conditions:

a) The Republic is required to calculate Excess GDP and the Payment Amount, which calculations are to be performed by the Ministry of Economy and Production of the Republic.

b) Other figures or formulae (for example the Performance Condition and the Adjustment Provision) are objective and their calculation is not reserved to the Republic.

c) In all cases, the figures to be used for Actual Real GDP and for the gross domestic product of Argentina in current prices are those published by INDEC.

18. It is an implied term, which is obvious and/or necessary for the business efficacy of the Securities, that the Republic shall produce the required statistical information and carry out those of the calculations which it is required to perform via INDEC, the Ministry of Treasury and/or the Ministry of Economy and Production, as appropriate, or shall procure such bodies to do so.

19. Further, it is an implied term, which is obvious and/or necessary for the business efficacy of the Securities, alternatively as a principle of the law relating to the exercise of contractual powers, that the Republic shall carry out those functions, or procure that they be carried out, in a manner which is consistent with the Terms of the Securities, for proper purposes, and in a way which is not irrational, arbitrary or capricious.

20. Section 22 of the Terms and Conditions provides that any modification or amendment of the Indenture or of the Terms and Conditions requires the consent of a supermajority of Holders of the Securities. The Republic has never sought, nor received, consent for any

---

[17] Form of Global Security G-7.

change to the Performance Condition, the Adjustment Provision or the method of calculation of the Payment Amount during the lifetime of the Securities. In the premises, if and to the extent the Republic seeks to defend its position on the basis that there has been a modification or amendment of the Indenture and/or the Terms and Conditions, then (i) there is no basis for such a defence and (ii) it would be a breach of Section 22 for it to do so.

## C: THE REPUBLIC'S REFUSAL TO PAY IN RESPECT OF REFERENCE YEAR 2013

21. For Reference Year 2013, in 1993 prices, Base Case GDP Growth was 3.22% (being the percentage change between Base Case GDP of ARS 361,124.97m for 2012 and ARS 372,753.73m for 2013 as set out in the Table in the Terms and Conditions[18]). For the Performance Condition to be met, it would be necessary for Actual Real GDP Growth in 1993 prices to exceed this figure of 3.22%.

22. According to INDEC's published GDP figures, annualised reported GDP growth in 1993 prices for the first three quarters of 2013 was +5.61% (composed of annualised growth of +3.0%, +8.3% and +5.5% respectively compared to the same three quarters of 2012). The last of those figures (for Q3 2013) was published in December 2013.

23. Accordingly, for the Performance Condition not to be met, an extreme downturn would have been required to have occurred in Q4 of 2013. This would have required:

    a) Annualised GDP growth in 1993 prices to fall to -3.85% in Q4 2013, compared to +5.5% year-on-year in the preceding quarter.

    b) GDP in Q4 2013 to contract by 5.77% compared to GDP in the preceding quarter.

24. It was therefore widely anticipated in the market and in the financial press, and would have been known to the Republic, that when the final GDP figures for 2013 were announced in February or March 2014, the Performance Condition would be met and, as a result, the Republic would be required to make a payment, likely exceeding US$2bn, in relation to the Securities for Reference Year 2013.

---

[18] Form of Global Security G-7.

7

25. This impending liability to make payment under the Securities was a matter of significant concern for the Government of the Republic because, *inter alia*:

a)  At this time, Argentina had diminishing foreign currency reserves, had limited access to US-dollar lending, and was in non-compliance with orders of the New York courts issued in litigation against it by bondholders who had declined to participate in the 2005 and 2010 exchange offers, all of which would make it difficult for the Republic to meet a large payment under the Securities; and

b)  There was political pressure not to make payment. It was a topic of open political debate, and some opposition legislators had threatened to sue government officials if reserves were used to make a payment under the Securities, which they considered should not be made.

26. In fact, the Republic never caused INDEC to publish and INDEC never published the Actual Real GDP figure for Reference Year 2013 in 1993 prices.

