# EXHIBIT 15

# BARD

*A College of the Liberal Arts and Sciences*                    *Division of Languages and Literature*

**On Behalf of Ali Sajad Faqirzada**

To Whom it May Concern:

Writing for Ali Sajad Faqirzada gives me particular pleasure. I taught him a year ago when he was beginning his studies at Bard College. I was also his advisor, a role that enabled me to meet with him often, and follow his progress as a first-year student. I co-taught the first-year seminar with Professor Wendy Urban-Mead, who also thinks very highly of Ali Sajad.

In this particular class, I had assigned a novel that was about the difficulties of rebuilding one's life. Many of the students took this book to heart, feeling it was relevant to their situation. Indeed, they were all adapting to new conventions and some, like Ali Sajad, to a new language. The cohort was at times quite opinionated. One day, one particularly agitated student began criticizing American institutions. I could immediately tell that this greatly upset Ali Sajad. He never tired telling his fellow students how grateful he was to have found in the USA a country of adoption, he seemed mystified by the student's attitude. It was a striking scene. He shook his head and spoke about how he finally felt respected and this, he would never take for granted. "I want to reciprocate this respect," I heard him say. "And how do you do that?" the suspicious student asked. Ali thought for a moment and then pointed to the book we were reading, to the heated classroom we were sitting in, and to the campus outside. "I want my English to be perfect so I can find a way of writing about this opportunity. In Afghanistan, many people, especially women, are no longer allowed to take classes. I think about them every day." The class became silent and even the disgruntled student looked away. When the class was over, this student went to Ali Sajad and shook his hand. "Thank you," she said. I will remember that scene for a long time.

Many of my students, foreign and American alike, do not always realize how fortunate they are. Sometimes it takes somebody like Ali to make them aware of their freedom and the great opportunity that education provides.

Ali Sajad's kindness and tolerance radiated on all the members of our seminar; his sunny disposition ended up making the classroom a better place. He wanted for others, especially for those who he left behind in Afghanistan, what he was experiencing himself. I only learned recently that his sister had fought for women's education in her home country. With this knowledge, I now understand why he had very little tolerance for those who seemed unappreciative. He is greatly missed at Bard.

Respectfully,

Marina van Zuylen
Clemente Chair in the Humanities, Professor of Literature

*PO Box 5000, Annandale-on-Hudson, NY  12504-5000*                    *Telephone: 845-758-6822*

[1990]

[COURT OF APPEAL]                                    A

DERBY & CO. LTD. AND OTHERS v. WELDON AND OTHERS

[1987 D. No. 3804]

1988   July 19, 20, 22, 25, 26, 27, 28, 29        May, Parker and Nicholls L.JJ.    B

*Injunction—Mareva injunction—Jurisdiction—Interlocutory application
to freeze foreign assets—Jurisdiction to grant worldwide
injunction—Safeguards to protect third parties and to avoid
oppression of defendants*

The first two defendants were formerly directors of two of the
plaintiff companies. The plaintiffs, all companies in a large group    C
of associated companies, sought substantial damages for breach of
contract, negligence, breach of fiduciary duty, deceit and conspiracy
to defraud alleging that the defendants, contrary to their obligations
to the plaintiffs, had dealt in commodities on their own behalf on
a large scale worldwide, and had allowed the plaintiff group to
suffer huge trading losses. The plaintiffs by motion sought *Mareva*
injunctions freezing and ordering disclosure of the defendants'    D
assets up to the value of £25m. both inside and outside the
jurisdiction. The defendants disclosed assets within the jurisdiction
which fell far short of the sum that would satisfy the claim and
denied that they had any assets elsewhere in the E.E.C. countries
or that the court had any jurisdiction to grant *Mareva* injunctions
outside the jurisdiction. On hearing the motion the judge granted
a *Mareva* injunction in relation to the defendants' English assets    E
on the grounds that a refusal would involve a real risk that a final
judgment in favour of the plaintiffs would remain unsatisfied since
there were grounds for supposing that the defendants might have
acted dishonestly and were able to lock away assets in inaccessible
overseas companies. However he refused a *Mareva* injunction in
relation to the foreign assets as being contrary to the court's
practice.

On the plaintiffs' appeal against the judge's refusal of a    F
worldwide *Mareva* and on the defendants' cross-appeal against the
judge's finding that there was a high risk that the defendants
would dispose of their foreign assets before judgment:—

*Held,* allowing the plaintiffs' appeal and dismissing the
defendants' cross-appeal, that the court would only make a pre-
judgment worldwide *Mareva* and concomitant disclosure order in
an exceptional case; that in view of the very large sum involved,    G
the insufficiency of English assets, the existence of foreign assets
and the judge's justifiable finding that there was a real risk that
they would be dissipated before trial it was appropriate as a matter
of justice to the plaintiffs to make such an order; that the
defendants had a safeguard against undue oppressiveness as long
as by undertaking or proviso or a combination of both they were
protected both from a multiplicity of proceedings in foreign    H
jurisdictions and from the misuse abroad of information gained
from the order for disclosure; and that, accordingly, since the
position of third parties would be protected by a proviso preserving
the personal effect of such an order on and to the particular

A    defendants against whom it was directed, in all the circumstances it was just and convenient to grant a *Mareva* injunction in relation to the defendants' assets wherever situated (post, pp. 54F–G, 55B–E, F–H, 56C–D. E, 57A–B, 58G, 61D).

   *Babanaft International Co. S.A. v. Bassatne* [1990] Ch. 13, C.A. and *Republic of Haiti v. Duvalier* [1990] Q.B. 202, C.A. applied.

   *Ashtiani v. Kashi* [1987] Q.B. 888, C.A. considered.

B    *Per curiam.* Although the principles applying to the grant of a *Mareva* injunction, a developing jurisdiction, should be fully argued where appropriate, there should not be allowed (i) any attempt to persuade a court to resolve disputed questions of fact whether relating to the merits of the underlying claim in respect of which a *Mareva* is sought or relating to the elements of the *Mareva* jurisdiction such as that of dissipation or (ii) detailed argument on difficult points of law on which the claim of either party may ultimately depend (post, pp. 58E–G, 64D–E).

C    Dicta of Lord Diplock in *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396, 407, H.L.(E.) and of Lord Templeman in *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460, 465, H.L.(E.) applied.

