# EXHIBIT 17

160
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR

Court of Appeal                                                    A

# *JSC Mezhdunarodniy Promyshlenniy Bank and another *v* Pugachev

## [2015] EWCA Civ 139

2015   Feb 17, 18, 19; 27                Arden, Lewison, Christopher Clarke LJJ     B

*Injunction — Freezing order — Disclosure — Freezing order in respect of defendant's assets including "any interest under any trust" — Defendant disclosing that he was beneficiary of trusts — Whether court having jurisdiction to order further disclosure in respect of trusts — CPR r 25.1(1)(g)[1]*
*Injunction — Freezing order — Undertaking as to damages — Whether undertaking to be unlimited in amount — Proper approach*                        C

The claimants, a Russian bank and its liquidator, brought proceedings in Russia against the defendant claiming sums in excess of US$2 billion. In support of those proceedings Henderson J made a freezing order in respect of the defendant's assets, expressly including, by paragraph 7(c), "any interest under any trust". Pursuant to the disclosure provisions of that order the defendant disclosed that he was one of a class of discretionary beneficiaries of five trusts. Henderson J then granted a further order requiring the defendant to provide further information about those trusts, including the identity of the trustees and beneficiaries and details of the trust assets. Rose J subsequently ordered that the continuation of the freezing order should be conditional on the provision of a cross-undertaking in damages unlimited in amount and that the cross-undertaking be fortified by the payment of $25m. The trustees applied to discharge Henderson J's order for further disclosure. David Richards J refused that application, holding that the court had jurisdiction to make that order for the purpose of ascertaining the extent of the defendant's control of assets held within the trust structures. The defendant appealed against the order for further disclosure, the trustees appealed against David Richards J's order and the claimants appealed against Rose J's order.

On the appeals—

*Held*, (1), dismissing the appeals of the defendant and the trustees, that the defendant's interest as one of the class of beneficiaries under the discretionary trusts was within the scope of paragraph 7(c) of the freezing order, even though it could not be the subject of execution, and so was subject to the disclosure provisions of the original freezing order; that the court had jurisdiction, both in exercise of its power to make whatever ancillary orders were necessary to make a freezing order effective and under CPR r 25.1(1)(g), to direct a party to provide information about assets which were or might be the subject of an application for a freezing order, even if the threshold conditions for the making of a freezing order in respect of those assets were not satisfied; that, therefore, the court had jurisdiction to order further disclosure in respect of the trust assets, even though the threshold test for including them within the scope of the freezing order was not currently met since they were not susceptible to execution, in order to test the claimants' assertion that the defendant was the effective owner of those assets; and that, accordingly, Henderson J had had jurisdiction to make his order for further disclosure and David Richards J had had jurisdiction to refuse to set it aside (post, paras 24–25, 45, 47, 52, 58, 60, 101, 102).

*Parker v CS Structured Credit Fund Ltd* [2003] 1 WLR 1680 and *Lichter v Rubin* [2008] EWHC 450 (Ch) considered.                        H

(2) Allowing the claimants' appeal in part, that the question of the extent of a cross-undertaking in respect of a freezing order was a matter for the discretion of the

---

[1] CPR r 25.1(1)(g): see post, para 48.

© 2016 The Incorporated Council of Law Reporting for England and Wales

161
[2016] 1 WLR    JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)

A judge who granted the order, whose decision would not be upset by the Court of Appeal except on the usual grounds for interfering with the exercise of judicial discretion; that the default position was that an applicant for a freezing order would be required to give an unlimited cross-undertaking in damages, and the burden lay on the applicant to show that any cross-undertaking should be limited; that the mere fact that the litigation in support of which the freezing order had been granted had been brought by the liquidator of an insolvent company did not compel the conclusion B that the cross-undertaking had to be limited; that a defendant did not have to show that the freezing order was likely to cause him a loss before a cross-undertaking of unlimited amount was required; that the possibility that external funds would be available to the applicant to back the cross-undertaking would be relevant; that, accordingly, Rose J had been entitled to exercise her discretion to order an unlimited cross-undertaking; but that, since there was no evidential basis for Rose J's conclusion that the defendant was likely to suffer loss as a result of the freezing order, C the order for fortification of the cross-undertaking would be quashed (post, paras 69–70, 78, 85–86, 99–100, 101, 102).

Decision of Henderson J affirmed.
Decision of David Richards J [2014] EWHC 3547 (Ch) affirmed.
Decision of Rose J reversed in part.

The following cases are referred to in the judgment of Lewison LJ:

D *Abbey Forwarding Ltd v Hone (No 3)* [2014] EWCA Civ 711; [2015] Ch 309; [2014] 3 WLR 1676, CA
*Abbey Forwarding Ltd v Revenue and Customs Comrs* [2015] EWHC 225 (Ch); [2015] Bus LR 882
*Algosaibi v Saad Investments Co Ltd* 2011 (1) CILR 178
*Bekhor (AJ) & Co Ltd v Bilton* [1981] QB 923; [1981] 2 WLR 601; [1981] 2 All ER 565; [1981] 1 Lloyd's Rep 491, CA
E *Bloomsbury International Ltd v Holyoake* [2010] EWHC 1150 (Ch)
*DPR Futures Ltd, In re* [1989] 1 WLR 778
*Energy Venture Partners Ltd v Malabu Oil And Gas Ltd* [2014] EWCA Civ 1295; [2015] 1 WLR 2309; [2015] 1 All ER (Comm) 97, CA
*Financial Services Authority v Sinaloa Gold plc* [2013] UKSC 11; [2013] 2 AC 28; [2013] 2 WLR 678; [2013] Bus LR 302; [2013] 2 All ER 339; [2013] 1 All ER (Comm) 1089, SC(E)
*Fitzgerald v Williams* [1996] QB 657; [1996] 2 WLR 447; [1996] 2 All ER 171, CA
F *Fourie v Le Roux* [2007] UKHL 1; [2007] 1 WLR 320; [2007] Bus LR 925; [2007] 1 All ER 1087; [2007] 1 All ER (Comm) 571, HL(E)
*Franses v Al Assad* [2007] EWHC 2442 (Ch); [2007] BPIR 1233
*Gartside v Inland Revenue Comrs* [1968] AC 553; [1968] 2 WLR 277; [1968] 1 All ER 121, HL(E)
*Guaranty Trust Co of New York v Hannay & Co* [1915] 2 KB 536, CA
*Hammond Suddards Solicitors v Agrichem International Holdings Ltd* [2001] G EWCA Civ 2065; [2002] CP Rep 21, CA
*Harley Street Capital Ltd v Tchigirinski* [2005] EWHC 2471 (Ch)
*Hyman v Rose* [1912] AC 623, HL(E)
*International Credit and Investment Co (Overseas) Ltd v Adham* [1998] BCC 134, CA
*JSC BTA Bank v Ablyazov (No 10)* [2012] EWHC 1819 (Comm); [2012] 2 All ER (Comm) 1243; [2013] EWCA Civ 928; [2014] 1 WLR 1414; [2014] 1 All H ER (Comm) 700; [2014] 1 Lloyd's Rep 195, CA
*JSC BTA Bank v Solodchenko* [2010] EWCA Civ 1436; [2011] 1 WLR 888; [2011] 4 All ER 1240; [2011] 2 All ER (Comm) 1063, CA
*Jaggard v Sawyer* [1995] 1 WLR 269; [1995] 2 All ER 189, CA
*Keary Developments Ltd v Tarmac Construction Ltd* [1995] 3 All ER 534; [1995] 2 BCLC 395, CA

© 2016 The Incorporated Council of Law Reporting for England and Wales

162
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR

*Lawrence v Fen Tigers Ltd* [2014] UKSC 13; [2014] AC 822; [2014] 2 WLR 433; [2014] PTSR 384; [2014] 2 All ER 622, SC(E)                                                        *A*
*Lichter v Rubin* [2008] EWHC 450 (Ch); The Times, 18 April 2008
*Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2011] EWHC 2339 (Comm); [2012] Bus LR 1649; [2011] 2 Lloyd's Rep 663
*Parbulk II AS v PT Humpuss Intermoda Transportasi TBK* [2011] EWHC 3143 (Comm); [2012] 2 All ER (Comm) 513
*Parker v CS Structured Credit Fund Ltd* [2003] EWHC 391 (Ch); [2003] 1 WLR 1680                                                        *B*
*RBG Resources plc v Rastogi* [2002] BPIR 1028
*SCF Finance Co Ltd v Masri* [1985] 1 WLR 876; [1985] 2 All ER 747; [1985] 2 Lloyd's Rep 206, CA
*Sinclair Investment Holdings SA v Cushnie* [2004] EWHC 218 (Ch)
*Tarasov v Nassif* (unreported) 29 June 1994, CA
*Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2009] CILR 474; [2011] UKPC 17; [2012] 1 WLR 1721; [2011] 4 All ER 704, PC                                                        *C*
*Whaley v Whaley* [2011] EWCA Civ 617; [2012] 1 FLR 735, CA
*Yorke (MV) Motors v Edwards* [1982] 1 WLR 444; [1982] 1 All ER 1024, HL(E)

No additional cases were cited in argument.

