# EXHIBIT 18

385

A                                   House of Lords

## Masri *v* Consolidated Contractors International (UK) Ltd
## and others (No 4)

### [2009] UKHL 43

B   2009  May 18–21;                    Lord Scott of Foscote, Lord Rodger of Earlsferry,
         July 30                        Lord Walker of Gestingthorpe, Lord Brown of
                                        Eaton-under-Heywood, Lord Mance

*Practice — Judgment — Enforcement — Order for officer of corporate judgment
    debtor to attend court to provide information — Officer resident and domiciled
    outside jurisdiction — Whether jurisdiction to grant order against officer abroad*
C   *— Civil Procedure Act 1997 (c 12), s 1 — CPR rr 6.30(2), 71.2*

The judgment creditor obtained judgment in English proceedings against,
inter alios, a foreign company, CCIC, which had submitted to the jurisdiction
by defending the proceedings. CCIC, which was incorporated in Lebanon and
domiciled in Greece, failed to meet the judgment debt. The judgment creditor
obtained a without notice order under CPR r 71.2[1], enacted pursuant to section 1 of
D   the Civil Procedure Act 1997[2], for the examination in England of TK, an officer of
CCIC domiciled in Greece, in respect of CCIC's foreign assets. TK applied for the
order to be set aside on the principal grounds that CPR r 71.2 did not apply to an
officer of a foreign judgment debtor in respect of its assets abroad and that any order
for the taking of evidence was regulated by European Community law. The master
granted the application and set aside the order for want of jurisdiction. The Court of
Appeal allowed the judgment creditor's appeal, holding that Community law did not
E   displace CPR r 71.2, that its wording was sufficient to include the order against TK
and that it was no breach of international law or comity for the order to be made.
On TK's appeal—
*Held*, (1) that whether and to what extent the presumption against
extraterritoriality applied in relation to foreigners outside the jurisdiction depended
on who was within the legislative grasp or intendment of the particular provision;
that Parliament was to be taken as understanding and endorsing the manner in which
F   the rule-making power in respect of extraterritorial jurisdiction had been exercised
over the years and as permitting the extension of the English courts' jurisdiction over
persons abroad so as to cover new causes of action and situations; and that the power
conferred by section 1 of the 1997 Act was wide enough, in principle, to permit the
rule-making authority to enact rules relating to the examination of an officer abroad
of a company against which judgment had been given within the jurisdiction (post,
paras 1–4, 10, 13–15).
But (2), allowing the appeal, that, since a corporate judgment debtor had a
G   separate legal personality from its officers and was not to be equated with them and
since the officers might have information about its affairs but had not submitted to
the jurisdiction, a corporate judgment debtor was in a different position from an
individual judgment debtor outside the jurisdiction against whom an order for
examination might be made under CPR r 71.2 and served abroad under CPR Pt 6;
that, although there was a close connection between the subject matter of an action
against a corporate judgment debtor and its officer, CPR Pt 71 was concerned with
H   obtaining information in aid of the enforcement of a private judgment in private
civil litigation; that in such proceedings, in contrast to proceedings where the

[1] CPR r 6.30(2): see post, para 16.
R 71.2: see post, para 8.
[2] Civil Procedure Act 1997, s 1: see post, para 11.

386
**Masri v Consolidated Contractors Int (UK) Ltd (No 4) (HL(E))**    **[2009] 3 WLR**

public interest required an officer's public examination, parties were not entitled to ask the court to summon witnesses from abroad to provide full information; that, since the historical origin of CPR Pt 71 concerning the examination of officers of a corporate judgment debtor and the extreme informality of its operation indicated a purely domestic focus, and since CPR rr 6.20(9) and 6.30(2) did not, properly construed, enable service out of the jurisdiction of an order under CPR Pt 71 which had been made against a non-party, CPR r 71.2 did not permit an order for examination to be made against an officer who was outside the jurisdiction; and, that, accordingly, the issues of European Community law did not arise and the order made against TK would be set aside ( post, paras 1–4, 16–19, 23–24, 26–27, 36–37, 39).

*In re Tucker (RC) (A Bankrupt); Ex p Tucker (KR)* [1990] Ch 148, CA considered.

*In re Seagull Manufacturing Co Ltd* [1993] Ch 345, CA distinguished.

Decision of the Court of Appeal [2008] EWCA Civ 876; [2009] 2 WLR 699; [2009] Bus LR 246 reversed.

The following cases are referred to in the opinion of Lord Mance:

*Aiden Shipping Co Ltd v Interbulk Ltd* [1986] AC 965; [1986] 2 WLR 1051; [1986] 2 All ER 409, HL(E)

*Aktiebolaget Robertsfors and La Société Anonyme des Papeteries de l'Aa, In re* [1910] 2 KB 727, CA

*Blain, Ex p; In re Sawers* (1879) 12 Ch D 522, CA

*British South African Co v Cia de Moçambique* [1893] AC 602, HL(E)

*Clark v Oceanic Contractors Inc* [1983] 2 AC 130; [1983] 2 WLR 94; [1983] 1 All ER 133, HL(E)

*Dickson v Neath and Brecon Railway Co* (1869) LR 4 Ex 87

*General Mediterranean Holdings SA v Patel* [2000] 1 WLR 272; [1999] 3 All ER 673

*Grosvenor Hotel, London (No 2), In re* [1965] Ch 1210; [1964] 3 WLR 992; [1964] 3 All ER 354, CA

*Holmes v Bangladesh Biman Corpn* [1989] AC 1112; [1989] 2 WLR 481; [1989] 1 All ER 852, HL(E)

*Interpool Ltd v Galani* [1988] QB 738; [1987] 3 WLR 1042; [1987] 2 All ER 981, CA

*Liddell's Settlment Trusts, In re* [1936] Ch 365; [1936] 1 All ER 239, CA

*Mansour v Mansour* [1989] 1 FLR 418, CA

*National Justice Cia Naviera SA v Prudential Assurance Co Ltd (The Ikarian Reefer) (No 2)* [2000] 1 WLR 603; [2000] 1 All ER 37, CA

*R (Al-Skeini) v Secretary of State for Defence (The Redress Trust intervening)* [2007] UKHL 26; [2008] AC 153; [2007] 3 WLR 33; [2007] 3 All ER 685, HL(E)

*Seagull Manufacturing Co Ltd, In re* [1993] Ch 345; [1993] 2 WLR 872; [1993] 2 All ER 980, CA

*Société Eram Shipping Co Ltd v Cie Internationale de Navigation* [2003] UKHL 30; [2004] 1 AC 260; [2003] 3 WLR 21; [2003] 3 All ER 465, HL(E)

*Sostad v Woldson* [1925] 3 DLR 779

*Tasarruf Mevduati Sigorta Fonu v Demirel* [2006] EWHC 3354 (Ch); [2007] 2 All ER 815; [2007] 1 All ER (Comm) 649; [2007] EWCA Civ 799; [2007] 1 WLR 2508; [2007] 4 All ER 1014; [2007] 2 All ER (Comm) 925; [2007] 2 Lloyd's Rep 440, CA

