# EXHIBIT 30

**IN THE HIGH COURT OF JUSTICE**                **Claim No. CL-2024-000129**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N:**

**(1) PETERSEN ENERGÍA INVERSORA, S.A.U.**

**(2) PETERSEN ENERGÍA, S.A.U.**

**(3) ETON PARK CAPITAL MANAGEMENT, L.P.**

**(4) ETON PARK MASTER FUND, LTD.**

**(5) ETON PARK FUND, L.P.**

**Claimants/Respondents**

**– and –**

**THE ARGENTINE REPUBLIC**

**Defendant/Applicant**

---

**DEFENDANT / APPLICANT'S SKELETON ARGUMENT**

**For a one-day hearing listed for 30 June 2025**

---

Recommended pre-reading (1/2 day): Please see the separate Reading List.

## A.  INTRODUCTION AND EXECUTIVE SUMMARY

1.    This is the application by the Defendant, the Republic of Argentina (the "**Republic**"), to stay proceedings by the Claimants for recognition and enforcement of a judgment for over US$16bn in the Claimants' favour from the US District Court for the Southern District of New York (the "**SDNY Judgment**") (the "**Stay Application**"). The SDNY Judgment is presently the subject of appeal in the US Court of Appeals for the Second Circuit. If the Republic is successful in the appeal, there will be no liability to pay.

2.    The Republic has also applied to set aside the Order granting permission to the Claimants to serve the Claim Form in these proceedings on the Republic out of the jurisdiction **{CB/1/1-4}** (the "**Jurisdiction Challenge**").  The essential basis for that application is that the SDNY Judgment relates to the Republic's domestic sovereign actions, taken in the national interest pursuant to Argentinian legislation. The application raises a number of complex questions as to act of state and state immunity, and the distinct tests for submission to the jurisdiction applied by the English and US courts.

3.    The question at this hearing is whether the present proceedings should be stayed pending resolution of the Republic's appeal, with a liberty to apply to lift the stay on 21 days' notice (see paragraphs 1-4 of the draft Order at **{CB/2/2}**).  The Republic's position in summary is that a stay is the appropriate and proportionate approach for the following principal reasons (developed further below):

   3.1.    *First*, the Republic's appeal is a bona fide appeal with a realistic prospect of success.  If the SDNY Judgment is set aside, that is the end of these proceedings.

   3.2.    *Second*, there is no material prejudice to the Claimants if a stay is granted.  In particular, the Claimants have not identified any assets in the jurisdiction that could be the subject of enforcement, and in any event do not intend to execute any English judgment they may obtain against any assets in England.

   3.3.    *Third*, if the present proceedings are not stayed but the SDNY Judgment is subsequently set aside, the Republic will be prejudiced.  In particular, it will have incurred substantial costs. Each of the Claimants is either in insolvency procedures[1]

---

[1] In the case of the First and Second Claimants.

or in liquidation,[2] and it is at best uncertain if the Republic will be able to make any recovery in respect of costs from them. Should the Claimants in fact make any recovery on any English judgment they may obtain, a similar issue would arise in respect of that.

3.4. *Fourth,* if the present proceedings are not stayed, but the SDNY Judgment is subsequently set aside, the Court's time and resource spent on the proceedings will be wasted. As to this, the Jurisdiction Challenge alone will likely require a 4-5 day hearing at first instance, with associated pre-reading and judgment writing time.

4. This is the first time this matter has been the subject of an inter partes hearing in the English Court. While the issue to be determined at this hearing is in essence a narrow one, there is considerable background to it which has been addressed by the parties in their evidence, and drawn on by them in support of submissions made. This skeleton accordingly seeks to pull together the relevant strands from that evidence before addressing the stay question. The various topics are accordingly addressed under the following headings:

4.1. The factual background to the underlying dispute (Section B);

4.2. The US proceedings (Section C);

4.3. The approach to stay in the US courts, both generally and in this case (Section D);

4.4.  A brief procedural background to the UK proceedings (Section E);

4.5. A summary of the Republic's substantive objections to the English Court's jurisdiction, which would fall to be determined if a stay is not granted (Section F);

4.6. The legal principles on applications for a stay of enforcement proceedings (Section G); and

4.7. The Republic's submissions on why a stay should be granted (Section H).

## B. FACTUAL BACKGROUND

5. The relevant factual background is set out in the First Witness Statement of Konrad

---

[2] In the case of the Third to Fifth Claimants.

Rodgers dated 13 December 2024 ("**Rodgers 1**") at §§16-42 **{CB/12/6-14}**. Key points are summarised below.

### a.  Establishment and privatisation of YPF

6.  Energy security is a crucial matter for any nation,[3] and governmental steps to preserve such security will generally fall within the realm of sovereign activity.

7.  In 1922, the Republic established YPF as a state-owned energy company in order to ensure an adequate domestic energy supply. In 1993 the company was privatised via an initial public offering ("**IPO**"). **[KWR1/7 at §3-4] {B/26/4}**: **Rodgers 1/16 {CB/12/6}**.

8.  YPF's corporate foundational document is its bylaws (the "**YPF Bylaws**") **[KWR1/9 at §13] {B/26/6}**. The YPF Bylaws are governed by Argentine law and subject to the jurisdiction of the Argentine Courts: **Rodgers 1/17 {CB/12/7}**.

9.  At all relevant times, the YPF Bylaws included the following provisions: (i) Section 7 of the YPF Bylaws stated that anyone "*wishing*" to "*acquire…whether directly or indirectly*" a certain percentage of Class D shares[4] shall *"[a]rrange a takeover bid for the acquisition of"* all the remaining shares **[MRH1/511] {B/10.1/166}**; (ii) Section 28 contained similar compulsory purchase provisions, but with a higher, 49% threshold **[MRH1/551]**. Unlike s.7, s.28 of the YPF Bylaws is a provision which can only be engaged by a state acquisition of YPF shares **[MRH1/551] {B/10.1/206}**.

10.  By 2001, a Spanish oil company named Repsol SA ("**Repsol**") had acquired over 99% of YPF's capital stock **[KWR1/12 at §21] {B/26/9}**.

11.  Between 2008 and 2011, the Petersen Group, a conglomerate of companies mostly based in Argentina and ultimately owned by the Eskenazi family, acquired around 25% of YPF's shares from Repsol **[MRH1/264] {B/2.1/11}**. The First and Second Claimants (collectively,

---

[3] Indeed, the UK Government has a Department specifically named "Department for Energy Security and Net Zero". The introduction to the UK Government's "Energy Security Plan" of 2023 states "Never again will we allow our energy security to be threatened":
https://assets.publishing.service.gov.uk/media/642708eafbe620000f17daa2/powering-up-britain-energy-security-plan.pdf.

[4] Although there were various classes of shares, for present purposes only Class D shares are relevant. For simplicity all securities acquired by the Claimants are referred to herein as "shares".

the "**Petersen Claimants**") are two Spanish special-purpose vehicles created for the purpose of holding the Petersen Group's interests in YPF: **Rodgers 1/20-21 {CB/12/7-8}**.

12. The Petersen Group's acquisitions of YPF shares were financed primarily through loans from (i) Repsol and (ii) a group of banks. These loans were secured in part by a pledge of the purchased YPF shares **[MRH1/300] {B/3/5}**. The Petersen Group's plan was to repay this financing through dividends: **Hastings 1/13 {CB/10/3}**. The relevant shareholders' agreement provided that Repsol and the Petersen Claimants "*agree[d] to distribute as a dividend ninety percent (90%) of the profit of the company*" on a semi-annual basis **[KWR1/15 at §32] {B/26/12}: Rodgers 1/21 {CB/12/8}**. The Petersen Claimants have been in liquidation since September 2014 **[PoC/3] {CB/4/1-2}**.

13. The Third to Fifth Claimants (collectively, the "**Eton Park Claimants**") acquired approximately 3% of YPF, mostly from Repsol, between late 2010 and March 2012. The Fourth and Fifth Claimants are investment vehicles of the Third Claimant, Eton Park Capital Management L.P., a hedge fund now in liquidation **[PoC/4-5] {CB/4/2} [MRH1/1090] {CB/22/24}: Rodgers 1/22 {CB/12/8}**.

14. As set out in **Rodgers 1/39-42 {CB/12/13-14}**, following the entry into insolvency processes by the Petersen Claimants, the right to prosecute the claims against the Republic was acquired by the major global litigation funder Burford Capital LLC ("**Burford**") through its wholly owned subsidiary Prospect Investments LLC **[KWR1/30] {B/26/27}**. Burford also acquired the right to prosecute the Eton Park Claimants' claims through another subsidiary named Ireton LLC.

   **b. The Republic's decision to expropriate a majority shareholding in YPF**

15. Between 2002 and 2011, energy production and reserves in Argentina declined steadily **[KWR1/18 at §47] {B/26/15}** such that, by 2011, Argentina had become a net energy importer **[KWR1/20 at §56] {B/26/17}**. In particular: (i) between 2001 and 2011, YPF's annual production of oil fell 41.2% in comparison to 13.8% for other oil producers in Argentina; (ii) from 2001 to 2011, YPF's average net daily crude oil production declined 38%; (iii) from 2004 to 2011, its net daily natural gas production declined 43%; and (iv) in each of 2008, 2009 and 2011, YPF paid more in dividends than its total net income for the year: **[KWR1/18-19 at §48-53] {B/26/15-16} – {B/26/16}; Rodgers 1/24 {CB/12/9}**.

16. Under Article 17 of the Republic's Constitution **[KWR1/39] {A/15/10}** as well as the General Expropriation Law, No. 21,499 **[KWR1/35-37] {A/15/6}-{A/15/8}** ("**General Expropriation Law**"), the Republic's Congress (its legislature) has the constitutional power to authorise the expropriation of an asset in the public interest. The Constitution and the General Expropriation Law require compensation to be paid to parties whose assets are expropriated **[MRH1/1090] {CB/22/24}**.

17. From around February 2012 the Republic's Government began to give serious consideration to taking control of YPF. It contemplated various alternatives for doing so, including: (i) expropriation of all or part of its shares pursuant to mechanisms specified in Argentina's Constitution; or (ii) conducting an 'open market transaction' consistent with the mechanisms specified under the YPF Bylaws: **Rodgers 1/25 {CB/12/9}**.

18. A policy paper prepared for the Government in early 2012 advised that "*The only way to go is expropriation*". **[KWR1/110] {A/15/81}**. The recommendation of this report was followed by the Republic's Government a few months later. On 16 April 2012, the Republic's President submitted proposed legislation to Congress to authorise the expropriation of 51% of YPF's capital stock represented by Class D shares held by Repsol **[MRH1/128] {B/30/8}**.

