# EXHIBIT 35

⬥ United States of America v Philip Morris Inc

Overview    |    [2004] EWCA Civ 330,    |    (2004) Times, 16 April,    |    148 Sol Jo LB 388,    |    [2004] All ER (D) 448 (Mar)

---

# ⬥United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

COURT OF APPEAL (CIVIL DIVISION)

BROOKE (Vice-President of the Court of Appeal (Civil Division)), CHADWICK, BAKER LJJ

23 MARCH 2004

23 MARCH 2004

**Civil evidence — Foreign proceedings — Letters of request — Discovery against non-party — Legal professional privilege.**

M Howard QC & D Pievsky for the First Appellant

C Hollander QC for Andrew Foyle the Second Appellant

K MacLean QC & J Goldsmith for the Respondent

Lovells; Norton Rose; Loble Solicitors

**BROOKE LJ :**

No. Heading Para No.

1 Introductory 1

2 The history of the action 3

3 The application for the letter of request 10

4 The court's approach to letters of request 16

5 The application relating to Mr Foyle 18

6 The claim to legal professional privilege and the judge's order 20

7 The scope of Mr Foyle's involvement 24

8 Legal advice privilege: the judge's analysis 40

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

9 Litigation privilege: the judge's analysis 47

10 Oppression: the judge's approach 58

11 The appeal: litigation privilege 59

12 The appeal: legal professional privilege 74

13 Oppression and a fair balance 84

*1 INTRODUCTORY*

**[1]**  This is an appeal by British American Tobacco (Investments) Ltd ("BATCo") and Mr Andrew Foyle against an order made by Moore-Bick J in the Commercial Court on 10 December 2003 whereby he directed that Mr Foyle be examined for the purposes of making his evidence available in proceedings currently pending before the United States District Court for the District of Columbia pursuant to letters of request issued by that court. BATCo is one of the parties to the litigation in the United States for the purposes of which the evidence is sought, and it was given permission to intervene to enable it to assert claims for privilege in respect of confidential communications which it feared that Mr Foyle might be asked to disclose if an order for his examination was made.

**[2]**  On the same occasion the judge refused to make a similar order in relation to Mr Martin Broughton, who held several senior positions in the BAT group, culminating in his appointment in February 1998 as chairman of British American Tobacco plc ("BAT plc"). There is no appeal against this part of the judge's order.

*2 THE HISTORY OF THE ACTION*

**[3]**  The action in relation to which the evidence was sought involves a claim by the Unites States of America against a number of tobacco companies under the Racketeer Influenced and Corrupt Organisations law, 18 USC para1962. It is one of the largest cases ever brought in a United States court. The judge received evidence to the effect that the sum claimed is at least US$289 billion, and that about 40 million documents would be produced in the course of discovery.

**[4]**  The United States alleges that since 1953 the tobacco companies have engaged in an unlawful enterprise to deceive and defraud the American public and consumers of cigarettes about the health risks of smoking and about their knowledge and attitude to them. The United States says that as part of that unlawful enterprise the companies, among other things, suppressed information available to them to the effect that smoking was addictive and was, or might be, injurious to health, manipulated the nicotine levels in cigarettes, and made false statements about the research they were undertaking and their readiness to communicate the results to the public.

**[5]**  It is an important part of the United States' case that the tobacco companies took active steps to ensure that documents which they thought might damage them in any litigation were destroyed or suppressed to ensure that they could not be disclosed. In particular, the companies are alleged to have systematically destroyed certain kinds of documents, to have sent others out of the jurisdiction to put them beyond the reach of the courts, and to have routed some communications through their lawyers with 'confidential' or similar markings in order to enable them to claim legal professional privilege in respect of them. The companies are also accused of having interfered with the integrity of scientific research into the effects of smoking on health by causing it to be directed, edited and controlled by their lawyers.

**[6]**  Two companies in the British American Tobacco group, Brown & Williamson Tobacco Corporation ("Brown & Williamson"), an American company, and BATCo, an English company, are among the defendants to the action in Washington DC. Both these companies are ultimately owned by BAT plc.

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

**[7]**  Mr Foyle is a partner in the firm of Lovells, the London solicitors. He is a litigation specialist. He acted for various companies in the BAT group between about November 1985 and May 1994 when he moved from London to Lovells' office in Hong Kong.

**[8]**  Tobacco litigation is not confined to the United States. In October 2001 Mrs Rolah McCabe brought an action in the Supreme Court of Victoria against British American Tobacco Australia Services Ltd ("BATAS") seeking damages for personal injury caused by smoking. On 6 February 2002 Eames J struck out BATAS's defence on the grounds that it had prevented the plaintiff from obtaining a fair trial by destroying potentially relevant documents at a time when it faced impending litigation. In his judgment Eames J referred at some length to the part played by Mr Foyle in advising the BAT group's companies in Australia. He quoted extensively from a document which has since become known as the "Foyle memorandum". On 6 December 2002 his judgment was reversed on appeal.

**[9]**  In the meantime matters had moved on in the United States. Following the delivery of judgment by Eames J in the *McCabe* case, the United States notified BATCo that it wished to take a deposition from Mr Foyle and asked it to make him available for that purpose. Since Mr Foyle was not an employee of BATCo, this request was refused. Requests to make available Mr Broughton and Mr Nicholas Cannar, who was formerly company secretary and head of BATCo's legal department, were also refused. On 1 July 2002 the United States therefore applied by motion for letters of request to be issued in respect of Mr Foyle, Mr Broughton and Mr Cannar. The letters of request relating to Mr Foyle and Mr Broughton were directed to the Royal Courts of Justice; the letter of request relating to Mr Cannar was directed to the Supreme Court of New South Wales, Mr Cannar then being resident in Australia.

*3 THE APPLICATION FOR THE LETTER OF REQUEST*

**[10]**  In its motion applying for a letter of request in relation to Mr Foyle the United States set out the grounds on which it made its application. They included an assurance that it sought evidence for use at trial rather than evidence in the nature of pre-trial discovery and an assertion that Mr Foyle's evidence was necessary for the just disposal of the case because he had played a "central role in the creation and implementation of document destruction policies implemented to protect BAT and its affiliates, including BATCo and Brown and Williamson". No evidence was offered in support of that allegation, but the draft letter of request originally submitted to the District Court with the application included the following recital:

> "WHEREAS, an attorney's providing advice on how to destroy documents relevant to current and anticipated litigation, amounts to the furtherance of a crime or fraud. In the United States and other jurisdictions (including the United Kingdom), such conduct obviates any attorney-client or legal professional privilege that might otherwise attach to such advice. . . Likewise, an attorney's advising a client to have scientists route their contacts "through the lawyers" so that privilege could be asserted for scientific communications is an improper practice and a fraud upon any court in which such privilege is asserted. For these reasons, the legal professional and attorney-client privileges do not stand in the way of Mr Foyle's being required to give testimony."

