# EXHIBIT 37



Neutral Citation Number: [2023] EWCA Civ 223

Case No: CA-2023-000292

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**
**MR JUSTICE MURRAY**
**[2023] EWHC 262 (KB)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 01/03/2023

**Before:**

**SIR GEOFFREY VOS, MASTER OF THE ROLLS**
**LADY JUSTICE CARR**
and
**LORD JUSTICE WARBY**

**Between:**

**WALTER TZVI SORIANO**

**Claimant/Appellant**

**- and –**

**(1) FORENSIC NEWS LLC**
**(2) SCOTT STEDMAN**

**Defendants/Respondents**

**(3) ERIC LEVAI**

**Defendant**

**Andrew Fulton KC** (instructed by **Rechtschaffen Law**) for the
**claimant/appellant** (Mr Soriano)

**Lord Falconer of Thoroton KC** (instructed by **Gibson, Dunn &**
**Crutcher UK LLP**) for the **respondents** (the defendants)

Hearing date: 21 February 2023
- - - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**SIR GEOFFREY VOS MR, LADY JUSTICE CARR, and LORD**

**JUSTICE WARBY:**

Introduction

1. This case has been brought on quickly as a rolled-up hearing for permission to appeal and, if permission is granted, the substantive hearing of that appeal. It raises one important issue as to this court's proper approach to defendants, who seek to use foreign court procedures to gather evidence to support their defence to litigation here. This is a defamation case, but it is for consideration whether the same principles apply to all types of litigation.

2. Mr Soriano, an Anglo-Israeli claimant, has sued the two US based defendants claiming that they libelled Mr Soriano in 8 online publications (the publications). The defendants contested the jurisdiction of the English court, but Jay J and the Court of Appeal ([2021] EWCA Civ 1952) held that Mr Soriano had shown that the English court was clearly the most suitable forum in which to bring the claim (see section 9 of the Defamation Act 2013).

3. The defendants filed a defence to Mr Soriano's claim on 22 March 2022, but disclosure has not yet occurred. This hearing was urgent because a preliminary hearing was fixed for 2 and 3 March 2023 to determine the meaning of the words complained of and to deal with Mr Soriano's application to strike out the defence contending that what was said was true and in the public interest.

4. In the build up to the preliminary hearing, the defendants applied to the District Court for the Southern District of New York (the DCSDNY) on 6 December 2022 for an order requiring HSBC Bank USA NA (HSBC USA) to produce two very broad categories of banking documents relating to Mr Soriano's companies in reliance on 28 USC §1782 (the 1782 application). That is a provision allowing a US court to provide assistance to an applicant in gathering evidence in support of legal proceedings in a foreign court. It provides that: "[t]he district court … may order [a person] to … produce a document or other thing for use in a proceeding in a foreign … tribunal", and "[t]he order may be made … upon the application of any interested person".

5. Once Mr Soriano had found out about the 1782 application: (i) he applied on 19 January 2023 in this jurisdiction for an anti-suit injunction on the grounds that it was vexatious, oppressive and unconscionable and would interfere with the efficient conduct of these proceedings, and (ii) on 20 January 2023, he sought to intervene before the DCSDNY in the 1782 application.

6.    Murray J (the judge) dismissed Mr Soriano's application for an anti-suit injunction on 9 February 2023. He held, in essence, that the defendants were not guilty of "conduct which [was] oppressive or vexatious or which [interfered] with the due process of the court" (in reliance on Lord Brandon at page 41C-D in *South Carolina Insurance Co v. Assurantie Maatschappij "De Zeven Provincien" NV* [1987] 1 AC 24 (*South Carolina*)).

7.    Mr Soriano raised five grounds of appeal. He contended that the 1782 application:

   i)      Was an inherently abusive fishing expedition which sought to circumvent English disclosure rules in general and *Yorkshire Provident Life Assurance Co v. Gilbert* [1895] 2 QB 148 (*Yorkshire Provident*) in particular. Lindley LJ had held at page 152 in *Yorkshire Provident* that the defendant to a libel action was only entitled to discovery "of all matters relating to the questions in issue as narrowed by the particulars" (the abusive ground).

   ii)     Involved abusive re-litigation in the DCSDNY of an issue already decided against the defendants in relation to jurisdiction, namely whether Mr Soriano was engaging in "libel tourism" (the libel tourism ground).

   iii)    Was vexatious and oppressive insofar as it caused the parties to run up costs when a substantial costs award was overdue from the defendants to Mr Soriano (the costs ground).

   iv)     Was an interference with due process in this jurisdiction as a matter of fact (the due process ground).

   v)      Should have allowed the judge to provide "helpful instructions" to the DCSDNY (as referred to in *Bankers Trust International Plc v. PT Dharmala Sakti Sejahtera* [1996] CLC 252 (*Bankers Trust*) at page 273) to the effect that the nature and scope of what was sought by way of discovery was oppressive (the helpful instructions ground).