27. Rather, at a date presently unknown to the Claimants, a decision was taken by the Republic not to publish or cause to be published in 1993 prices the GDP figures for Q4 2013 and for the full Reference Year 2013. Instead, on 27 March 2014, INDEC published GDP figures for Q4 2013, and the full year 2013, using only what purported to be 2004 Year of Base Prices.

28. This rebasing to what purported to be 2004 Year of Base Prices entailed a change in the underlying calculation of Argentina's GDP. On that new basis, the Minister of Economy announced that growth for 2013 had been 2.93%. This is despite the fact that the Republic was reported to be defending a GDP Growth estimate of approximately 4.9% just hours before the announcement.

29. On 15 December 2014, in a press release issued by the Ministry of Finance, the Republic then took the position that no payments were to be made under the Securities for Reference Year 2013, because the Performance Condition had not been met. Its position was (and has remained) that:

a)  The Performance Condition remained at 3.22%, notwithstanding the use by the Republic of a different Year of Base Prices.

8

b)  GDP growth of 2.93% based on the purported use of 2004 Base Prices did not meet the Performance Condition.

30. The Claimants contend that the Performance Condition of 3.22% in 1993 prices was met by the actual performance of Argentina's economy for 2013:

a) The trend of actual GDP in 1993 prices, and for the first three quarters in 2013, was one of significant growth.

b) There were no reported significant macroeconomic difficulties in Argentina in Q4 of 2013 of a kind which would have produced the drastic contraction necessary to fall below the Performance Condition for Reference Year 2013.

c) According to the raw numbers for INDEC's own indicator EMAE (*Estimador Mensual de Actividad Economica*, or monthly estimate of economic activity), as published in February 2014, growth for Q4 2013 was estimated to have been + 2.7% from Q4 2012 on an annualised basis in 1993 prices. Using the growth in EMAE as an indicator of growth in GDP, this would produce Actual Real GDP Growth in 1993 prices for 2013 of 4.92%.

d) The monthly raw unrevised EMAE numbers have historically been a very accurate predictor of INDEC's final GDP growth figure.

e) The IMF's April 2014 World Economic Outlook document estimated GDP growth at 4.3%.

f) Reuters reported that had 1993 prices been used, GDP growth would have been 5.1%.

**D: PAYMENT CONDITIONS FOR 2013 WERE MET USING 2004 PRICES**

31. The Claimants' case is that the Performance Condition was in fact met using the GDP in 2004 prices in respect of Reference Year 2013, which the Republic relies upon.

The Proper Approach to Use of a Different Year of Base Prices

32. As to the proper approach:

9

a) The definition of Year of Base Prices[19] provides that if for any given Reference Year, INDEC adopts a different calendar year for prices, that year shall become the Year of Base Prices.

b) The definition of Base Case GDP[20] provides that where there is such a change to the Year of Base Prices ("**the Adjustment Provision**"):

> *"the Base Case GDP for each Reference Year shall be adjusted to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year ... by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices".*

c) Thus, pursuant to the Adjustment Provision, for <u>each</u> relevant Reference Year it is necessary to ascertain the Actual Real GDP for that year, both: (i) in 1993 prices; and (ii) in prices as at the alternative Year of Base Prices. The adjusted Base Case GDP for each Reference Year replaces the Base Case GDP for that Reference Year set out in the Terms and Conditions. The formula for the Adjustment Provision is set out in Appendix B.

d) The effect of the Adjustment Provision is that, where a Year of Base Prices other than 1993 is used to calculate Actual Real GDP and Actual Real GDP Growth, the Base Case GDP is correspondingly adjusted so that the comparison is the same as if the Actual Real GDP, and actual Real GDP Growth, had been calculated by reference to constant 1993 prices. The effect is that if the Actual Real GDP is published in a Year of Base Prices other than 1993, the GDP Level Condition and the Performance Condition: (a) will still be met, if they would have been met using 1993 prices; and (b) will not be met, if they would not have been met using 1993 prices.

e) The application of the Adjustment Provision dictates that, upon the decision to use 2004 prices for Reference Year 2013, it was necessary to replace the Base Case GDP for each of 2012 and 2013 as set out in the definition. The effect of that is that Base Case GDP

---

[19] Form of Global Security G-9.
[20] Form of Global Security G-6.