   Order of Mervyn Davies J. varied.

D

   The following cases are referred to in the judgments:

   *A v. C (Note)* [1981] Q.B. 956; [1981] 2 W.L.R. 629; [1980] 2 All E.R. 347
   *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396; [1975] 2 W.L.R. 316; [1975] 1 All E.R. 504, H.L.(E.)
   *Ashtiani v. Kashi* [1987] Q.B. 888; [1986] 3 W.L.R. 647; [1986] 2 All E.R. 970, C.A.

E    *Babanaft International Co. S.A. v. Bassatne* [1990] Ch. 13; [1989] 2 W.L.R. 232; [1989] 1 All E.R. 433, C.A.
   *Ballabil Holdings Pty. Ltd. v. Hospital Products Ltd.* [1984] 2 N.S.W.L.R. 662; (1985) 1 N.S.W.L.R. 155
   *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353, C.A.
   *Clunies-Ross, In re; Ex parte Totterdell* (1987) 72 A.L.R. 241

F    *Coombs and Barei Constructions Pty. Ltd. v. Dynasty Pty. Ltd.* (1986) 42 S.A.S.R. 413
   *Guinness Plc. v. Saunders* [1988] 1 W.L.R. 863; [1988] 2 All E.R 940, C.A.
   *Haiti (Republic of) v. Duvalier* [1990] Q.B. 202; [1989] 2 W.L.R. 261; [1989] 1 All E.R. 456, C.A.
   *Interpool Ltd. v. Galani* [1988] Q.B. 738; [1987] 3 W.L.R. 1042; [1987] 2 All E.R. 981, C.A.

G    *Lister & Co. v. Stubbs* (1890) 45 Ch.D. 1, Stirling J. and C.A.
   *Maclaine Watson & Co. Ltd. v. International Tin Council (No. 2)* [1989] Ch. 286; [1988] 3 W.L.R. 1190; [1988] 3 All E.R. 257, C.A.
   *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460; [1986] 3 W.L.R. 972; [1986] 3 All E.R. 843, H.L.(E.)

H    The following additional cases were cited in argument:

   *Allied Arab Bank Ltd. v. Hajjar* [1988] Q.B. 787; [1988] 2 W.L.R. 942; [1987] 3 All E.R. 739
   *Attorney-General's Reference (No. 1 of 1985)* [1986] Q.B. 491; [1986] 2 W.L.R. 733; [1986] 2 All E.R. 219, C.A.

*Avant Petroleum Inc. v. Gatoil Overseas Inc.* [1986] 2 Lloyd's Rep. 236, C.A.

A

*Cook v. Deeks* [1916] 1 A.C. 554, P.C.

*Cook Industries Inc. v. Galliher* [1979] Ch. 439; [1978] 3 W.L.R. 637; [1978] 3 All E.R. 945

*Denilauler v. S.n.c. Couchet Frères* (Case 125/79) [1980] E.C.R. 1553, E.C.J.

*House of Spring Gardens Ltd. v. Waite* [1984] F.S.R. 277

B

*London and Counties Securities v. Caplan* (unreported), 26 May 1978, Templeman J.

*Marshall (Thomas) (Exports) Ltd. v. Guinle* [1979] Ch. 227; [1978] 3 W.L.R. 116; [1978] I.C.R. 905; [1978] 3 All E.R. 193

*Metropolitan Bank v. Heiron* (1880) 5 Ex.D. 319, C.A.

*National Bank of Greece v. Constantinos Dimitriou,* The Times, 16 November 1987; Court of Appeal (Civil Division) Transcript No. 1107 of 1987, C.A.

C

*Porzelack K.G. v. Porzelack (U.K.) Ltd.* [1987] 1 W.L.R. 420; [1987] 1 All E.R. 1074

*Shell-Mex and B.P. Ltd. v. Clayton* [1956] 1 W.L.R. 1198; [1956] 3 All E.R. 185, H.L.(E.)

*Space Investments Ltd. v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd.* [1986] 1 W.L.R. 1072; [1986] 3 All E.R. 75, P.C.

*Sterling Engineering Co. Ltd. v. Patchett* [1955] A.C. 534; [1955] 2 W.L.R. 424; [1955] 1 All E.R. 369, H.L.(E.)

D

*Thompson's Settlement, In re* [1986] Ch. 99; [1985] 3 W.L.R. 486; [1985] 2 All E.R. 720

*Yandil Holdings Pty. Ltd. v. Insurance Co. of North America* (1986) 7 N.S.W.L.R. 571

E

INTERLOCUTORY APPEAL AND CROSS-APPEAL from Mervyn Davies J.

The plaintiffs, Derby & Co. Ltd., Cocoa Merchants Ltd. (C.M.L.), Phibro-Salomon Finance A.G., Phibro-Salomon Ltd., Philipp Brothers Inc., Philipp Brothers Ltd. and Salomon Inc., all companies in the Salomon group of companies, issued a writ on 25 June 1987. They sought from the first and second defendants, Anthony Henry David Weldon and Ian Jay, formerly directors of C.M.L., and against the third and fourth defendants, Milco Corporation of Panama and C.M.L. Holding S.A. of Luxembourg (C.M.L.), damages for breach of contract, negligence, breach of fiduciary duty, deceit and conspiracy to defraud. The claims arose out of the trading activities of C.M.L. between February 1981 and June 1984 while under the management of the first and second defendants and in particular the dealings with a Far Eastern commodity dealer, Cocoa Merchants (Far East) Ltd. (C.M.F.E.), allegedly one of the first and second defendants' nominee companies, which in 1984 became insolvent owing over £35 million to C.M.L.

F

G

On 4 December 1987 the plaintiffs applied ex parte to Sir Nicolas Browne-Wilkinson V.-C. for *Mareva* orders restraining Mr. Weldon and Mr. Jay from removing out of the United Kingdom or from France, Italy, West Germany, Luxembourg, Eire, Denmark or the Netherlands any of their assets within the United Kingdom or the continental countries; from dealing with any such assets save in so far as they exceeded £25m.; and compelling Mr. Weldon and Mr. Jay to serve

H

A  affidavits within seven days disclosing the full value of the assets. The ex parte order was granted over seven days.