The following additional cases, although not cited, were referred to in the skeleton          *D*
arguments:

*Cardile v LED Builders Pty Ltd* [1999] HCA 18; 198 CLR 380
*Esteem Settlement, In re* [2003] JLR 188
*Ghoth v Ghoth* [1992] 2 All ER 920, CA
*Hitch v Stone* [2001] EWCA Civ 63; [2001] STC 214, CA
*Kazakhstan Kagazy plc v Arip* [2014] EWCA Civ 381; [2014] 1 CLC 451, CA
*L v K (Freezing Orders: Principles and Safeguards)* [2013] EWHC 1735 (Fam); [2014] Fam 35; [2014] 2 WLR 914                                                        *E*
*National Westminster Bank plc v Jones* [2001] 1 BCLC 98
*Ninemia Maritime Corpn v Trave Schiffahrtsgesellschaft mbH und Co KG* [1983] 1 WLR 1412; [1984] 1 All ER 398; [1983] 2 Lloyd's Rep 600, CA
*Official Assignee in Bankruptcy v Wilson* [2007] NZCA 122; [2008] 3 NZLR 45
*PCW (Underwriting Agencies) Ltd v Dixon* [1983] 2 All ER 158; [1983] 2 Lloyd's Rep 197                                                        *F*
*PJSC Vseukrainskyi Aktsionernyi Bank v Maksimov* [2013] EWHC 422 (Comm); 163 NLJ 324
*Snook v London and West Riding Investments Ltd* [1967] 2 QB 786; [1967] 2 WLR 1020; [1967] 1 All ER 518, CA
*TSB Private Bank International SA v Chabra* [1992] 1 WLR 231; [1992] 2 All ER 245, CA
*Wade v Wade* [2003] EWHC 773 (QB)                                                        *G*

**APPEALS** from Henderson J, Richards J and Rose J
    On 11 July 2014 Henderson J made a without notice freezing order over the assets of the defendant, Sergei Victorovich Pugachev, in support of proceedings brought by the claimants, JSC Mezhdunarodniy Promyshlenniy Bank and its liquidator, State Corporation "Deposit Insurance Agency", against the defendant in Russia. Pursuant to the disclosure provisions of that          *H* order the defendant disclosed that he was one of a class of discretionary beneficiaries under five trusts based in New Zealand, namely London Residence Trust, Kea Three Trust, Green Residence Trust, Riviera Residence Trust and Wiltshire Residence Trust. On 25 July 2014 Henderson J made a

© 2016 The Incorporated Council of Law Reporting for England and Wales

163

[2016] 1 WLR        JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)

A  further order requiring the defendant to swear an affidavit setting out to the best of his ability (i) the identity of the trustee(s), settlor(s), any protector(s), and the beneficiaries of, and any other person carrying on some or all of the functions of a protector or trustee under another title in relation to the trusts and (ii) details of the assets which were subject to those trusts at as 14 July 2014 (including their value and location), and to supply copies of the trust deeds relating to those trusts which were under his control or which he had a

B  right to inspect or copy.

By an appellant's notice filed on 31 July 2014 the defendant appealed against Henderson J's order of 25 July on the grounds that the judge had (1) misinterpreted the standard form disclosure clause in a manner which had significant impact on the width of disclosure obligations under a freezing order and the intended relationship between the assets to be frozen

C  and any ancillary disclosure; (2) failed to act in accordance with the fundamental aim of the freezing order jurisdiction, namely to ensure that the defendant did not wrongfully place his assets beyond the reach of any enforcement process; (3) failed to give any or sufficient weight to his own conclusion as to the nature of the interest of a beneficiary under a discretionary trust; (4) given none or too little weight to the requirements of

D  the *Chabra* jurisdiction (*TSB Private Bank International SA v Chabra* [1992] 1 WLR 231) and/or for establishing a sham trust; (5) wrongly considered that ancillary disclosure obligations could be invoked as an instrument of investigation and general inquiry rather than, as intended, a means of identifying what assets were owned by the defendant; (6) ordered the disclosure of information which did not achieve and/or was not relevant to the purpose which was the stated justification for the court granting the

E  order; and (7) introduced uncertainty and ambiguity in the standard draft order where certainty and clarity were required.

On 19 September 2014 Rose J ordered that (i) the continuation of the freezing order should be conditional on the provision of a cross-undertaking in damages unlimited in amount and (ii) the cross-undertaking be fortified by the payment of $25m.

F  By an appellant's notice filed on 3 October 2014 the claimants appealed against part (i) of Rose J's order and applied for permission to appeal against part (ii) of that order on the grounds that the judge had erred in (1) reaching a decision which was contrary to the established practice of the court; (2) relying on her conclusion that there was evidence of likely loss on the defendant's part; (3) distinguishing between a corporate office holder and an

G  individual office holder; and (4) taking into account the absence of a creditor willing to indemnify the liquidator and the liquidator's failure to obtain insurance against unlimited liability on the cross-undertaking.

On 30 October 2014 David Richards J [2014] EWHC 3547 (Ch) refused an application by the trustees of the five trusts, Kea Trust Co Ltd and others, to discharge Henderson J's order for further disclosure.

By an appellant's notice filed on 20 November 2014 the trustees appealed

H  against David Richards J's order on the grounds that (1) there was no jurisdiction to make a disclosure order unless the discretionary trusts were shams; (2) there was no reason to think that the trust assets might be dissipated; (3) the risk of injustice to the trustees if disclosure of assets were ordered outweighed the risk of injustice to the claimants if it were not

© 2016 The Incorporated Council of Law Reporting for England and Wales

164
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

ordered; and (4) if there were to be an disclosure order, the claimants should    *A*
give an undertaking in damages in respect of that order.

The facts are stated in the judgment of Lewison LJ, post, paras 1–12.

*Stephen Smith* QC and *Ben Griffiths* (instructed by *Hogan Lovells International LLP*) for the claimants.

*Francis Tregear* QC and *Alexander Milner* (instructed by *Fried Frank Harris Shriver & Jacobson (London) LLP*) for the defendant.    *B*

*Jonathan Adkin* QC (instructed by *Farrer & Co LLP*) for the trustees.

The court took time for consideration.

27 February 2015. The following judgments were handed down.

**LEWISON LJ**    *C*

1    There are three appeals before the court, all of which relate to powers exercisable in connection with the grant of a freezing order. The questions that they raise are: (i) Does the court have jurisdiction to order a member of a class of beneficiaries under a discretionary trust to make disclosure of the details of the trust and the trust assets? (ii) If so, in what circumstances should that jurisdiction be exercised? (iii) In what circumstances can the    *D* court require a cross-undertaking in damages unlimited in amount from a claimant who acts as liquidator of an insolvent corporation? (iv) Was it permissible on the facts of this case to require the cross-undertaking to be fortified?

2    It is not necessary to do more than to give a very short account of the underlying dispute in order to put these questions into context. In the early    *E* 1990s Mr Pugachev founded the JSC Mezhdunarodniy Promyshlenniy Bank ("the Bank") in Russia. It grew to become one of Russia's largest privately owned commercial banking groups. On 4 October 2010, the Russian Central Bank revoked the Bank's banking licence and appointed a "temporary administration". On 30 November 2010, the Bank was declared to be insolvent by the Russian court and placed into temporary administration. The court-appointed liquidator is State Corporation    *F* "Deposit Insurance Agency" ("the DIA"). The Bank and the DIA are the two claimants in the action. The DIA is described as:

"A Russian 'state corporation', a non-profit organisation established by the Russian state for the benefit of the public welfare and accountable, amongst other things, to the Russian Central Bank. The DIA's primary purpose is to maintain and operate a deposit insurance scheme to protect    *G* individual depositors of failed Russian banks. In addition, it also acts as the liquidator, in certain circumstances, of such banks."

3    Mr Pugachev left Russia in early 2011 and presently resides principally in London. The Russian liquidation of the Bank was recognised by an order made by Henderson J on 11 July 2014 pursuant to the Cross Border Insolvency Regulations 2006. The deficiency in the Bank's assets at    *H* the date of its entry into liquidation was approximately RUR70·1 billion (US$2·2 billion).

4    The DIA, as liquidator of the Bank, has brought proceedings against Mr Pugachev in Russia, alleging that, following receipt by the Bank of

© 2016 The Incorporated Council of Law Reporting for England and Wales

165

[2016] 1 WLR         JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)
Lewison LJ

A  substantial loans from the Russian Central Bank in order to recapitalise it in about December 2008, Mr Pugachev carried out a scheme designed to extract money from the Bank for the benefit of himself and companies under his control. The amounts claimed exceed US$2 billion. Similar proceedings have also been commenced in England. Mr Pugachev denies these allegations.

5    The freezing order with which we are concerned was made in aid of the Russian proceedings under section 25 of the Civil Jurisdiction and Judgments Act 1982. It was granted by Henderson J on 11 July 2014, and its material parts are as follows:

B

"5. Until the return date or further order of the court the respondent must not—

"(1) remove from England and Wales any of his assets which are in England and Wales up to the value of [£1·1 billion]

C

"(2) in any way dispose of, deal with or diminish the value of any of his assets whether they are in or outside England and Wales up to the same value

"(3) if the respondent has assets outside England and Wales, dispose or deal with those assets outside England and Wales unless the value of his assets in England and Wales remains above [£1·1 billion]

D  "(4) in respect of bodies corporate which are directly or indirectly owned and/or controlled by the respondent and have no substantial trading activities . . . procure or permit those bodies corporate to deal with any of their respective assets unless the value of his assets in England and Wales . . . remains above [£1·1 billion] . . .

"6. Paragraph 5 applies to all the respondent's assets whether or not they are in his own name and whether they are solely or jointly owned and whether the respondent is interested in them legally, beneficially or otherwise. For the purposes of this order the respondent's assets include any asset which he has the power, directly or indirectly, to dispose of or deal with as if it were his own. The respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with his direct or indirect instructions.

E

"7. This prohibition includes the following assets in particular: . . . (c) any interest under any trust or similar entity including any interest which may arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever."

F

"9(1) . . . the respondent must . . . inform the applicants' solicitors of his assets worldwide exceeding £10,000 in value as at the time this order is served whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets."

G

6    Disclosure was provided in a schedule attached to a letter from Mr Pugachev's solicitors dated 23 July 2014. Section L of the Schedule stated:

"SP is one of a class of discretionary beneficiaries under the following New Zealand based trusts:

H  "43.1 London Residence Trust
"43.2 Kea Three Trust
"43.3 Green Residence Trust
"43.4 Riviera Residence Trust
"43.5 Wiltshire Residence Trust."

© 2016 The Incorporated Council of Law Reporting for England and Wales

166
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

A

7    No further details of these trusts were given. The claimants applied to Henderson J for an order that Mr Pugachev be required to provide further information about these trusts and on 25 July Henderson J made such an order. It required Mr Pugachev to:

"swear . . . an affidavit setting out to the best of his ability (i) the identity of the trustee(s), settlor(s), any protector(s), and the beneficiaries of, and any other person carrying on some or all of the functions of a protector or trustee under another title in relation to the trusts referred to in paragraphs 43.1 to 43.5 of the schedule of assets . . . and (ii) details of the assets which were subject to those trusts at as . . . 14 July 2014 (including their value and location)."

B

8    He was also required to supply copies of the trust deeds relating to those trusts which were in his control or which he had a right to inspect or copy. The trustees of the trusts then applied to David Richards J to discharge those paragraphs of Henderson J's order. On 30 October 2014 he refused to do so [2014] EWHC 3547 (Ch). Mr Pugachev's appeal against Henderson J's order and the trustees' appeal against David Richards J's order are the first two of the three appeals.