*Theophile v Solicitor General* [1950] AC 186; [1950] 1 All ER 405, HL(E)

*Tucker (RC) (A Bankrupt), In re; Ex p Tucker (KR)* [1987] 1 WLR 928; [1987] 2 All ER 23; [1990] Ch 148; [1988] 2 WLR 748; [1988] 1 All ER 603, CA

*Union Bank of Finland Ltd v Lelakis* [1997] 1 WLR 590; [1996] 4 All ER 305, CA

*Vitol SA v Capri Marine Ltd* [2008] EWHC 378 (Comm); [2009] Bus LR 271

*Zollverein, The* (1856) Swab 96

387
[2009] 3 WLR          Masri v Consolidated Contractors Int (UK) Ltd (No 4) (HL(E))

A    The following additional cases were cited in argument:

*Al Sabah v Grupo Torras SA* [2005] UKPC 1; [2005] 2 AC 333; [2005] 2 WLR 904;
    [2005] 1 All ER 871, PC
*Amalia, The* (1863) 1 Moo NS 471, PC
*Attorney General for Alberta v Huggard Assets Ltd* [1953] AC 420; [1953] 2 WLR
    768; [1953] 2 All ER 951, PC
B    *Attorney Generl for Tuvalu v Philatelic Distribution Corpn Ltd* [1990] 1 WLR 926;
    [1990] 2 All ER 216, CA
*Beeston Shipping Ltd v Babanaft International SA* [1985] 1 All ER 923, CA
*Brannigan v Davison* [1997] AC 238; [1996] 3 WLR 859, PC
*Busfield, In re* (1886) 32 Ch D 123, CA
*C Inc plc v L* [2001] 2 All ER (Comm) 446; [2001] 2 Lloyd's Rep 459
*Casterbridge Properties Ltd, In re* [2002] BCC 453
*City & County Properties Ltd v Kamali* [2006] EWCA Civ 1879; [2007] 1 WLR
C    1219, CA
*Company, In re A* [1980] Ch 138; [1980] 2 WLR 241; [1980] 1 All ER 284, CA
*Federal Trade Commission v Cie de Saint-Gobain-Pont-à-Mousson* (1980) 636 F 2d
    1300
*Grand Jury, In re* (1982) 550 F Supp 24
*Hagen, The* [1908] P 189, CA
*Hall v Brand* (1883) 12 QBD 39, CA
D    *Johnson v Taylor Bros & Co Ltd* [1920] AC 144, HL(E)
*Kendall v Hamilton* (1879) 4 App Cas 504, CA
*Kuwait Oil Tanker Co SAK v Qabazard* [2003] UKHL 31; [2004] 1 AC 300; [2003]
    3 WLR 14; [2003] 3 All ER 501, HL(E)
*Lawson v Serco Ltd* [2006] UKHL 3; [2006] ICR 250; [2006] 1 All ER 823,
    HL(E)
*London Corpn v Cox* (1867) LR 2 HL 239, HL(E)
E    *Mackinnon v Donaldson, Lufkin and Jenrette Securities Corpn* [1986] Ch 482;
    [1982] 2 WLR 453; [1986] 1 All ER 653
*Maclaine Watson & Co v International Tin Council (No 2)* [1987] 1 WLR 1711;
    [1987] 3 All ER 886; [1989] Ch 286; [1988] 3 WLR 1190; [1988] 3 All ER 257,
    CA
*Masri v Consolidated Contractors International (UK) Ltd (No 2)* [2008] EWCA Civ
    303; [2009] 2 WLR 621; [2009] Bus LR 168; [2008] 2 All ER (Comm) 1099;
F    [2008] 2 Lloyd's Rep 128, CA
*Masri v Consolidated Contractors International (UK) Ltd (No 3)* [2008] EWCA Civ
    625; [2009] 2 WLR 669; [2009] Bus LR 216; [2008] 2 All ER (Comm) 1146;
    [2008] 2 Lloyds' Rep 301, CA
*Mercedes-Benz AG v Leiduck* [1996] AC 284; [1995] 3 WLR 718; [1995] 3 All ER
    929, PC
*Mitsui & Co Ltd v Nexen Petroleum UK Ltd* [2005] EWHC 625 (Ch); [2005] 3 All
G    ER 511
*Monro (George) Ltd v American Cyanamid and Chemical Corpn* [1944] KB 432;
    [1944] 1 All ER 386, CA
*Morris v Banque Arab et Internationale d'Investissement SA* The Times,
    23 December 1999
*Norwich Pharmacal Co v Customs and Excise Comrs* [1974] AC 133; [1973] 3 WLR
    164; [1973] 2 All ER 943, HL(E)
H    *Perry v Zissis* [1977] 1 Lloyd's Rep 607, CA
*Practice Note* [1928] WN 209
*Richardson v Richardson* [1927] P 228
*St Paul Dairy Industries NV v Unibel Exser BVBA* (Case C-104/03) [2006] All
    ER (EC) 172; [2005] ECR I-3481, ECJ
*Sayers v SmithKline Beecham plc (Disclosure of Data)* [2004] EWHC 1098 (QB)

388

**Masri v Consolidated Contractors Int (UK) Ltd (No 4) (HL(E))**      [2009] 3 WLR
**Lord Scott of Foscote**

*Shamil Bank of Bahrain EC v Beximco Pharmaceuticals Ltd* (unreported)
    22 February 2005, Master Miller
*Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] AC 670, PC
*Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA* [1979]
    AC 210; [1977] 3 WLR 818; [1977] 3 All ER 803, HL(E)
*Société Générale du Commerce et de l'Industrie en France v Johann Maria Farina &*
    *Co* [1904] 1 KB 794, CA
*Société Nationale Industrielle Aerospatiale v United States Distict Court for the*
    *Southern District of Iowa* (1986) 482 US 519
*Van Uden Maritime BV (trading as Van Uden Africa Line) v Kommanditgesellschaft*
    *in Firma Deco-Line* (Case C-391/95) [1999] QB 1225; [1999] 2 WLR 1181;
    [1999] All ER (Comm) 385; [1999] All ER (EC) 258; [1998] ECR I-7091,
    ECJ

**APPEAL** from the Court of Appeal

Toufic Said Khoury appealed with leave of an Appeal Committee of
the House of Lords (Lord Scott of Foscote, Lord Rodger of Earlsferry
and Lord Mance) granted on 14 January 2009 from the Court of Appeal
(Sir Anthony Clarke MR, Longmore and Lawrence Collins LJJ) which,
on 28 July 2008, had allowed an appeal by the judgment creditor,
Munib Masri, from the decision of Master Miller on 20 December 2007
to set aside his order made on 4 July 2007 without notice under
CPR Pt 71 on the application of the judgment creditor, directing that
Mr Khoury, who was resident and domiciled in Greece and an officer of
the foreign judgment debtor, Consolidated Contractors International
Co SAL, should attend and provide information about the judgment
debtor's means.