19. On 17 April 2012, the Secretary of Economic Policy and Planning Development of the Republic, Mr Axel Kicillof, addressed a joint meeting of the Argentine National Senate Committees on Budget and the Treasury, Constitutional Affairs and Mining, Energy and Fuels regarding the proposed expropriation. **[KWR1/22 at §63] {B/26/19}** and **[KWR1/118] {A/15/89}**. Mr Kicillof specifically referred to the YPF Bylaws and made clear that the Government did not intend to undergo the additional expense of an open market transaction and the related tender offer obligation which such transaction would have entailed (pursuant to the mechanisms set out in §9 above): **Rodgers 1/32 {CB/12/11}**.

20. On 3 May 2012, the Republic's Congress enacted Law No. 26,741 (the "**YPF Expropriation Law**"), the draft of which had been submitted to it on 16 April 2012 (see §18 above) and which went into effect four days later. Article 7 of the YPF Expropriation Law provided that YPF's 51% share would be expropriated for the "*public interest*" **[MRH1/573] {B/10.1/228}**. On 27 February 2014, Repsol and the Republic executed a settlement agreement providing that the Republic would, among other things, pay Repsol

US$5bn in final settlement of all claims relating to the expropriation **{B/26/25-26}**. On 8 May 2014, the expropriation was completed and the Republic took title to the expropriated shares **[MRH1/129] {B/30/9}**.

21. The position that the Republic has consistently taken, and maintains, is that under Argentinian law, the terms of the YPF Bylaws were superseded by the General Expropriation Law and YPF Expropriation Law.

## C. THE US PROCEEDINGS

22. The proceedings before this Court stem from the litigation in the US courts, initially commenced in the US District Court for the Southern District of New York ("**SDNY Court**"), and now awaiting resolution before the US Court of Appeals for the Second Circuit ("**Second Circuit**"). The full background to the US proceedings is set out in the first witness statement of Amanda Flug Davidoff dated 13 December 2024 ("**Davidoff 1**"). The key events are summarised below.

### a. Claims in the SDNY Court – April 2015 to November 2016

23. On 8 April 2015, the Petersen Claimants filed a complaint in the SDNY Court against the Republic and YPF: **Davidoff 1/7 {CB/13/3}**.

24. The Petersen Claimants alleged *inter alia* that by failing to launch a tender offer for all Class D shares when it expropriated those of Repsol, the Republic had breached ss.7 and 28 of the YPF Bylaws, or alternatively, the Republic had anticipatorily breached those same provisions by declaring that it would not launch a tender offer for Class D shares: **Davidoff 1/9 {CB/13/3}**.

25. On 8 September 2015, the Republic filed its initial motion to dismiss the Petersen Claimants' claims **[MRH1/252-253] {B/2/1-2}**. The Republic argued, *inter alia*, that: (i) the SDNY Court lacked jurisdiction to hear the claims under the Foreign Sovereign Immunities Act (the "**FSIA**"); (ii) the SDNY Court should decline to exercise jurisdiction under the doctrine of *forum non conveniens*; and /or (iii) the claims were barred by the act of state doctrine: **Davidoff 1/11 {CB/13/4-5}**.

26. On 9 September 2016, the SDNY Court denied the Republic's initial motion to dismiss. In denying the *forum non conveniens* argument, the SDNY Court was persuaded among other

6

things that Argentina would not be an appropriate forum by reason of a then ongoing criminal investigation in Argentina into the Claimants' lawyers, King & Spalding, and Burford in connection with unrelated litigation [**MRH1/342**] **{B/3/47}**: **Davidoff 1/18-20 {CB/13/7-8}**.

27. On 3 November 2016, the Eton Park Claimants filed a complaint in the SDNY Court against the Republic and YPF. The claims and factual allegations in the Eton Park action were materially identical to those in the Petersen action. The two actions were case managed together, although not formally consolidated: **Davidoff 1/29 {CB/13/10-11}**.

### b. First appeal to the Second Circuit – September 2016 to June 2019

28. On 23 September 2016, the Republic filed a notice of interlocutory appeal with the Second Circuit from the SDNY Court's 9 September 2016 order, on the ground that the court lacked subject-matter jurisdiction over the alleged claims and personal jurisdiction over each defendant under the FSIA [**MRH1/343**] **{B/4/1}**. In addition, on 7 October 2016 the SDNY Court granted the Republic permission to appeal[5] against its ruling on the act of state doctrine [**AFD1/140-144**] **{B/5/1-5}**. During the pendency of the appeal, the SDNY Court stayed the cases against the Republic.

29. On 10 July 2018, the Second Circuit ruled on the above appeal as follows: (i) as to the FSIA the Second Circuit upheld the SDNY Court's order denying the Republic's motion to dismiss for lack of subject matter jurisdiction on grounds of foreign sovereign immunity [**MRH1/607-651**] **{B/9/1-45}**; and (ii) as to the act of state doctrine, the Second Circuit declined to exercise its discretion to hear the appeal, and accordingly dismissed the portion of the appeal challenging this part of the SDNY Court ruling. [**MRH1/644-6**] **{B/9/38-40}**.

30. On 24 June 2019 the US Supreme Court denied the Republic's petition to appeal[6] the Second Circuit's ruling on the FSIA appeal. [**MRH1/655**] **{B/11/3-4}**.

### c. Renewed proceedings and the SDNY Judgment - August 2019 to September 2023

31. On 30 August 2019 the Republic and YPF filed a joint motion to dismiss the claims. The motion was premised on a change in circumstances following the SDNY Court's initial

---

[5] The phrase in US procedure being "certified for appeal".

[6] The phrase in US procedure being "denied the petition for a writ of certiorari".

dismissal of the Republic's *forum non conveniens* arguments (see §26 above). Among other things, a prior investigation of the Claimants' lawyers and Burford in Argentina had been terminated with prejudice and could not be revived **[MRH1/695-696] {B/14.1/8-9}**. The Republic argued further that both Argentine law and the YPF IPO prospectus made clear that Argentine courts had exclusive jurisdiction over disputes arising under YPF's Bylaws **[MRH1/711-714, 724-727] {B/14.1/24-27} and {B/14.1/37-40}**.

32. On 5 June 2020 the SDNY Court denied the Republic and YPF's motion to dismiss. Although it acknowledged that now Argentina was likely to be an adequate forum, the fact that the Eton Park Claimants had issued proceedings, and one was based in New York, was said to mean the balance of factors favoured continuing the litigation in New York. As part of its analysis, the SDNY Court noted it was not concerned by having to apply Argentine law because it predicted that no "complicated questions" would arise. In a footnote, the SDNY Court declined to abstain on international comity grounds, considering that no exceptional circumstances justified dismissal **[MRH1/750, 756, 768] {B/15/22}, {B/15/28}, {B/15/41}; Davidoff 1/44 {CB/13/15}**.

33. On 14 April 2022, all parties to the US litigation filed motions for summary judgment: **Davidoff 1/47-53 {CB/13/16}-{CB/13/17}**. On 31 March 2023 the SDNY Court gave summary judgment, among other things upholding the Claimants' claim for breach of contract and denying all of the Claimants' claims against YPF: **Davidoff 1/54 {CB/13/17}**.

34. It has always been common ground that Argentine law governs the key issues in the underlying US claims. In the summary judgment, among other things the SDNY Court rejected the Republic's position on Argentine law. In so doing, the SDNY Court upheld a "shareholder-versus-shareholder" damages action for breach of corporate bylaws that no Argentine court has ever recognised and concluded that the Claimants were entitled to damages, notwithstanding that (on the Republic's case) Argentine law precluded that remedy in the circumstances of this case. The SDNY Court ruled further that Argentina's exclusive process for compensating third parties with claims arising from an expropriation did not bar Claimants' US lawsuits, but it reached this decision without referencing and still less analysing any Argentine case law or commentary: **Davidoff 1/55 {CB/13/17-18}**.

35. As a result of the summary judgment, all that was left to be determined at trial was damages. Following a trial, on 15 September 2023, the SDNY Court entered its final judgment, for

which enforcement is now sought in England. The SDNY Court awarded the Petersen Claimants $14,385,449,737, and the Eton Park Claimants $1,714,338,556 **[MRH1/1-4] {CB/21/1-4}**.

### d.  Current appeal to the Second Circuit

36.  On 10 October 2023, the Republic appealed the SDNY Judgment to the Second Circuit, as well as the interlocutory orders and rulings merged into that judgment[7] **[MRH1/1019-1020] {B/38/1-2}**. The Claimants cross-appealed: **Davidoff 1/64 {CB/13/20}**.

37.  On 22 February 2024, the Republic filed its opening appeal brief in the Second Circuit. In summary, its submissions are as follows:

38.  As to ***forum non conveniens***, the Republic argues that (when this challenge was renewed on the basis of novel factual developments)[8] the SDNY Court wrongly deferred to the Claimants' choice of forum by invoking Eton Park's New York connection, because the Petersen Claimants chose the forum. To the extent that Eton Park's interest in litigating in New York was given any weight, the cases should have been analysed separately, with the result that the Petersen Claimants' claims ought not to have proceeded in the US courts. The Republic also argued that the SDNY Court wrongly balanced the public and private interests in the litigation because it discounted Argentina's statutorily expressed interest in and superior competence to host these Argentine-law disputes and inflated New York's competing interest **[MRH1/1067-1160] {CB/22/39-47}**.

39.  As to **international comity**, the Republic argues that: (i) that the SDNY Court applied the wrong legal standard, the "*exceptional circumstances*" standard rather than "*adjudicative comity*" **{CB/22/47-50}**; (ii) even if the former standard applied, the present cases do present exceptional circumstances warranting dismissal in that another sovereign with an adequate legal system has expressed its strong interest in serving as the exclusive forum for

---

[7] These include, *inter alia*, the opinion and order of 9 September 2016 denying defendants' motions to dismiss, the opinion and order of 5 June 2020 denying defendants' motion to dismiss pursuant to the doctrine of *forum non conveniens*, the opinion and order of 31 March 2023 addressing the motions for summary judgment, the memorandum and order of 24 May 2023 addressing the Republic's motion for reconsideration, and the findings of fact and conclusions of law of 8 September 2023: **Davidoff 1/63 {CB/13/20}**.

[8] See §31 above.

corporate disputes and in consolidating all claims arising from the expropriation {CB/22/51-52}.

40. As to **Argentine law**, the Republic argues that on a proper interpretation the Claimants' claims should have failed (see §34 above). Specifically, the Republic's position on appeal, which it has maintained throughout, is that: (i) Argentine corporate law does not recognize shareholder breach-of-contract claims for damages {CB/22/53-59}; (ii) even if a breach-of-contract suit were permissible, Argentine courts would not award damages, because (a) the YPF Bylaws contain an express penalty clause which under Argentine law is treated as exclusive, barring the Claimants' claims for damages {CB/22/59-63}, and / or (b) the Claimants failed to seek specific performance and show that specific performance was impossible, which also bars their claims for damages {CB/22/64-68}; (iii) under Argentine law, the Claimants were no longer shareholders when the supposed breach occurred {CB/22/69-71}; and (iv) the General Expropriation Law separately forecloses the Claimants' claims because the law required the Claimants to seek compensation through the expropriation process and because the SDNY Court misconstrued the law by adopting novel limits on Argentine law and ignoring relevant Argentine precedent [MRH1/1067-1160]; {CB/22/71-81}.