**[11]**  All three applications were opposed before the District Court on the grounds that they were in reality attempts to obtain discovery after the deadline for that stage of the proceedings had passed. In addition BATCo objected to the inclusion in any letter of request of a recital in the terms set out above on the grounds that it amounted to a finding by the court that what is known in the United States as the 'crime-fraud exception' to the right to claim privilege applied in this case without there having been any proper investigation into the matter.

**[12]**  The applications were referred for consideration to Special Master Levie. He recommended that no letter of request be issued in respect of Mr Broughton and that a letter of request be issued in respect of Mr Foyle in a modified form. He specifically recommended that the proposed recital referring to the crime-fraud exception be omitted from the letter of request issued in relation to Mr Foyle. This recommendation was accepted by Judge Kessler. On 3 October 2002 Judge Kessler issued letters of request in respect of Mr Foyle, Mr Broughton and Mr Cannar. The wording of the letter of request with which we are concerned made it clear that the factual statements in it were allegations made by the United States and not findings by the Court.

**[13]**  On 9 December 2002 in the Supreme Court of New South Wales James J granted an order *ex parte* for the

examination of Mr Cannar pursuant to the letter of request. On 8 October 2003 Bell J delivered a lengthy judgment refusing to set aside this order. She held, however, that certain documents, in particular the Foyle memorandum, remained privileged despite the fact that their contents had been made public to a greater or lesser degree. We were told that an appeal is still pending against her decision.

[14]  Meanwhile, back in Washington there had been further disputes arising out of BATCo's claim to privilege over certain documents. One of the documents under consideration was a memorandum ("document 182") written by Mr Foyle to Mr Cannar in September 1989 relating to the strategy to be adopted in preparing a defence to a pending patent action and the implications of that action for smoking and health litigation. The Special Master held that in principle document 182 was privileged, but that the crime-fraud exception applied because it had been prepared "in furtherance of BATCo's concealment of documents related to smoking and health". However, on 27 August 2003 Judge Kessler overturned that finding as "clearly erroneous", concluding that the advice contained in document 182 fell within "the generally accepted bounds of tactical legal planning engaged in by sophisticated corporate counsel."

[15]  Although many of these matters are of no direct relevance to the issues we have to decide on this appeal, they set the scene for the applications Moore-Bick J was concerned to determine.

*4 THE COURT'S APPROACH TO LETTERS OF REQUEST*

[16]  There has never been much dispute between the parties as to the principles to be applied when considering an application of this kind. They are summarised by Waller LJ in paras 28-32 of the judgment of the Court of Appeal in *Genira Trade and Finance Inc v Refco Capital Markets Ltd* [2001] EWCA Civ 1733. In particular, it is the duty and pleasure of the court to give all such assistance as it can to the requesting court within the limits imposed by the Evidence (Proceedings in other Jurisdictions) Act 1975 ("the 1975 Act") from which the jurisdiction to make orders of this kind is derived. One of the restrictions imposed by the 1975 Act which assumed considerable importance in the present case relates to privilege. This is preserved by s 3(1)(a) which provides as follows:

"A person shall not be compelled by virtue of an order under section 2 above to give evidence which he could not be compelled to give-

(a) in the part of the United Kingdom in which the court that made the order exercises jurisdiction. . ."

[17]  Moreover, the authorities make it clear that while observing the restrictions imposed by the 1975 Act, the court must also hold a fair balance between the interests of the requesting court and the interests of the witness: see *The State of Minnesota v Philip Morris Inc* [1997] ILP 170, 176 per Lord Woolf MR.

*5 THE APPLICATION RELATING TO MR FOYLE*

[18]  It was not disputed that Mr Foyle could give relevant and admissible evidence bearing on the issues in the litigation now proceeding in Washington DC. The application for his examination was resisted before the judge on two grounds: privilege and oppression. Like the judge, we are not concerned with any issues relating to the allegations of crime-fraud which were originally made against Mr Foyle in the United States' motion for the issue of a letter of request and the draft letter exhibited to it. At an early stage of the hearing before the judge, Mr Kenneth MacLean QC, who appeared for the United States, made it clear that his clients did not make any allegation of improper conduct against Mr Foyle and were not seeking any finding to that effect. He also stated that his clients did not intend to bring civil proceedings against him either, and indicated that he was authorised to give an undertaking to that effect.

[19]  On the appeal Mr MacLean said that there was still a live allegation in the principal proceedings to the effect that relevant documents had been destroyed while BATCo's document management policy was being implemented, but it was not being suggested that Mr Foyle was infected in any way by crime-fraud involvement.

*6 THE CLAIM TO LEGAL PROFESSIONAL PRIVILEGE AND THE JUDGE'S ORDER*

[20]  The main ground on which the application is now resisted on this appeal is that of legal professional privilege

although the "oppression" argument remained in the context of arguments about the court's duty to achieve a fair balance between the interests of the requesting court and the interests of Mr Foyle. Mr Charles Hollander QC, who appeared for Mr Foyle, and Mr Mark Howard QC, who appeared for BATCo, submit, as their predecessors did before the judge, that all communications passing between Mr Foyle and BATCo and other members of the BAT group were covered by both legal advice privilege and litigation privilege. Mr Foyle could not therefore be required to answer any questions on any of the matters identified in the letter of request unless BATCo waived privilege. Since BATCo did not intend to waive privilege, it would be a waste of time and money to make an order for his examination.

[21]  Mr MacLean has always recognised that Mr Foyle might well be entitled to refuse to answer many of the questions that the United States might wish to put to him. He continued to argue, however, that the right course was for objections to be raised and for privilege to be invoked when specific questions were asked, and in this context he persuaded the judge that it would not be right for the court to accede to a blanket assertion of privilege at that stage. The judge approached this application on the assumption that objection would be taken to Mr Foyle's answering any question that touched on the substance of the matters described in the letter of request. He felt, however, that until specific questions were asked the problem would remain theoretical rather than practical, and it was difficult to be confident that every assertion of privilege would be well-founded.

[22]  In the event his order included a direction that by 4 February 2004 the United States should supply to Mr Foyle and BATCo paginated bundles of documents on which it intended to rely at the examination, together with a written indication of the proposed lines of questioning, with reference, where appropriate, to documents, together with sample questions. He also fixed a directions hearing, which will take place at the end of March, at which he would be able to hear any objections by Mr Foyle and BATCo and give such further directions as seemed appropriate. The adoption of this procedure appears to me to be a sufficient answer to the appellants' complaint that no questions or lines of questions had been identified at the first hearing before the judge.

[23]  In his judgment under appeal the judge accepted that s 3 naturally contemplates that an order for the examination of the witness will already have been made by the time any question of privilege arises (see para 16 above). He said, however, that if the court were satisfied on the evidence before it that the exercise would be a pointless one because the witness could and would refuse to answer any questions of substance put to him, he could see no reason why in the exercise of its discretion the court might not refuse to make an order for his examination, although no doubt such a course would only be justified in the clearest case. Because BATCo submitted that this was such a case, the judge was obliged to examine the range of subjects on which the United States wished to question Mr Foyle, and the circumstances in which the communications about which he might be questioned had occurred.