8.    At the end of Mr Soriano's opening argument, we indicated that, subject to further argument, we were minded to grant permission to appeal on all grounds except the libel tourism ground. We confirm that indication in this judgment.

9.    Mr Andrew Fulton KC, leading counsel for Mr Soriano, argued orally that the cardinal principle was that English law regarded it as wrong for a libel defendant to be given the opportunity to scour the books and records of the person he has defamed before particularising a defence. The order sought from the DCSDNY was too broad and sought oppressively to penetrate a confidential banker customer

relationship. This was a case just like *Yorkshire Provident*, where A.L. Smith LJ had said at page 155 that "the defendants want … to go roving through the whole of the [claimant's] books to find out something if they can". As Lindley LJ said also in that case at page 152: "it would be a very bad precedent to suggest that a person can simply by libelling another obtain access to all his books and see whether he can justify what he has said or not". The defendants support the judge's decision.

10.    For the reasons that appear below, we have decided to dismiss the appeal. In the broadest outline, the principles applicable to a 1782 application made by a defendant to English proceedings were clearly stated in *South Carolina*, where Lord Brandon explained at page 40D that the court could grant an injunction restraining foreign proceedings where "one party to an action has behaved, or threatens to behave, in a manner which is unconscionable". Lord Brandon did not, however, (at page 42) think that the defendants had so behaved, nor did he think that they had in any way departed from, or interfered with, the procedure of the English court "by seeking to exercise a right potentially available to them under the Federal law of the United States". All they had done was "what any party preparing his case in the High Court here [was] entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case". It seems to us that the judge was entitled to reach the same conclusion here. The principles applicable to libel proceedings in this context are no different from those applicable to other civil proceedings; of course, the burden of proving truth is on the defendant in a libel action, but that should not mean that the defendant is disabled from evidence gathering in any lawful manner. The apparently undesirable breadth of the order sought is a matter for the DCSDNY applying its own principles. It will, however, realise from this judgment that such a broad order would be unlikely to be granted here.

11.    We shall now proceed to provide a brief summary of the factual background and of the judge's reasoning, before addressing each of the 5 grounds of appeal in turn.

Factual background

12.    Mr Soriano's business interests include involvement with a company called USG Security Limited (USG).  The first defendant (founded by the second defendant) is a Californian company which operates an online news platform.

13.    Mr Soriano's case, in summary, is that the publications alleged that he was guilty of corrupt dealings: (a) with the Russian state in connection with security at Sochi airport at the time of the 2014 Olympics, (b) with the Israeli President, Benjamin Netanyahu, and

(c) in Monaco. They also alleged that Mr Soriano was guilty of multiple homicide, of money laundering, and of being the middleman for a network of illegal Israeli hackers. The publications further alleged that there were grounds for thinking that Mr Soriano was involved in a conspiracy to interfere with the 2016 US presidential election, involved with the Russian mafia, and in the embezzlement of Russian state funds.

14.    The defendants rely, amongst other things, on substantive defences of truth and public interest. The meanings defended as true include that there are "grounds to investigate whether the relationship between the [c]laimant and his firm [USG] on the one hand and Deripaska-Sberbank LLC on the other, in respect of services provided to Sochi Airport involved any corrupt payments", and that there are "grounds to investigate whether the [c]laimant had knowledge of improper foreign interference into US politics". These meanings do not, as is obvious, cover the whole subject-area of Mr Soriano's claims nor do they reach the same level of gravity as the meanings which Mr Soriano places on the words complained of.

15.    The main issues in the libel claim are, therefore: (i) the meanings of the statements complained of, (ii) whether the publication of those statements caused serious harm to Mr Soriano's reputation, and if so, (iii) whether a defence of truth is available in respect of the imputations conveyed by the statements, or (iv) whether a public interest defence is available in respect of the publications. The first issue and the strike out we have already referred to are, as we have said, soon to be determined.

16.    The 1782 application sought two broad categories of documents from HSBC USA covering the period from 1 January 2007 to date, as follows:

> 1. All documents and communications relating to USG, including but not limited to any and all account information, information relating to any financial transactions, Wire Transfers, and/or CHIPs or SWIFT payment messages regarding any Wire Transfer.