Growth between Reference Year 2012 and Reference Year 2013 should have been calculated using the adjusted Base Case GDP.

33. That approach follows from a plain reading of the words of the Terms and Conditions. However, if and insofar as it is necessary for the Court to consider the factual matrix, the Claimants identify the following relevant points, which were reasonably available to the parties in 2005 and 2010:

a) There is no single or absolute way to measure real GDP or GDP growth using constant price estimates. Actual Real GDP or GDP growth figures at constant prices must always be by reference to a specified year of base prices.

b) A change to the year of base prices can make a substantial difference to the assessment of the level and growth of a nation's Actual Real GDP. GDP growth using one year of base prices may deviate very substantially from GDP growth using another year of base prices; and may be negative using one year of base prices and positive using another. This is so (in part) because when a different year of base prices is used, the relative weightings of various goods in the economy that collectively make up GDP are changed.

c) The relationship between levels of GDP and GDP growth measured in two different years of base prices is not linear, meaning that differences in GDP as measured in the two different years of base prices will vary from year to year.

d) Differences between measurements using two different years of base prices may be substantially affected by the methodology used and the quality and availability of data. The detail of what methodology or data Argentina might use in a future re-basing was unknown.

e) Differences may be particularly large where there has been substantial passage of time between the new and old years of base prices, and/or substantial changes in the composition of the economy. Developing economies such as Argentina are more volatile than developed economies in this regard.

f) By 2005 and 2010, 1993 prices were already significantly dated as a basis for the measurement of Argentina's economy.

11

g) If the Republic were to re-base GDP during the life of the Securities, the relationship between GDP and GDP growth figures in the new year of base prices, and the same figures in 1993 prices, would be non-linear and highly unpredictable.

h) Tying the satisfaction of the Performance Condition to 1993 prices permits investors to make their investment decisions (and the Republic to assess its potential obligations) by reference to a single consistent standard of measurement of GDP, which was already known and had been in operation for a number of years.

i) It would be possible for a government or national statistical agency in the course of a re-basing to manipulate GDP figures, and GDP growth figures, by manipulating the approach taken to a change in year of base prices.

Application of the Proper Approach to Reference Year 2013

34. It follows from the correct approach set out in paragraph 32 above that, applying the Adjustment Provision, the Performance Condition for Reference Year 2013, using 2004 prices, did not remain at 3.22% (being the percentage change between Base Case GDP in 2012 and Base Case GDP in 2013, each measured in 1993 prices), but rather was the change between the new Base Case GDP for each year adjusted to reflect the change to 2004 prices.

35. In circumstances where the Republic has so far failed to publish or disclose GDP figures for Q4 2013 and full year 2013 in 1993 prices, it is not currently possible for the Claimants to specify precisely what the correct figure for the Performance Condition for Reference Year 2013 was. This will be a matter for disclosure and expert evidence, but without prejudice to that the Claimants' best estimate is as follows:

a) As to Reference Year 2012:

   i) This requires multiplying the Base Case GDP for 2012 in 1993 prices (ARS 361.1bn) by the adjustment fraction.

   ii) The adjustment fraction is 1.80, which is (i) Actual Real GDP in 2004 prices of ARS 844.8bn over (ii) Actual Real GDP in 1993 prices of ARS 468.3bn.

   iii) Thus Base Case GDP for Reference Year 2012 using 2004 base prices is ARS 651.5bn.