On 11 December 1987 the matter came before Sir Nicolas Browne-Wilkinson V.-C. inter partes, when in a second notice of motion dated 8 December the plaintiffs sought even wider orders, freezing the assets exceeding £25m. wheresoever in the world situate and for disclosure of particulars of bank accounts, nominees, etc. At the hearing, as the

B  parties were not ready, Mr. Weldon and Mr. Jay gave undertakings essentially in the terms of the order sought holding the position until the motions could be heard. Affidavits of the assets were lodged with Chief Master Munrow and ordered not to be disclosed to the plaintiffs pending the hearing of the motions.

The motions came on before Mervyn Davies J. on 21 April 1988 and

C  on 20 June he gave judgment granting a *Mareva* injunction freezing the defendants' assets within the jurisdiction but refusing an order in relation to assets outside the jurisdiction and made orders pursuant to that judgment on 27 June including (in paragraph 6) certain orders for tracing relief in relation to sums of money paid by or on behalf of C.M.L. to C.M.F.E.

By a notice of appeal dated 4 July 1988 the plaintiffs appealed inter

D  alia from so much of the order of 27 June as declined to order that the defendants should be enjoined from disposing of assets outside the jurisdiction and that they should make and serve affidavits disclosing the whereabouts and value of such assets on the grounds, inter alia, that the judge failed to take into account the developing practice of the *Mareva* jurisdiction and the proper principles upon which it should be

E  exercised.

By a respondent's notice dated 8 July 1988 the defendants cross-appealed (in so far as necessary to rebut the plaintiffs' claim to *Mareva* relief against such defendants outside the jurisdiction) against (1) so much of the judgment of Mervyn Davies J. of 20 June as held that the two factors which the plaintiffs had to establish in order to ground their claim for *Mareva* relief, namely (a) that they had a good arguable case

F  and (b) that there was a danger that the defendants might dispose of their assets before judgment, were present on the facts of the case to a high degree and (2) against the grant of tracing relief.

The facts are stated in the judgment of May L.J.


*Michael Lyndon-Stanford Q.C., Charles Purle* and *J. Stephen Smith*

G  for the plaintiffs. The plaintiffs seek a worldwide pre-judgment *Mareva* injunction over the overseas assets of the defendants who the trial judge found were likely to dissipate those overseas assets so as to frustrate execution against them. The *Mareva* jurisdiction is constantly developing and there is no compelling reason why, subject to appropriate safeguards for third parties and the avoidance of undue oppressiveness to defendants,

H  an English court should not attempt to hold the position pending judgment when the plaintiffs have established a good arguable case on their claim against the defendants.

The court has jurisdiction to grant an injunction over property situated abroad and the practice of the court is becoming more

favourable to the grant of such a remedy in this fast developing area.    A
[Reference was made to *Ashtiani v. Kashi* [1987] Q.B. 888; *Babanaft International Co. S.A. v. Bassatne* [1990] Ch. 13; *Republic of Haiti v. Duvalier* [1990] Q.B. 202; *London and Counties Securities v. Caplan* (unreported), 26 May 1978, Templeman J. and *Cook Industries Inc. v. Galliher* [1979] Ch. 439.] This is especially appropriate in a world of ever increasing international trade and communication and in the light of the development of the mutual enforceability of court orders between    B
the countries of the European Economic Community: see *Porzelack K.G. v. Porzelack (U.K.) Ltd.* [1987] 1 W.L.R. 420. Furthermore *Denilauler v. S.n.c. Couchet Frères* (Case 125/79) [1980] E.C.R. 1553, made clear that it was not just final but also interlocutory court orders that were mutually enforceable between member states.

[The submissions of counsel on the protection of the position of third    C
parties and on avoiding undue oppressiveness to the defendants appear in the judgment, post pp. 55F–H, 59C–D, F–G, 60A].

The plaintiffs have a good arguable case to recover very substantial sums from the defendants. The plaintiffs also have a proprietary interest under a constructive trust in certain sums of money paid to C.M.F.E. [Further submissions of counsel on the proprietary claim appear in the judgment, post p. 63B–C.] On the claim for proprietary relief, the trial    D
judge erred in thinking that the circumstances prevalent in this case were akin to the circumstances prevalent in *Lister & Co. v. Stubbs* (1890) 45 Ch.D. 1: see *Metropolitan Bank v. Heiron* (1880) 5 Ex.D. 319; *Attorney-General's Reference (No. 1 of 1985)* [1986] Q.B. 491, "the bribe cases." Furthermore the defendants were self-dealing and no enforceable contract came into existence: see the principle explained in    E
*In re Thompson's Settlement* [1986] Ch. 99.

The defendants were both employees of the plaintiffs as well as being directors and employed to make the profits. As to the "product of the work which the servant is paid to do belongs to the master," see *Sterling Engineering Co. Ltd. v. Patchett* [1955] A.C. 534. The business opportunity and the information utilised was C.M.L.'s: see *Cook v. Deeks* [1916] 1 A.C. 554, and *Thomas Marshall (Exports) Ltd. v. Guinle*    F
[1979] Ch. 227. Until the profits and all assets derived therefrom are separately identified by the defendants, the plaintiffs have a charge on the defendants' assets wherever situate: see *Space Investments Ltd. v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd.* [1986] 1 W.L.R. 1072. [Reference was made to *Shell-Mex and B.P. Ltd. v. Clayton* [1956] 1 W.L.R. 1198 and *National Bank of Greece v. Constantinos Dimitriou*, The Times, 16 November 1987; Court of Appeal    G
(Civil Division) Transcript No. 1107 of 1987, on the questions of costs and allowances for living expenses.]

*Philip Heslop Q.C., John Brisby* and *Robert Miles* for the defendants. [Counsel's arguments on the principles applying to the grant of a *Mareva* injunction are set out in the judgment, post, pp. 54G—55B, 56E–G and 61E–H. The arguments on the proprietary claim appear post, p. 63A–B,    H
D–G.] The *Mareva* injunction should not be used as a means of forcing the defendants to settle: see *Avant Petroleum Inc. v. Gatoil Overseas Inc.* [1986] 2 Lloyd's Rep. 236, 242.