C

9    When Henderson J granted the original freezing order on 11 July 2014 the claimants gave a cross-undertaking in damages, limited to US$75m. Mr Pugachev applied for an order discharging the freezing order unless the claimants gave a cross-undertaking unlimited in amount; and also fortified it by making an appropriate payment into a bank account in England to be held to the order of the court. On 19 September 2014 Rose J ordered that the continuation of the freezing order should be conditional on the provision of a cross-undertaking unlimited in amount; and ordered that the cross-undertaking be fortified by the payment of US$25m. The claimants appeal against the first of these rulings; and ask for permission to appeal against the second.

D

E

10    This is not an appeal against the original freezing order. Nor is it an application to vary its terms. The question for us is whether, under the terms of the freezing order as made, the judge was right to order him to provide information about the discretionary trusts. That in turn is a question of interpretation of the scope of the freezing order, which must be considered in the light of the nature of the interest of a member of a class of potential beneficiaries under a discretionary trust, and the purpose of making freezing orders.

F

11    In granting the order for disclosure Henderson J held that the words in paragraph 7(c) of the freezing order "any interest under a trust" were wide enough to encompass the interest of a member of a class of potential beneficiaries under a discretionary trust. He said that although that interest was not a proprietary interest of a conventional type, it was in realistic terms an interest which can have considerable value. Accordingly he held that the order compelled Mr Pugachev to disclose his status as beneficiary under the trusts, which he has of course done. Henderson J then said that the court had power to make ancillary orders which will "enable the trust interest to be ascertained and policed by the claimants". He thus concluded that he should make the disclosure order sought:

G

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

A    "with a view to enabling the claimants . . . to take a view on the true nature of the trusts, the nature of Mr Pugachev's interests in them and to examine the question of whether any further steps need to be taken to safeguard the position."

12    He thus made the order the material part of which I have quoted.

13    A beneficiary under a discretionary trust has a right to be considered as a potential recipient of benefit by the trustees. That is an interest which equity will protect. The trustees must apply some objective criterion in deciding whether or not to exercise their discretion in favour of a particular beneficiary; so that each beneficiary has more than a mere hope. But that right is not a proprietary interest in the assets held by the trustees, although it can be described as an interest of sorts: *Gartside v Inland Revenue Comrs* [1968] AC 553, 617–618. In some areas of the law, such as matrimonial finance, legislation is drawn widely enough to enable the court to take into account the likelihood that trustees will exercise their discretion in favour of a particular beneficiary in deciding what provision to make for a former spouse on divorce: *Whaley v Whaley* [2012] 1 FLR 735. But even then the trust assets are not owned by the beneficiary spouse.

14    The principles on which freezing orders are granted are well known. The purpose underlying the grant of a freezing order is to prevent a defendant from putting assets beyond the reach of judgment creditors in the event that judgment is entered against him. This has been said on many occasions, and it is unnecessary to cite authority in support of that proposition. Assets may be put beyond the reach of judgment creditors by hiding them, by transferring them abroad, or by dissipating them. But the underlying purpose of the freezing order is always the same. It is because that is the purpose of a freezing order that its scope is normally restricted to assets which would be amenable to execution in aid of a judgment. In *JSC BTA Bank v Solodchenko* [2011] 1 WLR 888, para 49(1) Patten LJ said:

"the only purpose of [a freezing order] is to prevent the dissipation of assets which would otherwise be available to meet a judgment. The inclusion of trust assets is therefore only justifiable if there are proper grounds for believing that assets ostensibly held by the defendant on trust or as a nominee for a third party in fact belong to him (or to another person whose assets are also frozen). Absent such circumstances, I can see no possible justification for including in the order assets which belong beneficially to a third party and are not therefore the property of the defendant."

15    On the face of it assets held by the trustees of a discretionary trust would not be amenable to execution if judgment is entered against one of the class of potential beneficiaries at the suit of a third party. The trustees might in such circumstances decide to confer a benefit on the beneficiary to save him from bankruptcy; but that would be a matter for them. If they did exercise their discretion in favour of a particular beneficiary the amount of the benefit would thereupon cease to be a trust asset and would become the asset of the beneficiary. It would then truly be his asset.

16    Mr Tregear QC on behalf of Mr Pugachev thus submits that Henderson J was wrong in concluding that Mr Pugachev's "interest" as one of the class of beneficiaries under the discretionary trusts was within the

168
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

scope of paragraph 7(c) of the freezing order. He argues that paragraph 7(c) is in effect explanatory of paragraph 6 of the order which only included assets that can truly be said to be Mr Pugachev's own assets. This, he says, is reinforced both by paragraph 5 of the order which prohibits Mr Pugachev from removing "*his* assets" from the jurisdiction and from disposing or dealing with "*his* assets"; and also by paragraph 9 of the order which limits disclosure to "*his* assets worldwide . . . whether in his own name or not and whether solely or jointly owned". The governing concept underlying the order is that it applies only to Mr Pugachev's assets.

17    This, he argues, is consonant with the underlying purpose of a freezing order which is (or should be) normally limited to keeping available those assets which could be subject to some form of execution in the event of judgment being entered against the defendant in question. The mere fact that the defendant may exercise some form of influence or control over the asset in question is insufficient. What is required is that the defendant (or someone standing in the shoes of the defendant) can compel its application towards the satisfaction of a judgment debt. There is now a considerable body of case law at first instance which holds that the summary of principle by Sir John Chadwick P (sitting as a judge of the Court of Appeal of the Cayman Islands) in *Algosaibi v Saad Investments Co Ltd* 2011 (1) CILR 178 represents the law of England and Wales: *Linsen International Ltd v Humpuss Sea Transport Pte Ltd* [2012] Bus LR 1649 (Flaux J); *Parbulk II AS v PT Humpuss Intermoda Transportasi TBK* [2012] 2 All ER (Comm) 513 (Gloster J); *JSC BTA Bank v Ablyazov (No 10)* [2012] 2 All ER (Comm) 1243 (Christopher Clarke J). It was referred to with approval in this court on appeal from the last-mentioned decision [2014] 1 WLR 1414, para 35. The relevant parts of Sir John's summary are:

    "32. It is necessary to keep in mind the basis on which a court exercises the *Mareva* jurisdiction. It is to ensure that the effective enforcement of its judgment (when obtained) is not frustrated by the dissipation of assets which would be available to the claimant in satisfaction of that judgment. It is trite law that the jurisdiction is not exercised in order to provide the claimant with a security for his claim which he may otherwise have. But, as it seems to me, it is equally plain, as a matter of principle, that the jurisdiction is not exercised in order to give the claimant recourse to assets which would not otherwise be available to satisfy the judgment which he may obtain. The court needs to be satisfied of two matters before granting *Mareva* relief. First, that there is good reason to suppose that the assets in relation to which a freezing order is imposed would become available to satisfy the judgment which the claimant seeks; and, second, that there is good reason to suppose that, absent such relief, there is a real risk that those assets will be dissipated or otherwise put beyond the reach of the claimant.

    "33. The fact that the potential judgment debtor (the CAD) has substantial control over assets which are held by a party against whom no cause of action is alleged (the NCAD)—say, because the NCAD can be expected to act in accordance with the wishes or directions of the CAD (whether or not it could be compelled to do so)—is likely to be of critical importance in relation to the question whether there is a real risk that the assets will be dissipated or otherwise put beyond the reach of the

© 2016 The Incorporated Council of Law Reporting for England and Wales

169
[2016] 1 WLR        JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)
Lewison LJ

A    claimant.  But, as it seems to me, the existence of substantial control is not, of itself, enough to meet the first of the two requirements just mentioned.  It is not enough that the CAD could, if it chose, cause the assets held by the NCAD to be used to satisfy the judgment.  It is necessary that the court be satisfied that there is good reason to suppose either (i) that the CAD can be compelled (through some process of
B    enforcement) to cause the assets held by the NCAD to be used for that purpose; or (ii) that there is some other process of enforcement by which the claimant can obtain recourse to the assets held by the NCAD.”

18    Mr Smith QC, for the claimants, submitted that the actual decision in that case was wrong in the light of the court’s reliance at paras 50–53 on the decision of the Court of Appeal of the Cayman Islands in *Tasarruf*
C    *Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2009] CILR 474; a decision that was subsequently reversed by the Privy Council [2012] 1 WLR 1721.  He is probably correct in that submission, although the error was at the level of detail and does not necessarily affect the statement of general principle.  That said, it is noteworthy that in *JSC BTA Bank v Solodchenko* [2011] 1 WLR 888, para 26, Patten LJ, referring to paragraph 6 of the standard form of freezing order, said that “it makes it
D    clear that ‘the respondent’s assets’ can include assets held by a foreign trust or a Liechtenstein Anstalt when the defendant retains beneficial ownership *or effective control* of the asset . . .” (Emphasis added.)

19    At para 31, he repeated that that paragraph “[makes] it clear that ‘his assets’ include assets held by a third party in respect of which the defendant retains beneficial ownership *or control* . . .” (Emphasis added.)

E    20    I also observe that the final sentence of paragraph 6 says that a respondent will be regarded as having power to deal with or dispose of an asset “if a third party holds or controls the asset in accordance with his direct or indirect instructions”.  This does not, at least on the face of it, distinguish between a legal right to give instructions and the fact that a person in reality follows instructions (in much the same way as a shadow director might give instructions to the de jure directors of a company).  It would, I think, be a
F    matter of concern if a person could make himself judgment-proof merely by setting up discretionary trusts or, as Patten LJ said, a Liechtenstein Anstalt.  However, at this stage in the proceedings, it is unnecessary to reach a firm conclusion.

21    In *JSC BTA Bank v Ablyazov (No 10)* [2014] 1 WLR 1414 Beatson LJ identified three guiding principles:

G    *(i) The enforcement principle*.  The first and primary principle is that the purpose of a freezing order is to stop the injuncted defendant dissipating or disposing of property which could be the subject of enforcement if the claimant goes on to win the case it has brought, and not to give the claimant security for his claim.

*(ii) The flexibility principle*.  The jurisdiction to make a freezing order should be exercised in a flexible and adaptable manner so as to be able to
H    deal with new situations and new ways used by sophisticated and wily operators to make themselves immune to the courts’ orders or deliberately to thwart the effective enforcement of those orders.

*(iii) The strict interpretation principle*.  Because of the penal consequences of breaching a freezing order and the need of the defendant to know where

© 2016 The Incorporated Council of Law Reporting for England and Wales

170
**JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)**          [2016] 1 WLR
Lewison LJ

he, she or it stands, such orders should be clear and unequivocal, and should   *A*
be strictly construed.