The facts are stated in the opinion of Lord Mance.

*Alexander Layton QC* and *Thomas Raphael* (instructed by *Olswang
LLP*) for TK.
*Laurence Rabinowitz QC, Simon Salzedo* and *Colin West* (instructed by
*Simmons & Simmons*) for the judgment creditor.

The Committee took time for consideration

30 July 2009. **LORD SCOTT OF FOSCOTE**

1   My Lords, I have had the advantage of reading in draft the opinion
of my noble and learned friend, Lord Mance.  I agree with it, and for the
reasons given by Lord Mance I would allow this appeal and restore the order
of Master Miller.

**LORD RODGER OF EARLSFERRY**

2   My Lords, I have had the advantage of reading in draft the speech
which is to be delivered by my noble and learned friend, Lord Mance.
I agree with it and, for the reasons which he gives, I too would allow the
appeal and make the order which he proposes.

**LORD WALKER OF GESTINGTHORPE**

3   My Lords, I have had the advantage of reading in draft the opinion
of my noble and learned friend, Lord Mance.  I agree with it, and for the
reasons given by Lord Mance I would allow this appeal and restore the order
of Master Miller.

389

A    **LORD BROWN OF EATON-UNDER-HEYWOOD**

   4   My Lords, I have had the advantage of reading in draft the opinion of my noble and learned friend, Lord Mance.  I agree with it, and for the reasons given by Lord Mance I would allow this appeal and restore the order of Master Miller.

   **LORD MANCE**

B
   *Introduction*

   5   My Lords, Mr Masri, the respondent, is owed a judgment debt of US\$64m by Consolidated Contractors International Co SAL ("CCIC") and Consolidated Contractors (Oil and Gas) Co SAL ("CCOG"), both Lebanese companies.  The debt arises from judgments on liability and quantum

C   of Gloster J in the Commercial Court on 28 July 2006 and 4 May 2007. CCIC and CCOG have manifested their intention to avoid payment of this judgment debt at all costs.  Permissions to appeal to the House of Lords on jurisdictional and other issues in the proceedings were discharged for failure to comply with conditions requiring payment of all or most of the judgment debt.  Lord Bingham of Cornhill observed too truly in *Société Eram Shipping Co Ltd v Cie Internationale de Navigation* [2004] 1 AC 260, para 10:

D
   "As many a claimant has learned to his cost, it is one thing to recover a favourable judgment; it may prove quite another to enforce it against an unscrupulous defendant.  But an unenforceable judgment is at best valueless, at worst a source of additional loss."

   He added that this was a problem that our Victorian forebears had
E   addressed with characteristic energy and pragmatism.  That applies in this case.  CPR Pt 71 on which the appeal turns reflects the provisions of section 60 of the Common Law Procedure Act 1854 (17 & 18 Vict c 125), as extended by the Rules of the Supreme Court 1883 to redress the effect of the decision in *Dickson v Neath and Brecon Railway Co* (1869) LR 4 Ex 87.

   6   The issues now before your Lordships arise not between Mr Masri and CCIC or CCOG, but between Mr Masri and Mr Toufic Khoury.
F   Mr Khoury was the chairman, general manager and a director of CCIC. He has at all times been habitually resident in Greece.  On 6 July 2007, Mr Masri obtained without notice an order for his examination as an officer of CCIC in respect of CCIC's means under CPR Pt 71.  The order, granted without notice and on paper by Master Miller, provided for service on the London solicitors then acting for CCIC.  It is common ground that this

G   was not appropriate.  Subsequent steps were taken to serve Mr Khoury personally in Greece.

   7   On an application by Mr Khoury on 20 December 2007, Master Miller set aside the order, primarily on the grounds of lack of jurisdiction under both European Community and domestic law, and without finding it necessary to determine whether valid personal service had been effected in Greece.  He gave permission for a "leap-frog" appeal to the Court of Appeal

H   on all but one presently immaterial issue.  On 28 July 2008, the Court of Appeal allowed Mr Masri's appeal, and remitted the matter for further consideration of the issue relating to the validity of the service effected in Greece.  The House gave leave to appeal on 14 January 2009, indicating that it would hear first the issues of English law, and that, if the appeal failed on

390
**Masri v Consolidated Contractors Int (UK) Ltd (No 4) (HL(E))**      [2009] 3 WLR
Lord Mance

those points, it would refer the points of European law concerning in particular the application of Council Regulation (EC) No 1206/2001 of 28 May 2001 (OJ 2001 L174, p 1) ("the Evidence Regulation") and Council Regulation (EC) No 44/2001(OJ 2001 L12, p 1) ("the Brussels Regulation") to the Court of Justice of the European Communities. In the meanwhile in January 2008 Mr Khoury resigned from his offices with CCIC, while continuing to enjoy the benefit of the same legal team as represents CCIC. In December 2008 CCIC entered into judicial administration in Lebanon, but the appeal proceeds on the basis of the facts before Master Miller in December 2007. The Court of Appeal ordered on 19 February 2009 that no examination of Mr Khoury should take place until after the House's determination of the English law issues.

8 CPR Pt 71 provides:

"*71.2 Order to attend court*
"(1) A judgment creditor may apply for an order requiring— (a) a judgment debtor; or (b) if a judgment debtor is a company or other corporation, an officer of that body, to attend court to provide information about— (i) the judgment debtor's means; or (ii) any other matter about which information is needed to enforce a judgment or order.

"(2) An application under paragraph (1)— (a) may be made without notice; and (b)(i) must be issued in the court which made the judgment or order which it is sought to enforce, except that (ii) if the proceedings have since been transferred to a different court, it must be issued in that court.

"(3) The application notice must— (a) be in the form; and (b) contain the information required by the relevant practice direction.

"(4) An application under paragraph (1) may be dealt with by a court officer without a hearing.

"(5) If the application notice complies with paragraph (3), an order to attend court will be issued in the terms of paragraph (6).

"(6) A person served with an order issued under this rule must— (a) attend court at the time and place specified in the order; (b) when he does so, produce at court documents in his control which are described in the order; and (c) answer on oath such questions as the court may require.

"(7) An order under this rule will contain a notice in the following terms—'You must obey this order. If you do not, you may be sent to prison for contempt of court.' "

*The issues*

9 The issues now before the House are short, although the argument was long. They are (1) whether the language of CPR r 71.2 purports to confer power to order examination of a foreign director of a foreign company, (2) whether it purports to confer power to order such examination in respect of foreign assets, (3) whether, if it does, it is ultra vires the rule-making power, (4) whether, if it does, there is any basis under CPR Pt 6 for service upon Mr Khoury out of the jurisdiction in Greece, and (5) whether, if there is, the English courts should none the less give "primacy" or priority to use of the Evidence Regulation, before contemplating such domestic means. Mr Khoury submits that the last contention, were it thought to have any force at all and to be potentially decisive, should be referred along with the other European issues to the Court of Justice.