41. As to **quantum**, and in the alternative to any and all of the above grounds, the SDNY Court's damages calculations were in any event made in error. The Republic argues that at a minimum, the Claimants' damages must be recalculated because the SDNY Court misapplied New York's 'judgment-day rule' for currency conversion and used the wrong breach date and prejudgment interest rate under Argentine law. If the Second Circuit were to accept just the Republic's damages arguments, the SDNY Judgment would have to be recalculated on remand and would be reduced from US$16.1bn to a figure in the hundreds of millions [MRH1/1067-1160] {CB/22/81-91}; [MRH1/914-916] {B/28/48-50}.

42. The route map is as follows: (i) if either the *forum non conveniens* or international comity arguments ultimately succeed then the claims against the Republic in the US courts will be terminated immediately; (ii) if those jurisdictional[9] arguments fail, then the Argentine law

---

[9] On the Republic's substantive application, it contends that under the English law test there was no submission to the jurisdiction of the SDNY Court since the Republic may still challenge on the grounds of *forum non conveniens* and also on the basis of international comity. In US law terminology, *forum non conveniens* is treated as going to the exercise rather than the existence of jurisdiction. For English law purposes this is a distinction

arguments fall to be applied; (iii) if any one of the Argentine law objections raised succeeds then the claim fails on its merits; finally (iv) if both the jurisdictional and merits appeals fail, the quantum argument under US and Argentine law will fall to be applied.

43. The Republic's case on appeal is supported by numerous *amici curiae*, including various foreign sovereigns (Brazil, Uruguay, Ecuador and Chile), the Argentine Association of Administrative Law and Argentine public law scholars (including former Argentine Supreme Court justices), the Public Bar Association of Buenos Aires and Argentine private law scholars, and the Argentine Federal Organization of Hydrocarbon Producing States (whose members are Argentine Provinces with substantial oil and gas exploration, development and production ventures) **{B/57}; {B/58}; {B/59}; {B/60}; {B/61}; [AFD1/466-618]; Davidoff 1/77 {CB/13/24}**.

44. At present, the Republic is awaiting notification from the Second Circuit as to when the oral argument will take place: **Davidoff 3/8 {CB/20.1/3-4}**. The appeal briefing was complete on 6 September 2024, and it had been expected by the parties that oral argument would have been scheduled (and indeed taken place) by now. Ms Davidoff currently expects the appeal to be heard in September or October this year: **Davidoff 3/8 {CB/20.1/3-4}**. Based on published information, and her experience, her evidence is that decisions are often issued within 3 to 6 months after argument, but sometimes will take as long as a year: **Davidoff 1/83 {CB/13/26}**.

45. Mr Goldsmith considers there is no reliable way to estimate when a scheduling order will be issued, but he notes that in relation to the Republic's earlier interlocutory appeal the scheduling order was issued within a month of briefing being complete, and the hearing was two months later: **Goldsmith 1/165 {CB/16/39-40}**.

   e. **Next steps in the US proceedings**

46. Following the decision of the Second Circuit, any party would have the option to seek review of the Second Circuit's decision by the US Supreme Court. The time periods for this, and the determination of any further appeal, are addressed in **Davidoff 1/84 {CB/13/26-27}** and **Goldsmith 1/167 {CB/16/40-41}**. Ms Davidoff explains that typically

---

without a difference. In this Court, the English law position applies to determine whether the Republic's appearances in the SDNY Court constitute submission under s.31 CJJA. Such matters are not relevant for the present stage, where the Court is only concerned with a stay.

the US Supreme Court decides whether to grant a petition within approximately 6 weeks of filing of a certiorari petition, though the period can be much longer (including, e.g., if the US Supreme Court asks for the Solicitor General ("**SG**")'s views). Mr Goldsmith notes that in relation to the Republic's earlier appeal, in relation to which the SG's views were sought, the denial of the petition took almost 8 months from the time it was filed (being almost 12 months from the date of the Second Circuit's decision). If the US Supreme Court were to grant the petition, merits briefing would follow; it is usually at least 3 months from the grant of a petition for certiorari before a case is ready to be argued. Once the case is argued before the US Supreme Court, the evidence of Ms Davidoff is that a decision is typically issued 3 to 6 months later.

### D. STAY OF ENFORCEMENT OF THE SDNY JUDGMENT IN THE US PROCEEDINGS

47. The Court will decide whether to grant a stay applying relevant principles under English law (see below). One of the Claimants' arguments is that no stay is appropriate here because the SDNY Court has declined to continue a stay of enforcement pending resolution of the Republic's appeal. The US principles on stay are very different to those applied in the English Court.

#### a. US legal principles on stay

48. The applicable US legal principles on granting a stay are set out in the evidence of the Republic's US law expert, Professor Pamela Bookman: **Bookman 1** at §§86 to 89 **{CB/14/32-33}**. It is not understood that these principles are in dispute. In summary, Professor Bookman confirms that:

    48.1. The US Federal Rules of Civil Procedure provide that the appellant "*may obtain a stay by providing a bond or other security*." FRCP 62 **[PB1/4/208-9] {D/1/208-209}**. However, for cases involving money damages, the district court has discretion to waive the bond requirement upon request "*if the appellant provides an acceptable alternative means of securing the judgment*" **[PB1/30/565] {D/1/565}**.

    48.2. To guide the district court's discretion, the Second Circuit has adopted a non-exclusive list of five factors the court may consider when determining whether to waive the bond requirement, namely: "*(1) the complexity of the collection process;*

*(2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position."* **[PB1/30/565-6] {D/1/565-566}**.

49. Accordingly, the starting point is that the US courts generally require security in some form <u>as a condition of securing the stay</u> in all cases, and any derogation from that basic principle must be cogently justified by the judgment debtor. There is no exception for sovereigns. By contrast, in England (as referred to below) there is <u>no jurisdiction</u> to order security to be paid by a sovereign which enjoys presumptive adjudicative immunity under the State Immunity Act 1978 ("**SIA**"), as the Republic does in this case.

   **b.   Request for a stay of enforcement of the SDNY Judgment in the US proceedings**

50. At the same time as pursuing its appeal, on 26 October 2023 the Republic applied to the SDNY Court for a stay of enforcement of the SDNY Judgment pending appeal **[MRH1/1023-1044] {B/41/1-21}**. The judgment sum is a substantial percentage of the Republic's annual budget, being almost 20% of its 2023 budget: **Davidoff 1/69 {CB/13/21-22}, Rodgers 2/9.6 {A/31/8}**. On 21 November 2023, the SDNY Court granted a temporary stay without bond but held that the stay would continue past 5 December 2023 only if, by that date, the Republic pledged to the Claimants the Republic's equity interest in YPF and its receivables under a dam project governed by a treaty with Paraguay and also sought expedited review of its appeal. **[MRH1/1045-1055] {B/44}**.

51. On 19 November 2023 an election was held in Argentina, with the new President due to take office on 10 December 2023: **Davidoff 1/69 {CB/13/21-22}**. That election resulted in a change of administration, with Javier Milei becoming the President Elect.

52. Accordingly, on 27 November 2023, the Republic sought an extension until 10 January 2024 of the interim stay of enforcement and the related deadline to pledge assets. On 29 November 2023, the SDNY Court granted that request. **[MRH1/1056-1057] {B/46/1-2}**.

53. On 19 December 2023, the Republic sought a further extension of the stay and waiver of

the pledge requirement because: (i) the new administration needed time to review the appeal brief and inform themselves on the issues in the action; (ii) the Argentine executive branch could not legally or practically pledge the identified assets because doing so would require an act of the Argentine Congress; and (iii) the size of the SDNY Judgment and the burden of responding to enforcement actions would cause great strain on the country and new presidential administration. **[AFD1/457-459] {B/47/1-3}**.

54.   On 21 December 2023, the SDNY Court denied the Republic's request for a further extension of the stay and waiver of the pledge of assets. The SDNY Court ruled that the temporary stay of enforcement would therefore remain in effect until the earlier of either the Republic's failure to: (i) pledge the previously specified assets to the Claimants by 10 January 2024, or (ii) seek expedited treatment from the Second Circuit by 30 January 2024 [**AFD1/460-465**] **{B/49/1-6}**. The Republic did not pledge assets by 10 January 2024, and the temporary stay of enforcement expired by its terms on that date: **Davidoff 1/71 {CB/13/22}**.

### E.   THE UK PROCEEDINGS

55.   The background to these proceedings can be stated shortly:

55.1.   On 4 March 2024 the Claimants issued a claim for the recognition and enforcement of the SDNY Judgment under common law and / or under s.31 of the Civil Jurisdiction and Judgments Act 1982 ("**CJJA**") and / or under s.3 of the SIA **{A/2}**. The next day the Claimants applied for permission to serve outside the jurisdiction, supported by the First Witness Statement of Mark Hastings ("**Hastings 1**") **{CB/10}**.

55.2.   On 8 March 2024, on an *ex parte* basis, Bryan J made an order granting permission to serve the Claim Form and Particulars out of the jurisdiction on the Republic (the "**Service Out Order**") **{CB/6}**.

55.3.   The Republic acknowledged service on 20 September 2024 **{CB/5}**.

55.4.   By sealed consent order dated 14 November 2024, the parties agreed that the deadline for the Republic to file and serve its application to set aside the Service Out Order be extended to 13 December 2024 **{A/7}**. The Republic duly served its

14

application, being the Jurisdiction Challenge, on 13 December 2024. On the same application notice, and expressly without prejudice to the Republic's position on jurisdiction, the Republic also applied for the proceedings to be stayed pursuant to CPR r.3.1(2)(g) and/or the Court's inherent jurisdiction and/or s.49(3) of the Senior Courts Act 1981 and/or s.49 of the CJJA until further order of this Court and that, as a matter of effective case management, the question as to a stay be determined first. The parties agreed in January 2025 that the Stay Application be determined before the jurisdictional hearing: see Quillon's letter of 23 January 2025 **{A/48/2}**.

### F. SUMMARY OF THE REPUBLIC'S SUBSTANTIVE POSITION ON JURISDICTION

56. The primary object of the Stay Application is to avoid the need for the Court and the parties to address the Jurisdiction Challenge, or any other substantive aspect of these proceedings, until it is clear whether or not the SDNY Judgment will remain in place. If it is set aside (as on the Republic's case it should be), the whole of these proceedings becomes moot. As summarised below, the issues that arise on the Jurisdiction Challenge are complex, and in some respects novel.