*7 THE SCOPE OF MR FOYLE'S INVOLVEMENT*

[24]  The matters on which Mr Foyle's evidence was sought were described in the letter of request. The five main categories (each of which is broken down into several sub-categories) are:

1. The creation of the document management policy.

2. The implementation of the document management policy.

3. Rules and procedures set forth by the document management policy.

4. Destruction of smoking and health documents that pertain to BATCo's and Brown & Williamson's litigation position in the United States.

5. Transportation, routing, storage and warehousing of documents.

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

[25]  The judge commented that some of these, such as the creation of a document management policy, could obviously involve communications of a privileged nature. Others, such as arrangements for the transportation, routing, storage and warehousing of documents, seemed less likely to do so. He said, however, that in each case the question whether any particular communication was privileged would depend on its particular nature and the circumstances under which it occurred.

[26]  In his witness statement, the contents of which were not challenged, Mr Foyle said that all the work he undertook for the BAT companies involved giving general legal advice in relation to the nature and scope of claims by smokers and in relation to the obligation of disclosure under English law (whether in litigation in England or pursuant to letters of request) or giving legal advice directed specifically to the preparation or conduct of proceedings, whether existing or in contemplation. He said that his advice included the preparation of a defence strategy known as a "defence package", to be used if his clients became involved directly or indirectly in litigation of the type envisaged. On this basis he said that all communications between himself and the BAT companies were privileged.

[27]  Miss Dohmann QC, who appeared for BATCo in the court below, told the judge that it was virtually unprecedented for one party to litigation to seek to call evidence under compulsion from an opposing party's solicitor. The judge accepted that this was probably correct, because every lawyer is well aware of the rules relating to privilege and is inclined to assume that all communications made by and to a lawyer and all information obtained by him when acting for his client are privileged. He commented, however, that recent decisions in the Commercial Court and in the Court of Appeal make it clear that the court is not bound by the lawyer's own assessment of the position, and that it may be necessary to adopt a rather more critical approach to the question than has hitherto been the case. He therefore found himself obliged to refer to a little more of the evidence of the circumstances in which Lovells came to act for the BAT group, and the nature of the advice and assistance they were asked to give.

[28]  BATCo relied on evidence from its current senior litigation counsel, Mr Martyn Gilbey. He said that Lovells' advice was sought by BATCo and BAT (UK & Export) Ltd in November 1985 in relation to a review of its documents that was being put in hand in anticipation of litigation and of the need to give discovery. That was in part because Brown & Williamson had been involved in tobacco litigation in the United States. BATCo had decided to instruct solicitors to advise it about the nature and scope of its potential liability in relation to claims by smokers, and how it might best defend itself against them.

[29]  Mr Gilbey said that in carrying out those instructions Mr Foyle and his team collected, collated, reviewed and analysed many thousands of BATCo research documents to evaluate their relevance to claims that might be made by smokers. Mr Foyle also drafted reports, memoranda and analyses which set out his personal views on those matters, and advised BATCo on how it might best defend itself against such claims. The review of the Research & Development ("R & D") files which became known as "Project Discovery, Phase I" was conducted between 1986 and 1989. The main purpose of this exercise was to identify those of the files that had been brought into existence before the end of 1986 which were likely to contain documents that would be disclosable in smoking and health litigation.

[30]  Project Discovery, Phase II was carried out in a similar way. On this occasion, attention was concentrated on R & D files that had been created from the end of 1986 onwards, and files from other departments which dated back to 1954. Mr Foyle was involved in planning Phase II, but he ceased to be involved in its execution in May 1994 when he left to work in Hong Kong.

[31]  Mr Gilbey's account of these matters was reflected in some of the documents exhibited to the letter of request. The request itself set out at some length the United States' allegations relating to the document management policy on which it wished to obtain Mr Foyle's evidence, and a number of documents were exhibited in support. They included a memorandum dated 10 September 1985 written by Mr Cannar and another member of BATCo's legal department setting out the course of action to be taken in response to the risk, as they saw it, that orders for discovery of documents produced by the R & D department would be made against Brown & Williamson in proceedings then pending in the United States.

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

**[32]**  Although at that time no proceedings had been commenced or threatened against any members of the group outside the United States, it was apparent from that memorandum that Mr Cannar was concerned that documents held by the R & D department were likely to be relevant to any product liability actions begun in Europe or elsewhere. According to the memorandum there had never been a full review of the department's files, and he therefore considered it important to put such a review in hand at once with a view to assessing their contents. In order to review the documents from a European perspective Mr Cannar proposed to instruct a firm of solicitors to provide advice and additional manpower. The firm he instructed was Lovells and the partner who dealt with the matter was Mr Foyle.

**[33]**  Another document exhibited to the letter of request was a note of a meeting between Lovells and members of the BATCo legal department on 15 May 1986. It is headed "Privileged and Confidential", but it was later disclosed in proceedings between the State of Minnesota and various tobacco companies including BATCo ("the Minnesota action", for which see para 51 below). The purpose of that meeting was to discuss the form of the discovery exercise, the steps necessary to begin the document review, and the preparation of the "defence package" (see para 26 above).

**[34]**  The nature of the exercise that BATCo was seeking to carry out is described in the note of the meeting. Mr Cannar wanted BATCo to be able to respond to orders for discovery or interrogatories to the same extent as Brown & Williamson, whose documents had already been reviewed by its American lawyers. It appears that he appreciated that that might well require a more extensive exercise than would have been necessary for the purposes of complying with similar orders in England or other European jurisdictions. As a first step, therefore, it was proposed that Mr Foyle should meet the American lawyers to find out how they had gone about their document review. The question of destruction of documents arose, and according to the note it was decided that no destruction policy should be adopted. There would, however, be a "spring clean"
> "which could involve the destruction of documents such as previous drafts."

**[35]**  It was agreed that the legal department would circulate a note to the R & D department along lines to be suggested by Lovells. This note would instruct people to tidy up their files and loose documents, including documents held outside the official filing systems. Lovells would then co-ordinate the systematic copying of the files for review by lawyers with the assistance of scientists, where necessary. Mr Foyle described the organisation and structure of the team he thought would be necessary to carry out an exercise of that kind efficiently. It was agreed that the creation of the "defence package" should be postponed.

**[36]**  Towards the end of the meeting on 15 May 1986 BATCo asked Lovells to advise it on the ways in which an American plaintiff could obtain disclosure of documents in this country, how BATCo might delay or resist any applications for disclosure, and what the consequences of doing so might be. It seems that Lovells may have already given some advice in that area, but that it had not given advice on tactical questions. One exercise on which Lovells appear to have already carried out quite a lot of work was a description of the structure of the R & D department. This was intended to assist in identifying where documents might be kept.