> 2. All documents and communications relating to Walter Soriano including but not limited to any and all account information, information relating to any financial transactions, Wire Transfers, and/or CHIPs or SWIFT payment messages regarding any Wire Transfer concerning [USG], an English company, and a wide range of others related to USG [broadly defined to include associated entities].

17.     On 13 February 2023, Mr Soriano applied for permission to appeal the judge's refusal to injunct the 1782 application, seeking expedition. On the defendants' undertaking not to accept disclosure from HSBC USA in the meantime, the application was adjourned to this hearing with the appeal to follow if permission were granted.

The judge's judgment

18.     The judge concluded that:

i)      The *Yorkshire Provident* principle was no bar to the 1782 application. It meant simply that an English court would not order disclosure of documents that were not relevant to the pleaded case. It was compatible with the general principle that a party "should otherwise be free to gather evidence in any other way that is legitimately available to it" ([44]).

ii)     The 1782 application did not involve any unwarranted interference with the efficient case management of the English proceedings.

iii)    The individual criticisms of the 1782 application, such as excessive breadth and impact on third parties, were matters for the DCSDNY, which had procedures that allowed for proper objections to be addressed.

iv)     Although the pursuit of the 1782 application might cause Mr Soriano to incur costs in the US without the protection that would be available here, that was not, on its own, a reason to prevent the defendants seeing, via legitimate means, evidence to assist their defence "whether as it is currently pleaded or as it might in the future be pleaded" ([53]).

1. The abusive ground

19.     We were referred to only two occasions on which the English court had restrained a 1782 application on the grounds that it was abusive, unconscionable or vexatious. The first was in *Bankers Trust*, where Mance J took into account all the circumstances including the fact that costs could not be recovered in the New York court, the speculative nature of a proposed large-scale investigation into the claimant's business, and the fact that, if new material were found, the English trial, which had already concluded, would have to be reopened. In that case, Mance J thought that the English court was better placed to assess the background, implications and propriety of the 1782 proceedings, and that this court should not be hesitant about giving effect to its conclusions if it thought the 1782 application abusive (see page 263).

20.   In *Omega Group Holdings Ltd v. Kozeny* [2002] CLC 132, Peter Gross QC injuncted the defendant from seeking orders under 1782 to depose the claimant's employee witnesses in the US, on the ground that those witnesses would be subjected to unwarranted double cross-examination and the prospective English trial would suffer from unnecessary duplication.

21.   These two cases demonstrate the factual nature of the evaluation that the English court will undertake on an application such as this. The facts of those cases were very different from those in this case. The judge had here to determine whether, in all the circumstances of this case, the 1782 application was unconscionable, abusive or vexatious on one of several grounds including specifically whether it would interfere with the proper conduct of these proceedings. He decided that it was not. This court will always be slow to interfere with such a factual assessment unless the judge has made a legal error. That is no doubt why Mr Soriano seeks to elevate the decision in *Yorkshire Provident* into a principle that is generally applicable at least to all libel actions.

22.   As we have said, we do not think that evidence gathering in libel actions is affected by legal principles that are different from any other actions. It may be abusive to bring 1782 proceedings and it may not. It will depend on all the circumstances. It may depend also on the purpose for which the 1782 application is brought.

23.   Against this background, there are five reasons why we do not think the judge fell into error.

24.   First, the decisions in *Yorkshire Provident* and the similar, but later, case of *Arnold & Butler v. Bottomley* [1908] 2 KB 151 say nothing about evidence gathering. They go to the narrower question of what disclosure is available in libel actions in support of a defence of truth.

25.   Secondly, whilst it is true that the 1782 application as presently framed is far broader than any third-party disclosure order this court would make, its breadth is primarily a matter for the DCSDNY. In *Intel Corp v. Advanced Micro Devices, Inc* (2004) 542 U.S. 241, Justice Ruth Bader Ginsburg, giving the opinion of the majority of the US Supreme Court, acknowledged that the 1782 procedure was to assist the foreign court (as section 1782 itself implies by saying that the order is to produce documents for use in the foreign court – see [4] above). She said at [9]-[10] that "a court presented with a §1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign … court … to U.S. federal-court judicial assistance". Moreover, she said specifically that "a district court could consider whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions", that "unduly intrusive or burdensome requests may be rejected or trimmed", and

that the district court might consider "appropriate measures, if needed, to protect the confidentiality of materials". No reasons have been advanced as to why the DCSDNY is, in this case, unable to apply these principles appropriately.

26. Thirdly, there is nothing inherently objectionable from a domestic perspective, as Mr Soriano seems to suggest by calling the application an intrusion, about seeking evidence in an appropriate case from a party's bankers or from the bankers to the corporate entities in which the party has an interest. The Bankers' Books Evidence Act 1879 is a relevant comparator.