b) As to Reference Year 2013:

    i) This requires multiplying the Base Case GDP for 2013 in 1993 prices (ARS 372.8bn) by the adjustment fraction.

    ii) As to the adjustment fraction, the numerator is Actual Real GDP in 2004 prices of ARS 869.5bn. The published data for the denominator is incomplete, as the Republic (via INDEC) never published final figures for Q4 2013 or full year 2013. Using the published data for the first three quarters plus an estimate of change in GDP for the fourth quarter using the EMAE as an indicator produces an estimate for the year of ARS 491.3bn. This gives an adjustment fraction of 1.77.

    iii) On this basis, Base Case GDP for Reference Year 2013 in 2004 prices is ARS 659.7bn.

36. The effect of this is that, using 2004 Base Prices, the Performance Condition for Reference Year 2013 is 1.26% (being the percentage increase from ARS 651.5bn to ARS 659.7bn).

37. The Republic does not dispute that the other two conditions in Section 2(b) of the Terms and Conditions were met, regardless of whether 1993 or 2004 prices are used, in that: (i) that Actual Real GDP for the Reference Year 2013 is greater than Base Case GDP for the Reference Year 2013 and (ii) the aggregate amount of all payments made under the Securities, including the proper Payment Amount for Reference Year 2013, would not exceed the Payment Cap.

38. Accordingly on the Republic's own figures and using 2004 Base Prices, Actual Real GDP Growth (2.93%) exceeded the Performance Condition.

39. The Payment Amount should have been calculated at 7.04 cents per 1 euro notional amount outstanding, as follows:

a) Excess GDP was ARS 805.9bn (which for the purposes of the calculations necessary to determine the Payment Amount is taken to be ARS 805.9, rather than ARS 805,900,000,000).

13

b) Available Excess GDP is 5% of Excess GDP, namely ARS 40.3bn (which is similarly taken to be ARS 40.3 for the purposes of the calculations necessary to determine the Payment Amount).

c) ARS 40.3bn multiplied by the Unit of Currency Coefficient (0.015386959) and the average free market exchange rate of pesos to euros during the 15 days preceding 31 December of the relevant Reference Year (EUR 0.1135 per peso), produces a payment of EUR 0.0704 for each euro of notional value of the securities.

40. The effect of this is that the best estimate of the amount payable in respect of Reference Year 2013, in respect of the Securities held beneficially by the First to Third Claimants at the date of the Particulars of Claim present date, was EUR 384,733,711.50. In respect of the additional Securities acquired by the Second Claimant since the date of the Particulars of Claim it was EUR 37,857,606.69 41,693,670.59 and in respect of the securities held by the Fourth Claimant at the date of the Amended Particulars of Claim was EUR 218,857,644.50. Each amount was payable on 15 December 2014.

41. The Republic is in breach of contract by reason of:

a) Its failure to pay the proper Payment Amount; and/or

b) Its failure to publish and use, and/or procure the publication and use of GDP data in 1993 prices for Q4 2013 and Full Year 2013; and/or

c) Its failure to calculate the Payment Amount at all or by the correct method, which is a breach of Section 20 of the Terms and Conditions; and/or

d) Its adoption of a position that the Performance Condition had not been met, by the purported use of a Performance Condition of 3.22% in combination with 2004 prices.

The Republic's Case to the Contrary

42. In its Response Letter the Republic contends that:

a) Because INDEC did not publish GDP figures for full year 2013 in 1993 prices, a "*necessary input*" to the Adjustment Provision was "*unavailable*" and therefore the Adjustment Provision does not apply.

b) It is inappropriate to estimate GDP for 2013 in 1993 prices using EMAE or other estimates, because the Terms and Conditions mandate the use of INDEC published final figures only.

c) To succeed, the Claimants would have to show that the Republic was guilty of bad faith, wilful misconduct or manifest error.