A    The sort of factor which might constitute a case an exceptional one justifying an extraterritorial *Mareva* might be one in which assets located in a foreign country had been removed from the jurisdiction with the evident intention of stultifying a judgment: see for example *Yandil Holdings Pty. Ltd. v. Insurance Co. of North America* (1986) 7 N.S.W.L.R. 571, 577. *Ashtiani v. Kashi* [1987] Q.B. 888 was not followed by Leggatt J. in *Allied Arab Bank Ltd. v. Hajjar* [1988] Q.B.
B    787. Whereas *Ashtiani* was concerned with a liquidated claim on a contract, *Hajjar* involved a claim for fraudulent conspiracy. Hence, merely because the cause of action involves fraud, the case does not ipso facto fall into the exceptional category.

The plaintiffs are appealing against the provision in the trial judge's order allowing for the withdrawal of moneys within the jurisdiction for
C    living expenses and legal fees: [Reference was made to *House of Spring Gardens Ltd. v. Waite* [1984] F.S.R. 277 and *National Bank of Greece v. Constantinos Dimitriou,* The Times, 16 November 1987.]

*Lyndon-Stanford Q.C.* replied.


D    29 July.   The following judgments were handed down.


MAY L.J.   We have before us an appeal and cross-appeal in respect of orders made in *Mareva* proceedings before Mervyn Davies J. on 27 June 1988. The facts of the case are complicated: they were fully set out in the judge's judgment whose exposition of them I gratefully adopt. In
E    brief, at material times the first two defendants were directors of the second plaintiffs. The latter were members of what I may call the Salomon Group of which the principal holding company was the seventh plaintiff. At such times the first and second defendants were also directors of or had substantial interests in the fourth defendant.

The plaintiffs' various claims against the defendants rely on allegations of breach of contract, conspiracy, tort and fraudulent breach of fiduciary
F    duty. They arose initially out of the insolvency of a group of companies known as the Allied Group in February 1984 owing the second plaintiffs £35,580,424. That sum less £1,485,148 recovered from Allied in Hong Kong, namely a net £34,095,276, is amongst other relief now claimed from the defendants. In general terms the plaintiffs' complaints are that for their own ends, the defendants, and particularly the first and second
G    defendants (a) were content to allow improper credit to Allied and (b) on their own account, through the medium of companies in which they (the defendants) had influence or interest, engaged in transactions that were incompatible with their fiduciary duties to the plaintiffs. As to (b) the plaintiffs' case is that for their own interests and contrary to their obligations to the plaintiffs they and companies which they controlled
H    carried out foreign exchange dealings and business transactions in cocoa (physical) and cocoa futures to a substantial extent.

In the course of his judgment, having considered the material put before him, Mervyn Davies J. made the following comments:

"it seems to me that in the light of matters such as I have tried to A
summarise above, the refusal of a *Mareva* injunction 'would involve
a real risk that a judgment in favour of the plaintiffs would remain
unsatisfied.' I say that because there are grounds for supposing that
the defendants may have acted dishonestly, coupled with the fact
that they have the ability to lock away assets in inaccessible overseas
companies. . . . there is no doubt in my mind that this is a very
plain case for an ordinary *Mareva* order in that the two basic B
ingredients for the making of an order are present in a high degree.
Although a different picture may emerge when oral evidence is
given, the plaintiffs' case is highly arguable. As well there is, I
think, a high risk that any assets the defendants have, whether here
or overseas, will, if the plaintiffs obtain judgment, be unavailable
for execution. . . . The defendants are well used to moving funds C
worldwide."

Notwithstanding these findings the judge was only prepared to make
a *Mareva* order in respect of assets within the jurisdiction, refusing any
wider order on the basis of the decision of this court in *Ashtiani v. Kashi*
[1987] Q.B. 888. However, as has been said in a number of decisions in
*Mareva* proceedings, the jurisdiction is a developing one. In *Babanaft* D
*International Co. S.A. v. Bassatne*, this court was prepared to make a
post-judgment worldwide *Mareva* order subject to a proviso preserving
the personal effect of such an order on and to the particular defendants
against whom it was directed. The court in *Babanaft* indicated that in its
view a pre-judgment worldwide *Mareva* was legitimate, but of course
that comment was then obiter. However, in *Republic of Haiti v.*
*Duvalier*, decided during the hearing of the instant appeal, another E
division of this court made a pre-judgment worldwide *Mareva,* again
subject to the personal proviso to which I have already referred. The
court recognised that such an injunction was a most unusual measure,
such as should very rarely be granted. Nevertheless the court quoted the
dictum of Kerr L.J. in *Babanaft*:

"some situations . . . cry out—as a matter of justice to plaintiffs— F
for disclosure orders and *Mareva* type injunctions covering foreign
assets of defendants even before judgment."

Even though we are hearing this appeal almost simultaneously with the
delivery of the judgment in the *Duvalier* case, for my part I think that
this case also is one which cries out for a worldwide *Mareva* injunction
even though it is being sought before judgment. The amount involved G
and the findings of the judge about the first two defendants, which I
have already quoted in my judgment, make this clear.

In his submissions in the instant appeal, counsel for the defendants
submitted that, other things apart, a worldwide *Mareva* should only be
made where there was evidence either that the defendant had in fact
secreted or alternatively had attempted to secrete assets of his outside
the jurisdiction so as to render nugatory any judgment to which the H
plaintiff might ultimately be entitled. Counsel based this submission not
only on *Duvalier's* case to which I have already referred, but also on
*Ballabil Holdings Pty. Ltd. v. Hospital Products Ltd.* [1984] 2 N.S.W.L.R.

A  662 and (1985) 1 N.S.W.L.R. 155; *Coombs and Barei Constructions Pty. Ltd. v. Dynasty Pty. Ltd.* (1986) 42 S.A.S.R. 413 and *In re Clunies-Ross, Ex parte Totterdell* (1987) 72 A.L.R. 241. As counsel originally submitted, all these authorities show that as wide an order as that sought in the instant case should only be made where there is evidence of previous malpractice or nefarious intent. Counsel originally contended that one could deduce this as a principle of law from the authorities; in

B  his reply, however, he accepted that the highest he could put it was that the cases demonstrated that at least evidence of this nature, or of equivalent persuasive effect, was needed before the court was entitled to make so draconian an order as that sought in this case.