22    Although there is some tension between the flexibility principle and
the strict interpretation principle, the latter will generally prevail: Beatson LJ
at para 78.  However, the enforcement principle is not absolute: para 58.  In
that case the question was whether the right to exercise a right to borrow
was an "asset" for the purposes of a freezing order.  Both Christopher
Clarke J and this court said "no".  Beatson LJ said at para 75:      *B*

> "Where the words used clearly and unequivocally lead to the
> conclusion that the term 'asset' includes that which cannot be the subject
> of execution, effect must be given to the words.  Where they do not, the
> purpose of such orders will be a significant factor in determining the
> meaning of the term 'asset' in this context, and a pointer against including   *C*
> the particular right under consideration."

23    With these principles in mind I return to the phrase in paragraph 7(c)
which we must interpret.  It is: "any interest under any trust or similar entity
including any interest which may arise by virtue of the exercise of any power
of appointment, discretion or otherwise howsoever."

24    This phrase is non-standard wording, so that decisions of the court   *D*
on the meaning of the standard form of freezing order are not of direct help
or application.  Paragraph 7(c) appears to me to distinguish between two
kinds of interest.  The first is an interest under a trust.  The second is an
interest which may arise by virtue of the exercise of any discretion.  Both
parts of paragraph 7(c) must have been intended to catch something.  Let me
assume that the first part of the paragraph is intended to catch only a vested
interest under a trust (either in possession or in remainder).  What is the   *E*
second part of that paragraph intended to catch?  The first point to make is
that it is to be read in the context of the order as a whole, which imposes
immediate prohibitions on dealing with assets, and obligations of disclosure
which must be complied with in short order.  It is looking to the present
rather than to the future.  Accordingly it is concerned with a present interest
that may arise as a result of the exercise of any discretion.  The word
"interest" is a protean word which takes its meaning from the context in   *F*
which it is used.  The context here is an interest which is dependent on the
exercise of a discretion.  What kind of interest could that be?  The only
answer to my mind is that it is the interest of a member of a class of
beneficiaries created by a trust in whose favour a discretion could be
exercised.  Even if the interest of a beneficiary under a discretionary trust
cannot be the subject of execution, the words of paragraph 7(c) are clear   *G*
enough to encompass it.  The difficulty I have with Mr Tregear's submissions
is that they give no real meaning to that part of paragraph 7(c).  I do not
consider that they apply to a distribution which is made to a discretionary
beneficiary, because once the distribution has been made it ceases to be held
under the trust but becomes the beneficiary's own property.  In my judgment
the reading I favour is reinforced by paragraph 6 of the order which refers to
"all the respondent's assets . . . and whether the respondent is interested in   *H*
them legally, beneficially *or otherwise*".  The meaning of a legal interest and
the meaning of a beneficial interest may well encompass only assets in which
a respondent has a proprietary interest properly so-called.  But the words "or
otherwise" must have been intended to add something.  I need not decide

© 2016 The Incorporated Council of Law Reporting for England and Wales

whether, without more, those words would have been apt to include the interest of a potential beneficiary under a discretionary trust. But in the context of paragraph 7(c) of the order in my judgment they do.

25    I would hold, therefore, that both Henderson and David Richards JJ were correct in saying that Mr Pugachev's interests under the discretionary trusts are caught by the prohibition on dealing with assets and are also subject to the disclosure requirements of paragraph 9 of the order.

26    However, Mr Pugachev has disclosed those interests. Can he be compelled to go any further? Unless it can be said either that (a) the discretionary trusts are shams or (b) in practice at least the trustees do whatever Mr Pugachev asks them to, he cannot be regarded as the owner, either legally or beneficially, of any of the trust assets themselves.

27    In his first affidavit Mr Roberts referred to OPK Trust Co Ltd, a New Zealand company, which "purported to hold shares in [the Bank] on trust". The company's registered address was that of Patterson Hopkins, which is, apparently, a "three-bedroom villa" in a suburb of Auckland. Mr Roberts deposed in para 8 that:

> "The DIA believes that the trust was simply a façade put in place, in the light of Russian law restrictions on the commercial interests of members of parliament, in order to conceal Mr Pugachev's continued ownership and control of the Bank. There is extensive evidence that, notwithstanding the purported trust, Mr Pugachev continued to closely control the Bank's activities and, in reality, remained the ultimate beneficial owner of the Bank (as well as other assets purportedly held in a similar way)."

28    He added in para 10:

> "The trusts appear to have been wound up, and the OPK Trust Co was removed from the register in New Zealand in the course of 2011. Formally at least, the trust assets are said to have been distributed to Mr Pugachev's two adult sons. In reality, however, the DIA believes that Mr Pugachev remained the ultimate beneficial owner of the relevant assets. Indeed the evidence points to Mr Pugachev subsidising his children, rather than vice-versa, long after the purported trusts were established."

29    In para 41 of his affidavit Mr Roberts referred to "the (at best) opaque manner in which [Mr Pugachev's] assets are held (often involving the use of off-shore companies and nominees to distance himself from the assets in question) . . ."

30    He expanded on this in para 70 in relation to the OPK Trust, again asserting that it was clear that "Mr Pugachev continues to be recognised, including by his current partner Ms Tolstoy, as the ultimate owner of the relevant assets". In para 75 he again asserted that the OPK Trust "was a façade to conceal Mr Pugachev's continued ownership and control of the Bank". In para 74 he asserted that the way in which Mr Pugachev held assets "appears to be deliberately opaque, and intended to allow him to deny any connection to the assets in question". He said that a French chateau, which was Mr Pugachev's holiday home, was held indirectly in the name of Mr Pugachev's personal assistant which "further reinforces the DIA's view that formal ownership structures cannot simply be accepted at face value".

© 2016 The Incorporated Council of Law Reporting for England and Wales

172
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)           [2016] 1 WLR
Lewison LJ

31    In section 9 of his affidavit Mr Roberts gave evidence about what    A
was known about Mr Pugachev's assets.  He referred to Mr Pugachev's
residence in London which was owned by a Manx company. In para 459, he
said that Mr Pugachev was said to own another London property.  The
freehold of that property, he said, had been acquired by Kea Trust Co and he
added that "it seems likely that Kea Trust Co will purport to hold the
property on trust, and the DIA does not know who the purported    B
beneficiaries will be".  He returned to the theme in para 523: "the DIA
believes that the evidence presently available strongly points to the
purported trust arrangements being no more than a façade to conceal
Mr Pugachev's continued ownership and control of the relevant assets."

32    He supported this assertion with various pieces of circumstantial
evidence.

33    The trustees of the five trusts are all New Zealand corporations.    C
Mr William Patterson, a New Zealand solicitor of many years' standing, is a
director of each of the companies.  His wife Ms Hopkins, who is also a New
Zealand solicitor of many years' standing, is also a director of two of the
companies.  They are the partners in the firm of Patterson Hopkins.
In relation to two of the companies the board of directors consists of
Mr Patterson and Ms Natalia Dozortseva, who is a Russian lawyer and an
associate of Mr Pugachev.  In relation to another company the board    D
consists of Mr Patterson, Ms Hopkins and Ms Dozortseva.   The
shareholders in each trust company are Mr Patterson and his wife.  While
Mr Pugachev used to be a protector of the trusts, he ceased to have that role
after the grant of the freezing order.  In his second witness statement
Mr Patterson says that that will remain the case "unless and until the freezing
order is discharged".  Clearly that does not exclude the possibility that    E
Mr Pugachev will resume the role of protector if and when the freezing order
is discharged.  Depending on what powers the protector had under the terms
of the trusts, the temporary relinquishment of those powers in response to
the freezing order may in itself amount to an attempt to put assets beyond
the reach of creditors.

34    In his first witness statement, Mr Patterson said that Mr Pugachev    F
was not the settlor of the trusts, each of which was created by a declaration
of trust by the trustee.  He said, somewhat cryptically, that "Assets were
placed into the trusts".

35    In his second witness statement he added that his reference to the
settlor "was intended to refer not only to the person or persons who declared
the trusts but also to those who placed assets into the trusts".  Whether this is
a categorical denial that Mr Pugachev placed or caused to be placed assets    G
into the trusts is hard to say.

36    In para 4.2 of his first witness statement, Mr Patterson says that
"Neither I nor Ms Hopkins is aware of any basis on which it could be said
that the trusts are shams".

37    In his evidence Mr Patterson says that before the grant of the freezing
order no distributions had been made to Mr Pugachev from any of the trusts
concerned.   It was also said, on his instructions, that no loans to    H
Mr Pugachev had been made before that time; and this was confirmed in his
third witness statement (made after the hearing before David Richards J).
None of this is disputed.  The house in which Mr Pugachev lives in London is
owned by a Manx company which is itself owned by one of the trusts.

© 2016 The Incorporated Council of Law Reporting for England and Wales

173
[2016] 1 WLR          JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)
Lewison LJ

A    Mr Pugachev has a tenancy of that house. Although the tenancy agreement reserves a rent, the rent has not in fact been paid. That, Mr Pugachev says, is because of an agreement that due to tax reasons the accrued arrears of rent will be paid in 2014–2015.

38    As far as Ms Dozortseva is concerned, Mr Patterson says in his second witness statement that he rejects the suggestion that through Ms Dozortseva Mr Pugachev controls the trusts which does not accord with his experience of operating the trusts.

B

39    In his fifth witness statement Mr Roberts said that Mr Pugachev's lavish lifestyle, at least since the grant of the freezing order, came from the trusts' assets. He asserted that:

"in the light of the further evidence regarding the previous trusts administered by OPK Trust Co and Holding Trust Co, it cannot be assumed that there are in fact other real beneficiaries of the trusts."

C

40    In his latest evidence Mr Roberts, on behalf of the Bank, suggests that in practice the trustees do as Mr Pugachev wishes. He points to the fact that Mr Pugachev's lavish lifestyle does not appear to have any alternative source of funding. He draws attention to the fact that in September 2014 Mr Pugachev's solicitors notified him that Mr Pugachev had requested and had received a loan of over £700,000 from the trustee of the London Residence Trust in order to pay for his living expenses and tax. This was after the grant of the freezing order, which froze Mr Pugachev's own assets. In the same month Mr Tregear, appearing on Mr Pugachev's behalf in front of Rose J, told the judge that Mr Pugachev had "access to the trusts" for the purpose of doing business deals. Mr Tregear did, however, accept that money lent to Mr Pugachev by the trustee of a trust would become an asset of Mr Pugachev and hence subject to the terms of the freezing order.