*Scope of rule-making power*

10 It is convenient to start with the third issue. This depends upon the width of the rule-making power contained in section 1 of the Civil Procedure Act 1997. The first and second issues arise only if the first issue is answered in Mr Masri's favour and they depend upon the proper construction of CPR Pt 71 and CPR Pt 6. A conclusion about what would be within or outside the rule-maker's power may itself affect the construction to be put on the rules. At the heart of Mr Alexander Layton QC's submissions on behalf of Mr Khoury on all three issues is, however, a single theme, that the court lacks extraterritorial power—over Mr Khoury because he is abroad, and over CCIC's assets (about which Mr Masri wishes to question Mr Khoury) because they are also abroad. The principle relied upon is one of construction, underpinned by considerations of international comity and law. It is that "Unless the contrary intention appears . . . an enactment applies to all persons and matters within the territory to which it extends, but not to any other persons and matters": *Bennion, Statutory Interpretation*, 4th ed (2002), p 282, section 106, cited with approval, along with the considerable case law, by Lord Bingham of Cornhill in *R (Al-Skeini) v Secretary of State for Defence (The Redress Trust intervening)* [2008] AC 153, para 11. The principle may not apply, at any rate with the same force, to English subjects (see e g *The Zollverein* (1856) Swab 96, 98, per Dr Lushington and *Ex p Blain; In re Sawers* (1879) 12 Ch D 522, 526, per James LJ, cited with approval by Lord Scarman in *Clark v Oceanic Contractors Inc* [1983] 2 AC 130, 144E–H), but that is presently irrelevant. Whether and to what extent it applies in relation to foreigners outside the jurisdiction depends ultimately as Lord Wilberforce said in *Clark v Oceanic Contractors Inc* (p 152C) upon who is "within the legislative grasp, or intendment" of the relevant provision. To this a nuanced answer may be given, as in that case where United Kingdom PAYE legislation was held to apply to a foreign company employing workers to work in North Sea operations and as in *Holmes v Bangladesh Biman Corpn* [1989] AC 1112 where apparently general wording of a United Kingdom carriage by air Order was not taken to apply to carriage by air wholly to be performed in the territory of a foreign state.

11 The rule-making power in section 1 of the Civil Procedure Act 1997 reads:

"*Civil Procedure Rules*

"1(1) There are to be rules of court (to be called 'Civil Procedure Rules') governing the practice and procedure to be followed in . . . (b) the High Court . . .

"(2) Schedule 1 (which makes further provision about the extent of the power to make Civil Procedure Rules) is to have effect."

Schedule 1 includes these provisions:

"1. Among the matters which Civil Procedure Rules may be made about are any matters which were governed by the former Rules of the Supreme Court . . ."

"4. Civil Procedure Rules may modify the rules of evidence as they apply to proceedings in any court within the scope of the rules."

This language raises the questions: what is the scope of "practice and procedure" within section 1(1), and what is the scope of the matters "governed by the former Rules of the Supreme Court" to which paragraph 1 of Schedule 1 refers?  Mr Layton took the House through legislative and rule-making history from the reign of Queen Elizabeth I onwards.  His primary submission was that any exercise of jurisdiction in respect of foreigners abroad fell outside the concept of "practice and procedure" and required express statutory legitimation before it could become one of the matters governed by rules of court.  He cited Lord Halsbury's statement in *British South Africa Co v Cia de Moçambique* [1893] AC 602, 630 that "Rules of procedure and practice in England would not, I think, in the contemplation of any one, touch questions of territorial or international jurisdiction".  That was however said in relation to a claim brought for trespass to land situate abroad, long recognised as a context in which jurisdiction is strictly territorial.  He also cited *In re Grosvenor Hotel, London (No 2)* [1965] Ch 1210 and *General Mediterranean Holdings SA v Patel* [2000] 1 WLR 272 for the proposition that rules of practice and procedure cannot alter substantive law (in those cases, the rules relating to privileged documents).  In the former case, it was also said that they cannot alter rules of evidence, a matter now expressly catered for by Schedule 1, paragraph 4 to the Civil Procedure Act 1997.

12    In the present case, Mr Layton also relies upon the limitation of the court's power to enforce the attendance of witnesses or fine defaulting witnesses.  From the Statute of Elizabeth 1562 (5 Eliz 1 c 9) onwards, this had been regulated by statute and had never extended beyond the United Kingdom.  The procedure enacted in relation to other jurisdictions involves the taking of evidence, on commission or otherwise, with the assistance of the foreign court.  The service of a writ of subpoena is still only possible under section 36 of the Supreme Court Act 1981 in respect of persons in one of the parts of the United Kingdom.  The limitation of the court's power in this respect corresponds with the principle of international law, summarised robustly by Dr Mann in his Hague lecture "The Doctrine of Jurisdiction in International Law", *Recueil des Cours*, 1964-I, *The Definition of Jurisdiction*, p 137:

"Nor is a state entitled to enforce the attendance of a foreign witness before its own tribunals by threatening him with penalties in case of non-compliance.  There is, it is true, no objection to a state, by lawful means, inviting or perhaps requiring a foreign witness to appear for the purpose of giving evidence.  But the foreign witness is under no duty to comply, and to impose penalties upon him and to enforce them either against his property or against him personally on the occasion of a future visit constitutes an excess of criminal jurisdiction and runs contrary to the practice of states in regard to the taking of evidence as it has developed over a long period of time."

13    With regard to the heads of extraterritorial jurisdiction involved in what used to be RSC Ord 11 and is now CPR Pt 6, Mr Layton was able to trace many of them to express statutory provisions.  But he accepted that there are a number which cannot be so derived.  Thus, for example, the Rules of the Supreme Court 1883 were made under section 17 of the Supreme Court of Judicature Act 1875 (38 & 39 Vict c 77), which

393

A authorised the making of rules for regulating practice and procedure. But they included for the first time as grounds for service out of the jurisdiction that relief was "sought against any person domiciled or ordinarily resident within the jurisdiction" (paragraph (c)) and that "any person out of the jurisdiction is a necessary or proper party to an action properly brought against some other person duly served within the jurisdiction" (paragraph (g)): see Ord XI, r 1. Much later, of course, the latter provision

B was itself amended to apply whether the action was brought against another person served within *or out of* the jurisdiction: SI 1983/1181. A reading of *The Supreme Court Practice 1997* (applicable immediately prior to the CPR) makes it clear that there was a regular process of amendment and minor extension of the powers under Order 11 in order to address some new need or "small but irritating loophole": see notes, para 11/1 (history of rule,

C including SI 1983/1181 and its amendment by SI 1990/1689, SI 1990/2599, SI 1992/1907 and SI 1993/2760) and notes, paras 11/1/18 (breach within preceded by breach out of the jurisdiction), 11/1/19 (tort), 11/1/23 (trusts) and 11/1/25 (foreign judgment or award sufficient ground for grant of leave without presence of assets here). Most recently, following the expression by the Court of Appeal in *National Justice Cia Naviera SA v Prudential*

D *Assurance Co Ltd (The Ikarian Reefer) (No 2)* [2000] 1 WLR 603, 615D–F of anxiety about the existence of a possible lacuna in the rules, the rule-making committee added CPR r 6.20(17) expressly to enable service out of the jurisdiction of a claim against a non-party for costs under the Supreme Court Act 1981, section 51 (now section 4 of the Courts and Legal Services Act 1990) as interpreted by the House in *Aiden Shipping Co Ltd v Interbulk Ltd* [1986] AC 965.