57. The Republic is a state and accordingly the test for recognition of a foreign judgment against it is set by s.31 CJJA. There are two stages to be addressed: *first* the Claimants must show that the general 'common law' tests for recognition and enforcement of a foreign judgment are met (s.31(1)(a) CJJA); *second* the Claimants must show that the Republic would not have had adjudicative immunity from the US proceedings under the tests in ss.2-11 of the SIA (s.31(1)(b) CJJA). The two stages of s.31(1) CJJA are cumulative. If the Claimants do not meet the common law tests under s.31(1)(a) then the fact that they may be able to satisfy the SIA tests under s.31(1)(b) does not matter.

58. As to the **common law tests** under s.31(1)(a) CJJA:

59. The Claimants must show[10] that the SDNY Court was 'competent' to hear the dispute pursuant to English conflicts rules. Both of the alternative grounds relied upon by the Claimants ('presence' and 'voluntary submission') are flawed.

---

[10] In line with the Supreme Court's approach in <u>VTB Capital plc v Nutritek International Corp and others</u> [2013] 2 AC 337 at §164, the Republic will say that all of the jurisdictional questions in this case need to be satisfied in full, on a balance of probabilities standard, at the first opportunity, and not just on a 'serious issues to be tried'/'good arguable case' basis.

59.1.  **No "presence" in the jurisdiction at the time the US proceedings were commenced:** The Claimants rely on the novel argument that the Republic was 'present' in the US for the purpose of the SDNY Court's jurisdiction, because of the Republic's embassy in the US and consulate in New York,[11] and because some of the activities carried out at those locations were allegedly 'commercial'. However: (i) on the law, there is no binding precedent to the effect that a state can be 'present' in a jurisdiction simply by virtue of its <u>diplomatic</u> presence,[12] which is all that is relied upon by the Claimants here. Moreover, for the mere existence of an embassy or consulate to be the basis of a finding that a state is disqualified from making a jurisdictional objection would be contrary to the immunities conferred by the <u>Vienna Convention on Diplomatic Relations 1961</u>[13] **{A/26/66-81}** and the <u>Vienna Convention on Consular Relations 1963</u> **{A/26/17-45}**.[14] (ii) on the facts, the Republic's evidence demonstrates that the Claimants' supposed examples of 'business' being carried out at the New York Consulate and / or Embassy of the Republic to the US are nothing of the sort; rather they fall within standard diplomatic activities, such as the hosting of art exhibitions and the general promotion of economic relations.[15]

59.2.  To the extent the Claimants argue that by YPF maintaining a listing on the New York Stock Exchange the Republic is 'present' in the US,[16] this too will be contested robustly by the Republic. The actions relied upon by the Claimants as regards capital markets management are those of YPF and not the Republic, and in any event the Republic's Government (as one would expect) is located in Buenos Aires and the state takes decisions from there, not New York.[17]

---

[11] See Hastings **1/66.4 {CB/10/22-23}**; **Hastings 2/46-49 {CB/15/15-16}**.

[12] In <u>Heiser's Estate v The Islamic Republic of Iran</u> [2019] EWHC 2074 (QB) the Court suggested at §70(6) that an embassy could be a 'fixed physical presence' for the purpose of carrying on business, but this comment was *obiter* and, the Republic will suggest, wrong.

[13] See e.g. arts. 22(1), 31 **{A/26/72, 74}**.

[14] See e.g. arts. 31, 43 **{A/26/29, 33-34}**.

[15] **Rodgers 4/13-19 {CB/18/8-11}**.

[16] **Hastings 2/51 {CB/15/16}**.

[17] **Rodgers 4/20-21 {CB/18/11-12}**.

59.3. **No "voluntary submission" to the SDNY Court:** The Claimants argue that by its failure to reserve rights, and its decision to litigate points on the merits of the claims (including on appeal) the Republic has in effect submitted to the jurisdiction of the SDNY Court. As to this, the Republic has given extensive evidence, through both Ms Davidoff (in **Davidoff 1** and **Davidoff 2**) and Professor Bookman, as to why there was no such submission. The Republic's appearances and actions to date in the SDNY Court have each been on the basis that jurisdiction was being challenged, or that steps taken were implicitly without prejudice to a jurisdiction challenge.

60. There is an **additional requirement under s.31(4) CJJA, and s.13 SIA**, pursuant to which: where <u>enforcement</u> is sought (as it is here) then there must either have been a waiver of immunity as to assets or there must be assets available for execution which are for the time being in commercial use (none applies here).[18] The Republic's position is that for the Claimants to meet the later test, there is an implicit requirement that there be evidence of assets within the jurisdiction which are in commercial use. Since no such assets have been identified, enforcement is not available to the Claimants.

61. In addition, there is a **public policy exception** to recognition and enforcement of foreign judgments.[19] The Republic's decision not to carry out a tender offer under the YPF Bylaws and instead expropriate a majority shareholding in YPF was a deliberate sovereign act carried out in Argentina. It is significant that s.28 of the Bylaws can only be engaged by a state acquisition of YPF shares, and that the decision not to carry out a tender offer and instead go the expropriation route was adopted as policy of the Government in 2012. It was therefore an "act of state" by the Republic. The English Courts may not, as a matter of public policy, give judgment on certain acts of foreign states.[20] It follows that it would be

---

[18] See <u>NML Capital Ltd v Republic of Argentina</u> [2011] 2 A.C. 495 at §54: "*A foreign judgment against a state **will be capable of enforcement** in England, if both of the following conditions are fulfilled: First, that the foreign court would have had jurisdiction if it had applied the United Kingdom rules on sovereign immunity set out in sections 2 to 11 of the [1978 Act], the effect of which is that a state is not immune (inter alia) where it submits to the jurisdiction or where the proceedings relate to a commercial transaction; second, that under United Kingdom law **the state is not immune from the processes of execution**.*" (emphasis added)

[19] <u>Dicey</u>, Rule 54.

[20] <u>Maduro Board v Guaidó Board of the Central Bank of Venezuela</u> [2023] AC 156 at §165, *Per* Lord Lloyd Jones: "*…what is considered objectionable in such a course of conduct is the intrusion into the internal affairs of a foreign state which such an examination or passing of judgment would involve.*" He said further that where such rules exist they "*are rooted in the concept of mutual respect for the sovereignty and independence of states and are intended to promote international comity*".

17

contrary to English public policy to recognise a foreign judgment which itself was given in breach of foreign act of state rules. By seeking recognition of a judgment which impugns the Republic's sovereign conduct, the English Court would indirectly be trespassing on matters which are non-justiciable.[21]

62.   Argentine law is relevant to the sovereign characterisation of the decision not to make a tender offer taken by the Government and Congress of the Republic: as a matter of Argentine law, the terms of the YPF Bylaws were superseded by the General Expropriation Law and YPF Expropriation Law (see §21 above). The Republic has therefore applied for permission to adduce expert evidence on Argentine law **{CB/1/1}**, for the reasons set out at **Rodgers 4/33 {CB/18/15}**.  As Mr Rodgers explained at **Rodgers 1/72 {CB/12/23}**, the Republic intends to rely on the evidence of Professor Ismael Mata and Alfonso Santiago in this regard.  Further, in so far as there are material disputes in relation to this evidence, the Republic will seek directions for oral testimony.

63.   The Claimants have not agreed to the Republic relying on expert evidence of Argentine law. Mr Hastings said in **Hastings 2/65{CB/15/24-25}** that "[*i]f the Republic persists in its approach, this is a matter that will require directions from the Court*", and further that if and when the Republic obtains permission to rely on expert evidence of Argentine law, the Claimants will serve evidence in response. In a letter of 23 January 2025, the Claimants stated: "…*we will write to you on the matter of Argentine law under separate cover.*" **{A/48/2}.** However, the Claimants have not done so.  It will therefore be necessary in due course for the Court to give directions on this matter.

64.   As to the **tests relating to state immunity** under s.31(1)(b) CJJA:

65.   The Claimants must also demonstrate that, applying English law rules, the Republic was not entitled to immunity in the US proceedings. The Claimants rely on two provisions, arguing each of which would be independently sufficient to remove the Republic's *prima facie* immunity:

65.1.   Section 2 of the SIA relating to submission to the jurisdiction. The Republic will, for similar reasons to those above, deny that it has submitted to the jurisdiction of

---

[21] See §§18 to 21 above.

the US courts for the purposes of s.2 SIA.

65.2. Section 3 of the SIA relating to commercial acts. The Republic will, again for similar reasons to those above, argue that its decision not to carry out a tender offer under the Bylaws and instead expropriate a majority shareholding in YPF was a sovereign act which does not lead to a loss of immunity under s.3.

66. As to *forum*, the Republic will say that there is no 'legitimate benefit'[22] in the Claimants pursuing proceedings in England. The Claimants have had multiple opportunities to identify assets of the Republic which are available for execution but have failed to do so: no evidence of relevant assets was put before the Court at the *ex parte* hearing. Some months after initial permission to serve out was given, the Claimants alleged that the central bank of Argentina may hold some gold in the UK. In so doing they appear to have ignored the clear rule that a central bank's assets are separate from those of a state under s.14(4) SIA. Equally, the fact of certain bank accounts in the UK (whose existence the Republic disclosed to the Claimants in the US proceedings) is of no assistance. The Republic's Ambassador to the UK has certified that these are all in use for diplomatic purposes **{A/26/147-148}** and the Claimants have no basis (and so have not attempted) to contradict this.

67. Accordingly, there is no credible evidence as to what legitimate benefit the Claimants hope to obtain from pursuing the Republic in England. The only justification appears to be that the proceedings before this Court are part of an (admitted) broad international campaign of attrition being waged by Burford. The admission comes from Burford directly: in an investor earnings call Burford succinctly described its strategy as to put "*sand in the gears for [the Republic's] normalisation process*" (see **Rodgers 1/88 {CB/12/27}; {A/15/46})**. The "normalisation" process that Burford seeks to halt is the Republic rebuilding its economy and resuming a place on the world stage **{A/15/46}**. The Republic's case is that such tactics do not constitute a 'legitimate benefit' for the purposes of the relevant procedural test.

68. Both state immunity and non-justiciability on grounds of public policy are matters which must be decided on the balance of probabilities the first time that they are raised; there is

---

[22] See <u>Tasarruf Mevduati Sigorta Fonu v Demirel and another</u> [2007] 1 W.L.R. 2508 at §§27, 29.

no lower applicable standard of 'good arguable case' or 'serious issue to be tried' on those points, because this is a jurisdiction challenge.[23]

69.  For completeness, the Claimants have suggested that certain of the arguments above (specifically foreign act of state and the characterisation of the decision not to carry out a tender offer under the YPF Bylaws and instead expropriate a majority shareholding in YPF as a sovereign act) are no longer open to the Republic because they have already been the subject of a binding judgment of the SDNY Court, to which an issue estoppel applies.[24] That position is wrong. The Court of Appeal has recently confirmed that issue estoppel based on foreign proceedings may only be invoked where the foreign judgment in question is itself recognisable by the English courts: Hulley Enterprises v Russia [2025] EWCA Civ 108 at §75.