**[37]**  The next document exhibited to the letter of request was a letter from Mr Foyle to Mr Thornton at the R & D centre at Southampton dated 21 March 1988 on the subject of Buerger's disease, an illness said to be related to smoking. In the last paragraph of that letter Mr Foyle reminded Mr Thornton that contact between the scientists employed by different tobacco companies should be routed through their lawyers to ensure that privilege in the communications was not lost. He also told him to ensure that any internal memoranda written on Buerger's disease in relation to the current investigations should be marked "Privileged and Confidential."

**[38]**  The judge found these last two documents particularly informative, both because they provided a contemporaneous insight into the nature of the advice and assistance being provided to BATCo by Lovells at an early stage in their relationship, and also because they shed light on BATCo's assessment of the likely development of tobacco-related litigation in the United States and elsewhere.

**[39]**  The judge was told, as a result of enquiries made by Mr Gilbey during the hearing, that Brown & Williamson

was a party to the first tobacco claim made in the United States in March 1954. That action was dismissed later the same year. By the end of 1985 over 200 smoking and health actions had been brought against tobacco companies in the United States, of which about a quarter had been started in that year alone. Most of them had been dismissed, but over 70 actions were still pending. By the middle of 1986 there were 120 actions pending, including 20 in Texas involving Brown & Williamson.

*8 LEGAL ADVICE PRIVILEGE: THE JUDGE'S ANALYSIS*

**[40]**  The judge started his analysis of the law by considering what is usually called "legal advice" privilege. He defined this as the privilege that attaches to confidential communications between lawyer and client for the purposes of obtaining legal advice. He reminded himself that this ground of privilege had recently been considered by the Court of Appeal in *Three Rivers District Council v Bank of England (No 5)* [2003] EWCA Civ 474; [2003] QB 1556, [2003] 3 WLR 667. The question for the court in that case was whether privilege attached to certain documents brought into being by the Bank of England in connection with the Bingham Inquiry into the collapse of BCCI.

**[41]**  Four classes of documents arose for consideration: documents prepared by Bank employees with the intention that they should be sent to the Bank's solicitors and which had in fact been sent to them; documents that were said to have been prepared with the dominant purpose of obtaining legal advice, but which had not been sent to the solicitors; documents prepared otherwise than for the dominant purpose of obtaining legal advice but which had been sent to the solicitors; and documents in all those categories that had been prepared by Bank employees who were no longer employed by the Bank. This court held that legal advice privilege was restricted to communications passing between the client and his legal advisers for the purpose of requesting and communicating legal advice, documents evidencing such communications, and documents intended to be such communications. It therefore held that none of the categories of documents with which it was concerned was privileged.

**[42]**  The judge said that the precise ambit of what constituted legal advice for these purposes had been considered by Tomlinson J in a further application for disclosure in *Three Rivers District Council v Bank of England* [2003] EWHC 2565 (Comm). Following the Court of Appeal's judgment on the previous application the claimants had sought disclosure of documents passing between the Bank and the solicitors advising it in connection with the Bingham Inquiry which they had previously accepted were privileged. The application was made on the basis that many of those communications were concerned not with seeking or giving legal advice but with the manner in which the Bank's evidence should be presented to the Inquiry. Tomlinson J considered paras 32-37 of the earlier judgment, in which this court had considered the purpose for which the documents in question had been prepared, and concluded that communications between client and solicitor were privileged only if they were made for the dominant purpose of obtaining and communicating legal advice in the narrow sense of advice about the client's rights and obligations. The judge said that he agreed with that conclusion.

**[43]**  He said that it followed from these decisions that before legal advice privilege could be claimed in respect of any communication, three conditions must be satisfied:

> (i) the communication must pass between the lawyer and his client;

> (ii) it must be confidential; and

> (iii) it must be for the dominant purpose of obtaining or giving legal advice, that is, advice about the client's rights and obligations.

**[44]**  He added that this court had made it clear that the solicitor's own assertion that the dominant purpose of a particular communication was the obtaining of legal advice is not conclusive. This was a matter for the court to determine on the basis of the whole of the evidence before it: see per Longmore LJ at para 35. Miss Dohmann had reminded him of the observation made by Taylor LJ in *Balabel v Air India* [1988] Ch 317, [1988] 2 All ER 246, 330 about the "continuum of communications" (to which this court itself referred in the *Three Rivers* case) in support of

her submission that the privilege should not be unduly restricted. The judge said that he accepted that nothing said by this court in the *Three Rivers* case could be read as detracting from what was said in *Balabel v Air India*, and that the court should be careful not to allow incursions into what should properly be viewed as a continuous sequence of communications made for the dominant purpose of obtaining legal advice. However, in his view the decisions in the *Three Rivers* case highlighted the fact that it was necessary to approach a claim of legal advice privilege in a rather more critical manner than had perhaps been the case in the past.

**[45]**  He said that in the present case the evidence strongly suggested that many of the communications between Mr Foyle and BATCo were protected by legal advice privilege. He cited as examples communications between Mr Foyle and Mr Cannar concerning the law relating to the disclosure and inspection of documents and the law relating to privilege and to related matters, and their application to the particular circumstances of the BAT group. He said that these would on the face of it all fall within the scope of legal advice privilege, as Mr MacLean quite properly recognised. He added, however, that the evidence also suggested that Mr Foyle and his team from Lovells might have given advice and assistance on matters such as the organisation and implementation of the review of documents which less clearly fell within its scope. Moreover, without knowing the identity of the person with whom Mr Foyle communicated in any given case, it was impossible to say whether that person was properly to be regarded as his client for these purposes. Similarly, without further information about the general nature of a communication or the context in which it occurred, it was not possible to determine whether it was made for the dominant purpose of giving legal advice. He said that matters of that kind should be easier to decide in the context of specific questions.

**[46]**  In order to succeed in resisting the whole of the United States' application on this ground it would be necessary for BATCo to show that its assertion of legal advice privilege would prevent Mr Foyle from answering *any* question of substance about its document management policies or procedures. The judge said that this was not so clearly the case as to justify refusing to make an order for his examination.

*9 LITIGATION PRIVILEGE: THE JUDGE'S ANALYSIS*

**[47]**  The judge turned next to the question of litigation privilege. Miss Dohmann had submitted that all communications passing between Mr Foyle and employees of the BAT group (or indeed anyone else) relating to tobacco litigation were covered by litigation privilege. The judge said that in this case two requirements must be satisfied:

> (i) the communication must be confidential; and

> (ii) it must have been made for the dominant purpose of conducting or giving advice in relation to litigation, either pending or in contemplation.

**[48]**  Miss Dohmann and Mr Hapgood QC (who appeared for BATCo and Mr Foyle in the court below) had argued that all the communications between Mr Foyle and BATCo (and indeed other companies in the group) were confidential and were made in contemplation of litigation. Mr MacLean submitted, however, that when Lovells were first instructed, and indeed for much of the period during which Mr Foyle was advising BATCo, no litigation had been commenced against it or even threatened. The judge said that he therefore had to decide the extent to which litigation must be in contemplation in order to claim privilege in respect of confidential communications.