27. Fourthly, the cases on which Mr Soriano relies (*Flood v. Times Newspapers Ltd* [2009] EWHC 411 (QB), [2009] EMLR 18 and *Taranissi v. BBC* [2008] EWHC 2486 (QB)) to support a general principle prohibiting "fishing expeditions" relate to the scope of disclosure available from parties or third parties in an English libel action. They do not purport to restrict a defendant's lawful evidence gathering activities more generally. Indeed, the general rule is that the defences of truth and honest opinion "form part of the framework by which free speech is protected. It is therefore important that no unnecessary barriers to the use of these defences are erected" (see *McDonald's Corp v. Steel* [1995] EMLR 527 at page 535 per Neill LJ).

28. Fifthly, in our judgment, in this case the judge considered all the relevant facts before concluding at [56] that the 1782 application was not "oppressive, vexatious or otherwise unconscionable".

29. In these circumstances, we do not think it appropriate to interfere with the judge's evaluation that the 1782 application was not abusive, and we will dismiss this ground of appeal.

## 2. The libel tourism ground

30. Mr Soriano relies under this heading on passages in the defendants' reply brief in the DCSDNY, describing this claim as "libel tourism". Mr Soriano says that the judge should not have allowed the defendants to advance that argument in the DCSDNY "when Jay J and the Court of Appeal in England had specifically rejected such complaints". Mr Soriano argues that the judge's reference to "different principles, policies and cultural norms" in the US cannot justify the renewed reference to libel tourism.

31. In our view, this contention is misconceived. The simple reference to a label, however unhelpful, cannot justify an injunction in this case. The existence of different principles and cultural norms in the USA is nothing to the point. All these courts did in their earlier judgments was to confirm that Mr Soriano was not a "libel tourist" in the sense that he overcame the jurisdictional hurdle in section 9 of the

Defamation Act 2013. The defendants are not disputing that proposition in the DCSDNY.

32.    We do not regard the libel tourism ground as being properly arguable and we decline permission to appeal based upon it.

### 3. The costs ground

33.    The argument in support of the costs ground is that it was vexatious and abusive for the defendants to cause Mr Soriano to incur costs in the US courts when the defendants have failed, for a year, to pay a costs award due to Mr Soriano in the sum of £85,000 plus VAT and interest. The judge held that this was not of itself sufficient to justify an injunction. Mr Soriano had remedies available to him domestically in respect of the failure to pay costs.

34.    In our judgment, the non-payment of costs was one of the circumstances that the judge could properly have taken into account in determining the application. For that reason, we grant permission to appeal on this ground. We do not, however think that the judge made any error in his evaluation, and in his determination that the outstanding costs order did not justify an injunction in this case. As the judge said, the non-payment of a costs order gives rise to domestic remedies that Mr Soriano can pursue. It does not make it unconscionable for the defendants to pursue their 1782 application.

### 4. The due process ground

35.    This ground is, in effect, part and parcel of the abusive ground and we have dealt with it under that heading. In short, the judge was justified in finding that there was no unconscionable interference with the due process of the English court.

### 5. The helpful instructions ground

36.    This is not properly regarded as a ground of appeal at all since it does not challenge the essence of the order made by the judge, but we do nonetheless think it was worthy of consideration as part of the appeal. Even though we will be dismissing the appeal, we can see that the DCSDNY may find some assistance from this judgment. We accept, as we have already noted at [25], that the purpose of the 1782 process is to assist the foreign court, so that the US court will in all probability be interested in the English court's view of it.

37.    In our view, however, the DCSDNY is well capable in this case of deciding whether to make an order and, if so, the appropriate scope of that order. Mr Soriano has had and taken the opportunity to put in full and robust submissions objecting both to the order sought itself and to its breadth. There is, as we have explained under the abusive ground, nothing unconscionable in the circumstances of this

case in the defendants seeking to gather evidence as to allegedly suspicious payments made by USG, when that entity is owned or operated by Mr Soriano. It is noteworthy in this respect that the evidence demonstrated that the defendants' lawyers have seen legitimately obtained records connected to HSBC USA, which lead them to believe that there was a commercial relationship between USG and a Mr Aviram Azari, a convicted Israeli computer hacker, and that payments were made by USG, through HSBC USA, to Panolos Limited, a St Vincent and Grenadines company associated with Mr Azari.

38.    We would dismiss this ground too.

Conclusions

39.    For the reasons we have given, we will grant permission to appeal on the first, third, fourth and fifth grounds, and dismiss Mr Soriano's appeal.