43. Those are all matters of law, and the Claimants reserve the right to plead fully in Reply to a properly particularised Defence, but in summary the Claimants' position is as follows:

a) As to the first point:

i) Application of the Adjustment Provision is not optional - it is a required part of the assessment of whether the Performance Condition has been met under the Securities.

ii) As set out above, it was an implied term that the Republic produce or procure the production of the required statistical information so that (amongst other provisions of the Terms and Conditions) the Adjustment Provision could be operated, as agreed.

iii) The Republic is not entitled to rely on its own breach, in failing to produce or procure the production of the required statistical information, to change the basis on which the Performance Condition is applied.

b) As to the second point, the Republic will be required to give disclosure of the full year 2013 figures in 1993 prices. If such figures are not available, the Court is entitled to use the best evidence of what GDP and GDP Growth in 1993 prices would have been. The Claimants contend that the best evidence is the EMAE figures as published by INDEC.

c) As to the third point:

i) The definitions of Excess GDP and Payment Amount in the Terms and Conditions[21] provide that all calculations made by the Ministry of Economy in calculating the

---

[21] Form of Global Security G-8

Excess GDP and Payment Amount respectively shall be binding unless made in bad faith or the product of wilful misconduct or manifest error.

ii) On a true construction, those words apply only to the mechanical calculations to be carried out by the Ministry of Economy in determining Excess GDP and the Payment Amount. They do not and cannot, on a proper construction of the Securities, apply relevantly, to: (i) the question of whether the Performance Condition has been met, which is an objective question not subject to determination by the Republic or any other party; or (ii) the production and publication of the underlying GDP figures by INDEC.

iii) Alternatively, if those provisions do apply, then the Republic is guilty of manifest error, wilful misconduct and/or bad faith, for the reasons set out in Section E below.

**E: MANIFEST ERROR, WILFUL MISCONDUCT AND BAD FAITH**

44. Insofar as relevant, such conduct by the Republic complained of in Section D above amounts to a manifest error, in that its approach is manifestly inconsistent with the requirements of the Securities, including a refusal to apply the Adjustment Provision at all.

45. Further or alternatively, for the reasons set out in the following paragraphs, the Republic's conduct in (i) deciding to switch to 2004 as the Year of Base Prices and to immediately cease to publish or cause to be published data in 1993 prices, and/or (ii) refusing to apply the Adjustment Provision, and/or (iii) the matters set out in paragraph 39 above, amount to wilful default and/or bad faith on the part of the Republic, in that:

a) The relevant decisions aforesaid were made by the Republic wholly or principally for an improper purpose, namely for political and/or financial reasons in order to avoid or reduce a payment under the Securities; and/or

b) It was known by the Republic, and/or the Republic was reckless as to the fact that, the use of 2004 Base Prices would not produce an accurate estimate of the GDP of Argentina in 2013.

46. Despite requests in correspondence, the Republic has refused to give disclosure of its decision-making process and working papers in relation to these matters. The Claimants

reserve their right to plead further on the provision of disclosure, but at present rely on the following matters in this regard:

a) The background set out in paragraphs 21 to 24 above, namely that it appeared highly likely, based on the published data and on Argentina's reported economic performance, that based on GDP figures in 1993 prices, a substantial payment under the Securities would fall due in respect of Reference Year 2013.

b) The financial difficulties and political pressure faced by the Government of the Republic, in making such a payment, as set out in paragraph 25 above.

c) The timing of the announcement of the Republic's intention to adopt a new Year of Base Prices. This was announced on 27 September 2013, at the same time as the announcement of an 8.3% year-on-year growth figure for Q2 2013 in constant 1993 prices.

d) The combination of the sudden adoption in March 2014 of a new Year of Base Prices with the decision to immediately cease publishing data in 1993 prices even though:

i) Such a cessation was not a necessary consequence of a decision to publish data in 2004 prices. It would have been entirely feasible to publish both.