I entirely accept that it will only be in an exceptional case that the court will make such an order. Nevertheless each case must depend on

C  its own facts. In the light of the cases decided since the judge gave judgment herein, to which I have referred, I respectfully think that he misdirected himself with relation to his approach to the facts which he found and which I have outlined. For the reasons given by Nicholls L.J. in his judgment, which I have had the benefit of reading in draft, I do not think that at this stage any valid challenge can be sustained against those findings of fact made by the judge on the vast amount of material

D  before him. Nevertheless, as the court in this type of case is exercising the widest jurisdiction, which may, unless precautions are taken, prove more oppressive to those against whom the orders are made than beneficial to those whom they are intended to protect, I think that these orders should normally be restricted even more than merely by the proviso to which I have referred and suggested originally in the *Babanaft*

E  case.

As the judge in the instant case pointed out, first, such a wide order can be severely oppressive if the defendants, while preparing for a very complicated trial in England, at the same time find themselves engaged in courts overseas in further applications of a *Mareva* nature, bearing in mind that plaintiffs with substantial resources may not be slow to engage

F  the defendants in as many courts throughout the world as possible. Further, the judge, in referring to objections which had been voiced by Dillon L.J. in the *Ashtiani* case [1987] Q.B. 888 also pointed out that if a worldwide disclosure order is made simultaneously with a *Mareva* injunction, this may enable a plaintiff to obtain security in some foreign jurisdictions. It is in addition, as Lord Roskill has pointed out*, a substantial invasion of privacy. To obviate these very real difficulties,

G  Mr. Lyndon-Stanford on behalf of the plaintiffs undertook in the course of the argument in the instant case to leave any decision whether action should be taken by his clients in any foreign jurisdiction in respect of any of the assets of the two defendants to the English court. In my judgment such a term or undertaking should generally be part of any worldwide pre-judgment *Mareva* obtained in circumstances not dissimilar

H  from those in this or the *Duvalier* case. It is worth making the point that if a worldwide *Mareva* is not obtained and the plaintiffs do from time to time discover the whereabouts of assets of the defendants, they may well

* See *Home Office v. Harman* [1983] 1 A.C. 280, 323, H.L.(E.).

May L.J.          Derby & Co. Ltd. v. Weldon (C.A.)          [1990]

be minded to take those steps in foreign jurisdictions which in totality   A
might well be oppressive, whereas if a worldwide *Mareva* does contain a
term giving the English court the general control over the litigation this
would clearly obviate this potential difficulty. I should add that the third
particular reason which the judge gave for refusing a worldwide order
was

> "No dishonesty is yet proved and may never be proved. I must   B
> assume that the defendants are honest. Furthermore, they are not
> in breach of any court order."

These comments do not lie easily alongside the earlier comments made
by the judge in his judgment which I have already quoted, to support
which there was certainly evidence before him.

In these circumstances my opinion is that it falls to us to decide   C
whether the relief sought should be granted on the judge's findings of
fact and in the light of the law as I understand this court has now stated
it to be. For my part I have no doubt that with the appropriate
safeguards to which I have referred, this is a case in which a worldwide
*Mareva* injunction ought to be granted, with the concomitant disclosure.
As to the limited proprietary relief claimed by the plaintiffs, I have, as I
have indicated, had the opportunity of reading the judgment of Nicholls   D
L.J. in draft. I respectfully agree with it and with the conclusion to
which he comes. I have also had the opportunity of reading the
judgment of Parker L.J. in draft and for my part would respectfully
endorse the views he expresses therein. Subject to the caveats I have
expressed, therefore, I would allow the appeal and dismiss the cross-
appeal.                                                                   E

PARKER L.J.   I agree that this appeal should be allowed and I also
agree with the judgments of May L.J. and Nicholls L.J. which I have
had the opportunity to read in draft. I desire however to add some
observations of my own on two matters.

(1) It was submitted for the defendants (i) that if a worldwide   F
*Mareva* could be granted on no more than a good arguable case and a
risk of dissipation of assets it would follow that such an order could be
made in the vast majority of commercial cases in which material existed
for the grant of an internal *Mareva,* and (ii) that this would conflict with
statements in *Ashtiani v. Kashi* [1987] Q.B. 888; *Babanaft International
Co. S.A. v. Bassatne*, and *Republic of Haiti v. Duvalier*, that an
extraterritorial *Mareva,* albeit effective only in personam would only   G
rarely be granted and would require exceptional circumstances.

I do not accept the first of the above submissions. The mere fact that
the plaintiff shows a good arguable case and a real risk of disposal or
hiding of English assets—the requisites for an internal *Mareva*—clearly
cannot by itself be sufficient to justify an extraterritorial *Mareva* either
worldwide or at all. Such a *Mareva* would clearly be unjustified if, for
example, there were sufficient English assets to cover the appropriate   H
sum, or if the court were not satisfied that there were foreign assets or
that there was a real risk of disposal of the same, or if it would in all the
circumstances be oppressive to make the order.

A    Here, however, it is accepted that there are foreign assets. The judge has found, correctly in my view, that there is a high risk of disposal of such assets. The English assets are wholly insufficient to afford protection. The defendants are clearly sophisticated operators who have amply demonstrated their ability to render assets untraceable and a determination not to reveal them. In those circumstances it appears to me that there is every justification for a worldwide *Mareva,* so long as, by undertaking or proviso or a combination of both, (a) oppression of the defendants by way of exposure to a multiplicity of proceedings is avoided, (b) the defendants are protected against the misuse of information gained from the ordinary order for disclosure in aid of the *Mareva,* and (c) the position of third parties is protected. Whether, ultimately, the order in personam will be converted into an order attaching some or all of the assets disclosed will of course depend on (i) the court here giving the plaintiffs leave to proceed in a jurisdiction in which assets have been found and (ii) the decision of the court in such jurisdiction whether to make an order.

   (2) That the hearing of an application for interlocutory relief should take 26 days is, in my view, entirely unwarranted, as is also the fact that the documents for an appeal from the judge should comprise several thousand pages of affidavits and exhibits.

   There are in essence only three issues; (i) has the plaintiff a good arguable case; (ii) has the plaintiff satisfied the court that there are assets within and, where an extraterritorial order is sought, without the jurisdiction; and (iii) is there a real risk of dissipation or secretion of assets so as to render any judgment which the plaintiff may obtain nugatory. Such matters should be decided on comparatively brief evidence. In *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396, 407–408, Lord Diplock, dealing in that case with an application for an interlocutory injunction, said:

> "It is no part of the court's function at this stage of the litigation to try to resolve conflicts of evidence on affidavit as to facts on which the claims of either party may ultimately depend nor to decide difficult questions of law which call for detailed argument and mature considerations. These are matters to be dealt with at the trial. One of the reasons for the introduction of the practice of requiring an undertaking as to damages upon the grant of an interlocutory injunction was that 'it aided the court in doing that which was its great object, viz. abstaining from expressing any opinion upon the merits of the case until the hearing': *Wakefield v. Duke of Buccleugh* (1865) 12 L.T. 628, 629."