D

E

41    David Richards J heard the trustees' application to discharge that part of Henderson J's order. Unlike Henderson J he had the benefit of Mr Patterson's evidence. He said that it was clear that Mr Pugachev "has substantial connections with the trusts". The powers that he enjoyed as protector of the trusts were not explained and could not be understood without sight of the trust documents. Mr Patterson said nothing to suggest the substantial involvement in the discretionary trusts of anyone other than Mr Pugachev. David Richards J said that he agreed with the DIA that the evidence disclosed "good grounds for supposing that Mr Pugachev is in a position to control assets held within the trust structures". He noted that one of the trusts owned a company that in turn owned Mr Pugachev's London home, and that the rent was allowed to accrue without being paid. That led him to infer that Mr Pugachev could "dictate or at the very least influence when, and even perhaps if, it is paid". He also noted that there was no evidence about how Mr Pugachev's very expensive lifestyle was funded. The trustees had not put forward any evidence to establish that they and Mr Pugachev are at arms' length. Trustees who conduct the affairs of a discretionary trust independently of a defendant whose only interest is as a discretionary or other beneficiary "could be expected to come forward with evidence to establish that the trust's directly or indirectly held assets were not under his control." He summarised the DIA's case thus, at para 48:

F

G

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

174
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)           [2016] 1 WLR
Lewison LJ

"that there were good grounds for thinking, as indicated above, that the underlying assets were not directly held by the trustees but were held in a corporate structure, with the trustees holding the shares in the companies at the top of those structures. The claimants did not dispute that there could be no dealings in the shares in those top companies without the knowledge of the trustees and in particular of Mr Patterson. But it is their contention that there is good reason to believe that Mr Pugachev controls the assets held by companies within the corporate structure over which the trustees themselves do not or may well not have direct control. Without knowing the corporate structure and the directors of the companies within it, it is of course not possible to be certain about this."

42 Accordingly he held that the court had jurisdiction to order, at para 49:

"disclosure relating to the trusts for the purpose of ascertaining the true position, in particular as to the extent, if any, of Mr Pugachev's control of assets held within the trust structures. Where uncertainty exists as to the true position of the assets owned or controlled by a defendant, the court has power to order the cross-examination of the defendant on his affidavits of disclosure. This is not a means of building a case for committal for contempt of court in failing to comply with the court's order for disclosure but is essentially a form of oral discovery. A defendant may be cross-examined as to his possible ownership or control of assets, which have not been disclosed by him, where there is good reason to do so. Equally, in my view, the court has jurisdiction to order written disclosure."

43 I do not consider that we are in a position to accept that, on the current state of the evidence, the trustees of the trusts simply act at the behest of Mr Pugachev. On the other hand the DIA has raised issues which call for fuller explanation. What, then, can or should the court do in such a situation? Both Mr Tregear QC and Mr Adkin QC (who appeared for the trustees) emphasised the threshold test that must be met before the court will make a freezing order against assets held by a third party. They relied particularly on the enforcement principle, which Mr Adkin described as the "alpha and omega" of the jurisdiction. To return to Sir John Chadwick's analysis, the trust assets cannot be brought within the scope of the freezing order unless the court is satisfied that there is good reason to suppose: (i) that Mr Pugachev can be compelled (through some process of enforcement) to cause the assets held by the trustees to be used for that purpose; or (ii) that there is some other process of enforcement by which the claimant can obtain recourse to the assets held by the trustees.

44 If, on the evidence, the claimants have not established "good reason to suppose" that the trust assets are susceptible to execution, then they submit that those assets cannot or should not be frozen. The next step in the argument is the submission that the court has no jurisdiction to make an order requiring the disclosure of information unless the threshold conditions for the making of a freezing order were satisfied. By "jurisdiction" Mr Tregear meant that the court had no legal power to make such an order. That was Mr Adkin's primary submission too, although his fall-back

© 2016 The Incorporated Council of Law Reporting for England and Wales

175

A    position was that even if the court had such a power it should not exercise it unless the threshold conditions for the making of a freezing order were satisfied.

45   I do not accept that the court lacks jurisdiction in the strict sense. In *Guaranty Trust Co of New York v Hannay & Co* [1915] 2 KB 536, 563 Pickford LJ said:

B    "The first and, in my opinion, the only really correct sense of the expression that the court has no jurisdiction is that it has no power to deal with and decide the dispute as to the subject matter before it, no matter in what form or by whom it is raised. But there is another sense in which it is often used, i e, that, although the court has power to decide the question it will not according to its settled practice do so except in a certain way and

C    under certain circumstances."

46   This observation was approved by the House of Lords in *Fourie v Le Roux* [2007] 1 WLR 320, para 25. As Lord Scott of Foscote went on to explain:

"It seems to me clear that Park J had jurisdiction, in the strict sense, to grant an injunction against Mr Le Roux and Fintrade. Both were within

D    the territorial jurisdiction of the court at the time the freezing order was made. Both were, shortly after the freezing order had been made, served with an originating summons in which relief in the form of the freezing order was sought. There is no challenge to the propriety or the efficacy of the service on them. The power of a judge sitting in the High Court to grant an injunction against a party to proceedings properly served is

E    confirmed by, but does not derive from, section 37 of the Supreme Court Act 1981 and its statutory predecessors. It derives from the pre-Supreme Court of Judicature Act 1873 (36 & 37 Vict c 66) powers of the Chancery courts, and other courts, to grant injunctions (see section 16 of the 1873 Act and section 19(2)(b) of the 1981 Act). The issue is, in my opinion, not whether Park J had jurisdiction, in the strict sense, to make

F    the freezing order but whether it was proper, in the circumstances as they stood at the time he made the order, for him to make it. This question does not in the least involve a review of the area of discretion available to any judge who is asked to grant injunctive relief. It involves an examination of the restrictions and limitations which have been placed by a combination of judicial precedent and rules of court on the

G    circumstances in which the injunctive relief in question can properly be granted."

47   That, to my mind, is also the question in our case. So far as judicial precedent is concerned we can say with some confidence that the jurisdiction to make a freezing order also carries with it the power to make whatever ancillary orders are necessary to make the freezing order effective: *AJ*

H    *Bekhor & Co Ltd v Bilton* [1981] QB 923. This power also extends to the making of mandatory orders requiring a defendant to exercise powers, such as a power to revoke trusts: *Tasarruf Mevduati Sigorta Fonu v Merrill Lynch Bank and Trust Co (Cayman) Ltd* [2012] 1 WLR 1721. We were not shown any authority which places explicit limits on that power.

© 2016 The Incorporated Council of Law Reporting for England and Wales

176
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

48   So far as rules of court are concerned, in my judgment the only
relevant one is CPR r 25.1(1)(g) which enables a court to make:

> "an order directing a party to provide information about the location
> of relevant property or assets or to provide information about relevant
> property or assets which are *or may be* the subject of an application for a
> freezing injunction." (Emphasis added.)

49   In *Parker v CS Structured Credit Fund Ltd* [2003] 1 WLR 1680
Mr Gabriel Moss QC considered the scope of this power.  He held that this
sub-rule did not amount to a free-standing jurisdiction to order disclosure of
information which may, in some remote sense, be relevant to some possible
application for a freezing injunction.  He did not devote much attention to
the precise threshold that must be crossed before the power should be
exercised; but that was because the claimant accepted that it had no material
that would have justified an application for a freezing order.  Mr Moss did,
however, say at para 23:

> "it seems to me that it is dealing with a situation where there is either
> an application for a freezing injunction on foot or one where it is at least
> likely that there will be such an application.  In other words, the provision
> assumes that there is some credible material on which such an application
> might be based."

50   "Some credible material" seems to me to be a lower threshold than
"good reason to suppose".  This was also the view that Henderson J took in
*Lichter v Rubin* [2008] EWHC 450 (Ch); The Times, 18 April 2008.  In that
case Henderson J said at para 15:

> "The likelihood . . . is not one that has to be demonstrated to any very
> high degree and certainly does not amount to a likelihood on the balance
> of probabilities.  It seems to me that a reasonable possibility, based on
> credible evidence, should be sufficient to found the jurisdictional
> requirement of rule 25.1(1)(g)."

51   At para 21 he said:

> "But I do accept . . . that rule 25.1(1)(g) is intended to provide
> machinery, in a suitable case, for the provision of information in advance
> of an application for a freezing injunction.  Plainly a provision of that
> nature would lose its utility if it were necessary to demonstrate at that
> stage that a freezing order would, in due course, be granted.  It is only
> necessary to show that a freezing order may be applied for, and whether
> or not the application would be successful is not a matter on which the
> court can form a view at this stage; it need only be satisfied that there are
> credible grounds for making an application if so advised."

52   Neither Mr Tregear nor Mr Adkin said that either of these cases was
wrong.  In my judgment they were both rightly decided.  They are
inconsistent with Mr Adkin's fundamental submission that the threshold
test for asking questions is the same as the threshold test for freezing assets.
As Henderson J rightly said if that were the case CPR r 25.1(1)(g) would lose
its utility.  Whether, as Mr Tregear submitted, rule 25.1(1)(g) is a
codification of judge-made law or whether, as Mr Smith submitted, it
extends the court's powers does not matter.

© 2016 The Incorporated Council of Law Reporting for England and Wales

177

[2016] 1 WLR          JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)
Lewison LJ

A    53    So far as judicial precedent is concerned most of the cases which we were shown were cases in which a freezing order against what were ostensibly third party assets had either been made or had been applied for. Those cases do not bear directly on this one, where no application against what are ostensibly third party assets has yet been made. But in a case where a freezing order has been made, as Patten LJ explained in *JSC BTA Bank v Solodchenko* [2011] 1 WLR 888, para 39:

B

> "The wide form of order, for which the bank contends, is therefore likely in many cases to provide it with an opportunity of *investigating* the truth of the claim that the assets are held on trust before they are released from the injunction and its accompanying disclosure obligations." (Emphasis added.)

C    54    In such a case the freezing order is made before the investigation into the ownership of particular assets takes place. Ours is not that case because the trust assets have not been frozen. On the other hand our case is not a case of the kind that Mr Moss contemplated as being no more than a remote possibility.