E    14  In these circumstances I find both unpromising and unattractive Mr Layton's submission that the rule-making power in respect of extraterritorial jurisdiction is limited to matters covered by specific statutory authority. Parliament must be taken to have understood and endorsed the manner in which the power has been understood and exercised over the years; and it permits the extension of the jurisdiction of the English courts over persons abroad to cover new causes of action and situations. This being

F so, I would also reject, indeed regard as paradoxical, Mr Layton's further submission that the rule-making power in respect of persons outside the jurisdiction must exclude "purely procedural powers against non-parties". The exercise of the power to make CPR r 6.20(17) was in my view legitimate. The statutory constraint contained in section 36 of the Supreme Court Act 1981 precludes the possibility of a rule requiring an ordinary

G witness outside the jurisdiction to attend for examination within the jurisdiction. But it seems to me that the statutory rule-making power is wide enough, in principle, to permit the rule-making authority to enact rules relating to the examination of an officer abroad of a company against which a judgment has been given within the jurisdiction. While the two situations are not precisely comparable (see below), it is of some interest in this connection to note the origin of the rule-making power which was held by

H the Court of Appeal in *In re Seagull Manufacturing Co Ltd* [1993] Ch 345 to enable service out of the jurisdiction of an order for the public examination of an officer of a company being wound up by the court. Section 411 of the Insolvency Act 1986 authorises rules "for the purpose of giving effect" to, inter alia, Part IV of that Act, which includes the provisions in section 133

for public examination of such an officer. Rule 12.12 of the Insolvency
Rules 1986 (SI 1986/1925), which was held to permit service out, was made
under that general power.

15   I would also reject Mr Layton's submission that section 1 of the
Civil Procedure Act 1997, should be read as limited to assets within the
jurisdiction. Rules of practice and procedure could clearly be made to
enable the examination of an officer within the jurisdiction about assets
anywhere worldwide. If and so far as it would be legitimate to make a rule
for the examination of such an officer who is abroad, I see no basis for
limiting the scope of the power to authorise such examination to assets
within the jurisdiction.

*Scope of CPR Pt 71*

16   I turn to the scope of the rule actually made. I accept Mr Layton's
submission that, even though the rule-making power is wide enough to
enable rules to be made relating to the examination of an officer who
is outside the jurisdiction, the presumption against extraterritoriality
still applies when considering the scope of CPR Pt 71. Mr Laurence
Rabinowitz QC for Mr Masri points out that CPR Pt 71 covers first and
foremost judgment debtors who may be anywhere in the world. It must be
possible to obtain an order for examination of an individual when he or she
is the judgment debtor. Service out of the jurisdiction on such an individual
will be possible with leave under, or without leave by implication from, the
terms of CPR r 6.30(2), stating:

"where the permission of the court is required for a claim form to be
served out of the jurisdiction the permission of the court must also be
obtained for service out of the jurisdiction of any other document to
be served in the proceedings."

RSC Ord 11, r 9(4) (the differently worded predecessor to CPR r 6.30
(2)) was, rightly, held to authorise service out with leave in such a situation
in *Union Bank of Finland Ltd v Lelakis* [1997] 1 WLR 590. Further, I would
accept Mr Rabinowitz's submission that there is nothing in CPR Pt 71 to
limit its scope to domestic assets. The Court of Appeal was right to reject a
contrary submission in *Interpool Ltd v Galani* [1988] QB 738.

17   That being so, Mr Rabinowitz submits that, where the judgment
debtor is a company, there is no reason to limit the concept of "an officer of
that body" to an officer within the jurisdiction; the situations of an
individual and corporate debtor ought to be given parallel effect. Mr Layton
counters by submitting, correctly in my view, that the two situations are not
truly parallel. The judgment debtor is already subject to the court's
jurisdiction. In relation to him or her, the adjudicative and enforcement
stages are for this purpose part of a single whole: see *Union Bank of Finland
Ltd v Lelakis* [1997] 1 WLR 590, 593F, per Henry LJ. But there is nothing in
CPR Pt 71 to enable the court to summon a third party witness who might
have information about the personal judgment debtor's assets. A corporate
judgment debtor has a separate legal personality, and is not to be equated
with its officers. They may have information about its affairs, but they have
not submitted to the jurisdiction. Some, but certainly not all, officers of a
company may for some purposes be regarded as its alter ego. That was a
central element in the reasoning by which the Court of Appeal concluded

A that it had jurisdiction to order Mr Comninos, a non-party, to pay the costs of the false claim by his shipowning company which he had instituted, controlled and financed in *The Ikarian Reefer (No 2)* [2000] 1 WLR 603. But CPR Pt 71 is not limited to officers constituting a company's alter ego, and the present order was not obtained and is not defended on the basis of any suggestion that Mr Khoury was CCIC's alter ego.   In these circumstances, the conjunction in CPR Pt 71 of provision for oral
B examination of a personal judgment debtor (against whom an order may be obtained although he or she is out of the jurisdiction) with provision for oral examination of officers of a corporate judgment debtor is not persuasive support for a proposition that an order may be made against the latter when he or she is out of the jurisdiction.  There are basic differences between the two situations, and the presumption against extraterritoriality has a
C potential application to the latter which it does not have to the former.

   18   In Mr Rabinowitz's submission the key to the scope of CPR Pt 71 lies in a recognition of the English court's jurisdiction over the subject matter of the action (including the judgment) against CCIC and the close connection between that subject matter and Mr Khoury, who was CCIC's chairman, general manager and director.   In *The Ikarian Reefer (No 2)* [2000]
D 1 WLR 603 it was the existence of substantive proceedings over which the court had jurisdiction and of "a substantial connection with those proceedings by a non-party" that Waller LJ stressed in his judgment as the key to understanding the circumstances in which orders for costs would be made against such a non-party ( pp 611B–612B). Mr Rabinowitz took this as a useful analogy and found direct support for his submission in Professor Brownlie's identification in *Principles of Public International Law*, 7th ed
E (2008), p 311 of one criterion of jurisdiction as "a substantial and bona fide connection between the subject matter and the source of the jurisdiction" (to which however Professor Brownlie added, at p 312, that "the principle of non-intervention in the domestic or territorial jurisdiction of other states should be observed").   Mr Rabinowitz also relied on the statement by Sir Robert Jennings and Sir Arthur Watts in *Oppenheim's International Law*, 9th ed (1992) vol 1, pp 457–458 that there must be "a sufficiently close
F connection to justify th[e] state in regulating the matter and perhaps also to override any competing rights of other states".