70.  Accordingly, where issue estoppel and / or abuse of process are invoked against a State, the tests under s.31 of the CJJA must first be satisfied before the foreign judgment relied upon could even operate so as to have preclusive effect. The Claimants' attempt to establish an issue estoppel arising from the SDNY Judgment in the very proceedings intended to recognise that foreign judgment is a clear example of 'bootstraps' reasoning and should be rejected. In any event, the relevant tests under US law are not the same as those under English law, so any estoppel argument would fail.

71.  The foregoing demonstrates that the Jurisdiction Challenge raises numerous complex and to some degree untested arguments. They will be irrelevant if the Republic succeeds on its appeal to the Second Circuit. It would be an inappropriate use of the parties' and Court's resources to resolve these issues before the outcome of the appeal is known.

## G.  LEGAL PRINCIPLES ON STAY

### a.  Test for a stay of enforcement proceedings pending a foreign appeal

72.  The question is essentially one of case management. The Court has the discretionary power

---

[23] See London Steam-Ship Owners' Mutual Insurance Association Ltd v Kingdom of Spain [2022] 1 WLR 3434 at §55.

[24] **Hastings 2/60.10 {CB/15/23}**.

to order a stay of all or part of any proceedings.[25]

73. There is no dispute that a foreign judgment which is pending appeal <u>may</u> be enforced in the UK. However, it does not follow that such a judgment <u>should</u> be enforced. The question therefore is whether and if so when a pending appeal can justify a stay. The editors of <u>Dicey, Morris and Collins on Conflicts of Laws</u> say as follows at §14-030:[26]

> *At common law, a foreign judgment may be final and conclusive even though an appeal is actually pending in the foreign country where it was given. ... [I]f appealable the English court will only enforce it, subject to conditions which will save the interests of those who have the right of appeal.' So in a proper case a stay of execution would no doubt be ordered pending a possible appeal.*

74. There is little direct case law on the question of when a stay will be ordered of an action to enforce a foreign <u>judgment</u>. However, there is extensive, and recent, authority on the question of when a stay will be granted of proceedings to enforce a foreign <u>arbitral award</u>. It is submitted that the principles applicable to the grant of a stay of proceedings to enforce a foreign <u>judgment</u> are the same.

75. The leading modern case on staying enforcement of an arbitral award is <u>Hulley Enterprises Ltd and Yukos Universal Ltd v The Russian Federation</u> [2021] 1 W.L.R. 3429. Key factors identified by Henshaw J in <u>Hulley</u> (at §56-67) include the following:

    75.1. *First*, whether the application before the court in the country of origin is brought *bona fide* and not simply by way of delaying tactics: <u>Hulley</u> at §60;

    75.2. *Second,* whether the application before the court in the country of origin has at least a realistic prospect of success. This is the same as the test for summary judgment: <u>Hulley</u> at §60;

    75.3. *Third,* the extent of the delay occasioned by an adjournment and any resulting prejudice: <u>Hulley</u> at §60.

---

[25] See CPR r. 3.1(2)(g); s.49(3) of the Senior Courts Act 1981; s.49 CJJA.

[26] The above passage in Dicey was cited with apparent approval by a single judge panel (Chadwick LJ) in a Court of Appeal directions judgment: <u>Swycher v Vakil</u> [2004] EWCA Civ 444 at §34. The editors of <u>Cheshire, North and Fawcett on Private International Law</u> (15th ed.) write in similar terms: "*Neither the fact that the judgment may be reversed on appeal, nor even the stronger fact that an actual appeal is pending in the foreign country, is a bar to the effectiveness of the judgment in England; though <u>where an appeal is pending the English court has an equitable jurisdiction to stay execution, which it will generally exercise</u>*". (Emphasis added)

75.3.1.  One way of assessing the level of prejudice is the amount of interest on the award: Hulley at §62(v). When considering any prejudice to the claimant, an award of interest can "*both act as an incentive for the defendant to co-operate in speedy resolution and as some substantial compensation for the claimant*": Hulley at §62(vi). In Reichhold Norway ASA v Goldman Sachs International [2000] 1 WLR 173, the Court of Appeal (Lord Bingham MR) held at p.181 that on the facts of that case, *"the only prejudice which [the claimant] is likely to suffer if this action is stayed is a delay of about a year. Since delay of that kind can be compensated by an award of interest if [the claimant] is ultimately successful, that might be considered a small price to pay for the prospect of avoiding complex and costly litigation."*

75.3.2.  In assessing prejudice, "*The comparison must be between the position of the would-be enforcing party if he were allowed to enforce immediately, and his position if any steps by way of enforcement were delayed as a result of the grant of an adjournment*": Hulley at §63.

75.4.  *Fourth,* Henshaw J listed various further considerations at §62, which factor into the discretion as to whether to order a stay, and relate to interests wider than just the two parties, i.e. those of the Court and other Court users. These include, so far as relevant and *mutatis mutandis*:

75.4.1.  The risk of inconsistent or conflicting decisions: it has been emphasised several times that "*If possible, the court should avoid the risk of conflicting decisions, which would occur if the English court enforces the award and the [curial] court subsequently decides to set it aside*": Hulley at §62(i). Indeed, the risk of inconsistent judgments is "*always capable of amounting to a very strong reason for granting a stay*" Bundeszentralamt Fuer Steuern v Heis [2020] 1 B.C.L.C. 649 at §113.

75.4.2.  Avoiding inconvenience and inefficacy: for example, a stay was held to be appropriate in Stati v Kazakhstan [2015] EWHC 2542 (Comm) at §§2-5 in light of "*not only the interests of the parties but the interests of other court users and the efficient use of court resources*", in circumstances where the English proceedings "*may turn out to be unnecessary or may be the subject*

22

*of duplication"* and may *"result in considerable waste of time and costs"*: Hulley at §62(ii).

76. Notably, Henshaw J confirmed at §61 that the question of whether to stay English enforcement proceedings as a matter of English law <u>does not depend on the approach of the curial courts</u> to staying foreign proceedings; rather, it requires the court to "*exercise [its] discretion in accordance with the English authorities*".

77. The Republic anticipates that the Claimants may seek: (i) to distinguish <u>Hulley</u> and the related line of cases; and (ii) to argue that some higher threshold applies to the grant of a stay.[27] Both such arguments would be wrong.

78. As to the first argument, the tests in <u>Hulley</u> apply equally to situations such as the present, where a stay is sought pending an appeal of a foreign judgment:

    78.1. Although the issues in <u>Hulley</u> arose in the context of s.103(5), Arbitration Act 1996, there is no material difference between such factors and the general test to be applied under CPR r.3.1(2)(g) for a stay in other contexts; indeed Henshaw J considered that the power to grant or continue a stay in Hulley derived from the Court's general case management powers: <u>Hulley</u> at §230.

    78.2. Indeed, whereas in the context of New York Convention awards the Court has repeatedly affirmed that it has a strong 'pro-enforcement bias',[28] there is no equivalent bias applicable to the recognition and enforcement of foreign judgments, which rather must satisfy the relevant common law (and in some cases statutory) tests. Accordingly, any situation which satisfies the requirements for a stay under the s.103(5) rubric would justify a stay *a fortiori* when applied to proceedings for the recognition and enforcement of a foreign judgment.

    78.3. Although <u>Hulley</u> concerned whether a (consensual) stay should be continued, the factors applicable to the fresh grant of a stay are the same: <u>JSC Dtek Krymenergo v Russia</u> [2025] EWHC 1060 (Comm) at §240.

---

[27] The Republic notes that in enforcement proceedings in Ireland, the Claimants have made such arguments in seeking to resist a stay.

[28] See <u>Hulley</u> at §58.

23

79.   As to the second point, the Republic anticipates that the Claimants may argue that a stay can only be justified in 'rare and compelling' circumstances. The source of this phrase is the judgment in <u>Reichhold Norway ASA v Goldman Sachs International</u> [2000] 1 WLR 173, 186, where the Court of Appeal upheld the judge's decision to order a stay pending the outcome of parallel foreign arbitral proceedings with the same subject matter as those in England. [29] The <u>Reichhold</u> case does not assist the Claimants here.

80.   *First,* the phrase 'rare and compelling' does not constitute a legal test. In <u>Athena Capital Fund SICAV-FIS SCA v Secretariat of State for the Holy See</u> [2022] 1 W.L.R. 4570, Males LJ emphasised at §48 that the Court has the jurisdiction to grant a stay under s.49 SCA , as the statute provides, "*where it thinks fit to do so*", noting "*[t]he statute imposes no other requirement which must be satisfied. This is a wide discretion. **The test is simply what is required by the interests of justice in the particular case***" (emphasis added).

81.   *Second*, the 'rare and compelling' standard does not appear to have been applied in cases such as the present, where a stay is sought pending the appeal of a foreign judgment for which recognition and enforcement is sought. Rather, it has been applied in cases where parallel proceedings are taking place alongside a substantive claim in the UK. For instance, in <u>Athena</u> Males LJ said at §59:

> "*There is, as it seems to me, no reason to doubt that it is only in rare and compelling cases that it will be in the interests of justice to grant a stay on case management grounds in order to await the outcome of proceedings abroad. After all, **the usual function of a court is to decide cases and not to decline to do so, and access to justice is a fundamental principle under both the common law and article 6 ECHR**. ... ..*" (emphasis added)

82.   The underlined passage shows that the concern addressed by the "*rare and compelling circumstances*" gloss relates to the English Court's <u>adjudicative</u> function in respect of the underlying issues being supplanted by foreign proceedings.[30] That is irrelevant to

---

[29] In <u>Unwired Planet International Ltd v Huawei Technologies (UK) Co Ltd</u> [2020] Bus LR 2422 at §99 Lord Reed commented that a temporary stay "*would be justified only in rare or compelling circumstances*". However, neither of the *dicta* in <u>Unwired</u> nor <u>Reichhold</u> support a contention that the <u>Hulley</u> tests are inapplicable, or that there is some separate freestanding test laid down by these cases.

[30] Similarly, Lord Reed's citation of a 'rare or compelling' test in <u>Unwired</u> was expressly in the circumstances of "*parallel proceedings in another jurisdiction, raising similar or related issues between the same or related parties*".

proceedings to recognise and enforce a foreign judgment. In the latter, the English Court has no adjudicative function in respect of the underlying claim.

**b. No security may be granted against a state pending resolution of state immunity**

83. In Hulley at §221 Henshaw J rejected the suggestion by the Claimants that any continued stay must be made conditional on security being posted by the defendant state. Henshaw J held that "…*any exercise of powers under section 103 would constitute the assertion of adjudicative jurisdiction over Russia which the court has not yet held to exist. There can be no question of exercising any such powers unless and until Russia's claim to state immunity has been determined and rejected*." The same analysis and conclusion must apply here, outside the arbitration context.