**[49]**  The leading authority on litigation privilege is *Waugh v British Railways Board* [1980] AC 521, [1979] 2 All ER 1169. The House of Lords was not directly concerned in that case with the likelihood of litigation, but Lord Simon of Glaisdale and Lord Edmund Davies referred with approval to a passage in the judgment of Barwick CJ in the High Court of Australia in *Grant v Down*s (1976) 135 CR 674 in which he referred to documents produced at a time when litigation was "in reasonable prospect". In the later case of *Re Highgrade Traders* [1984] BCLC 151 this court, after considering a number of earlier authorities, held that litigation privilege might be claimed in respect of documents brought into being at a time when litigation was reasonably in prospect: see per Oliver LJ at p 172. The judge said that that test had been applied in many subsequent cases.

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

**[50]**  He saw little reason to doubt that by 1985 the increasing volume of tobacco litigation in the United States, coupled with the fact that a significant number of claims were being made against Brown & Williamson, had alerted BATCo to the need to consider its own position. The documents described in paras 31-37 of this judgment, together with the evidence of Mr Gilbey, showed that BATCo was aware that it might be required to disclose documents generated by the group's R & D department in litigation against Brown & Williamson in the United States, and that in due course similar claims might be made against BATCo itself or other companies in the group, whether in the United States or elsewhere. (BATCo had in fact been joined in one action in Chicago in 1969 but had been dismissed as a defendant at an early stage.)

**[51]**  In the event those fears were justified, although litigation against BATCo did not begin until some years later. In August 1994 BATCo was made a party to the Minnesota action, and in 1996 it was made a party to similar proceedings in Oklahoma and Washington. The Minnesota action was finally settled in May 1998 on terms which included giving public access to a large number of documents disclosed during the course of the proceedings. The present action in Washington DC was started in September 1999.

**[52]**  Despite the rising number of claims made against tobacco companies in the United States, however, the judge said that there was no evidence that any proceedings had been brought elsewhere against companies in the BAT group until the latter part of 1990. This was not a matter that was directly covered in the evidence filed on behalf of BATCo, but Eames J in the *McCabe* case referred briefly in his judgment (at paras 57-60) to four actions brought against WD & HO Wills Ltd, the predecessor of BATAS, in Australia between November 1990 and some time in 1999. Mrs McCabe started her action against BATAS in the Supreme Court of Victoria in October 2001.

**[53]**  BATCo had contended that in these circumstances all communications passing between Lovells and BATCo, and between Lovells and third parties, between late 1985 and May 1994 relating to the document review procedures were made for the dominant purpose of preparing for litigation already in contemplation and were therefore in principle subject to litigation privilege. The judge said that in relation to any given communication this depended primarily on whether litigation was reasonably in prospect at the time in question. Issues relating to its dominant purpose might also arise. BATCo's contention was that litigation was indeed reasonably in prospect throughout the period of Mr Foyle's involvement, both because it could expect to be sued itself in America and elsewhere before long, and because it could expect that applications for disclosure would be made against it in proceedings to which it was not itself a party.

**[54]**  The judge said that it had been recognised on many occasions that there was a conflict between the need to enable clients to communicate freely with their legal advisers in relation to litigation and the need to ensure that all relevant material was before the court. He cited in this context Lord Wilberforce in *Waugh v British Railways Board* at pp 531-532 and Lord Simon of Glaisdale at pp 535-537. The point at which litigation should be regarded as sufficiently likely for confidential communications between client and his lawyer to attract privilege on this ground therefore involved striking an appropriate balance between these two factors. The requirement that litigation be "reasonably in prospect" was not in his view satisfied unless the party seeking to claim privilege could show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility.

**[55]**  The judge said he was unable to accept that litigation against BATCo itself was reasonably in prospect in 1985 and 1986 when Lovells were first instructed. He quite accepted that at that time Mr Cannar had thought it a distinct possibility that sooner or later someone might make a claim against BATCo for smoking-related illness, if only because the burgeoning litigation in the United States could be expected to provide an example to claimants in other countries. At that stage, however, no claim had been made or even threatened. The fact that Mr Cannar considered it desirable for BATCo to put its house in order because of a general apprehension of future litigation was not in the judge's view sufficient to entitle it to claim litigation privilege in respect of communications made for that purpose. As time went on, of course, the position changed, but it was sufficient for present purposes to say that he was not persuaded that *all* communications which Mr Foyle might be asked to disclose in the course of the proposed examination were inevitably privileged on this ground.

**[56]**  The judge added that it was clear from the authorities that the justification for litigation privilege lay in the adversarial nature of legal proceedings: see *In re L (a Minor) (Police Investigation: Privilege)* [1997] AC 16, [1996] 2 All ER 78. An application by one party to legal proceedings against a person who was not a party to those proceedings to compel him to give evidence or to produce documents was in his view essentially adversarial in nature. It followed that confidential communications between a solicitor and his client or a third party for the dominant purpose of considering, preparing or conducting a defence to such an application were covered by litigation privilege.

**[57]**  It did not necessarily follow, however, that all communications relating to an application of that kind necessarily fell to be treated in the same way. The fact that disclosure was required for the purposes of litigation between third parties would not of itself be sufficient in his view to attract litigation privilege. What was required was that the communications be made for the preparation or conduct of litigation involving the solicitor's own client. Accordingly, practical advice about the best way of complying with an order for disclosure once it had been made might well not be covered by litigation privilege. Again, the judge thought that issues of that kind were better addressed in the context of specific questions as and when they were put to the witness. In the present case the United States wished to question Mr Foyle about steps taken by BATCo to review and organise its documents. Some communications on that subject might be privileged, but others might not. It was sufficient for present purposes that BATCo had not satisfied him that it would be pointless to make an order for the examination of Mr Foyle because he could properly refuse to answer any question of substance on the grounds of litigation privilege.

*10 OPPRESSION: THE JUDGE'S APPROACH*

**[58]**  The judge dealt quite briefly with Mr Foyle's contention that it would be oppressive to submit him to questioning of this kind. Given that he had now been granted immunity from prosecution, and the fact that the United States had offered an undertaking not to pursue civil proceedings against him or Lovells, the judge considered that any remaining risk of oppression could be adequately countered by his giving appropriate directions for the conduct of the examination. I have mentioned some of his directions in para 20 above. The judge also directed that in all the circumstances it was appropriate to direct that the examination be conducted by English counsel before a judge of the Commercial Court. The examination has now been fixed to commence, subject to the outcome of this appeal, on 26 April 2004.