ii) Data for the first three quarters of 2013 had already been published in 1993 prices. The fourth quarter of that year was already complete, and data in 1993 prices for that quarter was or ought to have been available.

iii) Data in 1993 prices was a necessary input to the Adjustment Provision and thus the Performance Condition under the Securities.

iv) The cessation made it impossible for investors in the Securities and others to compare the GDP position in 1993 prices to the asserted GDP position in 2004 prices.

e) The fact that the Republic's Response Letter refers to the decree implementing the 2004 economic census, and to an INDEC methodological note of 2007, but does not identify any indication in the period 2008 to 2012 that work was taking place on an intended re-

basing. Nor does it indicate when the decision to rebase was made by the Republic, or why it was made at that time.

f)  A purported re-basing to 2004 prices was a re-basing which was known to be using old data.

g)  The purported re-basing to 2004 prices was conducted at a time when, pursuant to international standards and the Republic's own 2004 decree, which mandated an economic census approximately every 10 years, a further economic census would have been due to be conducted later that year (2014), which would have produced much more up to date figures.

h)  The facts that INDEC's Director, Anna Maria Edwin, is reported by Citigroup to have said in October 2013 that the change to year of base prices should not affect GDP growth figure significantly. Contrary to her statement in October 2013, the figures released in March 2014 did reflect a significant difference (producing a figure of 2.93% using 2004 prices when, as set out above, the figure using 1993 prices would have been approximately 4.92%).

i)  The history of the Republic, under the governments of Nestor Kirchner and Cristina Fernandez de Kirchner (2003 to 2015), of manipulating its economic statistics, including for the purposes of (or with the effect of) depriving bondholders of sums to which they were entitled:

  i)  In 2007, the Commerce Secretary, Guillermo Moreno, instructed statisticians at INDEC to produce figures which substantially understated the CPI (Consumer Price Index).

  ii)  When a senior government statistician, the Director of Consumer Prices, Graciela Bevacqua, refused to comply with this request, she was removed from her post. Marcela Almeida, who was Coordinator of the National Consumer Price Index, was relieved of her tasks for a year without salary until a court ordered her reinstatement.

  iii) INDEC's government-instructed suppression of CPI figures from 2007 onwards was estimated to have saved the Republic approximately US$2.5bn on its inflation-linked bonds.

18

iv) The government attempted to use legal measures to suppress dissent in relation to its CPI figures. The Economist reported that in February 2011 Mr Moreno sent letters to 12 dissenting economists and consultants, including Ms Bevacqua, demanding they reveal their rival methodology and suggesting they may be misleading consumers. 7 were subsequently fined a sum of US$123,000 each.

v) In a statement of 1 February 2013 the IMF's Executive Board issued a declaration of censure against the Republic in relation to its CPI and GDP Data. This was the first such reprimand issued by the IMF since 2004.

vi) The IMF's censure was not withdrawn until November 2016, a year after the election of President Mauricio Macri, who, shortly after taking office, had declared a "*national statistical emergency*" which involved the replacement of key personnel at INDEC and substantial revisions to its working practices.

j) It is to be inferred, based on the matters set out in the preceding sub-paragraphs, that the Republic did not have any or any real belief that the purported rebasing was being carried out on a sound statistical basis.

## F: PERFORMANCE CONDITION AND PAYMENT ACCOUNT TO BE CALCULATED BY REFERENCE TO 1993 PRICES

47. In the event that the Court determines that the effect of the change in Year of Base Prices is not as set out in Section D above, the Claimants advance the alternative case set out in this section.

48. On a true construction, the references in the Terms and Conditions to use of a different Year of Base Prices or a "*change*" to the Year of Base Prices are to the use of a Year of Base Prices other than 1993 which is made and implemented in good faith for the proper purpose of producing an accurate assessment of the GDP of Argentina, and in a manner which is not irrational, arbitrary or capricious.