In my view the difference between an application for an ordinary injunction and a *Mareva* lies only in this, that in the former case the plaintiff need only establish that there is a serious question to be tried, whereas in the latter the test is said to be whether the plaintiff shows a good arguable case. This difference, which is incapable of definition, does not however affect the applicability of Lord Diplock's observations to *Mareva* cases.

**58**

Parker L.J.          Derby & Co. Ltd. v. Weldon (C.A.)          [1990]

In the present case this seems to have been forgotten. It was not     A
until the eighteenth day of the hearing before the judge that the
defendants accepted that there was a good arguable case which, unless
the many conflicts on the affidavit evidence are resolved in the
defendants' favour, there plainly is. Moreover, the defendants sought to
go into and obtain the court's view on questions of law, which the
argument before us and the judgment of the judge show clearly to be
questions calling for detailed argument and mature consideration. This is     B
quite wrong. More recently, in relation to an application under R.S.C.,
Ord. 12, r. 8 to set aside service of a writ outside the jurisdiction, Lord
Templeman in *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987]
A.C. 460, 465, said that such cases should be measured in hours not
days, that appeals should be rare and that this court should be slow to
interfere. These observations in my view also apply to cases such as the     C
present.

Mr. Heslop for the defendants has however sought to go yet again
into large parts of the evidence in order to persuade us that the judge's
finding that there is a high risk of dissipation of assets both here and
overseas should be reversed in respect of overseas assets. In essence he
sought to persuade us to attempt to resolve conflicts of fact going to the
merits of the claim but which were also important on the question of     D
risk of dissipation. This is no part of this court's function any more than
it is the function of the court at first instance. He also sought to show
that the plaintiffs in the present case have no proprietary claim. His
submissions in this behalf depended on the resolution both of disputed,
detailed and complex fact and of difficult questions of law requiring
mature consideration. The function of this court is again misappreciated.     E

It is to be hoped that in future the observations of Lord Diplock and
Lord Templeman will be borne in mind in applications for a *Mareva*
injunction, that they will take hours not days and that appeals will be
rare. I do not mean by the foregoing to indicate that argument as to the
principles applying to the grant of a *Mareva* injunction should not be
fully argued. With a developing jurisdiction it is inevitable and desirable
that they should be. What, however, should not be allowed is (1) any     F
attempt to persuade a court to resolve disputed questions of fact whether
relating to the merits of the underlying claim in respect of which a
*Mareva* is sought or relating to the elements of the *Mareva* jurisdiction
such as that of dissipation or (2) detailed argument on difficult points of
law on which the claim of either party may ultimately depend. If such
attempts are made they can and should be discouraged by appropriate     G
orders as to costs.

NICHOLLS L.J.    I agree that this appeal should be allowed. It is now
established that under section 37 of the Supreme Court Act 1981 the
English court has jurisdiction to make a *Mareva* "restraint" order in
respect of assets outside England and Wales, both before judgment
(*Republic of Haiti v. Duvalier*), and after judgment (*Babanaft International*     H
*Co. S.A. v. Bassatne*, ante, p. 13). Likewise, the English court has
jurisdiction to make a "disclosure" order in respect of assets outside
England and Wales, both before judgment (*Republic of Haiti v. Duvalier*)

A  and after judgment (*Interpool Ltd. v. Galani* [1988] Q.B. 738 and *Maclaine Watson & Co. Ltd. v. International Tin Council (No. 2)* [1989] Ch. 286).

The jurisdiction is established, but what is still being worked out, in this fast developing area of law, is the manner in which, in practice, the court should exercise its discretionary power under this wide jurisdiction. One important matter in this regard concerns the limitations and
B  safeguards normally appropriate to be built into restraint and disclosure orders regarding overseas assets. As to restraint orders, some of the points canvassed, but left open, in the judgments of this court in the *Babanaft* case were subsequently considered in the very recent decision, also of this court, in *Republic of Haiti v. Duvalier*. In particular, in the *Duvalier* case the court engrafted onto what was there described as the
C  "*Babanaft* proviso," whereby the order was expressed not to affect third parties, the qualification "unless and to the extent that it is enforced by the courts of the state in which the assets are located." This was the limitation suggested by Kerr L.J. in the *Babanaft* case.

In the present case the plaintiffs propose that this point should be dealt with by the plaintiffs giving to the English court an undertaking in terms which will preclude them from making any application to a foreign
D  court to enforce the order without first obtaining leave from the English court. This seems to me to be a convenient course. If this undertaking is accepted, and an order is made, it would then be for the judge of the English court to whom any application for such leave might be made to consider, amongst other matters, whether the enforcement of the order in the country or countries for which leave is sought will, under the law
E  of that country, result in the order having a substantially similar effect there to a *Mareva* restraint order in this country, as distinct from the order having there a more far-reaching effect (such as the assets in the country being attached as a form of security for the plaintiffs' claims, which is not the object of a *Mareva* restraint order). On any application for such leave, which normally would be inter partes, the judge can be expected to have before him what we do not have, namely, evidence of
F  the law and practice in the country or countries in which the order is sought to be enforced. The undertaking, I add, is being offered by all the plaintiffs, which include amongst their number English companies whose substance has not been questioned. So the undertaking is a worthwhile one.

As to extraterritoriality and the protection of third parties, the
G  restraint order as sought by the plaintiffs also embodies the restriction on the "*Babanaft* proviso" adopted in the *Duvalier* case, to the effect that individuals who are resident in this country are to be affected by the restraint order regarding overseas assets, even in respect of acts done by them outside England and Wales. As Staughton L.J. recognised in *Duvalier*, the distinction thus drawn between natural and other persons resident in this country is not satisfactory. However, no argument
H  was addressed to us on this point by counsel. This is not a suitable case therefore to seek to take this particular point further.