55    We must not lose sight of the fact that at this stage the claimants are only asking for information. An order for the provision of information is far less intrusive than an order which prevents someone from dealing with assets. Moreover the claimants are asking only for information from Mr Pugachev who is bound by the terms of the freezing order. They are not asking the trustees to do or say anything. Where a party to litigation has documents which a third party has supplied to him in confidence that is not enough, on its own, to entitle the litigant to withhold disclosure and inspection; although disclosure and inspection may (as in this case) be restricted to a "confidentiality club". Moreover the court has wide powers to require third parties to provide evidence or to produce documents by means of a witness summons under CPR r 34.2, and may require documents to be produced before trial.

56    In *SCF Finance Co Ltd v Masri* [1985] 1 WLR 876 the claimants obtained a freezing order not only against the defendant's bank accounts in London but against his wife's as well, on the ground that he was carrying on business using that account. The wife applied to discharge the injunction against her on the ground that the account was hers. The question was whether the court should accept her assertion without further investigation. Hirst J said "no" and this court upheld his decision. Lloyd LJ gave the only reasoned judgment. He said, at p 884:

G

> "For convenience I would summarise the position as follows: (i) Where a plaintiff invites the court to include within the scope of a *Mareva* injunction assets which appear on their face to belong to a third party, e g a bank account in the name of a third party, the court should not accede to the invitation without good reason for supposing that the assets are in truth the assets of the defendant. (ii) Where the defendant asserts that the assets belong to a third party, the court is not obliged to accept that assertion without inquiry, but may do so depending on the circumstances. The same applies where it is the third party who makes the assertion, on an application to intervene. (iii) In deciding whether to accept the assertion of a defendant or a third party, without further

D

E

F

H

© 2016 The Incorporated Council of Law Reporting for England and Wales

178
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)        [2016] 1 WLR
Lewison LJ

inquiry, the court will be guided by what is just and convenient, not only between the plaintiff and the defendant, but also between the plaintiff, the defendant and the third party. (iv) Where the court decides not to accept the assertion without further inquiry, it may order an issue to be tried between the plaintiff and the third party in advance of the main action, or it may order that the issue await the outcome of the main action, again depending in each case on what is just and convenient. (v) On the facts of the present case the judge was in my view plainly right to hold that he could not decide the matter without further inquiry; . . .”

57   Although both Mr Tregear and Mr Adkin relied heavily on paragraph (i) of that summary of principle, the critical point is that in our case the assets of the trusts themselves are not within the scope of the freezing order. The “good reason to suppose” test in paragraph (i) supports the making of the freezing order itself. It justifies a policy of “shoot first and ask questions later” but only where there is “good reason to suppose”. What are already within the scope of the freezing order granted by Henderson J are Mr Pugachev’s interests in the trusts, whatever those may be. The underlying trust assets are not. There appears to be a dispute between the claimants on the one hand, and Mr Pugachev and the trustees on the other, about whether in reality Mr Pugachev is in effective control of the trust assets.

58   As I have said, I do not consider that the court is in a position to reach even a provisional conclusion on the current state of the evidence. But it is here, in my judgment, that the principle of flexibility comes into play. I do not consider that if the threshold test for including an asset within the scope of a freezing order is not met, the court is powerless. The bank does not ask that the trust assets be brought within the scope of the freezing order immediately. It asks for the opportunity to test its assertion that Mr Pugachev is the effective owner of those assets against his (and the trustees’) assertion that he is not. If its assertion is correct, it may then be in a position to apply for the scope of the freezing order to be widened. If its assertion is incorrect then an application to that effect will fail. But in my judgment the court’s concern that sophisticated and wily operators should not be able to make themselves immune to the courts’ orders militates against denying the DIA that opportunity. As Robert Walker J put it in *International Credit and Investment Co (Overseas) Ltd v Adham* [1998] BCC 134, 136:

“the court will, on appropriate occasions, take drastic action and will not allow its orders to be evaded by the manipulation of shadowy offshore trusts and companies formed in jurisdictions where secrecy is highly prized and official regulation is at a low level.”

59   Depending on the answers to the questions posed there may be “good reason to suppose” that by one means or another the trust assets would be susceptible to enforcement. A number of possibilities were canvassed in argument, but it is not necessary to discuss them. Their availability will depend on what the investigation reveals.

60   I hold therefore that Henderson J had jurisdiction to make the order that he did; and that David Richards J had jurisdiction to refuse to set it aside. Once that position has been reached the exercise of that jurisdiction is

© 2016 The Incorporated Council of Law Reporting for England and Wales

a question of judicial discretion.  I have not been persuaded that in the light of the evidence taken as a whole, either judge exercised his discretion in an impermissible manner.

61    There is one further point arising on the trustees' appeal.  They submit that David Richards J was wrong not to require the claimants to give a cross-undertaking in damages in their favour.

62    The judge rejected that submission largely because he considered that there was no credible evidence that the trustees would suffer loss as a result of the order against Mr Pugachev; and because the trustees had not been ordered to do anything.  He said at para 58:

> "It is not, so far as I am aware, the practice of the court to require an undertaking in damages in respect of an order for disclosure, whether against a party or a third party.  For example, if, as commonly occurs, banks and other persons are required to provide information to claimants seeking to trace assets or obtain evidence of wrongdoing, it is not I think usual to include an undertaking in damages in the order, as opposed to an undertaking to pay the cost of compliance with the order.  There might be circumstances in which this was appropriate but only if there was evidence which indicated that there was a real risk of loss.  As a general practice, undertakings in damages are required only in respect of injunctions in the ordinarily understood sense of that word, that is an order that a party either refrain from taking a step which they assert they are entitled to take or take a step which they assert they are not required to take."

63    However, the trustees point to the standard form of freezing order which contains an undertaking in paragraph 7 of Schedule B:

> "The applicant will pay the reasonable costs of anyone other than the respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the applicant will comply with any order the court may make."

64    In effect the trustees say that the judge was wrong about the usual practice of the court.  The default position is contained in the standard form of freezing order and there was no good reason to depart from it.  The absence of credible evidence of loss is not a good reason; not least because in the normal case an undertaking of this kind is required before the third party is even aware of the grant of the freezing order and ex hypothesi has not given any evidence at all, let alone evidence of loss.  On the face of it those are powerful submissions.  However, they are blunted on the facts of this case because the freezing order that Henderson J made does in fact contain the cross-undertaking set out in the standard form of freezing order that I have already quoted.  I cannot see the point of duplicating that cross-undertaking with another one.  To the extent that the trustees seek to broaden the cross-undertaking to extend to the order requiring Mr Pugachev to make disclosure, I agree with the judge that it is for them to adduce some credible evidence that there is a realistic risk of loss even if disclosure is limited to the "confidentiality club".  I also agree with the judge that they have not yet done so.  Once the nature and location of the trust assets have

© 2016 The Incorporated Council of Law Reporting for England and Wales

180
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

been revealed to the "confidentiality club" the position may change; but that    *A*
is for another day.

65    Accordingly, I would dismiss both Mr Pugachev's appeal and the
trustees' appeal.

66    That leaves the claimants' appeal against the order of Rose J.  There
are two points here: (i) Was the judge wrong to require a cross-undertaking
unlimited in amount?  (ii) Was she wrong to order that the cross-undertaking    *B*
be fortified?

67    I have already described the DIA.  Ms Chudutova, a Russian lawyer
instructed by the DIA, has given evidence about the Bank.  She says that
among its major creditors is the Russian Central Bank which is owed RUR21
billion.  In July 2014, when she made her witness statement, that was the
equivalent of USD $660m.  Another major creditor is OJSC Severstal, a
Russian mining conglomerate, although she does not say how much it claims    *C*
to be owed.  Among the other creditors are a number of other well known
banks.  Clearly, then, there are major creditors for whose ultimate benefit the
claim against Mr Pugachev is brought.  Comparing the Bank's assets with its
liabilities, there is a deficit of some USD$2·3 billion.  Any recovery to which
Mr Pugachev would be entitled on the cross-undertaking would, it seems,
under Russian insolvency law rank high in the order of priorities in the    *D*
liquidation.

68    The default position is that an applicant for an interim injunction is
required to give an unlimited cross-undertaking in damages.  That is
regarded as the price for interfering with the defendant's freedom before he
has been found liable for anything.  It is reflected in paragraph 5.1 of Practice
Direction 25A supplementing CPR Pt 25 which says that unless the court
orders otherwise an order for an injunction must contain a cross-    *E*
undertaking to "pay *any* damages" which the respondent sustains which the
court considers that the applicant ought to pay.  This price is not exacted
when the applicant is a law enforcement agency simply enforcing the law in
the public interest.  But that is not this case.  There is also another possible
exception where the applicant has no personal interest in the litigation and is
bringing the action on behalf of others.  One example is where litigation is    *F*
being brought by liquidators on behalf of an insolvent company where there
are no large creditors who can be expected to indemnify them and where it
has proved impossible to obtain insurance against unlimited liability on the
cross-undertaking: *In re DPR Futures Ltd* [1989] 1 WLR 778.  In that case
an order froze assets of £2·3m and the applicants who were liquidators were
permitted to cap their liability under the cross-undertaking at £2m.  An
order to similar effect was made by Laddie J in *RBG Resources plc v Rastogi*    *G*
[2002] BPIR 1028.  That was a case in which Laddie J considered that there
was "an extremely strong case" against the principal defendants; and that if
he did not accept the limited undertaking "the freezing orders will have to
go": paras 51–52.

69    However, like the grant or refusal of the freezing order itself, the
question of the extent of the cross-undertaking is, in my judgment, a matter
of discretion for the judge who grants the injunction.  I do not consider that    *H*
the mere fact that litigation is being brought by a liquidator of an insolvent
company compels the conclusion that the cross-undertaking must be
capped.  The fact that the claimant is a liquidator is of course a highly
relevant factor, because he is not bringing the claim for his own benefit.

© 2016 The Incorporated Council of Law Reporting for England and Wales

181
[2016] 1 WLR        JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)
Lewison LJ

A liquidator has wide powers under the Insolvency Act 1986 to investigate the causes of corporate failure; to set aside transactions; and to pursue delinquent directors. Many of these powers are given to him in the public interest; because there is a strong public interest in ensuring that failed companies are subjected to an orderly process of liquidation, and in holding those who control companies to account in the event of abuse of powers. That in turn maintains confidence in the system of limited liability on which a modern economy depends. Where, however, a liquidator seeks to recover assets he generally does so primarily for the benefit of creditors. In many cases a major creditor is prepared to undertake to indemnify the liquidator against his or her liability on the cross-undertaking. For example HMRC is often prepared to undertake to indemnify a provisional liquidator on a cross-undertaking in damages given on appointment by the court; or on the subsequent grant of a freezing order. A recent example is *Abbey Forwarding Ltd v Hone (No 3)* [2015] Ch 309; *Abbey Forwarding Ltd v Revenue and Customs Comrs* [2015] Bus LR 882. In that event there is no reason to accept a limited cross-undertaking.