   19   I accept that the existence of a close connection between a subject matter over which this country and its courts have jurisdiction and another person or subject over which it is suggested that they have taken jurisdiction will be relevant in determining whether the further jurisdiction has been
G taken.   It will be a factor in construing, or ascertaining the grasp and intendment of, the relevant legislation or rule.  Mr Layton submits that in the present case the connection between the judgment obtained in the proceedings against CCIC and Mr Khoury is weak: no or little stronger than that which exists between the court in ongoing proceedings and a witness who could give important evidence that would assist the court to resolve issues of liability or quantum.   He cites *In re Tucker (RC) (A Bankrupt);*
H *Ex p Tucker (KR)* [1990] Ch 148, where the Court of Appeal set aside an order obtained by a trustee in bankruptcy for the examination under section 25(1) of the Bankruptcy Act 1914 of the debtor's brother, a British subject resident in Belgium.  Section 25(1) gave the court power to summon before it for examination "any person whom the court may deem capable of

giving information respecting the debtor, his dealings or property" and to require him to produce relevant documents, while rule 86 of the Bankruptcy Rules 1952 (SI 1952/2113), as amended, authorised the court to order service out of the jurisdiction of any process or order requiring to be so served. The origin of section 25(1) went back before 1914 to 1883 and the trustee acknowledged, at pp 156–157, that

> "in the light of the accepted practice of nations and comity in the field of international law and international relations, eyebrows might be raised at the notion that Parliament had in 1914 or 1883 given jurisdiction to any bankruptcy court, which might well be a county court, to summon anyone in the world before it to be examined and produce documents."

He argued in the alternative that it sufficed that the brother was a British citizen. That submission too was rejected. Dillon LJ noted the limitations of RSC Ord 11 and of the power to subpoena witnesses, and said that against this background he "would not expect section 25(1) to have empowered the English court to haul before it persons who could not be served with the necessary summons within the jurisdiction of the English court" (p 158E–F). He noted first an alternative procedure provided by orders in aid in respect of persons resident in Scotland or Ireland or other British courts and "finally and conclusively" a provision in section 25(6) giving the court power to order the examination out of England of "any person who if in England would be liable to be brought before it under this section".

20 Mr Rabinowitz relied upon the later case of *In re Seagull Manufacturing Co Ltd* [1993] Ch 345 (para 14 above), in which *In re Tucker* was distinguished on several grounds. *In re Seagull* concerned section 133 of the Insolvency Act 1986, authorising the public examination of a narrower category of persons, viz

> "any person who— (a) is or has been an officer of the company; or (b) has acted as liquidator or administrator of the company or as receiver or manager . . . or (c) not being a person falling within paragraph (a) or (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company."

Failure without reasonable excuse to obey such an order was punishable as a contempt of court under section 134. Rule 12.12 of the Insolvency Rules 1986 authorised the court to order service out of the jurisdiction of any process or order requiring to be so served for the purposes of insolvency proceedings. The Court of Appeal upheld an order made for the public examination of a former director living in Alderney. Peter Gibson J, with whose judgment the other members of the court concurred, said at p 354 that:

> "Where a company has come to a calamitous end and has been wound up by the court, the obvious intention of this section was that those responsible for the company's state of affairs should be liable to be subjected to a process of investigation and that investigation should be in public. Parliament could not have intended that a person who had that responsibility could escape liability to investigation simply by not being within the jurisdiction. Indeed, if the section were to be construed as

A  leaving out of its grasp anyone not within the jurisdiction, deliberate evasion by removing oneself from the jurisdiction would suffice."

21  Peter Gibson J cited the *Report of the Review Committee on Insolvency Law and Practice* (the Cork Committee) (1982) (Cmnd 8558) for the importance placed in it on public examination during compulsory winding up proceedings: to form the basis of reports for submission to the

B  department; to obtain material information for the administration of the estate; and to give publicity, for creditors and the community at large. Peter Gibson J distinguished *In re Tucker* on the grounds that it involved private examination, that it concerned section 25(1) of the Bankruptcy Act 1914 under which the class of persons who could be "hauled" before the court went notably wider than the three categories identified in section 133 of the

C  Insolvency Act 1986 and that section 25(6) of the former Act had no parallel in section 133 of the latter Act. The ability to make use of the in aid procedure to procure the private examination of the former director in Alderney was regarded as no adequate substitute for an ability to require an officer abroad to be subject to public examination.

22  Peter Gibson J also laid some emphasis on the fact that the issue before the court was the scope of the Act and the court was not concerned

D  with whether the order for public examination could be effectively enforced out of the jurisdiction. I have some difficulty with this aspect of his judgment. Peter Gibson J cited *Theophile v Solicitor General* [1950] AC 186, 195. That was a case concerned with the legitimacy of making bankrupt, on the basis of debts unpaid in respect of his English trading, a foreigner who had left the jurisdiction. Lord Porter observed in that context

E  that the person concerned could not take exception to such an order "though it may be he will escape from compliance with its terms because he is out of the jurisdiction and cannot be reached by English process". Making a bankruptcy order in respect of English trading against a debtor who has gone abroad is a different matter to making a mandatory order against someone abroad with no personal connection with England for attendance within the jurisdiction to be examined as a witness. Impracticality of enforcement is in

F  my opinion a factor of greater relevance than Peter Gibson J's words suggest. It is in particular a relevant factor when considering whether CPR Pt 71 covers officers abroad.

23  The present case stands between *In re Tucker* [1990] Ch 148 and *In re Seagull* [1993] Ch 345. The category of persons embraced by CPR Pt 71 is confined to "an officer" of the company or other corporation—

G  on the face of it probably only a current officer at the time of the application or order, whereas section 133 extended (unsurprisingly since it deals with a company being wound up) to past officers and some other closely connected persons. There is in the context of CPR Pt 71 no equivalent of the provision in section 25(6) which was for Dillon LJ "conclusive" in *In re Tucker*. On the other hand, CPR Pt 71 is concerned with obtaining information in aid of the enforcement of a private judgment. The public interest that "those

H  responsible for the company's state of affairs should be liable to be subjected to a process of investigation and that investigation should be in public" (*In re Seagull*, at p 354) is absent. The universality of a winding up order, in the sense that it relates at least in theory to all assets wherever situate, is also absent. Private civil litigation is different. A fair and efficient legal system is

of course a cornerstone of the rule of law, and it can also be said that there is a public interest in a court getting to the bottom of litigation and ensuring that parties have the means of obtaining full information to enable it to do so. Yet the parties have no right to ask the court to summon witnesses from abroad for that purpose. While a judgment crystallises rights and establishes an unsuccessful defendant's liability, the court is still acting in aid of private rights after judgment, and it may be questioned whether, in terms of public interest, there is a very great difference between the importance of evidence for the trial of liability and quantum and for the enforcement of a judgment. A judgment which is mistaken because of a lack of full information or documentation could even be seen as a greater miscarriage of justice than a judgment which is not enforced because of the same lack.