84. In JSC Dtek Krymenergo v Russia [2025] EWHC 1060 (Comm), which was an arbitral award enforcement case other than under s.103 of the Arbitration Act 1996, Dame Clare Moulder KC confirmed at §200 that following Hulley, the Court had no jurisdiction to order security be paid by a state which continued to assert immunity, as a condition for a stay pending a foreign appeal.

**H. SUBMISSIONS**

**a. A stay is justified**

**i. The Republic's appeal has a realistic prospect of success**

85. Each of the separate grounds of the Republic's appeal to the Second Circuit has a realistic prospect of success. It is sufficient for present purposes that any one of them should succeed (including, as to quantum, succeeding in part). While the standard to be met is a question of English law, whether the Republic meets such standard on the facts (foreign law being a question of fact) is considered by reference to expert evidence on US law.

86. The Republic relies on Professor Bookman's conclusions at §§91 to 104 **{CB/14/34-38}**. Professor Bookman was asked to address whether the Republic's arguments on appeal (as summarised at §37 above) have a 'realistic prospect of success'. In order to give her opinion, Professor Bookman was provided with a definition of that test, as set out in the relevant English case law, at Schedule 3 to Bookman 1 **{D/1/25}**.

25

87.    The Claimants have adduced an expert report from Dean (Emeritus) David F Levi ("**Levi 1**"). Dean Levi provides only a partial response because his report does not address (i) the 'realistic prospect of success' test; or (ii) the merits of all of the elements of the Republic's ongoing appeal. The Claimants have deliberately asked Dean Levi to restrict his merits views to only the *forum non conveniens* and international comity elements.

88.    As regards the standards to be applied by an appellate review there seems to be very little (if any) difference between Professor Bookman and Dean Levi:

88.1.    As to ***forum non conveniens***: Professor Bookman explains that in the Second Circuit, a *forum non conveniens* analysis involves three steps, including determining the level of deference due to the plaintiff's choice of forum, the availability of an alternative available forum, and the balancing of several public and private interest factors: **Bookman 1/97 {CB/14/35-36}**. She comments that "*While the abuse-of-discretion standard is a high standard of review, it is not insuperable. The Second Circuit has previously reversed district courts' dismissals of motions to dismiss on grounds of forum non conveniens*": **Bookman 1/98 {CB/14/36}**. Since the Republic has framed some of its objections to the SDNY Court's interpretation of the standard for *forum non conveniens* as legal errors, Professor Bookman explains that the Second Circuit will review *de novo* the legal standard applied for *forum non conveniens*: **Bookman 1/98 {CB/14/36}**. Dean Levi is silent both as to the characterisation of these matters as legal errors and the effect of such characterisation on the standard of review to be applied by the Second Circuit. Both experts agree that following a trial it is necessary for the appellant to show that a discretionary decision has caused substantial prejudice to the appellant: **Levi 1/147, 152-164 {CB/17/49}, {CB/17/50-55}.**

88.2.    As to **international comity**: There is a distinction between a review of: (i) the legal test applied (whether "exceptional circumstances" are necessary), and (ii) the review of the exercise for discretion. As to (i), Professor Bookman comments that the proper legal standard for evaluating international comity abstention in the Second Circuit is a question of law subject to *de novo* review: **Bookman 1/101 {CB/14/37}**. Dean Levi is silent as to the characterisation of this point as a legal error. As to (ii), Professor Bookman explains that the Republic's appeal will also

26

be reviewed for an abuse of discretion: **Bookman 1/100 {CB/14/36-37}**. Dean Levi agrees: **Levi 1/148 {CB/17/49}**.

88.3.   As regards **<u>Argentine Law</u>**: In US courts, foreign law is determined as a matter of law, not fact. Professor Bookman explains that since the Republic's arguments about the SDNY Court's interpretation and application of Argentine law are based on novel questions of Argentine law that are issues of first impression before US courts (meaning that these are legal issues that have not previously been addressed by the Second Circuit) **[MRH1/1110] {CB/22/44}**, the Court of Appeals will consider for itself the meaning and application of Argentine law to the facts, without deference to the SDNY Court's interpretation: **Bookman 1/102 {CB/14/37}**. In concluding that the appeal is not fanciful or frivolous and so has a real prospect of success in this context, Professor Bookman notes that "*it raises questions about the proper interpretation of Argentine law which have no guiding precedent in the Second Circuit that the Court of Appeals could revisit*": **Bookman 1/25 {CB/14/10}**. Dean Levi appears to accept that the Second Circuit will undertake a *de novo* review of Argentine law points: **Levi 1/150 {CB/17/50}**.

88.4.   Finally, as regards **<u>quantum</u>** Professor Bookman observes that the Republic's arguments that the damages award should be reduced also involve some questions of law subject to *de novo* review, as well as contested issues regarding the proper standard of review. These arguments turn on several questions regarding the proper calculation of damages that could be subject to reversal or adjustment on appeal: **Bookman 1/103 {CB/14/37}**. Dean Levi comments that the SDNY Court's fact findings relating to the calculation of damages are reviewed for clear error, and that discretionary aspects, including pre-judgment interest, are reviewed on an abuse of discretion standard: **Levi 1/150 {CB/17/50}**.

88.5.   Notably, Professor Bookman records also that although 'frivolous' appeals (i.e. those "*totally lacking in merit, framed with no relevant supporting law, conclusory in nature, and utterly unsupported by the evidence*") may be dismissed summarily under the relevant US rules, the Claimants have not sought to argue that the Republic's case on appeal is frivolous: **Bookman1/96 {CB/14/35}**. Dean Levi is silent on this point.

27

89. Overall, Professor Bookman comments that given the novel or unresolved nature of many of these legal issues in the Second Circuit, the appeal has a "*realistic prospect of success*.": **Bookman 1/104 {CB/14/38}**. She thus was asked to, and did, comment on the appeal generally.

90. By contrast, and as noted above, Dean Levi's instructions were restricted to the prospects of the Republic's appeal only on *forum non conveniens* and international comity grounds.[31] Accordingly, Professor Bookman's evidence is unchallenged insofar as it relates to the appeal as to Argentine law and quantum.

91. On *forum*, Dean Levi comments: It is "*most unlikely that Argentina will succeed*" on its appeal of the SDNY Court's rulings: **Levi 1/154 {CB/17/51}**. While it is recognised that the Court cannot on this application easily resolve differences of view between the experts, this conclusion does not assist the Court for the following reasons: *first*, there is no explanation as to what threshold the designation "*most unlikely*" entails; it is not inconsistent with there being a 'realistic prospect of success' (the test to be applied under English law). *Second*, the substantive reasons proffered by Dean Levi for his conclusions should be given little weight:

91.1. *First,* the fact that there has been 'considerable work' by the SDNY Court would not in any event be a reason to uphold a decision that is wrong;[32]

91.2. *Second,* the fact that there may be a 'heavy burden' on the appellant does not mean that the appeal will fail. Every appeal imposes a heavy burden on the appellant, as they seek to overturn an existing judgment against them. Professor Bookman has explained why in her view there is a realistic prospect of success on the Republic's appeal;[33]

91.3. *Third,* Dean Levi's view that the opinions by the SDNY Court are "*methodical and carefully reasoned*" again is not a basis for saying they cannot be overturned on

---

[31] Specifically, Dean Levi was asked to: *"(1) address the standards of review which apply to Argentina's pending appeal, and (2) opine on the prospects of success of Argentina's pending appeal on grounds that: (i) the SDNY Court should have dismissed the Claimants' suit under the doctrine of forum non conveniens, and (ii) the SDNY Court should have dismissed the Claimants' suit under the principles of international comity."* **{CB/17/48}**.

[32] Cf. Levi 1/155 **{CB/17/51}**.

[33] See Bookman 1 /97-99 **{CB/14/35-36}** Cf. Levi 1/156 {**CB/17/51-52**}.

appeal; and in any event it is denied that these epithets are properly applicable to the decisions on appeal;[34]

91.4.    *Fourth,* the suggestion that the Republic did not provide assurances that the Claimants' lawyers would not be prosecuted in Argentina ignores the fact that the Republic is a democracy which (much as the US or UK) has a 'separation of powers' doctrine which means that the Central Government does not control every aspect of the justice system. The evidence before this Court confirms that the Republic demonstrated (to the satisfaction of the SDNY Court: **Davidoff 1/42-44 {CB/13/14-15}**[35]) that the (unrelated) criminal actions which had been commenced against the Claimants' lawyers and Burford had been dismissed with prejudice;[36]

91.5.    *Fifth,* Dean Levi attempts to dismiss the distinction between the Eton Park Claimants and the Petersen Claimants, but this remains a live and important issue: they are claims brought at different times by different parties. The mere procedural fact that they were case managed together does not mean that *forum* objections which apply to one party but less so to another can be ignored;[37]

91.6.    *Sixth,* the suggestion that the US is an appropriate forum to litigate the legality of acts which occurred in Argentina, were governed by Argentinian law, and were subject to the jurisdiction of Argentinian courts, merely because there was at one point some 30 years ago an IPO of securities in the US, is patently tenuous.[38]

91.7.    *Seventh,* the invocation of the (undisputed) "*substantial prejudice*" requirement does not assist the Claimants on the facts. The Republic's case is that these issues should never have been determined by the SDNY Court, which has purported to apply Argentine law but has done so in a perverse and unsupported manner.[39]

---

[34] Cf. Levi 1/157 {**CB/17/52**}.

[35] See also Levi/159 {**CB/17/52**}.

[36] Cf. Levi 1/158 {**CB/17/52**}.

[37] Cf. Levi 1/159 {**CB/17/52**}.

[38] Cf. Levi 1/160 {**CB/17/52-53**}.

[39] Cf. Levi 1/161 {**CB/17/53**}.

92.    Dean Levi opines that it is "*most unlikely*" that the Republic will succeed on international comity grounds. This conclusion should also be given little weight.

   92.1.    As a preliminary point, Dean Levi does not go as far as to argue (as the Claimants do) that the Republic has waived this objection and instead refers to this only obliquely: **Levi 1/165 {CB/17/55}**.

   92.2.    He goes on to suggest that the Second Circuit is unlikely to overturn the SDNY Court's decision due to "*the considerable interests of the United States in policing its stock markets and holding issuers to account for their breaches*": **Levi 1/166 {CB/17/55}**. This argument puts the cart before the horse in <u>assuming</u> the culpability of the relevant party. The Claimants' case in the US courts is not about any purported breach of US securities or capital markets rules or regulations, but rather an alleged Argentine state breach of Argentine company bylaws through Argentine state expropriation. To treat this appeal as a straightforward and narrow capital markets matter governed by contract presupposes that questions arising from Argentine governing law and Argentina's sovereign decision-making reflected in national legislation are to be sidelined by the Second Circuit. That is untenable in the context of the Republic's expropriation of YPF shares and given the Second Circuit is yet to hear oral argument. Argentine governing law and the Argentine Government's decision-making power remain significant matters to be given proper weight.