*11 THE APPEAL: LITIGATION PRIVILEGE*

**[59]**  It is convenient to consider this aspect of the appeal first. I have summarised in paras 47 to 57 of this judgment the judge's approach to this issue. Its importance lies in the fact that the scope of legal advice privilege is restricted to communications passing between the lawyer and his client, whereas documents emanating from third parties may attract litigation privilege. This distinction is most clearly drawn in the judgments in this court in *Wheeler v Le Marchant* 17 Ch D 675, 45 JP 728. Privilege was denied to a communication from a surveyor to a solicitor which had come into existence when the latter had wished to ascertain further facts before giving his client the advice he sought in some non-contentious matter. Sir George Jessel MR defined the scope of litigation privilege in relation to documents containing information required or asked for by solicitors in these terms (at p 681):

> "The cases, no doubt, establish that such documents are protected where they have come into existence after litigation, either for the purpose of obtaining advice as to such litigation, or of obtaining evidence to be used in such litigation, or of obtaining information which might lead to the obtaining of such evidence; but it has never hitherto been decided that documents are protected merely because they are produced by a third party in answer to an inquiry made by the solicitor."

**[60]**  In the same case Cotton LJ rationalised the position in these terms (at pp 684-5):

> "Hitherto such communications have only been protected when they have been in contemplation of some litigation, or for the purpose of giving advice or obtaining evidence with reference to it. And that is reasonable, because then the solicitor is preparing for the defence or for bringing the action, and all the communications he makes for that purpose, and the communications made to him for the purpose of giving him the information, are, in fact, the brief in the action, and ought to be protected."

**[61]**  In *Wheeler v Le Marchant* all three members of the court used the expression "contemplated" or "in contemplation" when speaking of litigation which was not actually pending. The Master of the Rolls also used the

word "threatened". In *Collins v London General Omnibus Company* (1893) 68 LT NS 831 Wills J and Charles J adopted a very narrow approach, the former postulating circumstances being such that "no reasonable person could doubt that an action would follow", and the latter defining a case in which litigation was reasonably apprehended as being one "when there is a high probability, amounting to certainty, that an action will ensue". Later authority adopted a rather less restrictive approach.

**[62]**  In *Jarman v Lambert & Cooke Contractors Ltd* [1951] 2 KB 937, [1951] 2 All ER 255 this court was concerned with the interpretation of s 1(3) of the Evidence Act 1938. This sub-section restricted the general admissibility of written evidence permitted by s 1(1) by providing that

> "Nothing in this section shall render admissible as evidence any statement made by a person interested at a time when proceedings were pending or anticipated involving a dispute as to any fact which the statement might tend to establish."

**[63]**  Denning LJ observed at p 946 that the words "pending" or "anticipated" were the words habitually used in connection with legal professional privilege. He added:

> "The privilege only obtains if litigation is 'pending or anticipated', and in that connection it is well settled that a mere vague apprehension of litigation generally is not sufficient: see *The Annual Practice* (1950) p 499."

**[64]**  In *Waugh v British Railways Board* [1980] AC 521argument centred on the status of an internal report prepared by two of the Board's officers two days after a collision involving the death of a locomotive driver (whose widow brought the action). Lord Wilberforce said at p 536 that the report undoubtedly contained material collected by or on behalf of the Board for the use of their solicitors in anticipated litigation, but the House of Lords ruled that because it could not be shown that this was its dominant purpose the document did not attract litigation privilege. Lord Edmund-Davies, for his part, cited at pp 541-2 a passage in the Sixteenth Report of the Law Reform Committee (at para 17(a)) in which they had defined the scope of litigation privilege as covering communications between the client and third parties

> "for the purpose of obtaining information to be submitted to the client's professional legal advisers for the purpose of obtaining advice upon pending or contemplated litigation."

**[65]**  He said of this aspect of privilege from disclosure:

> "Litigation, apprehended or actual, is its hallmark. Referring to 'the rule which protects confidential communications from discovery as regards the other side', Sir George Jessel MR said in *Anderson v Bank of British Columbia* 2 Ch D 644, 649:
>
> 'The object and meaning of the rule is this: that as, by reason of the complexity and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have recourse to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enable properly to conduct his litigation. That is the meaning of the rule.'
>
> And in the Court of Appeal James LJ summed up the position, at p 656, by speaking succinctly of
>
> '. . . an intelligible principle, that as you have no right to see your adversary's brief, you have no right to see that which comes into existence merely as the materials for the brief.'
>
> Preparation with a view to litigation – pending or anticipated – being thus the essential purpose which protects a communication from disclosure in such cases as the present, what in the last resort is the touchstone of the privilege?"

**[66]**  Lord Wilberforce spoke of "anticipated litigation", and Lord Simon of Glaisdale (at p 535) of "apprehended litigation". In *Re Highgrade Traders Ltd* [1984] BCLC 151, a case concerned with reports commissioned following a fire at the company's business premises, Oliver LJ at p 172 used the expression "if litigation is reasonably in prospect". As Moore-Bick J said, this approach has often been adopted in later cases. In *Mitsubishi Electric Australia Pty Ltd v Victorian Work Cover Authority* [2002] VSCA 59 Batt JA conducted a valuable survey of English and Australian authority (at paras 16-19) from which he concluded that

> "as a general rule at least, there must be a real prospect of litigation as distinct from a mere possibility, but it does not have to be more likely than not."

This does not seem to be very far from Oliver LJ's formulation, although Batt JA did not cite it in his judgment.

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

**[67]**  On the appeal to this court Mr Howard contended that the judge had used the wrong test. Although he had purported to apply the test which involved examining whether litigation was reasonably in prospect (see para 42 of his judgment), he said at para 46:

> "The requirement that litigation be 'reasonably in prospect' is not in my view satisfied unless the party seeking to claim privilege can show that he was aware of circumstances which rendered litigation between himself and a particular person or class of persons a real likelihood rather than a mere possibility."

This, it was argued, was to set the hurdle too high.

**[68]**  For my part, I do not consider that the judge misdirected himself when this long passage of his judgment is read as a whole. Some concepts are difficult to express in words. It has, for example, been notoriously difficult to express in words the meaning of such concepts as "a real prospect of success": indeed, the draftsman of CPR Pt 54 included no criterion for the grant of permission to apply for judicial review because the whole topic of arguability is so fraught with difficulty. In the present case it is quite clear that the judge correctly considered that a "mere possibility" of litigation did not suffice. He was also correct to conclude that the fact that there was "a distinct possibility that sooner or later someone might make a claim" was insufficient. So was "a general apprehension of future litigation". He repeated three times that the appropriate test was that litigation must have been reasonably in prospect. The expression "real likelihood" seems to have been used as a counterpoise to "a mere possibility", and I do not consider that any more can properly be read into this phrase. The judge was certainly not saying that there must have been a greater than 50% chance of litigation.

**[69]**  In any event, I consider that it would be impossible to conclude that litigation against BATCo itself was reasonably in prospect when that company engaged Mr Foyle's services to advise it. The last time anyone had sued that company had been as long ago as 1969, and there had been no letters before action or other precursors of contentious litigation when Mr Foyle was advising it between 1986 and 1994. In his third witness statement the most that Mr Gilbey could say was that "it would be reasonable for BATCo to have anticipated that it might be made a defendant to litigation in the United States or elsewhere". This tentative assessment accords well with the contemporary view, expressed in a minute dated 26 February 1986, to the effect that litigation experts in the UK had been briefed concerning "possible" liability litigation against BATCo. Similarly, on 21 May 1986 there was a statement by a senior BATCo executive that he did not wish it to be seen that the company had only instituted a destruction policy when the possibility of their being involved in litigation became real.