49. The purported switch in early 2014, to 2004 as a Year of Base Prices and to cease to publish GDP figures in 1993 prices was not a change within the meaning of paragraph 48 above, for the reasons set out in Section E above.

19

50. Accordingly, the Payment Conditions and the Payment Amount therefore remained to be determined by reference to 1993 prices. On this basis:

a) The Performance Condition remained at 3.22% based on the GDP for Reference Year 2012 in 1993 prices. This condition was met for the reasons set out at paragraph 30 above.

b) The other Conditions were also met.

c) The Payment Amount will be a matter for disclosure and expert evidence, but without prejudice to that the Claimants' best estimate is that, using the EMAE figure for Q4 2013 and the full year 2014, the Payment Amount should have been calculated at 5.72 cents in the Euro, as follows:

   i) Excess GDP was ARS 655.1bn.

   ii) Available Excess GDP is 5% of Excess GDP, namely ARS 32.8bn.

   iii) ARS 32.8bn multiplied by the Unit of Currency Coefficient (0.015386959) and the average free market exchange rate of pesos to euros during the 15 days preceding 31 December 2013 (EUR 0.1135 per peso); produces a payment of EUR 0.0572 for each euro of notional value of the Securities.

51. The Republic is in breach of contract by reason of:

a) Its failure to pay the proper Payment Amount; and/or

b) Its failure to publish and to use GDP data in 1993 prices for Q4 2013 and Full Year 2013; and/or

c) Its failure to calculate the Payment Amount at all or by the correct method, which is a breach of Section 20 of the Terms and Conditions.

**G: CLAIMANTS' ENTITLEMENT TO A REMEDY**

52. Pursuant to Section 4.9 of the Indenture, the Claimants have an absolute and unconditional right to pursue proceedings for the enforcement of principal and interest on the Securities in respect of their own beneficial interests.

53. Further and in any event, the First and Second Claimants have complied with the provisions of Section 4.8 of the Indenture, entitling them to institute proceedings in their own name to enforce the terms of the Securities. By a letter of 14 March 2019, the Trustee confirmed that, notwithstanding the offer of a reasonable indemnity and/or security as required and which it considered to be sufficient, its decision was that it would not pursue the proposed claims.

54. The Claimants seek the following remedies:

a) Declaratory relief setting out the proper construction and operation of the relevant provisions in the context of a purported change to the Year of Base Prices.

b) Further or alternatively, declaratory relief that:

    i) The Republic's position in relation to the Performance Condition for Reference Year 2013 is incorrect.

    ii) The Republic was not entitled to calculate, and has not validly calculated, the Payment Amount for Reference Year 2013 based on 2004 prices.

c) An Order for payment by the Republic to the Claimants of the principal amounts due on the Securities of which they are the beneficial owners for Reference Year 2013, being EUR 384,733,711.50 in respect of the Securities held by the First to Third Claimants at the date of the Particulars of Claim, EUR ~~37,857,606.69~~ 41,693,670.59 in respect of the Securities acquired by the Second Claimant since the Particulars of Claim and ~~EUR 218,857,644.50 in respect of the Fourth Claimant~~, alternatively EUR 312,596,140.60 in respect of the First to Third Claimants at the date of the Particulars of Claim, EUR ~~30,759,305.43~~ 33,876,107.35 in respect of the Securities acquired by the Second Claimant since the Particulars of Claim and EUR 177,821,836.10 in respect of the Fourth Claimant, based on their current holdings.

d) Alternatively, an Order for payment of the same amounts to the Trustee by the Republic, and by the Trustee to the Claimants.

e) Alternatively, an Order for payment of the full amount due for Reference Year 2013 under all of the Securities to the Trustee, and for distribution of that amount (net of any permitted deductions) by the Trustee to the beneficial owners of the Securities; and, in

that event, an Order that the Claimants be indemnified as to their costs out of the sums paid to the Trustee;

f) Further or alternatively, damages for breach of contract reflecting the loss and damage suffered by the Claimants by reason of the failure to pay the amounts to which they should have been entitled under the Securities for Reference Year 2013;

g) Interest on the amounts specified above, pursuant to the s.35A of the Senior Courts Act 1981, alternatively in the equitable discretion of the Court:

   i) At the rate of 8% simple.