As to the disclosure order in respect of overseas assets, in the present case this order is intended to be ancillary to the worldwide

restraint order. Disclosure is sought in order to render that restraint A
order effective, or more effective. Here also the undertaking being
offered by the plaintiffs is in terms which will preclude them from
making any use of information so disclosed in proceedings abroad
against the first and second defendants (to whom I shall refer simply as
"the defendants") without the leave of the English court. Here again,
therefore, reasonable protection for the defendants is being built into
the order to ensure that the information compulsorily disclosed is not B
misused and that it does not lead to the defendants being harassed or
oppressed by having to face litigation, brought by financially more
powerful parties, in overseas courts throughout the world.

I have referred to the safeguards being embodied in the order before
considering whether a worldwide restraint order, and an ancillary
worldwide disclosure order, should be made at all, because the extent C
and adequacy of the safeguards available are of particular relevance in
the present case having regard to the criticisms advanced by the plaintiffs
of the factors which weighed with the judge when he exercised his
discretion. After a full exploration of voluminous, complex affidavit
evidence for more than five weeks, made with the assistance of
submissions by leading counsel on both sides, the judge's conclusions on
the facts included the following. These conclusions were set out as items D
4, 5 and 6 in the judge's list of 12 material considerations. First, that
there was a very real risk that assets, here or abroad, presently owned
by the defendants would, by the use of foreign companies, nominee
directors, bearer shares and the like, remain hidden or now be spirited
away, so as to render any future judgment useless. Second, that that risk
would be reduced, if not eliminated, by a restraint order affecting E
overseas assets. Third, in the circumstances of this case an order
affecting only assets in England and Wales might for practical purposes
be virtually useless. Fourth, that the defendants had not sought to help
themselves by disclosing any details of their assets beyond saying that
they have some assets in England and that they have no assets elsewhere
in the E.E.C. countries.

Despite this the judge declined to make a restraint order, with an F
ancillary disclosure order, in respect of overseas assets (the defendants
did not resist the making of such orders in respect of assets in England
and Wales). He declined, because of the importance he attached to
three considerations, numbered 8, 11 and 12 in his list. He felt that
these three considerations were of such strength as to outweigh all the
others. Items 8 and 11 concerned the oppressiveness of the use which G
the plaintiffs might make of information regarding the defendants'
overseas assets: the defendants could be made to engage in courts
overseas in applications of a *Mareva* nature, and the information could
lead to the plaintiffs obtaining security in some foreign jurisdictions. If
making the disclosure order would be likely to have those consequences
in this case, I would agree with the judge on the weightiness of these
factors. As the judge rightly recognised, those were the considerations H
which prompted this court to discharge an overseas disclosure order in
*Ashtiani v. Kashi* [1987] Q.B. 888. But in the present case the
undertaking offered by the plaintiffs puts the matter into an altogether

different light, by giving the defendants reasonable protection. So I think that the judge, who did not have the benefit of the subsequent decisions in the *Babanaft* and *Duvalier* cases, fell into error in not taking the undertaking proffered by the plaintiffs into account as providing an answer to his justifiable concern on these two points.

The third point, numbered 12 in the list, to which the judge attached overriding weight was that in previous cases where orders have been made regarding overseas assets there was a background of proven misconduct by a defendant, but in the present case no dishonesty has yet been proved. The judge said that he must assume that the two individual defendants are honest. Of course, the outcome of the trial may be that the defendants are wholly innocent of all the charges, and are not liable under any of the claims made against them. But if by what he said the judge meant that a restraint order in respect of overseas assets should not be made in the absence of proof of dishonesty on the part of the defendants even though the action is only at a very early interlocutory stage, then I would feel bound to part company from him. However I do not think that it is necessary to consider further whether this indeed is what the judge meant. Having regard to the misdirection already mentioned, the judge's exercise of his discretion cannot stand.

In these circumstances it is for this court to exercise its own discretion. As to that I am in no doubt that a restraint order in respect of overseas assets ought to be made pending the trial or further order, with an ancillary disclosure order. Mr. Heslop challenged the judge's conclusions about the very real risk of assets remaining hidden or being spirited away so as to render any judgment useless. He drew our attention to certain passages in the evidence. These were lengthy but they still fell far short of the totality of evidence considered by the judge. Having considered those passages, and Mr. Heslop's submissions, I am not persuaded that the judge can be faulted in his conclusion on these points.

Mr. Heslop further submitted that, even if these conclusions regarding the risk of assets being secreted or removed were to stand, no order should be made. He placed much emphasis on judicial observations that pre-judgment restraint orders regarding overseas assets will be granted only "in extreme situations" (*per* Kerr L.J. in *Babanaft* [1990] Ch. 13, 37E) and that cases where it will be appropriate to grant such injunctions "will be rare, if not very rare indeed": *per* Staughton L.J. in *Republic of Haiti v. Duvalier*. He submitted that before an overseas restraint order is made more must be required than a good arguable case and a real risk that the overseas assets will be dissipated or secreted. He contended that if those were the only pre-requisites to a worldwide restraint order, the facts which would justify a restraint order regarding assets in England and Wales would frequently, if not normally, also justify a restraint order regarding assets overseas. If that were so, a restraint order regarding overseas assets would become commonplace, because if a defendant is likely to dissipate or spirit away or secrete his United Kingdom assets, he is likely to behave similarly regarding his overseas assets.

In my view each case must depend on its own facts. An order    A
restraining a defendant from dealing with any of his assets overseas, and
requiring him to disclose details of all his assets wherever located, is a
draconian order. The risk of prejudice to which, in the absence of such
an order, the plaintiff will be subject is that of the dissipation or
secretion of assets *abroad*. This risk must, on the facts, be appropriately
grave before it will be just and convenient for such a draconian order to
be made. It goes without saying that before such an order is made the    B
court will scrutinise the facts with particular care. In the instant case
there are present the special factors to which May and Parker L.JJ. have
referred. I do not think that it is correct that, if an order is made in the
present case regarding overseas assets, such an order will become, or
should become, the norm in cases where a restraint order is made
regarding assets within the jurisdiction.    C

For completeness I should add that in the present case nothing turns
on the position regarding assets which are located abroad in countries
which are parties to the 1968 European Judgments Convention as
distinct from assets which are located elsewhere abroad. The defendants
assert that they have no assets in convention countries. Quite rightly,
time was not spent on what, in that circumstance, would have been arid
argument. Mr. Heslop accepted that his clients' position regarding    D
convention countries should stand or fall with the fate of this appeal so
far as it is related to other countries throughout the world: if a
worldwide order should be made, that should embrace convention
countries as well as non-convention countries. Conversely, if a worldwide
order should not be made, there should be no special order regarding
convention countries.    E