70   In the *Rastogi* case [2002] BPIR 1028 Laddie J's conclusion at para 41 was that the acceptance of a limited cross-undertaking was "within the scope of [his] discretion". In my judgment that is right. Since the decision to accept or to refuse a limited cross-undertaking is discretionary, the judge's decision one way or the other will not be upset by the Court of Appeal except on the usual grounds for interfering with the exercise of judicial discretion.

71   What, then, were the reasons that led Rose J to refuse to accept a limited cross-undertaking? She referred both to *In re DPR Futures* and also to the *Rastogi* case. At para 34, she said:

"The present case seems to me a very different situation from that which arose in *In re DPR Futures*. First, it is clear on the evidence that there are major creditors who are very substantial entities including the central bank of Russia. Further, behind the DIA lies the Russian state. The only evidence as to why those creditors cannot support the cross-undertaking is a rather vague statement in the witness statement of Mr Roberts where he says: 'The DIA understands that major creditors are not willing to expose themselves to further potential losses.' "

72   In the following paragraph, she said:

"It may well be that creditors would prefer not to expose themselves to further potential losses, but that does not answer the question whether that kind of indemnity should be a condition of continuing in force this wide ranging freezing order. There is no evidence here that the DIA have tried to obtain insurance to support a cross-undertaking or whether they have sought an indemnity from the creditors for an unlimited cross-undertaking. There is no danger here of individual liquidators putting their personal assets at risk as in *In re DPR Futures*. Therefore, at present, there is no evidence before me to justify the imposition of a cap on the undertaking in damages."

73   The main ground on which the claimants attack the judge's decision on this point is that they assert that the judge's decision was "contrary to the established (and almost invariable) practice of the court since the decision

© 2016 The Incorporated Council of Law Reporting for England and Wales

182
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

years ago" in *In re DPR Futures*. The word "almost" reveals the weakness in      A
the argument. The starting point, as I have said, is that the decision whether
to accept or refuse a limited cross-undertaking is a discretionary decision.
Discretions of this kind should not be fettered by rigid judge-made rules:
*Lawrence v Fen Tigers Ltd* [2014] AC 822, para 120; *Hyman v Rose* [1912]
AC 623, 631. Previous cases are often no more than illustrations of how
judges have exercised their discretion in practice: *Lawrence v Fen Tigers Ltd*,      B
para 120 approving Millett LJ in *Jaggard v Sawyer* [1995] 1 WLR 269, 288.

74   In addition to reliance on the "established (and almost invariable)
practice of the court" the claimants attack the judge's decision on three
grounds: (i) The judge was wrong to rely on her conclusion that there was
evidence of likely loss on the part of Mr Pugachev; and even if there was it
was less than the cap offered by the DIA. (ii) The judge was wrong to
distinguish between a corporate office holder and an individual office holder.      C
(iii) The absence of a creditor willing to indemnify the DIA and the failure to
seek insurance were irrelevant considerations.

75   The first of these points raises the question whether it is necessary for
a defendant to establish a likelihood of the freezing order causing loss in
order to become entitled to a cross-undertaking unlimited in amount. In
*Sinclair Investment Holdings SA v Cushnie* [2004] EWHC 218 (Ch) at [25]
Mann J said that a failure to establish a sufficient risk of loss was "no reason      D
for not extracting a cross-undertaking". The same point emerges from
*Financial Services Authority v Sinaloa Gold plc* [2013] 2 AC 28 which is a
recent decision of the Supreme Court about when a law enforcement agency
should be required to give a cross-undertaking in damages. At para 29, Lord
Mance JSC said:

> "The purpose of a cross-undertaking in favour of a defendant is to      E
> cover the possibility of loss in the event that the grant of an injunction
> proves to have been inappropriate. To refuse to require a cross-
> undertaking because it appears, however strongly, unlikely ever to be
> capable of being invoked misses the point. The remoteness of the
> possibility of loss might indeed be thought to be a reason why the public
> authority would be unlikely to be inhibited from seeking injunctive relief      F
> by fear that public funds may be exposed to claims for compensation."

76   At para 30, he continued:

> "In private litigation, a claimant acts in its own interests and has a
> choice whether to commit its assets and energies to doing so. If it seeks
> interim relief which may, if unjustified, cause loss or expense to the
> defendant, it is usually fair to require the claimant to be ready to accept      G
> responsibility for the loss or expense. Particularly in the commercial
> context in which freezing orders commonly originate, a claimant should
> be prepared to back its own interests with its own assets against the event
> that it obtains unjustifiably an injunction which harms another's
> interests."

77   It is, then, fairness rather than likelihood of loss that leads to the      H
requirement of a cross-undertaking. At the stage when a freezing order is
granted nothing has been decided. The court cannot be seen to prefer the
interests of one litigant over another. In addition, as mentioned, the cross-
undertaking is regarded as the price that must be paid for the interim

© 2016 The Incorporated Council of Law Reporting for England and Wales

A interference with the defendant's freedom. Moreover, cross-undertakings in damages are required to be given by applicants for freezing orders (and other injunctions) on without notice applications. Necessarily the cross-undertaking is required and given before the defendant has had the opportunity to give any evidence about loss (or indeed anything else). Nor in my experience is it usual for defendants to set out the prospective loss that they might suffer as a reason for requiring the cross-undertaking. Evidence

B of that kind is often deployed on the question of the balance of convenience, but that is a different point.

78   I do not, therefore, consider that the claimants are correct in their submission that the defendant must show that the freezing order is likely to cause him a loss before a cross-undertaking of unlimited amount is required.

79   The second ground of attack focuses on the judge's statement that:

C "There is no danger here of individual liquidators putting their personal assets at risk as in *In re DPR Futures*."

80   However, I do not consider that the judge was simply distinguishing between individual and corporate office holders. The context in which that statement must be read is her earlier statement that "behind the DIA lies the Russian state". The DIA, the liquidator, and the Russian Central Bank, which is the largest creditor, are both effectively emanations of the Russian

D state. I do not consider that the judge made an error of principle in distinguishing the position of a state-backed entity from that of an individual professional insolvency practitioner.

81   The third ground is that the judge should not have looked at the possibility of external sources of finance. One of the points that Millett J made in *In re DPR Futures* was that the liquidators "seek to recover for the

E benefit of a large number of small creditors from whom it is impractical to obtain an indemnity". In *Bloomsbury International Ltd v Holyoake* [2010] EWHC 1150 (Ch) Floyd J commented on that at para 16:

"in cases with a lot of small creditors it is not practicable for the administrators to obtain an indemnity from the creditors for whose benefit they are bringing the claim, but by inference where large and

F substantial creditors exist the position may be different."

82   This is a case in which there are indeed large and substantial creditors. Likewise in *Franses v Al Assad* [2007] BPIR 1233, having referred to *In re DPR Futures*, Henderson J said at para 81 that the matter would take on "a different complexion if the liquidator is being funded by a third party which has a commercial interest in the recoveries to be made by the

G liquidator".

83   In *Sinclair Investment Holdings SA v Cushnie* [2004] EWHC 218 (Ch), albeit in the context of fortification of a cross-undertaking, Mann J applied by analogy the approach of the court to arguments used to resist applications for security for costs. He referred in particular to what Peter Gibson LJ had said in *Keary Developments Ltd v Tarmac Construction Ltd*

H [1995] 3 All ER 534, 551:

"However, the court should consider not only whether the plaintiff company can provide security out of its own resources to continue the litigation, but also whether it can raise the amount needed from its directors, shareholders or other backers or interested persons. As this is

© 2016 The Incorporated Council of Law Reporting for England and Wales

184
**JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)**    [2016] 1 WLR
Lewison LJ

likely to be peculiarly within the knowledge of the plaintiff company, it is    A
for the plaintiff to satisfy the court that it would be prevented by an order
for security from continuing the litigation."

84    Likewise in the *Holyoake* case [2010] EWHC 1150 (Ch) at [29]
Floyd J said:

"The second factor that is material is that the creditors in the present    B
case are substantial undertakings—banks. Unlike the administrators, the
litigation is being brought for their benefit. Unlike the position facing
the administrators in *In re DPR Futures*, it is entirely realistic for the
administrators in the present case to seek an indemnity from these
creditors, and for the creditors to give one. They are being kept informed
of progress, yet it does not appear that the issue of an indemnity has even
been raised with them in the period when this application has been    C
awaiting a hearing. In a case where one finds, as I have, that a defendant
is at risk of significant harm if it turns out that a freezing order has been
wrongly granted, it is material to inquire whether there is any
corresponding harm to the claimant if fortification is ordered. This is not
a case, like *Allen v Jambo Holdings Ltd* [1980] 1 WLR 1252 where to
require fortification beyond the claimant's immediate assets would be    D
likely to stifle the action. Nor is it even one like *In re DPR Futures* where
the administrators are being asked to accept an unreasonable personal
risk. Whilst Mr McQuater movingly suggested that the creditors had
suffered enough at the hands of Mr Holyoake, and should not even be
approached to fortify the cross undertaking, I do not think that is an
adequate response. Quite apart from it being based on a one-sided    E
evaluation of the merits of the case, if a party is going to suggest some
difficulty with providing security (be it security for costs or security on the
cross-undertaking) it is incumbent on it to produce some evidence of that
difficulty. Here, there is none."

85    I do not, therefore, consider that the claimants are correct in
submitting that the potential availability of external funds can be dismissed    F
as simply irrelevant. The same approach is applicable in many other
procedural contexts. Examples are: whether a payment into court should be
ordered as a condition of being able to defend a claim (*MV Yorke Motors v
Edwards* [1982] 1 WLR 444); whether a stay of execution pending appeal
should be granted (*Hammond Suddards Solicitors v Agrichem International
Holdings Ltd* [2002] CP Rep 21); whether a defendant to a proprietary claim
should have access to frozen funds for the purposes of paying his legal costs    G
(*Fitzgerald v Williams* [1996] QB 657). In all these cases the burden lies on
the litigant who says that he cannot comply with the court's order to
demonstrate why that is so. In my judgment the same approach should be
adopted in a case in which an applicant for an injunction says that he should
not be required to give an unlimited cross-undertaking as the price of that
injunction. In my judgment the judge was entitled to take into account the    H
lack of evidence about what efforts the DIA had made to persuade
substantial creditors, for whose benefits the recoveries would enure, to back
the cross-undertaking. She was thus entitled to conclude that the DIA had
failed to discharge that burden. It should also be said that the judge left open

© 2016 The Incorporated Council of Law Reporting for England and Wales

A    the possibility that future changes in circumstances might lead to a reconsideration of the question.