24 In my view Dillon LJ's observation in *In re Tucker*, p 157 that "eyebrows might be raised" at the notion that Parliament had in 1914 or 1883 given jurisdiction to any bankruptcy court to summon anyone in the world before it to be examined and produce documents has weight also in the context of CPR Pt 71. The historical origin of CPR Pt 71 consists in an amendment of the Rules in 1883 made in the light of the decision in *Dickson v Neath and Brecon Railway Co* LR 4 Ex 87 in 1869. The Court of Exchequer there held that the pre-existing power to order oral examination of a judgment debtor did not enable examination of the company's three directors, about whose presence within the jurisdiction there was clearly no doubt. The Rule Committee in 1883 is likely to have been focusing on domestic judgments and domestically based officers. If it thought at all about foreign judgments, which might be enforced in England, it is unlikely to have contemplated that a judgment creditor, having come here for that purpose, would then need assistance abroad to make the enforcement effective. The extreme informality of the process by which the rules enable an order for examination to be obtained continues to point towards a purely domestic focus. An application for an order may under CPR Pt 71 be made without notice, may be dealt with ministerially by a court officer and will lead to the automatic issue of an order (albeit with the general safeguard of the right to apply to set aside which exists under CPR r 23.10 in the case of any order made without service of the relevant application notice). These considerations all tend to point against the application of CPR Pt 71 to company officers outside the jurisdiction.

25 Sir Anthony Clarke MR, with whose judgment the other members of the Court of Appeal in the present case agreed, said [2009] 2 WLR 699, para 16 that it would "defeat its object" if CPR r 71.2 were restricted to persons within the jurisdiction. That is, I think, to put matters substantially too high. Small though the world may have become, relatively few officers of companies are likely to contemplate, let alone be able to undertake, emigration or flight to a different country in order to avoid giving information about their company's affairs. For the same reason, the deployment in *In re Seagull* [1993] Ch 345 of the possibility of "deliberate evasion" by an officer removing himself from the jurisdiction seems to me a factor of greater forensic than real weight, although such weight as it may have may be greater after the calamity of compulsory winding up (when something has evidently gone wrong and may require embarrassing or even potentially incriminating investigation) than in the context of an unpaid judgment debt.

26   In my view CPR Pt 71 was not conceived with officers abroad in mind, and, although it contains no express exclusion in respect of them, there are lacking critical considerations which enabled the Court of Appeal in *In re Seagull* to hold that the presumption of territoriality was displaced and that the relevant statutory provision there, on its true construction and having regard to the legislative grasp or intendment, embraced a foreign officer. Although CPR Pt 71 is limited to officers of the judgment debtor company, I regard the position of such officers as closer to that of ordinary witnesses than to that of officers of a company being compulsorily wound up by the court. I conclude that CPR Pt 71 does not contemplate an application and order in relation to an officer outside the jurisdiction.

*Service out of the jurisdiction*

27   This conclusion is reinforced by a consideration of the position relating to service. Mr Salzedo advances two alternative bases upon which he submits that an order made against a non-party under CPR Pt 71 could be served: under CPR r 6.30(2), or alternatively under CPR r 6.20(9). The Court of Appeal accepted the former, and found it unnecessary to consider the latter.

28   The primary purpose of CPR r 6.30(2) is, on any view, to require leave for service out of the jurisdiction on a defendant to proceedings of documents requiring to be served during such proceedings on such defendant, where the original claim form required such leave. It is an understandable provision. By inference, it indicates that if the claim form did not require leave for service out of the jurisdiction, then ancillary documents requiring to be served on the defendant during the proceedings do not require such leave. The Court of Appeal interpreted CPR r 6.30(2) as having a second and much wider effect, that of enabling any non-party on whom it might be appropriate to serve any document during the course of proceedings to be served, with leave if the proceedings against the original defendant required leave for service out, without leave if they did not.

29   The wider interpretation put by the Court of Appeal on CPR r 6.30(2) leads to a surprising result. In a case where service of the original proceedings took place abroad with leave using one of the gateways in CPR r 6.20, there would be an open discretion to grant leave for service out of the jurisdiction of any ancillary document on a non-party. Still more surprisingly, if the original proceedings did not require leave to serve out (e g because the defendant was domiciled in a Brussels Regulation state), a non-party could be served abroad (on the face of it in any country in the world) without leave.

30   The Court of Appeal relied upon two cases under Ord 11, r 9 of the previous Rules, which read, as amended:

"(1) Rule 1 of this Order shall apply to the service out of the jurisdiction of an originating summons, notice of motion or petition as it applies to service of a writ . . ."

"(4) Service out of the jurisdiction of any summons, notice or order issued, given or made in any proceedings is permissible with the leave of the court, but leave shall not be required for such service in any proceedings in which the writ, originating summons, motion or petition

may by these rules or under any Act be served *out of the jurisdiction* A
without leave." (Emphasis added.)

In *Union Bank of Finland Ltd v Lelakis* [1997] 1 WLR 590, the Court of
Appeal held that it was sufficient to engage Ord 11, r 9(4) if the proceedings
against the defendant were proceedings which could have been served out of
the jurisdiction. They did not actually have to be so served. (In that case, the
proceedings had in fact been served within the jurisdiction under submission B
to jurisdiction clauses contained in the guarantees upon which suit was
brought against the defendant.)  The issue under Ord 11, r 9(4) arose in
relation to the service on the defendant of an order for his examination as
a judgment debtor.  So there was no question of service on a non-party.
The case does not help on the present issue.