93.    So far as necessary, the Court is invited to prefer the evidence of Professor Bookman for the reasons set out above. By way of summary: (i) the experts are very largely agreed as to the relevant tests and standards of review on appeal in the Second Circuit; (ii) to the extent that they disagree (which is not wholly clear, given the limited scope of Dean Levi's instructions and the fact that he was not directed to the 'realistic prospect of success' threshold) the disagreement is limited to the merits of the Republic's appeal on *forum non conveniens* and international comity; and (iii) insofar as Dean Levi's reasoning differs from that of Professor Bookman, Professor Bookman's should be preferred.

   **ii.    The Republic's challenge is *bona fide***

94.    The Republic is pursuing its appeal in the properly held belief that it has a real prospect of success and is therefore justifiable: **Rodgers 1/116.2 {CB/12/36}**. The fact of the detailed

30

appellate submissions – the substance of which is considered by Professor Bookman to have a realistic prospect of success – is evidence that the Republic is raising its appeal in good faith.

95. None of this is undermined by comments the Claimants have selectively used to suggest that the Republic is an inveterate and intransigent debtor. The Claimants have cherrypicked out of date or irrelevant material, which bears no relation to the present and cannot be treated as material "evidence".

95.1.    At **Hastings2/109-114 {CB/15/39-41},** Mr Hastings refers to the <u>Palladian</u> litigation. The relevant question there was whether permission to appeal an English Court judgment should be conditional on the payment of security. That is very different to whether there should be a stay of an application to recognise and enforce a foreign judgment which is being appealed.

95.2.    At **Hastings2/115 {CB/15/41}**, Mr Hastings mentions other "*instances of the Republic's conduct being criticised*" and refers to two comments from US courts which are nearly 20 and 15 years old, respectively.  Mr Hastings chose not to refer to the far more recent decision of the Second Circuit in the case of <u>Bison Bee LLC vs Republic of Argentina</u>, 778 Fed.Appx. 72 (2d Cir.2019) where the Second Circuit commented that [**KWR3/178**] **{A/26/154}**: "*[In] NML Capital, Ltd v Republic of Argentina, 727 F.3d 230, 247 (2D Cir. 2013). ...we held that Argentina violated the pari passu clause at issue because it was, at the time, a 'uniquely recalcitrant debtor.' ...* ***But times have changed, and Argentina is 'uniquely recalcitrant' no more****. It is for this reason that we went so far as to affirm the vacatur of a pari passu injunction against Argentina just a few years ago…*" (emphasis added).

### iii.  Delay from a stay being granted

96. Although a stay until the final resolution of the Republic's appeal (should the Republic's appeal fail) would likely delay the hearing of the Jurisdiction Challenge, and should that challenge fail, the resolution of the Claimants' claim for recognition and enforcement of the SDNY Judgment, it is of course only if the Republic's appeal and the Jurisdiction Challenge fail (i.e. contrary to the Republic's primary position), and the Claimants then

31

succeed in their application for the recognition and enforcement of the SDNY Judgment, that any question of prejudice from the delay arises.

97.  As to the length of the delay resulting from a stay, this would be from when the stay is granted, until (should the Republic's appeal fail) it is lifted on the final resolution of the appeal.  As referred to above, there are different views based on the parties' respective US lawyers' experience as to this period (see §§44-45 above).  The relevant time periods may be broken down into stages as follows:

97.1.  **Time from now until a hearing of the Second Circuit appeal:** The Republic's position is that a hearing is expected in September or October 2025: **Davidoff 3/8 {CB/20.1/3-4}**.  On behalf of the Claimants, Mr Goldsmith says in his second witness statement ("**Goldsmith 2**") at **Goldsmith 2/7 {CB/20.2/2-3}** that he does not know when oral argument of the appeal will be heard and that he is therefore unable to give any precise estimate on timings.

97.2.  **Time from now until a decision by the Second Circuit:**  The Republic's position is that time from now for the Second Circuit's decision will likely be in the range of 6 to 16 months.[40] The Claimants do not give an estimate for the timing of the present appeal being decided, but suggest that the timing is likely to be no quicker than a previous appeal in this matter, which was decided 13 months after argument: **Goldsmith 1/165 {CB/16/40}**.  Taking as a starting point the Republic's evidence on the likely listing (see §97.1), the range on the Claimants' case would be 16 to 17 months.[41] This is virtually the same as the Republic's case.

97.3.  **Time from now until a decision of the US Supreme Court (if petition is granted)**: The Republic's position is that the additional time for any further appeal to the US Supreme Court (if petition is granted) could be in the range of at least a further 11.5 to 14.5 months after a decision by the Second Circuit, meaning from now a predicted **<u>minimum of around a year and a half</u>** (17.5 months) and a

---

[40] As regards the appeal to the Second Circuit **Davidoff 3/8** provides that "*I now expect the appeal to be heard in September or October of this year*" (i.e. 3-4 months) {**CB/30.1/3-4**} and **Davidoff 1/83** provides that "*decisions are often issued within 3 to 6 months after argument, though sometimes decisions will take as long as a year to issue.*" {**CB/13/26**} Accordingly, on the Republic's case the range is 6 months (3+3) to 16 months (4+12).

[41] The Republic's evidence is for a hearing in 3-4 months. Adding this to the Claimants' single figure of 13 months, the range would be 16 (3+13) to 17 (4+13) months.

**maximum of around 2 and a half years** (30.5 months), for a Supreme Court decision.[42] The Claimants' position is again unclear but Mr Goldsmith seems to suggest at **Goldsmith 1/167 {CB/16/40}** that a certiorari decision might be up to 8 months from the date of a judgment of the Second Circuit (Ms Davidoff's evidence suggests it would be 5.5 months).[43] The Claimants do not give an estimate of the time until the completion of a Supreme Court appeal, but adopting the Republic's evidence on this, the Claimants' estimate of the additional time for a decision by the US Supreme Court is similar to that put forward by the Republic.[44]

98.  In its draft Order **{CB/2/2}** the Republic seeks a stay with liberty to apply on 21 days' notice.  This is designed to provide the opportunity for the stay to be reviewed in the light of any changed circumstances, in particular after any decision of the Second Circuit, and any potential further appeal to the US Supreme Court. On either the Claimants' or the Republic's estimates as set out above, the Claimants would suffer no material prejudice by reason of a stay being granted.

### iv.  Lack of prejudice to the Claimants if a stay is granted

99.  The short point is that there are no assets in this jurisdiction against which the Claimants could enforce the SDNY Judgment. Further, the Republic has given evidence that there is no prospect of any other assets of the Republic which may be available for execution coming into the United Kingdom in the near- or medium-term future: **García Hamilton**[45] **1/9 {CB/20/3}**. The Claimants' *ex parte* application made no reference to assets in the

---

[42] See **Davidoff 1/84 {CB/13/26}**, in which Ms Davidoff explains that: (i) a party seeking to appeal to the US Supreme Court has 90 days to file a writ of certiorari absent extension; (ii) typically the Supreme Court decides whether to grant a petition within 6 weeks of a party filing a certiorari petition although the period can be much longer; (iii) it is usually at least 3 months from the grant of a petition for certiorari before a case is ready to be argued and; (iv) once a case is argued, a decision is typically issued 3 to 6 months later. Mr Goldsmith notes that the opponent of a Supreme Court petition has 30 days to respond **Goldsmith 1/167 {CB/16/40}**. Thus, the figures might be a minimum of (90 days [3 months] + 30 days [1 month] + 6 weeks [1.5 months] + 3 months + 3 months) = 11.5 months; or a maximum of (90 days [3 months] + 30 days [1 month] + 6 weeks [1.5 months] + 3 months + 6 months) = 14.5 months.

[43] Mr Goldsmith says that the US Supreme Court might allow: (i) 150 days from the date of a Second Circuit judgment for a certiorari petition; (ii) then a further 30 days for a response; (iii) the Supreme Court might then seek the views of the US Solicitor General, which might mean that certiorari is not decided until eight months after the petition is filed: **Goldsmith 1/167 {CB/16/40}**.

[44] 8 months (Claimants' estimate for a certiorari decision) + 3 months (Republic's estimate for case to be ready for oral argument) + 3-6 months (Republic's estimate for a Supreme Court decision) = 14-17 months, which is very slightly more than the Republic's overall estimate of 11.5-14.5 months.

[45] Namely the First Witness Statement of José Ignacio García Hamilton dated 21 February 2025.

jurisdiction. The Republic has already given disclosure of its assets in the UK (required by the US proceedings), and the Ambassador of the Republic to the UK has further confirmed by certificate that all bank accounts held by the Republic are for diplomatic purposes and hence immune **{CB/20/2}** and **{A/26/147-148}**.

100. It is not sufficient for the Claimants vaguely to assert that they are investigating and that 'something may turn up' at some indeterminate point in the future. As noted above, the Claimants have belatedly suggested – based on news reports – that the Central Bank of Argentina may now or at some point in the future hold assets in the UK: **Hastings 2/75-80 {CB/15/30-32}**. Even if this were the case, it ignores the basic principle that the assets of a central bank are separate to those of a foreign sovereign and are separately immune from execution unless waiver is given by the central bank: s.14(4) SIA. The Claimants have not attempted to suggest that there is any basis for going behind this position.

101. Again, as noted above, the only other 'evidence' of assets in this jurisdiction put forward by the Claimants are details of a set of bank accounts referred to at **Hastings 2/81 {CB/15/32}**, whose existence was disclosed by the Republic in the US proceedings. The Republic's Ambassador to the UK has certified that each of these bank accounts is in use for diplomatic purposes **{CB/20/2}** and **{A/26/147-148}**. Pursuant to s.13(5) SIA that certificate must be accepted as sufficient evidence of that fact unless the contrary is proved. The Claimants have not contradicted the Ambassador's evidence, let alone proven otherwise.

102. Indeed, the most that the Claimants say of such accounts is that "*the Republic makes ready use of London as a banking centre*": **Hastings 2/82 {CB/15/33}**. But even that nebulous statement is not borne out by the facts. Plainly, to operate embassies, consulates and other diplomatic establishments in a country, it is necessary to have available bank accounts in that country. The existence of the diplomatic bank accounts referred to by the Claimants shows nothing more than the fact that the Republic conducts diplomatic operations here in the usual manner. In no sense does the existence of such accounts demonstrate that London is a "*banking centre*" for the Republic, whatever that label may be intended to mean.