**[70]**  My views on this matter are reinforced by the consideration that the exercise for which Lovells was retained had nothing to do with the preparation of the brief for a trial which is the traditional justification for litigation privilege (see, for example, Lord Simon of Glaisdale in *Waugh* at p 536). Its main objectives fall fairly and squarely within the traditional scope of legal advice privilege, although in the next main section of this judgment I will be considering the correctness (or otherwise) of the judge's view that it would be wrong to give blanket coverage on that ground for everything said and done in pursuance of Lovells' retainer.

**[71]**  The question whether a demand for the production of BATCo's documents in litigation against a sister company was reasonably in prospect in 1985-6 raises rather different considerations, as does the question whether litigation privilege would attach to any, and if so what, communications even if it did. The judge was clearly influenced by Lord Jauncey's description in *In re L (A Minor)* [1997] AC 16, 25 of litigation privilege as an essential component of adversarial procedure. Lord Jauncey said this in a case in which he was distinguishing ordinary adversarial procedure with the essentially non-adversarial character of care proceedings. This does not, however, mean that all adversarial proceedings are to be treated in the same way.

**[72]**  There is, in my judgment, a clear distinction to be made between adversarial proceedings (pending or contemplated) between two or more parties which are destined, in theory at any rate, for a contested hearing in a court or court-like body, and proceedings whereby a party may compel a non-party to produce relevant documents for the purposes of the main proceedings. The non-party may well wish to seek legal advice about his obligations in this regard, but all that will be in issue is whether he is or is not legally obliged to do what is required of him. In this context there is never any question of collecting evidence from third parties as part of the material for the brief in the

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

action, or of seeking information which might lead to the obtaining of such evidence (see paras 59, 60 and 65 above). If the non-party wishes to notify somebody else that it has received the application, and that other party may wish to take steps to assert a claim for confidentiality or privilege in the documents sought, it is difficult to see why litigation privilege should attach to that communication.

**[73]**  For these reasons, while the judge was correct in my judgment to categorise the letter of request process as adversarial, I do not consider that this fact alone would give rise to a sustainable claim for litigation privilege. It follows that while I accept the appellants' argument that the receipt of some form of letter of request in relation to Brown & Williamson litigation in the United States was reasonably in prospect when Mr Foyle was first instructed (not least because that corporation had made financial contributions to the R & D work conducted by BATCo in England, as Mr Cannar observed in his September 1985 minute), I do not consider that any question of litigation privilege arises as a result. Furthermore, I do not see any reason why this issue should be capable of being reopened as a matter of right at some later stage of the examination process. Of course a judge may always reconsider a finding he or she has made during the case-management handling of a case, but this would be not be appropriate in the present context unless, for instance, genuine new evidence emerged which an appeal court would have been willing to admit under conventional *Ladd v Marshall* principles.

*12 THE APPEAL: LEGAL PROFESSIONAL PRIVILEGE*

**[74]**  The scope of legal professional privilege has been pegged out in recent years in three judgments of this court and in one decision of the House of Lords, and it is not necessary for the purposes of this judgment to travel back beyond the first of these cases, decided in 1988, although we were shown all the relevant earlier caselaw mentioned in these decisions. It is convenient to begin with an extract from the speech of Lord Nicholls in *R (on the application of B) v Derby Magistrates' Court* [1996] AC 487, [1995] 4 All ER 526, 510:

> "Legal professional privilege is concerned with the interaction between two aspects of the public interest in the administration of justice. The public interest in the efficient working of the legal system requires that people should be able to obtain professional legal advice on their rights and liabilities and obligations. This is desirable for the orderly conduct of everyday affairs. Similarly, people should be able to seek legal advice and assistance in connection with the proper conduct of court proceedings. To this end communications between clients and lawyers must be uninhibited. But, in practice, candour cannot be expected if disclosure of the contents of communications between client and lawyer may be compelled, to a client's prejudice and contrary to his wishes. That is one aspect of the public interest. It takes the form of according to the client a right, or privilege as it is unhelpfully called, to withhold disclosure of the contents of client-lawyer communications. In the ordinary course the client has an interest in asserting this right, in so far as disclosure would or might prejudice him.
>
> The other aspect of the public interest is that all relevant material should be available to courts when deciding cases. Courts should not have to reach decisions in ignorance of the contents of documents or other material which, if disclosed, might prejudice him.
>
> All this is familiar ground, well traversed in many authorities over several centuries."

**[75]**  The leading modern authority on the practical application of these principles is still *Balabel v Air India* [1988] Ch 317. In that case Taylor LJ, who gave the leading judgment, considered two diverging lines of authority, and after citing the well-known passage in the judgment of Sir George Jessel MR in *Anderson v Bank of British Columbia* (see para 65 above) he said (at pp 330-331):

> "Although originally confined to advice regarding litigation, the privilege was extended to non-litigious business. Nevertheless, despite that extension, the purpose and scope of the privilege is still to enable legal advice to be sought and given in confidence. In my judgment, therefore, the test is whether the communication or other document was made confidentially for the purposes of legal advice. Those purposes have to be construed broadly. Privilege obviously attaches to a document conveying legal advice from a solicitor to client and to a specific request from the client for such advice. But it does not follow that all other communications between them lack privilege. In most solicitor and client relationships, especially where a transaction involves protracted dealings, advice may be required or appropriate on matters great or small at various stages. There will be a continuum of communication and meetings between the solicitor and client. The negotiations for a lease such as occurred in the present case are only one example. Where information is passed by the solicitor or client to the other as part of the continuum aimed at keeping both informed so that advice may be sought and given as required, privilege will attach. A letter from the client containing information may end with such words as 'please

advise me what I should do'. But, even if it does not, there will usually be implied in the relationship an overall expectation that the solicitor will at each stage, whether asked specifically or not, tender appropriate advice. Moreover legal advice is not confined to telling the client the law; it must include advice as to what should prudently and sensible be done in the relevant legal context.

It may be that applying this test to any series of communications might isolate occasional letters or notes which could not be said to enjoy privilege. But to be disclosable such documents must be not only privilege-free but also material and relevant. Usually a letter which does no more than acknowledge receipt of a document or suggest a date for a meeting will be irrelevant and so non-disclosable. In effect therefore, the 'purpose of legal advice' test will result in most communications between solicitor and client in, for example, a conveyancing transaction being exempt from disclosure, either because they are privileged or because they are immaterial or irrelevant."

[76]  A little later (at pp 331-2) he said that the scope of the privilege had to be kept within justifiable bounds. He stated, in relation to documents recording information or transactions (with or without instructions) or recording meetings

"[W]hether such documents are privileged or not must depend on whether they are part of that necessary exchange of information of which the object is the giving of legal advice as and when appropriate."