   ii) Alternatively, at such other rate as the Court shall think fit.

   iii) In each case for the period from 15 December 2014 to the date of payment, alternatively for such period as the Court thinks fit.

h) An order for specific performance or final injunctive relief requiring the Republic to:

   i) publish or cause to be published GDP data in 1993 prices for each Reference Year from 2013 until the expiry of the Securities, along with any other required information; and

   ii) to make payment for each Reference Year based on a Performance Condition and Payment Amount determined on the correct basis for each such Reference Year.

i) Such further or other relief (including any accounts or enquiries) as may be necessary to vindicate the Claimants' rights under the Securities.

**AND THE CLAIMANTS CLAIM:**

1) Declaratory relief

2) Payment of the amounts due under the Securities

3) Damages

4) Interest

5) Specific performance

6) Final injunctive relief

7) Further or other relief

8) Costs

~~Sue Prevezer QC~~

~~Alex Barden~~

~~SUE PREVEZER QC~~

~~ALEX BARDEN~~

SUE PREVEZER QC

ALEX BARDEN

**Statement of Truth**

The Claimants believe that the facts stated in these Re-Amended Particulars of Claim are true.

…………………………………………..

Name: AIDAN ALEXANDER O'ROURKE

Date: 23 DECEMBER 2019.

Position held: PARTNER, QUINN EMANUEL URQUHART AND SULLIVAN UK LLP

23

**Appendix A**

**Holdings of EUR-denominated Securities in notional amounts (as referred to in paragraph 3 of Particulars of Claim ~~at the date of the Particulars of Claim~~):**

1.  **Palladian Partners, L.P. =** 2,854,353,464.00

2.  **HBK Master Fund L.P.** = ~~2,488,614,029.00~~   ~~3,026,364,124~~  3,080,853,668

3.  **Hirsh Group LLC  =**  122,000,000.00

4.  **Virtual Emerald International Limited  =**  3,108,773,359.00

24

**Appendix B**

**"Payment Amount"[1]**

$$Payment\ Amount = 5\% \times (N - Y^* \times D) \times K \times E \times Q$$

$$\underline{\text{Where: }} D = \frac{N}{Y}$$

In the above formula:

- $D$ = *'GDP Deflator'*
- $N$ = the gross domestic product of Argentina for such Reference Year measured at the current prices of such Reference Year.
- $Y$ = '*Actual Real GDP*'[2] for the Reference Year.
- $Y^*$ = '*Base Case GDP*'[3] for the Reference Year.
- $K$ = Unit of Currency Coefficient (i.e. 0.015387).
- $E$ = exchange rate of pesos to euro using the average free market exchange rate of pesos to euro during the 15 days preceding December 31 of the relevant Reference Year.
- $Q$ = the notional amount of the outstanding Securities.

Each of N, Y and Y* are expressed as the number of billion Argentine pesos (i.e. the number of Argentine pesos, divided by 1 billion).

**"Adjustment Provision"**

$$Base\ Case\ GDP\ in\ (new)\ Year\ of\ Base\ Prices = X \times \frac{Y}{Z}$$

In the above formula:

- $X$ = '*Base Case GDP*' for such Reference Year (as set forth in the chart in the Form of Global Security G-7).
- $Y$ = the '*Actual Real GDP*' for such Reference Year measured in constant prices of the (new) Year of Base Prices.
- $Z$ = the '*Actual Real GDP*' for such Reference Year measured in constant 1993 prices.

---

[1]  Subject to a Payment Cap in any given Reference Year.

[2]  Form of Global Security G-6.

[3]  Form of Global Security G-6.