I turn to the defendants' cross-appeal in respect of paragraph 6 in the
judge's order. In my view it is clear that an order along these lines
cannot be justified unless the plaintiffs have a seriously arguable claim to
have a proprietary interest in the sums of money paid by or on behalf of
C.M.L. to Cocoa Merchants (Far East) Ltd. (C.M.F.E.), one of the
defendants' nominee companies, in respect of profits from the foreign
exchange transactions being attacked by the plaintiffs. The judge's    F
order, indeed, goes wider than foreign exchange transactions entered
into with C.M.F.E., but before us Mr. Lyndon-Stanford was content to
confine the plaintiffs' claim to C.M.F.E. transactions. Mr. Heslop
presented a formidable argument to the effect that neither on the
pleadings nor on the evidence is such a claim made out as a serious
issue. I agree with him that the statement of claim leaves much to be    G
desired on this point. But in a case of this complexity I do not think that
the present state of the statement of claim, already once amended and
likely, I suspect, to be amended more than once hereafter, should be
decisive on an interlocutory application of the nature with which this
appeal is concerned. I attach more importance to the state of the
evidence. There will be ample opportunity for the statement of claim to
be tidied up well before the trial so as to accord with the case being    H
advanced against the defendants as deposed to in the affidavit evidence.

So I turn to the evidence. As to that, the defendants' liability to
account, like all the other claims against the defendants, is strenuously

resisted by the defendants. But Mr. Heslop, rightly in my view, accepted for the purposes of this appeal that on the evidence, much disputed though it is, the plaintiffs have an arguable case that the defendants are required in equity to account for the profits in question. Mr. Heslop's case on this point on this appeal was that this claim is not proprietary in nature. The plaintiffs' claim, he submitted, is one of obligation leading, if established at the trial, to a money judgment. The claim, however much the plaintiffs contend otherwise, is not an ownership claim under which specific property from the moment it reached C.M.F.E. was impressed with a trust in favour of C.M.L. For this distinction Mr. Heslop relied on such well-known cases as *Lister & Co. v. Stubbs* (1890) 45 Ch.D. 1.

The plaintiffs sought to distinguish these cases on the basis that here the money being claimed as an unauthorised profit emanated from C.M.L. Contrast *Lister v. Stubbs* where the money received as a bribe came to the defendant from a third party. Reliance was placed on the very recent decision of this court in *Guinness Plc. v. Saunders* [1988] 1 W.L.R. 863. That case concerned a sum of £5.2m. paid by Guinness to a company on behalf of Mr. Ward under a contract made in breach of Mr. Ward's fiduciary duty as a director of Guinness. The Court of Appeal upheld Sir Nicolas Browne-Wilkinson V.-C.'s decision. His order included a declaration that Guinness was entitled to an equitable charge over any bank account or other property to the extent to which the balance in the account, or the property, derived from the sum of £5.2m. or any part of that sum.

In turn Mr. Heslop sought to deflect that line of attack. He submitted that the crucial question is whether the money paid over by the plaintiff to the defendant, and received by him as an unauthorised profit, was the property of the plaintiff *before* the alleged wrongful act. If it was not, then there is no proprietary claim. On the facts in the instant case, he submitted that the money paid by C.M.L. to C.M.F.E. which the plaintiffs are asserting was impressed with a trust in favour of C.M.L. was not money which belonged to C.M.L. prior to the acts of which complaint is being made. He relied on his clients' evidence that all the foreign exchange transactions by C.M.L. with C.M.F.E. were backed by corresponding transactions between C.M.L. and a bank. So that the source of the money which passed to C.M.F.E. as its profits was not C.M.L. but was the banks under the corresponding, backing transactions. The money only came to C.M.L., and passed through C.M.L., as part and parcel of the transactions now being impugned.

In my view these rival contentions raise a seriously arguable point, of some general importance, which it is undesirable for the court to pursue and decide on this interlocutory application. The underlying facts are far from clear. There is a dispute on the evidence on the way in which the impugned foreign exchange transactions were conducted. This is not a satisfactory basis for the court to decide a point of law which, as presented to us, may turn on fine questions of fact, presently obscure, concerning what sums of money actually passed from whom and to whom and when and in respect of what.

If the plaintiffs have a seriously arguable case that they had a proprietary interest, under a constructive trust, in certain sums of money paid to C.M.F.E., then in my view the court has jurisdiction, under the principles set out in *A v. C (Note)* [1981] Q.B. 956, 959, and *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, to require the defendants to provide information about what has happened to those sums. In the exercise of his discretion Mervyn Davies J. considered that an order to that effect should be made in this case. I can see no ground entitling or requiring this court to interfere with that exercise of his discretion.

Mr. Heslop challenged the form of the order in several respects. I agree that the order, so far as it related to the disclosure of copies of documents, should be limited to documents in the possession, custody or power of the defendants. But I am unable to accept Mr. Heslop's other criticisms of the width of the order. In particular, for the disclosure obligation to cease once the money, running into millions of pounds, paid to C.M.F.E. has been mixed with the general assets of that company would fail to recognise that, if there is a trust claim here, the plaintiffs may be entitled to a charge on a mixed fund held by C.M.F.E. or on property derived therefrom. With that one minor variation, and subject to confining the order to foreign exchange transactions entered into with C.M.F.E., I would dismiss the defendants' cross-appeal. There will, of course, be an undertaking by the plaintiffs not to make any use of the information provided by the defendants without leave of the court.

In his judgment, which I have had the advantage of reading in draft, Parker L.J. has commented on the nature of *Mareva* proceedings. Of course, whether or not a restraint or disclosure order should be made will often be a matter of great importance to one or both of the parties in an action. But this is equally true of applications for other forms of interlocutory injunctive relief. I wish to associate myself, therefore, with Parker L.J.'s observations on this point. It is devoutly to be hoped that never again will there be an application for *Mareva* relief which will occupy the court for over five weeks.

*Appeal allowed.*
*Cross-appeal dismissed.*

*Solicitors: Lovell White Durrant; Hopkins & Wood.*

S. W.