86    I do not wish to cast doubt on the many cases in which judges have been prepared to accept limited cross-undertakings from liquidators and other office holders. To do so is an entirely proper exercise of discretion in appropriate circumstances. Nor am I saying that I would necessarily have exercised an original discretion in the way that the judge did; for that is not the question for an appeal court. The only question for us was whether the judge was entitled to exercise her discretion in the way that she did; and in my judgment she was. I would dismiss the appeal against the judge's requirement of an unlimited cross-undertaking.

87    The last issue is that of fortification. The claimants have not been given permission to appeal on this issue. So we must consider whether to give permission to appeal and, if so, how to dispose of the appeal.

88    The judge dealt with fortification in an earlier part of her judgment. She took into account a number of factors: (i) Neither the Bank nor the DIA has any assets in England: para 13. (ii) There is no formal mechanism for enforcing orders of the English court in Russia: para 13. (iii) The Bank is in insolvent liquidation and it is not clear what assets would be left in the event that the cross-undertaking had to be honoured: para 14. (iv) There was a sufficient risk of Mr Pugachev suffering loss as a result of the freezing order: para 15. That was the most hotly contested issue before the judge and the principal issue before us.

89    Mr Tregear referred us to *Tarasov v Nassif* (unreported) 29 June 1994 in which this court considered whether it was appropriate to maintain fortification of a cross-undertaking given in support of a freezing order. Dillon LJ said:

    "It is quite correct that normally fortification of a cross-undertaking is only required on a foreign plaintiff who has no assets here. That is quite correct in the sense that the majority of applications for fortification of a cross-undertaking are likely to be applications where the plaintiff is a foreign plaintiff with no assets here . . . The essential question is whether there are assets readily available to satisfy any liability under the cross-undertaking . . . the key question is whether there are assets within the jurisdiction . . ."

90    That, however, is not the end of the inquiry because in *Tarasov v Nassif* the court went on to consider whether the defendants had shown any risk of loss. Since they had not, there was no need for the fortification to remain in place. Thus Mr Tregear did not argue that the mere fact that there were no assets within the jurisdiction, coupled with possible difficulties of enforcing a cross-undertaking in Russia, was enough to justify an order for fortification. In *Energy Venture Partners Ltd v Malabu Oil And Gas Ltd* [2015] 1 WLR 2309 (a case decided after Rose J had given judgment in our case) this court approved the distillation of principle by Mr Michael Briggs QC in *Harley Street Capital Ltd v Tchigirinski* [2005] EWHC 2471 (Ch). The requirements for an order for fortification are, at para 13:

    "first, that the court has made an intelligent estimate of the likely amount of loss which might result to a defendant by reason of the injunction; secondly, that the applicant for fortification has shown a

© 2016 The Incorporated Council of Law Reporting for England and Wales

186
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

sufficient level of risk of loss to require fortification; and, thirdly, that the contemplated loss would be caused by the grant of the injunction."

91   The judge referred to a number of earlier authorities that had been cited to her. They were *Sinclair Investment Holdings SA v Cushnie* [2004] EWHC 218 (Ch) (in which the freezing order attached only to Mr Cushnie's house in France); *Harley Street Capital Ltd v Tchigirinski* [2005] EWHC 2471 (Ch) (in which the freezing order attached to shareholdings in two companies) and the *Holyoake* case [2010] EWHC 1150 (Ch) (in which the freezing order was described as "a very extensive one"). The judge noted that the freezing order in our case in effect covered all of Mr Pugachev's assets: paras 16 and 22.

92   She referred to evidence that had been given on Mr Pugachev's behalf about likely losses. That evidence referred to the collapse of a joint venture investing in real estate in Russia which, according to the evidence, would have given Mr Pugachev a profit of US$25m or more. It also referred to an abortive sale of a property in Cap Ferrat which resulted in a loss of US$2·89m. The judge was not persuaded that these particular losses were occasioned by the freezing order but she was persuaded that they indicated "the nature of the deals that Mr Pugachev is likely to wish to do and they are useful to that extent": para 26. Mr Smith demonstrated, convincingly to my mind, that it was unarguable that these putative transactions were aborted by the grant of the freezing order.

93   In essence the judge reasoned that an international businessman on the scale of Mr Pugachev was likely to suffer loss if prevented from conducting his ordinary business activities. At para 16, she said:

"What is the loss that Mr Pugachev alleges that he will suffer here? He says that he will suffer, or might suffer, very substantial loss because his business dealings have been stifled, if not brought to a halt, by this freezing injunction. The assets disclosed pursuant to the obligations under the freezing injunction are worth tens of millions. The injunction prevents him from investing in new business ventures. He does business [on] an extremely large scale and the injunction applies to all his assets."

94   She adopted the approach of Floyd J in the *Holyoake* case [2010] EWHC 1150 (Ch) at [25]:

"It is not easy at this stage definitively to relate many of these instances to the preventive or coercive effects of the order. Nevertheless I think it is realistic to suppose that the existence of the freezing order could cause significant damage to Mr Holyoake. Firstly, it is clear from the evidence that Mr Holyoake has an extensive asset portfolio. It is almost inevitable that the existence of the freezing order will cause him loss. The assets discussed in the evidence are worth millions of pounds. It is entirely reasonable to suppose that damage will be incurred on a commensurate scale by Mr Holyoake if he is unable to deal freely and properly with his assets. Secondly, the freezing order is a very extensive one, and does not relate solely to one or two assets. As Mann J observed in *Sinclair Investment Holdings SA v Cushnie*, it will be easier to foresee a risk of loss in such cases."

© 2016 The Incorporated Council of Law Reporting for England and Wales

187

[2016] 1 WLR        JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)
Lewison LJ

95    Having quoted that passage the judge continued at para 18:

"Mr Pugachev, like Mr Holyoake, is a man with considerable assets who is used to dealing with his portfolio of assets in a flexible manner to take advantage of substantial business opportunities as and when they arise, wherever they arise in the world.  In my judgment the same comments that Floyd J made in the *Holyoake* case apply in this case too."

96    At para 22 she concluded:

"In my judgment it is clear that there is sufficient risk of Mr Pugachev suffering significant loss of the kind referred to by Floyd J in the *Holyoake* case.  A person who generally conducts business on a very large scale does not usually rely on reservoirs of cash sitting in bank accounts in his personal name.  But that does not mean that he has no intention of continuing his business activities or that he does not have the wherewithal to do so.  He is prevented by the injunction from operating his funds to conduct his business and that injunction attaches to funds once they come into his hands."

97    It will be apparent that the judge relied heavily on the approach of Floyd J in the *Holyoake* case.  In *Energy Venture Partners Ltd v Malabu Oil And Gas Ltd* [2015] 1 WLR 2309, para 51 Tomlinson LJ quoted the passage from the *Holyoake* case at para 25 of Floyd J's judgment and said, at para 52: "In my judgment the approach adopted by the judges of first instance in these cases has been entirely appropriate and in accordance with principle."

98    I read that as express approval of the quoted passage from Floyd J's judgment.  Accordingly in my judgment it cannot be said that the judge erred in the principles of law that she applied.  The real question, in my judgment, is whether there was the evidential foundation for the general conclusions that the judge stated.

99    It is not difficult to imagine a case in which a defendant is able to give evidence that up to the grant of a freezing order he was in the habit of making deals or engaging in business ventures over a sustained period and that his established pattern of business enterprise would be stifled by the grant of an order freezing all his assets.  In such a case the defendant may have real difficulty in predicting what particular business opportunities are likely to arise in the future.  But it would be necessary in such a case to establish by evidence a continuing pattern of business activity.  As mentioned Mr Pugachev left Russia in January 2011; and has since been resident partly in England and partly in France.  That is a period of some four years.  What evidence is there of business activity during that period?  The short answer is that there is virtually none.  Mr Pugachev had business interests in Russia, both in shipyards and coal mines.  But his case is that he lost control of the shipyards as a result of an illegal raid by the Russian state in the summer of 2010; and that he lost control of the coal mines when the mining licence was wrongfully terminated in December 2012.  Apart from the abortive real estate transactions I have mentioned Mr Pugachev has disclosed the existence of a French grocery business.  But that has been sold and according to Mr Pugachev the proceeds of sale are needed to pay existing liabilities.  He has disclosed that he owns shares in two Swiss companies.  One is "in bankruptcy" and there is no information about the other.  He has also said that he owns shares in an English company; but that

© 2016 The Incorporated Council of Law Reporting for England and Wales

188
JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA)          [2016] 1 WLR
Lewison LJ

the company is unlikely to have any value.  He has disclosed no other active trading entity.  Nor has he identified any other venture in prospect.  We have no information about how he has occupied his time since he left Russia four years ago.  A single failed real estate venture in the best part of a four-year period is, in my judgment, too slender a foundation on which to build a picture of an established pattern of business activity from which it can be inferred (without more evidence) that the freezing order will cause loss.  The judge did not descend into any detail about why she reached the general conclusions that she did; and in my judgment they are simply unsustainable on the evidence.  Nor did the evidence placed before the judge on behalf of Mr Pugachev in fact allege that "his business dealings [had] been stifled, if not brought to a halt, by this freezing injunction".  Since the judge's decision further evidence has been given by Mr Michaelson on Mr Pugachev's behalf, but even that evidence contains nothing about Mr Pugachev's business activities since he left Russia in 2011.  If, in the future, a real opportunity is identified it is open to Mr Pugachev to take steps to secure permission (either from the claimants or from the court) to take advantage of it; and to renew his application for fortification.  Accordingly I would grant permission to appeal against the judge's decision to order fortification of the cross-undertaking; and allow the appeal to that extent.

100    The upshot is that I would dismiss the two appeals from Henderson and David Richards JJ; but I would allow the appeal in part from Rose J.

**CHRISTOPHER CLARKE LJ**
101    I agree.

**ARDEN LJ**
102    I also agree.

*Appeals of defendant and trustees dismissed.*
*Claimants' appeal allowed in part.*

BRENDAN WRIGHT, Barrister

© 2016 The Incorporated Council of Law Reporting for England and Wales