31  The second case is *The Ikarian Reefer (No 2)* [2000] 1 WLR 603, C
where the Court of Appeal was concerned that there might be a lacuna in the
rules in relation to a non-party whom the successful defendant sought to
hold liable for costs ordered against the unsuccessful claimant company.
However, the court considered, first, that Ord 11, r 9(4) enabled leave to be
given for service of an application for such costs on Mr Comninos, and
opined, second, that there must anyway be an inherent power to give leave
to join a non-party and serve him out of the jurisdiction. D

32  The latter proposition is at odds with the generally understood
position accepted by the court in the *Lelakis* case [1997] 1 WLR 590, 593H.
It has long been established that service out of the jurisdiction requires
express authorisation either by statute or in the Rules.  Thus, in *In re
Aktiebolaget Robertsfors and La Société Anonymes des Papeteries de l'Aa*
[1910] 2 KB 727, where the Court of Appeal had to construe Ord XI, r 8A E
made in 1909 to extend the power to serve out to summonses, orders or
notices, the court held that this power was only exercisable in situations
where service out of a writ was permissible under Ord XI, r 8 and so did not
cover a summons to set aside an arbitration award.  There was no suggestion
that the heads of Ord XI, r 8 were anything other than exclusive.  Ord 11,
r 9(1) which replaced Ord XI, r 8A confirmed the exclusive nature of the
heads of jurisdiction to serve out provided by Ord 11, r 1. F

33  As to the former proposition, *The Ikarian Reefer (No 2)*  may be
viewed as a special case, since Mr Comninos was the alter ego of the
claimant company whose proceedings he had instigated, controlled and
financed.  In such circumstances it may be legitimate to assimilate the party
and non-party, and to treat any means of service available against the
former as available also against the latter.  As Waller LJ put it [2000] G
1 WLR 603, 613E, "if what is alleged . . . is that the non-party in reality
brought the main proceedings, the English court has jurisdiction to decide
whether there has in effect been a submission to the jurisdiction by the
non-party".  Nothing equivalent can be or is alleged in respect of Mr Khoury
in the present case, and Waller LJ's statement was by way of coda to the
primary basis on which the Court of Appeal held that there was jurisdiction
to serve out on a non-party.  That involved reliance upon the Court of H
Appeal's previous decision in *Mansour v Mansour* [1989] 1 FLR 418.

34  Waller LJ noted that Sir John Donaldson MR in *Mansour* had been
addressing a version of Ord 11, r 9(4), which omitted the words "out of the
jurisdiction" which I have italicised in quoting its language above.  In fact

401

**[2009] 3 WLR**          Masri v Consolidated Contractors Int (UK) Ltd (No 4) (HL(E))
                                                                    Lord Mance

A  Sir John Donaldson MR was in error in omitting those words. Waller LJ, believing that they had been added subsequent to *Mansour*, said [2000] 1 WLR 603, 613 that

> "With the insertion of those words it is not possible to argue that, simply because the action was started by a writ where service of the same could be made without leave, any summons in the action which is to be
B   served on a person outside the jurisdiction can be served without leave."

But he continued by finding in Sir John Donaldson MR's reasoning support for "the view that, where there is an action pending before the English court, then a summons in that action can be served on a person domiciled and resident outside the jurisdiction", whether or not he or she was already a party. Bearing in mind that the proceedings in *The Ikarian Reefer (No 2)*
C   were brought by writ served on insurers within the jurisdiction by Mr Comninos's shipowning company, I find it difficult to discern the distinction between the proposition rejected and the proposition accepted in these two sentences. Leaving aside situations where the non-party is the alter ego of a party to existing litigation, any suggestion that any non-party can be served without leave under CPR r 6.30(2) with any ancillary
D   summons issued by either party in any proceedings properly brought and served within the jurisdiction clearly cannot be right. It is not without interest that the Rule Committee, following *The Ikarian Reefer (No 2)*, concluded that the rules should be supplemented by adding CPR r 6.20(17) in order expressly to permit service out of a claim for an order for costs against a non-party.

35   Mr Salzedo also referred to dicta of Galliher JA and, on one view,
E   Martin JA in *Sostad v Woldson* [1925] 3 DLR 779 as supporting the view that the British Colombian equivalent of Ord XI, r 8A was not subject to restrictions in Ord XI, r 1. But the dicta do not appear to have been necessary for the decision. Galliher JA made clear that the case had been argued, and Macdonald JA decided the case, on the basis that the relevant obligation arose within the jurisdiction, and so within Ord XI, r 1(e) (now
F   CPR r 6.20(6)). Mr Salzedo also relied upon *In re Liddell's Settlement Trusts* [1936] Ch 365 as a case where the Court of Appeal had upheld an injunction issued against Mrs Liddell who was not a party to the proceedings and who had taken her children to the United States. But the court was careful to distinguish *In re Aktiebolaget Robertsfors* [1910] 2 KB 727 on the ground that Mrs Liddell was domiciled or ordinarily resident within the
G   jurisdiction (see per Slesser LJ at pp 370–371, per Romer LJ at p 374 and per Greene LJ agreeing with both judgments at p 375); and that there was accordingly an independent head of jurisdiction under Ord XI, r 1 (now CPR r 6.20(1)). The case therefore supports, rather than undermines Mr Khoury's case.

36   The scope of CPR r 6.30(2) has been comprehensively reviewed by Tomlinson J in *Vitol AS v Capri Marine Ltd* [2009] Bus LR 271, in a context
H   paralleling the present—service on an officer resident in Greece of an order for his examination under CPR Pt 71. Tomlinson J held that CPR r 6.30(2) was concerned with documents requiring to be served on parties to the proceedings. The Court of Appeal in the present case disagreed and thought that CPR Pt 71 was not "naturally limited" in this way. In my opinion,

402
**Masri v Consolidated Contractors Int (UK) Ltd (No 4) (HL(E))**     **[2009] 3 WLR**
**Lord Mance**

Tomlinson J was right, and I agree with his clear reasons (including those he gave for distinguishing *The Ikarian Reefer (No 2)*) and his conclusion.

37   Although there may have been lacunae in the Victorian rules regarding service out of the jurisdiction, the continuing absence in the modern rules of any provision enabling service out of an order under CPR Pt 71 is both consistent with and in my opinion supportive of the view that CPR Pt 71 was not contemplated, any more than its differently worded predecessors were, as applying to officers outside the jurisdiction.

38   Finally, Mr Salzedo submitted that, all else failing, the case could be brought within one of the heads of CPR r 6.20, that is "(9) a claim . . . made to enforce any judgment or arbitral award". In my view, this submission also fails. An application to enforce a judgment within the jurisdiction is distinct from an application to order examination of a witness who is abroad with a view to enforcing the judgment wherever assets may prove to exist. The former does not trespass outside the jurisdiction of the English courts. The latter would, in a manner which was clearly not in mind in CPR r 6.20(9). Nothing in the history of CPR r 6.20(9), discussed in *Tasarruf Mevduati Sigorta Fonu v Demirel* [2007] 2 All ER 815 (Lawrence Collins J) and [2007] 1 WLR 2508 suggests any wider intention.

*Conclusion*

39   It follows that Mr Khoury is in my opinion correct in submitting that CPR Pt 71 does not enable an order for examination to be made against an officer who is outside the jurisdiction, and that CPR Pt 6 provides no basis for service out of the jurisdiction of any such order, had it been possible to make one. The appeal should be allowed accordingly, the Court of Appeal's order of 28 July 2008 for the examination and service out of the jurisdiction of Mr Khoury should be set aside and Master Miller's order of 20 December 2007 restored. In these circumstances, the European issues considered in the Court of Appeal do not arise, and it is unnecessary to make any reference to the Court of Justice.

*Appeal allowed.*

D E C P