103. Notably, to address the weaknesses identified at §§101 to 102 above, Mr Hastings confirmed in responsive evidence at **Hastings2/118 {CB/15/42}** that the Claimants are, at this stage, only seeking recognition and enforcement of the SDNY Judgment (as opposed

34

to execution of any resulting English judgment against the Republic's assets). The Claimants' *ex parte* application did not draw this distinction. In truth, this statement concedes that the Claimants do not intend (and have no basis for expecting) to recover any sums by way of enforcement in England at this juncture.

104. Indeed, rather than actually seeking to recover assets in this jurisdiction (which would, as the Republic has explained, be impossible, because there are none), it seems that the aim (as expressed by Burford in its earnings call at the end of last year: {**A/15/46**}) is simply to try to '*put sand in the gears*' and to use any English judgment to bring the Republic to the negotiating table. This is wholly speculative, and there is an issue in the Jurisdiction Challenge as to whether this is a 'legitimate interest' (see **Rodgers 1/9.3 {CB/12/5**}). But if there is any genuine commercial benefit in this, it is not explained why the fact of the SDNY Judgment, and the pending recognition and enforcement proceedings here, do not have the effect the Claimants intend in any event.

105. As referred to above, each of the Claimants is in some form of insolvency procedure or liquidation, and is not currently operating. There is no question of any of them being deprived of a commercial opportunity from using any recoveries (if there were any assets here against which they might be able to enforce) which they might otherwise make sooner than later should a stay not be granted. Interest would be adequate compensation for any delay there might be in the resolution of these proceedings – there is no suggestion to the contrary. In that respect, interest continues to accrue daily on the sum awarded in the SDNY Judgment, at a rate of 5.42% compounded per annum,[46] currently some US$2.5m per day.[47]

### v.  Prejudice to the Republic if a stay is not granted

106. There are two particular aspects to the prejudice which the Republic will face if a stay is not granted.

107. *First*, the Republic will be put to the considerable cost of opposing jurisdiction in circumstances where such hearing may well be rendered moot by the results in the US.

---

[46] Pursuant to 28 U.S.C. §1961 **Hastings 1/66.2 {CB/10/22}**.

[47] The interest set by the SDNY Court is 5.42%, compounded {**CB/21/4**}. On a USD$16.1bn judgment, the sum would be approaching US$900m per year even before compounding.

Given that the Claimants' case has expanded progressively through its evidence (for example the introduction via **Hastings 2** of entirely new arguments in opposition to immunity under s.3 SIA), the Republic's current best estimate for the hearing of the Jurisdiction Challenge hearing is **4 - 5 days hearing plus 2 days pre-reading**. The Court will appreciate that such a hearing would be expensive.  Mr Rodgers had originally estimated that a shorter hearing (1 day reading and 2 days hearing) would give rise to costs "*well into seven figures for each of the parties*": **Rodgers 4/63.2 {CB/18/28}.** That initial estimate will be exceeded.

108. The Republic would not be protected by a costs order in its favour.  Even if made on the indemnity basis, there would likely still be substantial irrecoverable costs.  Furthermore, each of the Claimants is in some form of foreign insolvency proceedings or liquidation, and so recoverability of any sums ordered to be paid to the Republic would be at best uncertain (see further below).  While a costs recovery from Burford might be possible, the Claimants' evidence is (see **Hastings 1/84.6 {CB/10/29}**) that Burford is not funding the English litigation, a position no doubt taken in an attempt to avoid that liability.

109. *Second*, if the Claimants were to succeed in their current proceedings, and (notwithstanding the numerous points set out above) make a recovery here, but the SDNY Judgment was subsequently reversed, there would be the difficulty of unwinding the position.  While any English judgment would no doubt be set aside, the recovery of any sums paid would (again) be at best uncertain.

110. As to this, all of the Claimants are in some form of insolvency procedure or liquidation: see §§12 to 13 above. Their monies are not in the hands of management. Rather, any recoveries by them appear to be subject to a combination of: (i) the discretion of the liquidators; (ii) any contractual arrangements that they have with funders such as Burford; (iii) the claims of any onward creditors, especially those who have preferential claims; and (iv) mandatory waterfall requirements imposed by the laws of the relevant countries governing the liquidation processes.

111. As regards the Petersen Claimants, in September 2014 a receiver was appointed and the Spanish Courts made a liquidation order [**MRH1/68-107**] **{A/12/19-58}**. In October 2014, the Petersen Claimants submitted a liquidation plan in the Spanish bankruptcy proceedings which contemplated the "sale or assignment" of any claims by the Petersen Claimants in a

36

public action or, if not practicable, "third party management and financing of such claims" [**KWR1/45**] {**A/15/16**}. Burford succeeded in the bidding process, through its wholly owned subsidiary, Prospect Investments LLC ("**Prospect**"). Under a Claims Prosecution Agreement entered into by the Petersen Claimants and Prospect dated 4 March 2025 [**KWR1/42-59**] {**A/15/13-30**} it is recorded that Prospect would fund the claims: **Rodgers 1/41 {CB/12/13-14}**. It appears that the Petersen Claimants are being maintained in existence without the relevant 'Insolvency Administration'[48] concluding, for so long as there are obligations under this Claims Prosecution Agreement.

112. As regards the Eton Park Claimants, Mr Hastings has confirmed at **Hastings 1/20 {CB/10/5}** that Eton Park Liquidating GP Ltd is the authorised representative for the Third Claimant and the voluntary liquidator of the Fourth Claimant (which, in turn, has been appointed as attorney-in-fact of the Third Claimant [**MRHI/116**] {**A/12/71**}. The general partner of the Fifth Claimant appointed a liquidator to "*replace the general partner for the purposes of overseeing the winding-up and liquidation of the Partnership*" [**MRH1/109**] {**A/12/62**}.

113. There has not been any positive assurance (still less evidence) that the Republic could be made whole in the event that there is enforcement against assets which later turns out to be wrongful because the Republic's appeal succeeds before the US courts. If such an assurance could have been given, it is to be expected that it would have been provided.

114. This may of course be explained by the reality that there is no question of enforcement against any assets here, and no prejudice to the Claimants from a stay being granted. Even if there were some potential benefit to the Claimants from simply being able to put '*sand in the gears*' if there were no stay, this would necessarily result in an equal and opposing detriment to the Republic. The Claimants have not identified how such detriment could be reversed if the Republic's appeal was subsequently granted.

### vi.  Waste of the English Court's resources

115. If no stay is granted, and the Court proceeds to hear the Jurisdiction Challenge, but the SDNY Judgment is subsequently set aside, there will be a substantial waste of Court resources. The interests of other Court users and the efficient use of the Court's resources

---

[48] This is the term used in the Claims Prosecution Agreement {**A/15/16**} and {**A/15/30**}**.**

are factors relevant to the Court's discretion: see <u>Hulley</u> at §62(ii). As referred to above, the Republic's current estimate is that the Jurisdiction Challenge will need 4-5 days of Court time for argument and oral testimony from witnesses of Argentina law, with 2 days of Court pre-reading time. There would then need to be associated judgment writing time, on issues which are complex and in some respects novel. The total judicial resource required to deal with the Jurisdiction Challenge at first instance may accordingly be of the order of 8 to 10 days, or longer including writing time. This will be wasted if the SDNY Judgment is subsequently set aside. Furthermore, given the nature of many of the points raised in the Jurisdiction Challenge, it is likely that a number of them will need to be considered at appellate level.

### b. English Courts must apply their own test for a stay rather than simply following curial courts

116. One of the Claimants' arguments as to why there should be no stay in the English Court is that the SDNY Court's stay of enforcement has expired. This argument is of no assistance to the Claimants.

117. As a matter of principle, it is well established that the question of whether to stay English enforcement proceedings as a matter of English law does not depend on the approach of the curial courts to staying foreign enforcement proceedings; rather, it requires this court to "*exercise [its] discretion in accordance with the English authorities*": <u>Hulley</u> at §61. The fact that the SDNY Court's earlier stay of enforcement has expired is therefore irrelevant. Any suggestion by the Claimants that the position adopted by the SDNY Court should be determinative or otherwise precludes the grant of a stay by this Court would be contrary to principle.

118. Moreover, the expiry of the SDNY Court's stay should also be given no weight as a matter of fact.

118.1. Under US law (whether generally or in these particular proceedings) a court has the power to order that the Republic should provide security. Thus, the starting point of the SDNY Court's analysis (as Professor Bookman makes clear)[49] is that

---

[49] See §48 above.

security ought to be provided as a matter of course, and any derogation from this position must be justified by cogent reasons.

118.2.    In England, by contrast, the situation is different: security cannot be ordered against a state entitled to presumptive immunity, unless and until immunity has been determined not to exist. Since the Court is not at the stage of making such determination here, the starting point is different. Thus, the expiry of the SDNY Court's stay because the Republic did not pledge certain assets by the relevant deadline cannot provide a justification for the English Court rejecting the present application for a stay.

118.3.    The Republic explained through a letter from Sullivan & Cromwell [**AFD1/457-458**] **{B/47/1}** that: "*The new Argentine government also cannot legally or practically pledge or encumber the assets identified in this Court's November 21 Order by January 10. As an initial matter and as Plaintiffs have acknowledged in correspondence with the Republic, pledging these assets would require an act of the Argentine Congress. …*".

**c.    No security can be required as a condition for the stay**

119.    The position as set out in <u>Hulley</u> and <u>Dtek Krymenergo</u> above (see §§83 to 84) is clear. No security can be ordered as a condition for the stay at this juncture, before the Republic's claims to immunity have been resolved.

**d.    The Claimants' offers in correspondence**

120.    In recent correspondence the Claimants have stated that they will indicate to the Court that in the event a stay is refused (1) they will not proceed with the execution of any English judgment they might obtain pending final resolution of the US appeal process, and (2) in the event the US appeal process is finally resolved on terms overturning the finding of liability in the SDNY Judgment, they will (i) pay any wasted future costs incurred by the Republic in connection with the proceedings, and (ii) agree to have any English order recognising and enforcing the SDNY Judgment set aside **{A/76/1}**.  The Claimants invited the Republic to agree to the determination of the Stay Application on that basis.

121. The Republic has declined this proposal.  Point (1) merely confirms that there is no prejudice to the Claimants from the grant of a stay: they are not in any event intending to execute any judgment here, and there are no assets against which they could do so. As to point (2), an agreement to pay wasted future costs does not address past costs, irrecoverable costs, or how they would be paid (see §§106 to 114 above).  And proposing to agree to have any English order recognising and enforcing the SDNY Judgment set aside is the minimum consequence in English law where the fundamental basis for such an order has gone, and the proceedings based on it have been a complete waste of time and resource.

## I.   CONCLUSIONS

122. For the foregoing reasons, the Republic respectfully requests that a stay be granted on the terms sought.

**DAVID RAILTON K.C.**

**RAJESH PILLAI K.C.**

**JACOB TURNER**

**24 June 2025**