[77]  In my recitation of Moore-Bick J's approach to the matters now under appeal I included (at paras 40-41 above) his summary of the effect of the decision of this court in *Three Rivers District Council v Bank of England (No 5)* [2003] EWCA Civ 474; [2003] QB 1556, and I need not repeat that here. It is sufficient to say that the court excluded from the scope of privilege all documents which had not actually been sent to the Bank's solicitors with the dominant purpose of obtaining legal advice.

[78]  In *Three Rivers District Council v Bank of England (No 10)* [2004] EWCA Civ 218 this court was concerned with the defendant's appeal from the judgment of Tomlinson J which Moore-Bick J considered in his judgment. The topic under consideration related to communications which came into being in connection with Bingham's LJ non-statutory inquiry into the collapse of BCCI. The court rejected the Bank's claim for privilege in relation to its communications with the solicitors who were assisting in the obtaining, preparation and presentation of evidence and submissions to the Inquiry, unless they were sent in the context of seeking specific legal advice.

[79]  Mr Howard submitted that this decision (and in particular para 28 of the court's judgment) endorsed his contention that the court should identify the dominant purpose of a solicitor's retainer (or his "dominant role"), and that if this related to the giving of legal advice, that was conclusive of the matter however long the retainer remained in being. I do not accept this submission. If part of the solicitor's duties embrace the giving of legal advice on his client's rights, liabilities and obligations, and a further significant part of his duties relate to activities which cannot be so characterised, then the two recent decisions of this court in the *Three Rivers* cases show that it is too simplistic to refer simply to the dominant purpose of the original retainer, or to try and identify the dominant purpose of a role assumed over a number of years, involving the solicitor in many different activities.

[80]  While it would be wrong for this court, not being apprised of the detail, to express any views on any particular disputed item, there is obvious force in the general thrust of Mr MacLean's submission that advice or assistance in collecting and collating, listing, spring-cleaning, storing, transporting and warehousing documents does not amount to legal advice concerning BATCo's legal rights and obligations and is not the sort of assistance that requires any knowledge of the law.

[81]  In the course of his submissions Mr Howard maintained that *Balabel* was still binding on this court, and that when the judge said that he felt it necessary to approach a claim of legal advice privilege in a rather more critical manner than had perhaps been the case in the past (see para 44 above) he had been wrong to do so if these words were interpreted as watering down in any way what Taylor LJ said in *Balabel*. I do not understand this to have been the judge's intention. He was simply concerned to deny blanket approval to a claim for privilege in relation to all communications passing between Mr Foyle and anyone in the BATCo organisation (or outside it) over a nine-year period, and in my judgment he was right to do so. The judgment in *Balabel* pegs out the ground rules, and the procedure the judge selected will give him the chance of expressing a view on the proposed lines of questioning at the forthcoming directions hearing, and will then leave it to the examining judge to exercise further control over individual questions. It will also provide an opportunity to identify more precisely the person or people

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

who should be treated as Mr Foyle's clients to whom he was furnishing legal advice on their rights, liabilities and obligations.

[82]  The decision of this court in *Three Rivers (No 10)* shows that if in the course of many communications passing between a firm of solicitors and their clients' representatives there are some letters which were written for the dominant purpose of seeking legal advice, this does not itself confer privilege on the entire correspondence. In *Balabel* Taylor LJ spoke on the one hand of the continuum of communication and meetings between solicitor and client with the aim of keeping both informed so that advice may be sought and given as required. On the other hand, however, he identified "the necessary exchange of information of which the object is the giving of legal advice as and when appropriate" as distinguishable from the contents of the type of document he mentioned on pp 331-2 of his judgment.

[83]  In my judgment the judge was correct in the way he decided to police the furtherance of the letter of request. If I were satisfied that he had failed to take into account the fact that legal professional privilege is a fundamental human right (*Morgan Grenfell v Special Commissioner of Income Tax* [2003] UKHL 21 at [7]; [2003] 1 AC 563, [2002] 3 All ER 1), then of course it would be open to this court to interfere with the judge's decision, but I can see no fault in the way the judge approached the question.

*13 OPPRESSION AND A FAIR BALANCE*

[84]  Mr Hollander, for his part, argued that to submit Mr Foyle to an inquisition of this kind, ranging over the history of events between 10 and 20 years ago, would be unduly oppressive, and the judge had been clearly wrong in the way he had sought to strike a fair balance between the interests of the requesting court and the interests of the witness (see Lord Woolf MR in the *Minnesota* letter of request case, para 18 above). He said that this point was particularly important because of the way in which the ground rules had shifted between the time the United States first sought the letters of request from the District Court (see para 11 above) and the time when Mr MacLean made his concessions to the judge (see para 19 above).

[85]  It was pointed out to us that although Judge Kessler struck out the offending preamble to the original letter of request (see para 11 above), the main thrust of that document remained unaltered. Mr Howard argued that once Mr MacLean had made his concessions, the court should have declined the invitation in the letter of request, so that Judge Kessler could have the opportunity, if approached, of considering the matter afresh now that all the insinuations of crime-fraud had been withdrawn.

[86]  Although this would have been a possible course to take, it would have been productive of further delay at a time when the trial date was approaching, and I do not consider that the judge went outside the ambit of discretion available to him when he decided to act on the request as it stood rather than sending the whole process back to start all over again.

[87]  The case that the judge did not strike a fair balance, so that he wrongly exposed Mr Foyle to the prospect of an unduly oppressive examination, was vividly encapsulated in BATCo's final written submission:
> "How, it may be asked, is the issue of whether a particular question can or cannot be answered due to privilege actually to be resolved, either at the directions hearing, or at the examination? How, for example, is Mr Foyle supposed to explain to the Court why *he* thinks he cannot answer a particular question, once he genuinely forms that view, without himself revealing the content of his answer in the presence of BATCo's litigation adversaries? How, further, is BATCo to know whether it can properly raise a valid privilege objection to Mr Foyle answering any particular question, without first knowing in advance what his answer is?"

And so on.

[88]  I do not accept that the situation is as clearcut as is suggested here. There are likely to be areas which are quite plainly covered by legal advice privilege. There will be other areas which quite plainly are not. In the debatable areas the judge, at the restored directions hearing, and the judge-examiner will both have to proceed with care. But this is no good reason why the whole enterprise should be called off now. It must be remembered that it is the duty

United States of America v Philip Morris Inc and others [2004] EWCA Civ 330

and pleasure of the English court to respond positively to a letter of request if it can. It is also in the public interest that a court (on either side of the Atlantic) should have all relevant material available to it when it decides a case, let alone a case as important as this one, unless it is clear even at this early stage that the overwhelming majority of relevant questions will be successfully resisted on the grounds of legal advice privilege. This, in my judgment, cannot be said in this case.

[89]  For these reasons I would dismiss these appeals.

**CHADWICK LJ:**

[90]  I agree.

**BAKER LJ:**

[91]  I also agree.

Appeals dismissed.

---

End of Document